UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GEORGE KNIGHTON,

Petitioner,

v.

9:23-CV-1012
(DNH/ML)

JULIE WOLCOTT,

Respondent.

APPEARANCES: OF COUNSEL:

GEORGE KNIGHTON
*Pro se* Petitioner
Attica Correctional Facility
Box 149
Attica, New York 14011

LETITIA A. JAMES
New York State Attorney General
Counsel for Respondent
28 Liberty Street
New York, New York 10005

MICHELLE MAEROV, ESQ.
Assistant Attorney General

MIROSLAV LOVRIC, United States Magistrate Judge

**REPORT and RECOMMENDATION**

## I. INTRODUCTION

Currently before the Court in this habeas corpus proceeding filed[1] by the petitioner, George Knighton ("Petitioner"), pursuant to 28 U.S.C. § 2254, is a referral to the undersigned to prepare a report and recommendation to Senior United States District Judge David N. Hurd

[1] Petitioner originally commenced this action in the Western District of New York. It was transferred to the Northern District of New York on August 18, 2023. (Dkt. Nos. 1, 4.)

regarding the Petition. (Dkt. No. 1.) Petitioner is challenging a judgment of conviction in New York State Supreme Court of Onondaga County. (Dkt. No. 1.)

On July 10, 2023, Petitioner filed a *pro se* Petition seeking a writ of habeas corpus challenging his confinement. (Dkt. No. 1.) Respondent opposed that motion, with their response including a memorandum of law and portions of the state court record filed under seal. (Dkt. Nos. 8, 20, 21.) Petitioner filed a traverse. (Dkt. No. 24.)

For the following reasons, the undersigned recommends that the Petition be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On October 4, 2024, this Court issued a narrowly tailored order granting Respondent's motion to file an unredacted memorandum of law and state court record under seal in order to protect the privacy of the sexual assault victim mentioned throughout those documents. (Dkt. No. 20.) Consistent with that order and Local Rules 5.2(a)(6) and 5.3, this Court will refer to that individual as "Victim" and only discuss such details as are necessary to evaluate the habeas corpus petition. Because certain documents are not on the public docket, references to the sealed state court record will be designated as "SR" and references to the other material filed under seal will cite those specific documents and their respective pagination.

### A. Arrest & Indictment

On November 25, 2016, Petitioner was arrested at his apartment by the City of Syracuse Police Department for Criminal Sexual Act in the First Degree (New York Penal Law § 130.50(1)); Menacing in the Second Degree and Criminal Possession of a Weapon (New York Penal Law § 265.01(02) and 120.14(01)); and Criminal Obstruction of Breathing and Harassment in the Second Degree (New York Penal Law §121.11(a) and 240.26(1)). (SR 37, 41-43.) As set forth in the documents supporting the arrest, Victim was in a relationship with

Petitioner and shared the apartment. (SR 59).

The previous day, Petitioner and Victim attended Thanksgiving dinner together at the home of Victim's mother. (*Id.*) As described by Victim, after returning to their apartment that night, Petitioner accused Victim of being interested in another man. (*Id.*) Petitioner then proceeded to slap Victim, put his hands around her throat, and threatened her with a hammer. (*Id.*) Petitioner then forced Victim to perform oral sex on him while he held a knife near her head. (*Id.*)

The state court record includes a November 26, 2016 notice from the Onondaga County District Attorney's office that the charges against Petitioner would be presented to a grand jury. (SR 40.) That notice includes the following statement:

> Pursuant to Criminal Procedure Law Section 190.50(5), if it is your desire to testify before the Grand Jury on your own behalf, you must immediately serve upon this office a written notice making such a request and stating an address to which communications may be sent to enable this office to notify you as to the exact date and time you may be heard by the Grand Jury. In addition, you will be required to execute a Waiver of Immunity before the Grand Jury pursuant to Criminal Procedure Law Section 190.45.

(*Id.*)

In an indictment filed on January 6, 2017, an Onondaga County grand jury charged Petitioner with Predatory Sexual Assault (New York Penal Law § 130.95(1)(b); Criminal Sexual Act in the First Degree (New York Penal Law § 130.50(1)); two counts of Menacing in the Second Degree (New York Penal Law § 120.14(1)); Criminal Possession of a Weapon in the Third Degree (New York Penal Law § 265.02(1); Criminal Obstruction of Breathing or Blood Circulation; and Harassment in the Second Degree (New York Penal Law § 240.26(1)). (SR 33-34.)

**B. Pretrial Proceedings**

In papers filed on January 31, 2017, Petitioner's counsel filed discovery demands on the

prosecution as well as an omnibus motion in which he sought dismissal of the indictment, production of exculpatory material, and suppression of petitioner's statements to the police. (SR 74-82.) In papers filed April 20, 2017, Petitioner's counsel filed an additional motion to suppress tangible evidence, including a knife obtained from Petitioner's apartment that counsel asserted was "obtained by means of an unlawful search and seizure." (SR 102.)

On May 19, 2017, Onondaga County Court Judge Stephen J. Dougherty held a hearing on Petitioner's suppression motion, with testimony from two witnesses. (Suppression Hearing Transcript at 1-31.) City of Syracuse Police Officer Shannon Einbeck, who was present at Petitioner's arrest, testified regarding Victim's November 25, 2016 victim report and Victim's grant of permission to enter the shared apartment. (Suppression Hearing Transcript at 6-7.) She further testified that the police went to the apartment intending to interview Petitioner. (Suppression Hearing Transcript at 8.)

In her direct testimony, Officer Einbeck described knocking on the apartment door and identifying herself as police. (Suppression Hearing Transcript at 8-9.) As described in her testimony, Petitioner answered and stepped aside and opened the door wider to allow the police to cross the threshold into the apartment. (Suppression Hearing Transcript at 9, 15-16.) Officer Einbeck testified that she entered the apartment and immediately observed a hammer and a knife matching Victim's statement to the police, prompting her to place Petitioner under arrest. (Suppression Hearing Transcript at 9-10.)

Petitioner's counsel cross-examined Officer Einbeck and challenged her testimony on a number of topics, including whether or not the officers received Victim's permission to enter the apartment, whether Petitioner consented to their entry by stepping aside, and the timeline regarding her observation of the hammer and knife within the apartment. (Suppression Hearing

Transcript at 11-16.) He then solicited direct testimony from Petitioner that he had been intoxicated and sleeping on the couch when the police arrived, that Petitioner had not granted the police permission to enter the apartment, and that the police walked into the apartment as soon as Petitioner identified himself, forcing him to "back up because they were walking towards me." (Suppression Hearing Transcript at 18-21.)

Following the hearing, Petitioner's counsel submitted a brief arguing that the knife and hammer recovered from Petitioner's apartment were the product of an illegal and unconstitutional search and should be excluded from trial evidence. (SR 104-107.) Counsel made a series of related arguments: (1) the only proof of Victim's consent to enter and search the apartment was hearsay offered by the police, (2) the police did not take the appropriate steps to confirm Victim's authority to provide permission to enter the apartment, and (3) Petitioner, who was the only party present when police arrived, did not provide permission to enter. (SR 105-107.)

In a Decision and Order dated June 6, 2017, Judge Dougherty denied Petitioner's motion to suppress. (SR 108-112.) Citing *Georgia v. Randolph*, 547 U.S. 103 (2006), Judge Dougherty concluded that the hammer and knife were not obtained as result of an unlawful search and seizure, because the police had obtained valid consent from the Victim to enter the shared apartment where the recovered evidence was in plain view and the record was "devoid of any evidence" that Petitioner objected to the police entry to and search of the apartment. (SR 112.)

**C. Trial, Jury Verdict & Sentencing**

Petitioner's jury trial commenced in Onondaga County Court on June 12, 2017 before Judge Dougherty. (Trial Transcript at 1-435.) Over the course of the four day trial, the prosecution presented testimony from a number of witnesses including Officer Einbeck, City of

Syracuse Police Officer Jeffrey Goodrow, Victim, Victim's sister, and a neighbor who had interacted with Petitioner outside the apartment on Thanksgiving night. (Trial Transcript at 222-300, 311-332, 337-343.) The defense did not call any witnesses. (Trial Transcript at 353.)

On June 15, 2017, the jury convicted Petitioner of (1) one count of predatory sexual assault, (2) two counts of menacing in the second degree, and (3) one count of criminal possession of a weapon in the third degree. (SR 204-205; Trial Transcript at 430-432.) On September 8, 2017, Judge Dougherty sentenced Petitioner to twenty-five years to life on the predatory sexual assault conviction, running concurrently with one year on each of the menacing convictions and 2/13 to 7 years on the criminal possession of a weapon conviction. (SR 32; Sentencing Transcript at 15.)

**D. Petitioner's 330.30 Motion to Set Aside Verdict**

On August 16, 2017, Petitioner filed a counseled motion to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30. (SR 226-241.) In said motion, Petitioner's counsel sought to set aside the guilty verdict on several grounds: (1) the trial court's jury instruction and denial of a mistrial regarding an unduly prejudicial witness statement that Petitioner is a "mean drunk;" and (2) the trial court's denial of the request from Petitioner's counsel for copies of the trial transcript in order to adequately prepare the 330.30 motion and/or inspect the transcript for possible errors. (SR 230-233.)

Petitioner also filed a *pro se* motion to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30, in papers dated July 31, 2017. (SR 208-225.) In this motion, Petitioner offered a number of other reasons why the verdict should be set aside: (1) Petitioner's counsel was ineffective for failing to object to the prosecutor's summation and failing to argue that Petitioner had been "set up" by the police; (2) the prosecution engaged in misconduct by

offering hearsay and false testimony during his summation; (3) Officer Einbeck testified falsely about the police seizure and handling of the knife; and (4) the prosecution added charges to the indictment in order to punish Petitioner for refusing to waive his right to a preliminary hearing. (SR 216-224.)

The People opposed both motions. (SR 242-244.) On September 8, 2017, Judge Dougherty allowed Petitioner an opportunity to argue the merits of his *pro se* motion prior to issuing his decision. (Sentencing Transcript at 4-5.) Judge Dougherty then denied the motions to set aside the verdict, finding "no ground appearing in the record which if raised upon appeal from a perspective judgment of conviction would require reversal or modification of the judgment as a matter of law by the appellate court." (Sentencing Transcript at 5.)

**E. Direct Appeal**

On September 24, 2019, Petitioner filed a counseled appellate brief which argued that (1) the jury verdict was against the weight of the credible evidence and (2) Petitioner's twenty-five years to life sentence was excessive. (SR 1-24.) The People filed a brief opposing Petitioner's arguments. (SR 255-276.)

On March 13, 2020, the Appellate Division, Fourth Department unanimously affirmed the judgment of conviction. (SR 277-278.) The Appellate Division held that (1) the verdict was not against the weight of the evidence and (2) Petitioner's sentence was not unduly harsh or severe in light of Petitioner's prior criminal history and "complete lack of remorse." (SR 277.)

On March 17, 2020, Petitioner filed a counseled motion seeking leave to appeal to the New York Court of Appeals, relying on the points raised in Petitioner's brief to the Appellate Division. (SR. 279-281.) Petitioner also filed a *pro se* brief dated July 27, 2020 in further

support of the motion for leave to appeal raising a *Batson* claim,[2] a Fourth Amendment unreasonable search and seizure claim, a claim that he was unlawfully denied the trial transcript prior to his 330.30 motion and supplementing his original argument that his sentence was excessive. (SR 285-319.) The People opposed Petitioner's application for leave to appeal to the Court of Appeals. (SR 282-283.)

On September 16, 2020, the New York Court of Appeals denied Petitioner's application for leave to appeal. (SR. 320.)

**F. Petitioner's 440.10 Motion to Vacate Judgment of Conviction**

On October 12, 2021, Petitioner filed a *pro se* motion in Onondaga County Supreme Court pursuant to N.Y. Crim. Proc. L. § 440.10 seeking to vacate the judgment of conviction. (SR. 321-440.) Petitioner's motion argued that his legal counsel was ineffective for (1) failing to follow up on Petitioner's time-sensitive request to testify before the grand jury; (2) failing to investigate the record or contest the grand jury minutes with respect to Officer Einbeck's testimony regarding the evidence retrieved from Petitioner's apartment; 3) failing to call Petitioner's ex-wife and his brother, as well as two other individuals originally listed on defense counsel's witness list (4) failing to obtain certain discovery material from the prosecution, including videos that Victim took at her mother's home on Thanksgiving Day as well as previous domestic violence claims made and then withdrawn by Victim that could have been used to impeach her testimony; (5) failing to obtain a copy of the trial transcript when preparing the 330.30 motion to set aside the verdict; and (6) failing to argue that the police had illegally entered his apartment building to effectuate his arrest. (*Id*. at 328-346, 370-377, 394-397.)

---

2 A *Batson* claim alleges racial discrimination in the jury selection process. *See Batson v. Kentucky*, 476 U.S. 79, (1986).

Petitioner further argued that the prosecution engaged in misconduct by (1) suborning perjury from Officer Einbeck before the grand jury regarding the collection of the knife from Petitioner's apartment and Petitioner's intoxication at the time of his arrest; and (2) suppressing the videos recorded by Victim and information about prior domestic violence complaints filed by Petitioner and Victim. (SR 331-339, 397, 421, 425-427.) Finally, Petitioner asserted that the verdict should be vacated because he is factually innocent. (SR 437-439.) In support of his innocence claim, Petitioner provided a letter from his defense counsel expressing his "wholehearted belief that Mr. Knighton is in prison for crimes he did not commit." (SR 438.)

The People opposed Petitioner's motion pursuant to N.Y. Crim. Proc. L. § 440.10. (SR. 441-465.) Petitioner filed a reply, charging that the People's response was untimely and factually inaccurate. (SR 468-482.)

On November 22, 2022, Onondaga County Supreme Court Justice Rory A. McMahon denied Petitioner's motion pursuant to N.Y. Crim. Proc. L. § 440.10 in its entirety. (SR 483-486.) The motion court found that Petitioner's disagreement with strategic decisions regarding grand jury testimony, motions to suppress with "no chance of success," and selection of witnesses did not demonstrate ineffective assistance of counsel. (SR 483-485.) In addition, the motion court found no facts to support Petitioner's allegations of prosecutorial misconduct or Petitioner's contention that he is actually innocent. (SR 485-486.)

The Appellate Division, Fourth Department denied Plaintiff leave to appeal the N.Y. Crim. Proc. L. § 440.10 motion on March 28, 2023. (SR 509.) On June 22, 2023, the New York Court of Appeals denied Petitioner leave to appeal. (SR 529.)

## III. GROUNDS RAISED IN THIS PROCEEDING

### A. Petition

On July 10, 2023, Petitioner commenced this proceeding by the filing of a verified Petition for writ of habeas corpus. (Dkt. No. 1.) The Petition asserts the following three grounds for habeas relief: (1) Petitioner's right to effective assistance of counsel was violated ("Ground One"); (2) the prosecutor committed misconduct ("Ground Two"); and (3) Petitioner was actually innocent of the crimes for which he was convicted. ("Ground Three"). [3] (*See generally* Dkt. No. 1.)

Expanding on his ineffective assistance of counsel claim, Petitioner asserts several reasons why he received constitutionally defective legal representation: "(1) Defense counsel failed to argue defendant was illegally arrested in his home without warrant or exigent circumstances during suppression hearing; (2) failed to investigate or call exculpatory witnesses; (3) failed to obtain copy of transcripts to prepare the CPL 330.30 motion; and (4) failed to secure requested Brady/Rosario material requested by defense." (Dkt. No. 1 at 5.)

Offering supporting arguments in support of his prosecutorial misconduct claim, Petitioner contends that (1) the prosecution failed to correct the perjury committed by Officer Einbeck at the grand jury proceeding; (2) failed to turn over requested Brady/Rosario material; (3) illegally arrested defendant in his home without warrant or exigent circumstances; (4) illegally entered Petitioner's home without warrant or consent; and (5) denied Petitioner the right to testify before the grand jury. (Dkt. No. 1 at 7.)

---

[3] Utilizing the District Court's form petition, Petitioner's narrative explanation for the prosecutorial misconduct claim flowed into the section labeled "Ground Three." (Dkt. No. 1 at 7-10.) Thus, the third ground raised by Petitioner is set forth in the section labeled "Ground Four." (Dkt. No. 1 at 10-11.)

Addressing the actual innocence claim, Petitioner asserts that he is "actually innocent of the accused crimes and has shown that he is factually innocent of the crimes alleged and defendant has made a colorable claim of actual innocence predicate on ineffective assistance of trial counsel." (Dkt. No. 1 at 10.)

**B. Respondent's Answer and Memorandum of Law**

Respondent filed an answer to the petition on October 17, 2024. (Dkt. No. 21.) In the subsequent memorandum of law, Respondent argued that Plaintiff's ineffective assistance of counsel claims are meritless (Resp. Mem. of Law at 17-24.); Petitioner's allegations of misconduct in the grand jury process are noncognizable on federal habeas review (*Id*. at 24-25); Petitioner's challenge to the circumstances of his arrest, including any Fourth Amendment claim, is noncognizable on federal habeas review (*Id*. at 25-26); and Petitioner's actual innocence claim is noncognizable and meritless. (*Id*. at 27-28.)

More specifically, with respect to Ground One, Respondent asserted that Petitioner's complaint that counsel should have challenged his arrest and seizure of evidence from his apartment is meritless because counsel actually did move to suppress the knife and hammer recovered from Petitioner's apartment based on a lack of exigent circumstances. (*Id*. at 19, citing SR 102.). Respondent further asserts that the doctrine of exigent circumstances does not apply because Victim had granted the police permission to enter the shared apartment so neither a warrant nor a showing of exigent circumstance was required. (*Id*. at 19.)

Addressing the merits of Petitioner's argument that counsel should have investigated and presented exculpatory witnesses, Respondent notes that the petition does not identify the witnesses but prior pleadings identified them as Petitioner's ex-wife, Petitioner's brother, and two other individuals whose connection to the case is unclear. (Resp. Mem. of Law at 20.)

Respondent points out that the state court record contained no information about these individuals or their value to the case, so any ineffective assistance of counsel claim would be purely speculative. (*Id*.)

Moving to Petitioner's argument that counsel was ineffective for failing to obtain transcripts to support his motion to set aside the verdict, Respondent asserts that this claim is "plainly meritless" because the record shows counsel requested such transcripts and "the court apparently granted, but never acted on, that request." (*Id*. at 21.) Respondent notes that New York law does not include a right to receive a transcript to prepare a post-verdict motion, and Petitioner was not prejudiced because his CPL § 330.30 presented numerous claims based on trial testimony despite the lack of a transcript. (*Id*.) Respondent also notes that even if Petitioner had foregone certain arguments in the 330.30 motion due to the lack of a transcript, he was not prejudiced because he "still had recourse to challenge record-based errors in his subsequent direct appeal" where the transcript was available. (*Id*.)

Addressing Petitioner's final ineffective assistance of counsel claim related to a purported failure to obtain "*Brady/Rosario*" material, Respondent notes that Petitioner did not identify the material in his papers submitted to this Court, but prior pleadings refer to phone camera videos that Victim took on Thanksgiving Day prior to the sexual assault. (Resp. Mem. of Law at 22.) Respondent cited the state court's reasoning that the recordings in question "could not be deemed *Brady* material because they were made 'more than 12 hours' before the assault" and were not in the prosecution's possession. (*Id*, citing SR 485.)

Respondent asserted that the state court's decision on the *Brady/Rosario* question was reasonable for three reasons: (1) Petitioner's claim that counsel had failed to make appropriate discovery requests was contradicted by the record; (2) the videos of an earlier holiday gathering

did not qualify as *Brady* or *Rosario* material because they were never in the prosecution's possession and were not relevant to the sexual assault that occurred hours later, and (3) Petitioner's counsel made the reasonable strategic decision to ask the trial court to instruct the jury that it should draw an adverse inference from the prosecution's failure to produce the videos. (*Id*. at 24.)

With regard to Petitioner's arguments regarding prosecutorial misconduct (Ground Two), Respondent cites Second Circuit precedent that there is no constitutional right to a grand jury in a state criminal prosecution, so claims regarding false evidence or a state statutory right to testify before the grand jury are noncognizable on habeas review. (Resp. Mem. of Law at 24-25.) Addressing Petitioner's argument that the police lacked an arrest warrant, Respondent notes that Petitioner had an adequate opportunity in state court to challenge the circumstances of his arrest. (*Id*. at 25-26.)

Finally, Respondent elaborates on the contention that Petitioner's actual innocence claim is noncognizable and meritless. (*Id*. at 27-28.) First, Respondent notes that the United States Supreme Court has never recognized that an actual innocence claim is cognizable for non-capital defendants. (*Id*. at 27.) Respondent also asserts that Petitioner has not produced any new and reliable evidence of his innocence and merely offers the unsupported and previously rejected contention that Officer Einbeck and Victim both lied in their trial testimony. (*Id*. at 27-28.)

**C. Petitioner's Traverse**

This Court notes that the arguments in Petitioner's Traverse frequently overlap, so they are set out herein in a revised order for clarity. Read in the light most favorable to the *pro se* party, Petitioner generally argues in his Traverse that the state court unreasonably applied clearly established federal law and United States Supreme Court precedent with regard to his ineffective

assistance of counsel (Ground One) and prosecutorial misconduct (Ground Two) claims and ignored Petitioner's actual innocence (Ground Three). (*See generally* Dkt. No. 24.)

**1. Ineffective Assistance of Counsel Claims**

More specifically, with respect to Ground One, Petitioner asserts that he had disagreed with his original counsel regarding waiver of the preliminary hearing following his arrest and Petitioner's desire to testify before the grand jury. (Dkt. No. 24 at 14.) As set forth in the traverse, Petitioner contends that his original counsel withdrew due to this disagreement, abandoning Petitioner at a "critical stage" of his prosecution. (*Id*.)

Further alleging inadequate legal counsel from the new attorney who represented him through trial and post-verdict motions, Petitioner argues that his attorney failed to adequately challenge the police regarding their trespass into the common areas of his "locked and secured" apartment building and their eventual entry into Petitioner's apartment without a warrant, exigent circumstances, or Petitioner's express consent. (Dkt. No. 24 at 4-5, 9.) Asserting that Officer Einbeck perjured herself regarding the circumstances of Petitioner's arrest and the discovery of the knife and hammer in Petitioner's apartment, Petitioner asserts that his counsel failed to adequately cross-examine or rebut this perjured testimony. (*Id*. at 9.) Petitioner also asserts that even if the Fourth Amendment violations underlying these arguments are not cognizable in a federal habeas proceeding, the Sixth Amendment protections against inadequate legal representation still present viable claims to this Court. (*Id*. at 4-5.)

Petitioner further asserts that counsel's failure to investigate or call exculpatory witnesses such as Petitioner's brother and ex-wife did not represent a strategic choice, but rather a demonstration of counsel's failure to confer with his client about that strategy. (Dkt. No. 24 at 11.). Petitioner contends that his lack of knowledge about the potential testimony of two other

potential witnesses originally identified by counsel, Wanda Phelps and Thomas Wiers, further underscores that lack of communication. (*Id*.)

Finally, Petitioner contends that trial counsel failed to adequately pursue the trial transcript once the court failed to provide it in advance of the 330.30 motion. (Dkt. No. 24 at 12.) Conceding the partial validity of Respondent's argument that "it is unclear what more counsel could have done" to secure the requested trial transcript, Petitioner argues that the open question merits an evidentiary hearing. (*Id*.)

**2. Prosecutorial Misconduct Claims**

In support of his assertion of prosecutorial misconduct in Ground Two, Petitioner contends that the prosecution suborned perjury from Officer Einbeck regarding Petitioner's behavior and apparent intoxication when he answered the apartment door. (Dkt. No. 24 at 6.) Petitioner also rejects Respondent's "conclusory and unsupported statements" that the police had Victim's permission to enter the apartment she shared with Petitioner. (*Id*.) Petitioner also contends that the police never advised him that they had such permission from Victim. (*Id.*)

Petitioner further argues that the prosecution should be deemed to have knowledge and control of the Thanksgiving Day videos on Victim's phone, and had a corresponding *Brady/Rosario* obligation to turn them over to the defense. (*Id*. at 9-10.)

**3. Actual Innocence Claim**

Petitioner's Traverse also touches on Ground Three, arguing that his ineffective assistance of counsel supports his claims of actual innocence. (Dkt. No. 24 at 13-14.) Petitioner also asserts that ". . . it is long past time that we finally give a free standing claim of actual innocence some teeth and create a subdivision of factual innocence as respectfully asserted by petitioner." (Dkt. No. 24 at 14.)

## IV. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Review of Habeas Petition

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.).

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)); *accord, Cullen*, 563 U.S. at 181. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting 28 U.S.C. § 2254(e)(1)); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro*, 550 U.S. at 473 (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 563

U.S. at 181; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001); *see Willson v. Sellars*, 138 S. Ct. 1188, 1192 (2018) (holding that a federal habeas court reviewing an unexplained state-court decision on the merits "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," but that "the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision").

**B. Legal Standard Governing Exhaustion of Remedies**

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Baldwin*, 541 U.S. at 29; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in

like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir. 1982)).

Where a petitioner has failed to exhaust his claims, but he cannot return to state court, petitioner's claims are then "deemed" exhausted, but barred by procedural default. *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994). The merits of such a procedurally defaulted claim may not be reviewed by a federal court unless the petitioner can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that the constitutional violation has resulted in the conviction of one who is "actually innocent." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). The actual innocence prong is referred to as the fundamental miscarriage of justice exception. *Rivas,* 687 F.3d at 540. "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

### C. Legal Standard Governing Ineffective Assistance of Trial Counsel Claims

To prove ineffective assistance of counsel, petitioner must meet the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The first prong requires petitioner to show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 688. The Court must apply a "strong

presumption of competence" and "affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (citation and internal quotation marks omitted). The second prong requires petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Demonstrating constitutionally ineffective assistance of counsel is "never an easy task . . . [and] establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citations and internal quotation marks omitted); *Burt v. Titlow*, 571 U.S. 12, 19 (2013) (noting that "AEDPA erects a formidable barrier" to federal habeas review of claims that have been adjudicated in state court). When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable–a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Harrington*, 131 S. Ct. at 788. Instead, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

**D. Legal Standard for Prosecutorial Misconduct**

"[P]rosecutorial misconduct cannot give rise to a constitutional claim unless the

prosecutor's acts constitute egregious misconduct." *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (internal quotations omitted). To determine if misconduct rises to an egregious level, a court must assess the alleged misconduct "in the context of the entire trial." *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974). "The relevant inquiry, therefore, is whether the prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Sheard v. Lee*, No. 18-CV-2125, 2019 WL 5847151, at *6 (S.D.N.Y. Oct. 7, 2019) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

#### 1. Legal Standard for Alleged *Brady* Violations

The prosecutor in a criminal case has a constitutional obligation to disclose material, exculpatory evidence to a defendant.[4] *Brady v. Maryland*, 373 U.S. 83 (1962). To establish a *Brady* violation, "a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose." *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Under these principles, a *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant

---

[4] Petitioner also references "*Rosario*" material. The New York Court of Appeals' decision in *People v. Rosario*, 9 N.Y.S.2d 448 (1961) stands for the proposition that, as a matter of state law, "a criminal defendant is entitled to the prior statements of the prosecution's witnesses in order to determine if the testimony of such witnesses in court departs from their prior statements." *Ely v. Lempke*, No. 09-CV-5836, 2012 WL 7050432, at *16 n.8 (S.D.N.Y. Oct. 18, 2012), *adopted by*, 2013 WL 544070 (S.D.N.Y. Feb. 11, 2013). "It is well settled, however, that to the extent that Petitioner's claim relies on *Rosario*, he is asserting a state law claim which is not a cognizable claim for habeas relief." *Chrysler v. Guiney*, 14 F. Supp. 3d 418, 448 n.17 (S.D.N.Y. 2014) (citing *Ely*, 2012 WL 7050432, at *16; *Johnson v. New York*, No. 01-CV-4219, 2002 WL 1974048, at *2 (S.D.N.Y. Aug. 26, 2002). The Court will therefore evaluate Petitioner's claim only to the extent it is based on the constitutional requirements set forth in *Brady*.

claims was suppressed. *Strickler*, 527 U.S. at 281. That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

A petitioner bears the burden of proving that the prosecution withheld material information. *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998). "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief." *Harris*, 9 F. Supp. 2d at 275 (quotations omitted); *see also Mallet v. Miller*, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) (*Brady* claim dismissed where supported only by conjecture); *Flynn v. Colvin*, 13-CV-1247, 2016 WL 7053582, at *6 (N.D.N.Y. Dec. 5, 2016) (Singleton, J.) ("It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief.") (citation omitted).

**2. Legal Standard for Alleged Suborning of Perjury**

"Perjury is committed when a witness 'gives false testimony concerning a material matter with the willful intent to provide false testimony.' " *Velazquez v. Poole*, 614 F. Supp. 2d 284, 333 (E.D.N.Y. 2007) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). "To establish prosecutorial misconduct premised upon the presentation of perjury, [petitioner] must first establish that perjury was committed; i.e. that the testimony was 'actually, and intentionally, false.' " *Gibson v. Artus*, No. 04-CV-820 (LEK), 2008 WL 9434482, at *14 (N.D.N.Y. Mar. 21, 2008) (alternation in original) (collecting cases), *aff'd*, 407 F. App'x 517 (2d Cir. 2010). A petitioner "must also establish that 'the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have

affected the judgment of the jury." *Id*. (citations omitted). Thus, under a due process analysis, a conviction must be set aside where "(1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

**E. Legal Standard for Actual Innocence Claim**

Although the Supreme Court has determined a federal habeas petitioner may assert a "gateway claim" of actual innocence to overcome the procedural default of a constitutional claim or to equitably toll AEDPA's statute of limitations, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 385-87, 392 (2013); *Osorio v. Johnson*, No. 9:21-CV-00708 (BKS/TWD), 2023 WL 11644017, at *8 (N.D.N.Y. Nov. 3, 2023), *rep't and rec. adopted*, 2024 WL 1635656 (N.D.N.Y. Apr. 16, 2024). Even if a freestanding actual innocence claim were cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in [*Herrera v. Collins*, 506 U.S. 390] and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than Schlup.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible," meaning the petitioner has supported it by "new reliable evidence—whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The claim also must be "compelling," which requires the petitioner to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence." *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019) (citing *Schlup*, 927 F.3d 639).

## V. ANALYSIS

Neither party has raised exhaustion or procedural default concerns, and none are apparent on the face of the Petition or the broader record. Therefore, this Court will issue its recommendations based on the substance of the parties' arguments.

### A. Ground One – Ineffective Assistance of Counsel

After carefully considering the matter, I recommend that Petitioner's Ground One claim for ineffective assistance of counsel be denied for the reasons set forth in Respondent's memorandum of law. (Resp. Mem. of Law at 19-24.) The following is intended to supplement, not supplant, those reasons.

As set forth above, the state court rejected Petitioner's ineffective assistance of counsel claims as presented in his 440.10 motion for failure to satisfy the *Strickland* requirements, and this Court sees no basis to disturb that ruling. To begin with, many of Petitioner's allegations of ineffective assistance of counsel are contradicted by the record that documents counsel (1) seeking to suppress evidence obtained from Petitioner's apartment due to a lack of a warrant, exigent circumstances, or Petitioner's permission, (2) requesting *Brady* materials from the

prosecution, (3) challenging the lack of production of Victim's cell phone videos, (4) cross-examining Officer Einbeck and Victim regarding their testimony, and (5) requesting a copy of the trial transcript after the verdict was rendered. *Zayas-Torres v. Martuscello*, No. 9:18-CV-00526 (TJM/CFH), 2024 WL 4654258, at *18 (N.D.N.Y. May 15, 2024), *rep't and rec. adopted*, 2024 WL 4651817 (N.D.N.Y. Nov. 1, 2024) ("counsel cannot be deemed ineffective for failing to assert a claim that he had in fact raised.") (internal citations omitted). Counsel also used the absence of the videos to attack Victim's credibility in his summation, and complained of the lack of a trial transcript in seeking to set aside the verdict. (Trial Transcript at 308-309; 362; SR 416-417.) To the extent that Petitioner expected more, that disappointment does not satisfy *Strickland*.

Strategic choices such as the decision whether to object to evidence are "virtually unchallengeable" absent extraordinary circumstances. *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) ("Decisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics,' and thus are 'virtually unchallengeable' absent exceptional grounds for doing so.") (internal citations omitted). Likewise, an attorney's decision "whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1986) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."), *cert. denied*, 484 U.S. 958 (1987); *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999).

"Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689 (citation omitted). Petitioner has not shown that there is a

reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. Because Petitioner's claims do not meet either prong of the *Strickland* standard for ineffective counsel, I recommend that Petitioner's Ground One claim be dismissed.

**B. Ground Two – Prosecutorial Misconduct**

After carefully considering the matter, I recommend that Petitioner's Ground Two claim of prosecutorial misconduct be denied for the reasons stated in Respondent's memorandum of law. (Resp. Mem. of Law at 24-26.) The following is intended to supplement—not supplant—those reasons.

To the extent that Petitioner's prosecutorial misconduct attempts to raise Fourth Amendment claim related to Petitioner's arrest, such claims were fully litigated in state court and are not cognizable in a habeas corpus proceeding. *See Stone v. Powell*, 428 U.S. 465, 482 (1976). Likewise, challenges to prosecutorial actions before the grand jury are not cognizable in this proceeding. *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (citing *United States v. Mechanik*, 475 U.S. 66 (1986)); *see also Davis v. Mantello*, 42 F. App'x 488, 490 (2d Cir. 2002) (summary order) (citing *Lopez*, 865 F.2d at 32).

With regard to Petitioner's allegations related to the evidence produced at trial, the state court found no evidence in the record to support the allegations of perjury against Officer Einbeck and concluded that the videos recorded by Victim more than twelve hours prior to the attack were not *Brady* material because they were too remote from the actual crime and were not in the possession of the prosecution. (SR 485.) Petitioner describes the videos of an earlier Thanksgiving gathering as relevant to his level of intoxication hours later and his broader character, but even in the most favorable light such evidence would not be material under *Brady*.

*United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."); *see also Major v. Lamanna*, No. 9:18-CV-0418 (DNH/TWD), 2021 WL 4267851, at *20 (N.D.N.Y. Sept. 3, 2021), *rep't and rec. adopted*, 2022 WL 408819 (N.D.N.Y. Feb. 10, 2022) (collecting cases). Petitioner's trial counsel had challenged the veracity of Officer Einbeck and Victim's testimony on multiple fronts. (Trial Transcript at 258-280, 327-332, 337-340, 362-365.) Petitioner's speculation suggests only that the unavailable videos would allow further challenge of their testimony.

To the extent that Petitioner's misconduct claims are based on more than speculation or unsupported factual disputes, this Court does not view the prosecutor's actions as so "egregious" that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Therefore, I recommend that Petitioner's Ground Two claim of prosecutorial misconduct be dismissed.

**C. Ground Three – Actual Innocence**

After carefully considering the matter, I recommend that Petitioner's Ground Three claim of actual innocence be denied for the reasons stated in Respondent's memorandum of law. (Resp. Mem. of Law at 24-26.) The following is intended to supplement—not supplant—those reasons.

"Once guilt is ... established ... a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence ... [r]ather, a federal habeas court will review state convictions for constitutional error." *Hyman*, 927 F.3d at 656. The United States Supreme Court has never ruled that a freestanding claim of actual innocence may serve as

a basis for federal habeas relief, so it is generally accepted that a purported error by a state court in declining to hear an actual innocence claim in a non-capital case cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Cosey v. Lilley*, 62 F.4th 74, 85 n.11 (summarizing current Supreme Court caselaw). Therefore, habeas review is unavailable for Petitioner's actual innocence claim and it should be dismissed.

Even if Petitioner's actual innocence claim were cognizable in this habeas proceeding, this court would recommend dismissal on the merits because Petitioner has failed to meet the "extraordinarily high" bar that would be required for such claims. *See Herrera,* 506 U.S. at 417 (noting that, "in capital cases," "the threshold showing for [a freestanding innocence claim] would necessarily be extraordinarily high"). Rather than offering any new evidence that would absolve him of criminal liability, Petitioner's actual innocence claim appears premised on acceptance of his arguments that the evidence against him was the product of perjury and prosecutorial misconduct and that his legal representation failed to adequately point that out.

## VI. CERTIFICATE OF APPEALABILITY

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could

resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[5] *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

In this instance, I find that jurists of reason would not find it debatable as to whether the petition in this matter is meritorious. Accordingly, I recommend against the issuance of a COA.

**ACCORDINGLY**, it is

**RECOMMENDED** that the Petition (Dkt. No. 1) be **DENIED and DISMISSED**, and that a certificate of appealability not be issued to Petitioner; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013);

---

[5] A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

[6] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: August 20, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

2019 WL 5847151
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

David SHEARD, Petitioner,
v.
William A. LEE, Respondent.

No. 18 Civ. 2125 (ALC) (RWL)
|
Signed 10/07/2019

**Attorneys and Law Firms**

David Sheard, Woodbourne, NY, pro se.

Michelle Elaine Maerov, New York State Attorney General's Office, New York, NY, for Respondent.

**REPORT AND RECOMMENDATION TO HON. ANDREW L. CARTER, JR.: HABEAS PETITION**

ROBERT W. LEHRBURGER, United States Magistrate Judge.

***1** David Sheard, proceeding *pro se*, brings this action for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Following a jury trial, Sheard was convicted of third-degree criminal sale of a controlled substance and third-degree criminal possession of a controlled substance. As a second felony drug offender previously convicted of a violent felony, Sheard received an aggregate seven-year prison term. Sheard unsuccessfully appealed his conviction to the Appellate Division, First Department and the New York Court of Appeals. In his instant Petition, Sheard makes the same four arguments rejected by the state courts: (1) he was arrested without probable cause; (2) the prosecution committed misconduct in summation; (3) his conviction was against the weight of the evidence; and (4) due to ineffective assistance of counsel, he was deprived of his right to call his codefendant as a defense witness. For the reasons set forth below, I recommend that the Petition be DENIED and the case be DISMISSED.

## Background [1]

1 The State's Answer in Opposition to the Petition for a Writ of Habeas Corpus consists of five documents filed together. (*See* Dkt. 9.) Dkt. 9-1 is the State's Memorandum of Law. ("State Mem.") Dkt. 9-2 through 9-4 make up the State Court Record ("R.") and are referred to collectively as such. The trial court held a suppression hearing on March 5, 2013; the transcript of this hearing begins on page 1 and ends on page 63 of the PDF filed as Dkt. 9-4. ("H."). The Trial Transcript begins on page 174 and ends on page 396 of the PDF filed as Dkt. 9-4. ("Tr.")

### A. The Crime

On June 16, 2012, a team of New York Police Department ("NYPD") officers, including Detective Rudy Lahens ("Detective Lahens"), Undercover Officer 113 ("UC 113"), and Officer Kendric Victoria ("Officer Victoria"), planned to conduct a "buy-and-bust" operation on the West Side of Manhattan near 42nd Street in response to a high number of complaints of narcotic transactions in that area. [2] (*See* Tr. at 20, 62, 82, 115.)

2 At the time of the trial, Detective Lahens had been a member of NYPD for 12 years. He had previously participated in over 100 narcotics-related arrests and over 100 “buy-and-bust” operations. (H. at 18; Tr. at 17.) UC 113 had been a member of NYPD for over seven years. He had participated in over 350 successful buy-and-bust operations, approximately 200 of which involved the purchase of crack cocaine. (Tr. at 77-78). Officer Victoria had been a member of NYPD for six years and had participated in approximately 50 buy-and-bust operations. (Tr. at 113-14).

That afternoon, Detective Lahens, who dressed in plain clothes, saw Luis Rodriguez (“Rodriguez”) and Sheard standing about one foot apart on 42nd Street between Eighth and Ninth Avenues. (Tr. at 25-26.) When Detective Lahens walked past Sheard and Rodriguez, Rodriguez made eye contact with Detective Lahens and “engaged in conversation.” (Tr. at 27.) Detective Lahens asked Rodriguez where he could buy “bud,” referring to marijuana. (Tr. at 27.) Rodriguez said that he did not have any marijuana but that he was “rocking the hard,” meaning that he was selling crack cocaine. (Tr. at 27-28, 59.) Detective Lahens asked Rodriguez whether he could buy some crack cocaine for his girlfriend; Rodriguez agreed to the sale and said that he needed to get the drugs from his “man.” (Tr. at 28, 59.) Rodriguez walked over to Sheard, who pulled a small object out of his waistband and handed it to Rodriguez. (Tr. at 31, 62, 72, 74, 99.) The NYPD field team listened to the conversation between Detective Lahens and Rodriguez over Lahens' radio and instructed UC 113 to buy the narcotics from Rodriguez. (Tr. at 20-22; *see also*, 82, 85-86.)

***2** After Sheard handed Rodriguez the small object from his waistband, Sheard and Rodriguez started to walk toward Detective Lahens. (Tr. at 88.) UC 113 intercepted Rodriguez and asked whether he could buy crack cocaine; Rodriguez agreed to sell the cocaine to UC 113. (Tr. at 82, 85-89.) Sheard stood nearby, looking up and down the street, while UC 113 and Rodriguez shook hands. (Tr. at 88, 101.) During that handshake, Rodriguez handed UC 113 a twist of crack cocaine, and UC 113 passed Rodriguez $20 of pre-recorded buy money in exchange.[3] (Tr. at 32-33; *see also*, 67, 70, 89.) When UC 113 said he would buy more crack cocaine from Rodriguez, Rodriguez agreed to the sale and confirmed to UC 113 that Sheard was holding the drugs. (Tr. at 89, 92, 95) Rodriguez and Sheard then made eye contact and started to walk with UC 113 toward Ninth Avenue. (Tr. 60, 92.) Rodriguez turned to Detective Lahens and said, “I still got you.” Sheard then reached into his waistband again. (Tr. at 33-35; *see also*, 69, 92, 106.) After that, UC 113 gave a signal to his field team to let them know that he had bought drugs. (Tr. at 33, 68-69, 93, 105.) Officer Victoria, who was watching from across the street, and the rest of the field team received UC 113's signal and then arrested Rodriguez and Sheard. (Tr. at 35, 117.) When Officer Victoria arrested Rodriguez, Rodriguez had the $20 pre-recorded money that UC 113 had given him. (Tr. at 117.)

3 A “twist” is a colloquialism referring to a small plastic package containing drugs secured with a twist tie. *See, e.g.*, *United States v. Felder*, 760 F. App'x 74, 77 (2d Cir. 2019) (describing quantities of drugs and units of measurement).

After the arrest, the field team took Sheard and Rodriguez to the Tenth Precinct stationhouse. (Tr. at 39.) Detective Lahens and his supervisor brought Sheard into the bathroom and asked him to give them what he was concealing in his underwear. (Tr. at 40-41.) Sheard reached into his underwear and handed the officers one loose “twist” of crack cocaine and a bag containing twenty additional twists of crack cocaine. (Tr. at 40-42, 70.) Later testing confirmed that all the seized packages and the package that UC 113 had bought contained cocaine. (Tr. at 43, 47; *see also*, 123-24, 127.)

**B. Pre-trial Hearings**

In response to a pre-trial motion by Sheard, Justice Robert M. Stolz of the New York County Supreme Court held a suppression hearing on March 5, 2013 regarding the admissibility of the drugs discovered on Sheard's person following his arrest. (*See generally*, Dkt. 9-4 at 1-63.) Detective Lahens testified for the State, describing the circumstances surrounding the arrest. (H. at 21-37.)

At the suppression hearing, Sheard was represented by *pro bono* counsel. (H. at 1-2.) Defense counsel cross-examined Detective Lahens but did not present any evidence. (H. at 26-35; 37-38).[4] (*See* H. at 37-38.) In conclusion, defense counsel made an oral application to suppress, arguing that any drugs found on Sheard should not be admissible because Sheard did not have contact with Rodriguez. (*Id.*)

4 Although not raised by this petition, the transcript from the suppression hearing reflects that the court and defense counsel spent a good amount of time discussing Sheard's refusal to agree to the State's plea deal (contrary to the advice of defense counsel). (H. at 1-16.) The court ultimately determined that Sheard's decision was "knowing and intelligent" despite the advice of counsel. (H. at 13.)

Ruling from the bench, the court credited Detective Lahens's testimony and concluded that the police had probable cause to arrest Sheard when Rodriguez gave UC 113 the drugs that Rodriguez had retrieved from Sheard. (H. at 42-43.) The court further found that the subsequent search of Sheard was reasonable. (*See* H. at 43-44 (finding that "the search at the precinct was reasonable [because] [t]here was certainly reasonable suspicion that the defendant was concealing evidence beneath his clothing.")) Accordingly, the court denied suppression. (H. at 44.)

In another pre-trial hearing, Sheard expressed his desire to call his co-defendant, Rodriguez, to testify on Sheard's behalf. (R. at 176.) Sheard's defense counsel disagreed and explained to the court that he did not want Rodriguez to testify as a matter of strategy because Rodriguez had pleaded guilty and inculpated Sheard during his plea allocution. The judge confirmed that Rodriguez had pled guilty and inculpated Sheard. The judge then encouraged Sheard to discuss the matter with his counsel. (*See* R. at 176-78.) Ultimately, defense counsel did not call Rodriguez as a witness.

### C. The Trial and Verdict

***3** On March 11, 2013, Sheard proceeded to trial before Justice Stolz on charges of third-degree criminal possession of a controlled substance and third-degree criminal sale of a controlled substance. (Tr. at 1.) The State produced witness testimony of three police officers – Detective Lahens, UC 113, and Officer Victoria – who participated in the arrest of Sheard and Rodriguez. As summarized above, the three witnesses testified that Sheard possessed and sold crack cocaine to an undercover police officer in Manhattan. (*See* Tr. at 16-118.)

After the State presented its case, Sheard testified in his own defense and denied selling or possessing cocaine on June 16, 2012. He testified that on that afternoon, after "panhandling" for change on 42nd Street between Eighth and Ninth Avenues in Manhattan, he decided to buy pizza on his way to visit a friend nearby. (Tr. at 131-33, 135-38.) He ran into Rodriguez on the way, whom he stated that he knew from homeless shelters, and stopped to talk to him briefly. (Tr. at 132-34, 138.) Sheard was arrested a "couple of seconds" later. (Tr. at 132.) Sheard testified that he was strip-searched at the precinct, but the police did not recover any drugs from him. (Tr. at 133, 140-41.)

On March 12, 2013, the jury unanimously convicted Sheard of both counts of the crime charged. (Tr. at 210-13.) On April 3, 2013, Justice Stolz sentenced Sheard to seven years of incarceration followed by three years of post-release supervision. (Tr. at 397.)

### D. The Direct Appeal

Represented by counsel, Sheard timely appealed his conviction.[5] (Dkt. 9-3 at 10-23.) On December 6, 2016, the First Department unanimously rejected Sheard's arguments and affirmed the April 3, 2013 conviction. *People v. Sheard*, 145 A.D.3d 476, 477 (1st Dep't 2016) (*see also*, Tr. at 139-141). Two days later, Sheard, still represented by *pro bono* defense counsel, sought leave to appeal to the New York Court of Appeals. (Tr. at 142-149.) The Court of Appeals denied leave to appeal on March 3, 2017. *People v. Sheard*, 29 N.Y.3d 952 (2017); *see also* Tr. at 153.

5 Sheard's initial appeal to the First Department came in the form of a counseled Appellant's Brief dated April 29, 2014. (Dkt. 9-3 at 1-31) (brief submitted by Robert S. Dean, Esq. of the Center for Appellate Litigation). The State filed its Respondent's Brief on December 1, 2014. (Dkt. 9-3 at 32-59.) Sheard then filed a *pro se* "Supplemental Brief" on July 11, 2016. (Dkt. 9-3 at 60-96.) The State submitted a reply brief to the "Supplemental Brief" on September 1, 2016. (Dkt. 9-3 at 97-137.)

**E. Sheard's Habeas Petition**

On March 8, 2018, Sheard filed the instant habeas petition asserting the same grounds he asserted in his state court appeals. First, he argues that he was arrested without probable cause because the police had not actually observed the exchange of drugs between Sheard and Rodriguez, the same argument made at his suppression hearing. (Dkt. 1 (“Petition”) at 3-5.) Second, Sheard argues that the prosecutor committed misconduct in summation by making “inflammatory and unsupported statements” that denied him a fair trial. (Petition at 5-8.) Third, Sheard contends his conviction was against the weight of the evidence. (Petition at 8-9.) Finally, Sheard asserts that he was deprived of his right to call his codefendant as a defense witness because his trial counsel failed to do so and was thus ineffective. (Petition at 10-12.)

The State filed its answer opposing Sheard's Petition on May 22, 2018. (Dkt. 9.) On August 23, 2018, Sheard informed this Court that he was filing a motion for a writ of *error coram nobis* in the Court of Appeals. [6] (Dkt. 11.) On March 14, 2019, the State filed a status letter explaining that Sheard had filed two *pro se* motions for a writ of *error coram nobis* in which he argued that the indictment was defective and that the trial court mishandled a jury note. (Dkt. 13 at 2.) Both motions were denied by the Appellate Division, First Department. (*Id.*) In its letter, the State urged this Court not to stay this action even though Sheard could still apply for leave to appeal the denial of the *coram nobis* motions. (Dkt. 13 at 2-3.) On March 18, 2019, Sheard filed his own letter stating that this Court “should move on with a decision without waiting for [the result]” regarding his *error coram nobis* motion. (Dkt. 14.) The Court does so now.

6 In New York, a convicted criminal defendant may file a motion for a writ of *error coram nobis* to set aside a judgment due to errors not apparent on the record. *See* N.Y. Crim. Proc. Law § 460.30; “Writ of Error,” BLACK'S LAW DICTIONARY (11th ed. 2019).

## Legal Standards

***4** This case is governed by the Antiterrorism and Effective Death Penalty Act (“AEDPA”). Congress enacted AEDPA to limit “the power of federal courts to grant writs of habeas corpus to state prisoners.” *Williams v. Taylor*, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring). Under AEDPA, a district court may consider a state prisoner's application for a writ of habeas corpus “only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2254(a). [7]

7 Habeas petitioners also must meet certain threshold requirements such as timeliness and exhaustion of state remedies. *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005). Sheard satisfies those requirements, and the State does not contend otherwise.

**A. Overall Standard**

A district court may grant a writ of habeas corpus only where the state court's adjudication of the claim resulted in a decision that was either: (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court's decision is “contrary to” clearly established federal law if “the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.” *Taylor*, 529 U.S. at 412-13. A decision involves “an unreasonable application of clearly established federal law” when a state court “identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case.” *Id.* at 413. This standard does not require that all reasonable jurists agree that the state court was wrong. *Taylor*, 529 U.S. at 409-10. Rather, the standard falls somewhere between “ ‘merely erroneous and unreasonable to all reasonable jurists.’ ” *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000) (quoting *Francis v. Stone*, 221 F.3d 100, 109 (2d


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cir. 2000)). Ultimately, a federal court may overrule a state court's judgment only if "after the closest examination of the state court judgment, [the] court is firmly convinced that a federal constitutional right has been violated." *Taylor*, 529 U.S. at 389.

**B. Materiality of State Court Error**

Even if a state trial court error meets the standards required by AEDPA, habeas relief is not warranted unless the violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (confirming continued applicability of *Brecht* under AEDPA); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) ("[h]abeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict") (quoting *Brecht*, 507 U.S. at 635); *Butler v. Graham*, No. 07 Civ. 6586, 2008 WL 2388740 *6 (S.D.N.Y. June 12, 2008) (recognizing and applying "substantial and injurious effect standard" and citing *Brecht* and *Fry*). For example, the standard for determining whether the admission of evidence deprived a defendant of due process under the Fourteenth Amendment is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *see also Perez v. Phillips*, 210 Fed. App'x 55, 57-58 (2d Cir. 2006) (denying habeas relief where evidence excluded by state court, if otherwise admitted, would not have created "a previously non-existent reasonable doubt" and thus was not material).

**C. Deference to State Court Decisions**

***5** AEDPA imposes a " 'highly deferential standard for evaluating state court rulings and demands that state court decisions be given the benefit of the doubt.' " *Jones v. Murphy*, 694 F.3d 225, 234 (2d Cir. 2012) (quoting *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam)). This stringent standard requires a petitioner to show that the "state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *White v. Woodall*, 572 U.S. 415, 419-20 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A state court's findings of fact are "presumed to be correct," 28 U.S.C. § 2254(e)(1), and will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." *Lynn v. Bliden*, 443 F.3d 238, 246-47 (2d Cir. 2006) (quoting *Miller-El v Cockrell*, 537 U.S. 322, 340 (2003)).

**D. Burden of Proof**

The petitioner "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997). The petitioner also bears "the burden of rebutting the presumption of correctness" of state court fact determinations "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Because Sheard is proceeding *pro se*, the Court must construe his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *Kirkland v. Cablevision Systems*, 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). This does not, however, excuse Sheard "from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th Cir. 1981) (per curiam) (internal quotations omitted)).

**Discussion**

**A. Sheard's Fourth Amendment Claim Is Not a Viable Habeas Claim.**

Sheard asserts that habeas relief should be granted pursuant to the Fourth Amendment because his arrest was not supported by probable cause. (Petition at 3-5.) This claim is not cognizable on federal habeas review because the procedures followed by the state court were adequate.

Federal habeas relief is not available on a Fourth Amendment claim “where the State has provided an opportunity for full and fair litigation of [the] claim.” *Stone v. Powell*, 428 U.S. 465, 481-82 (1976); *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Under this standard, there are only two instances in which review of a Fourth Amendment claim will be granted: (1) “if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations”; or (2) “if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.” *Capellan*, 975 F.2d at 70. “[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief.” *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002)

“It is well-established that New York's corrective procedures for litigating Fourth Amendment claims under Criminal Procedure Law § 710.10 *et seq.* are constitutionally adequate.” *Monroe v. Smith*, No. 16 Civ. 2074, 2017 WL 933109, at *9 (S.D.N.Y. March 8, 2017); *accord Capellan*, 975 F.2d at 70 n.1 (“[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* ... as being facially adequate.”) (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). Sheard must therefore show that he was precluded from using that mechanism because of an unconscionable breakdown in the process. He does not and cannot do so.

***6** The procedures followed here were adequate. Sheard presented the Fourth Amendment suppression claim to the state court. The issue was addressed at length at the suppression hearing on March 5, 2013. (H. at 17-40.) The court analyzed the issues and made well-considered rulings following discussion and questioning of counsel. (H. at 40-44.) Sheard also made the suppression claim on appeal in his *pro se* supplemental brief. (R. at 70-77). The First Department explicitly considered this claim and summarily rejected it. *Sheard*, 145 A.D.3d at 477.

The petition fails to assert, and this Court cannot infer, any basis to conclude that the state's process was flawed. Accordingly, Sheard's Fourth Amendment claim is not a ground for granting habeas relief. *See, e.g.*, *Garcia v. Griffin*, No. 16 Civ. 2584, 2018 WL 9801209, *13 (S.D.N.Y. May 8, 2018) (Fourth Amendment claim not cognizable after petitioner's Fourth Amendment claim was addressed at a suppression hearing and summarily rejected by the Appellate Division); *Monroe*, 2017 WL 933109, at *9 (Fourth Amendment claim not cognizable where state trial court fully considered claim); *Haynes*, 2012 WL 1339434, at *4 (Fourth Amendment claim not cognizable where trial court conducted full suppression hearing).

**B. Sheard's Prosecutorial Misconduct Claim Has No Merit.**

Sheard's prosecutorial misconduct claim is based on the prosecutor's “inflammatory and unsupported statements” in summation, which allegedly “deprived [Sheard] of a fair trial[.]” (Petition at 5-6.) More specifically, Sheard argues that when commenting on Sheard's relationship to Rodriguez, the prosecutor “distorted the evidence during summation to support her speculative and inflammatory accusation....” (Petition at 5.) Sheard also argues that the prosecutor committed misconduct in summation when she allegedly “belittle[d] the defense” by calling Sheard “lying” and “vouch[ed] for the people's witness[es.]” (Petition at 5.) Sheard raised these misconduct arguments on direct appeal to the First Department, which rejected the claim as meritless. *Sheard*, 145 A.D.3d at 477.

Generally, “prosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute ‘egregious misconduct.’ ” *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974)). Any misconduct “must be assessed ‘in the context of the entire trial.’ ” *Id.* at 180 (quoting *Donnelly*, 416 U.S. at 639). The relevant inquiry, therefore, is whether the prosecutor's conduct “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly*, 416 U.S. at 643); *see also Murray v. Greene*, No. 06 Civ. 3677, 2006 WL 3751294, at *17 n. 36 (S.D.N.Y. Dec. 21, 2006) (describing high bar in prosecutorial misconduct cases) (citations omitted).

“[T]he Supreme Court has instructed federal courts reviewing habeas claims brought by state prisoners and premised upon prosecutorial misconduct in summation to distinguish between ‘ordinary trial error of a prosecutor and that sort of egregious

misconduct ... amount[ing] to a denial of constitutional due process.' " *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (second and third alterations in original) (quoting *Donnelly*, 416 U.S. at 647-48). It is not enough that the prosecutor's remarks were improper; rather, "the question ... is whether 'the prosecutorial remarks were so prejudicial that they rendered the trial ... fundamentally unfair.' " *Id.* (quoting *Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986)); *see also Dunn v. Sears*, 561 F. Supp. 2d 444, 455 (S.D.N.Y. 2008) ("It is well-settled that the propriety of comments made by a prosecutor on summation generally does not present a federal constitutional violation").

***7** Under these standards, the prosecutor's statements in summation were neither improper nor so prejudicial as to render trial fundamentally unfair.

### 1. The Prosecutor's Statements Were Not Improper.

Sheard first contends that the prosecutor "distorted the evidence during summation to support her speculative and inflammatory accusation in summation." (Petition at 5.) Specifically, Sheard points to the following statements made by the prosecutor:

> I submit that was not the first sale that those two made together on June 16, 2012. And I submit that those two, the defendant and Luis Rodriguez both from the Bronx know each other quite a bit more than the defendant let's [sic] on. This was a team effort, this was a planned thing, their roles were known.

(Tr. at 166.) The State contends that "[t]he prosecutor's remarks ... commented fairly on the evidence and drew inferences with support in the record" because (1) "it was reasonable to infer that [Sheard] and Rodriguez knew each other ... since they both told police that they lived in the Bronx [ ] and they were obviously working together" and (2) "[i]t was reasonable for the prosecutor to suggest that they had made other sales that day based on the high degree of coordination that they used to execute the charged sale." (State Mem. at 15-16.)

This Court agrees with the State that the prosecutor's remarks were reasonable inferences drawn from the record. The jury had heard testimony from two NYPD officers – Detective Lahens and UC 113 – who personally saw Sheard and Rodriguez work together on 42nd street. (Tr. at 20-21.) They heard testimony that when Detective Lahens asked to purchase narcotics, Rodriguez stated that he needed to get drugs from his "man" and walked over to Sheard, who gave Rodriguez an object from his underpants that tested positive for crack cocaine. (Tr. at 21-23.) Both Sheard and Rodriguez also told the officers that they lived in the Bronx. (Tr. at 39.) In short, the prosecutor's statement describing their work as a "team effort" and asserting that they "know each other" is reasonable from the record plainly before the jury. Having made comments based on reasonable inferences, the prosecutor did not engage in misconduct. *See United States v. Hawkins,* 125 F. App'x 364, 366 (2d Cir. 2005) (a prosecutor does not commit misconduct if he merely presents "one view of the evidence, which the jury could accept or reject based on its own knowledge and judgment of the entire record."); *see also Dunn*, 561 F. Supp. 2d at 456 (no prosecutorial misconduct when prosecutor fairly commented on the evidence and made reasonable inferences).

Sheard next argues that the prosecutor committed misconduct in summation when the prosecutor "belittle[d] the defense" by calling Sheard "lying" and "vouch[ed] for the people's witness[es.]" (Petition at 5.) In defending the credibility of its witnesses, the prosecutor stated that the testifying police officers were "telling you the truth" (Tr. at 176); "[t]hey were not evasive, they answered all the questions that defense counsel asked them"; and "they [were] sure about the things that they saw ... they did not waiver ..." (Tr. at 175-77.) And in commenting on Sheard's defense, the prosecutor stated: "Think about why the defendant may not be [ ] truthful to you ... his story was ridiculous, he lied, think about why he lied, because he is guilty." (Tr. at 177.)

***8** The State argues that the prosecutor's remarks were appropriate because they merely "responded to petitioner's aggressive attack on the police officers' credibility[.]" (State Mem. at 15-16.) Indeed, as the State aptly notes, "[i]n summation petitioner

described the police witnesses, because they worked in an undercover capacity, as 'trained liars,' who were 'trained to deceive[.]' " (State Mem. at 16) (quoting Tr. at 153.)

The State is correct. Because Sheard attacked the credibility of the prosecution's witnesses, the prosecutor was well within bounds to respond by calling Sheard a liar. *See Dunn*, 561 F. Supp. 2d at 455-56 (prosecutor's remarks, including calling petitioner a "prolific and skillful con artist[,]" were not inappropriate because they were invited by petitioner's summation); *United States v. Thomas*, 377 F.3d 232, 246 (2d Cir. 2004) (prosecutor's use of the word "lied" more than once on summation in connection with defendant does not constitute misconduct). Further, the prosecutor's "vouching" for the police witnesses was not improper because "the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." *United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (citations and internal quotation marks omitted); *see also Osorio v. Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007) (prosecutor's "vouching" for the government's witness was appropriate because it was "merely a response to defense counsel's attacks on [the witness's] reliability); *Sheard v. Conway*, No. 09 CV 3603, 2010 WL 9023189, at *10 (E.D.N.Y. July 19, 2010) (prosecutor's vouching for government's witnesses was not improper after defense counsel attacked government's witnesses as "unprofessional" and "not worthy of belief").

In short, the prosecutor's statements during summation were entirely proper.

**2. Sheard Suffered No Actual Prejudice.**

Even assuming *arguendo* that the prosecutor's summation was improper, Sheard suffered no actual prejudice. That is because the prosecution produced ample evidence by which reasonable jurors could have found Sheard guilty beyond a reasonable doubt. *Dunn*, 561 F. Supp. 2d at 458 ("[i]f there is clear evidence of guilt, prosecutorial misconduct on summation is considered harmless error.") (citing *Garofolo*, 804 F.2d 201 at 206).

The State produced substantial evidence proving Sheard's guilt at trial, including testimony from three police officers who participated in Sheard's arrest, and physical evidence seized from Sheard after he was arrested. Meanwhile, Sheard's defense consisted only of his own testimony. Regardless of the propriety of the prosecutor's summation, Sheard cannot demonstrate that he suffered actual prejudice because the State presented clear evidence of Sheard's guilt at trial. *See, e.g.*, *Bradley v. Meachum*, 918 F.2d 338, 344 (2d Cir. 1990) (finding prosecutor's improper summation harmless when prosecutor produced detailed witness testimony about the alleged crime); *Dunn*, 561 F. Supp. 2d at 458 (finding prosecutor's improper summation harmless when prosecution produced "overwhelming" evidence consisting of numerous witnesses and recovered physical evidence in defendant's possession while defendant was arrested).

***9** Any prejudice also was mitigated by the trial court's instructions to the jury following summation. As the court instructed:

> In deliberation you will use your recollection of the testimony, not that of either lawyer or myself for that matter. As judges of the facts it is you alone that determine the truthfulness and accuracy of the testimony of each witness. You must decide whether a witness told the truth and was accurate or instead testified falsely or was mistaken...

(Tr. at 184.); *see, e.g., Osorio*, 496 F. Supp. 2d at 302 (petitioner suffered no prejudice from prosecutor's summation when trial court "mitigated any prejudice" by instructing the jury that "what the lawyers say is not evidence"); *Garcia*, 2018 WL 9801209, at *18 (petitioner was not prejudiced by the prosecutor's summation when trial judge reminded the jury that they were the "judges of the facts in the case"); *Velazquez v. Poole*, 614 F. Supp. 2d 284, 318 (E.D.N.Y. 2007) (prosecutor's improper summation was sufficiently mitigated when trial court's closing charge instructed jury that "[jury] must determine both the

credibility of each witness and the weight to afford each witness's testimony"). Any prejudice was even further mitigated by the brevity of the prosecutor's statements and the fact that she did not repeat them. *See Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir. 1998) (the severity of prosecutor's misconduct on summation, if any, was "mitigated by the brevity and fleeting nature of the improper comments"); *Dunn*, 561 F. Supp. 2d at 456 (no prosecutorial misconduct when allegedly improper remarks by prosecutor were brief, isolated, and not repeated after a sustained objection).

In sum, this Court finds that the challenged statements from the prosecutor's summation were neither improper nor so prejudicial as to have denied Sheard a fair trial. The First Department's rejection of Sheard's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, Supreme Court law. Accordingly, Sheard is not entitled to habeas relief based on prosecutorial misconduct.

**C. Sheard's Weight of Evidence Claim Is Not Actionable.**

Sheard argues that his guilty verdict was "against the weight of the evidence." (Petition at 8.) The State correctly points out that this claim is not a cognizable ground under federal habeas review.

Courts in the Second Circuit have long established that " '[a] weight of the evidence argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)' which empowers New York State intermediate appellate court to make weight of the evidence determinations." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (quoting *Correa v. Duncan,* 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001)). The Appellate Division, First Department did exactly that when it considered but rejected Sheard's weight of the evidence claim.

Simply put, in making a "weight of the evidence" argument, petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a); instead, he has raised an error of state law, for which habeas review is not available. *Garrett*, 438 F. Supp. 2d at 470 (citing *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)); *see also Douglas v. Portuondo,* 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (a weight of the evidence claim is "an error of state law, for which habeas review is not available.") Accordingly, habeas relief is not warranted based on Sheard's weight of the evidence argument.

**D. Sheard's Ineffective Assistance of Counsel Claim Lacks Merit.**

***10** Sheard argues that his counsel was ineffective because he did not call Sheard's co-defendant, Rodriguez, to testify even though Sheard asked to do so. (Petition at 9-11.) Sheard raised this claim on direct appeal to the Appellate Division, which rejected it and concluded the following:

> Although defendant "vehemently" wanted his codefendant to testify on his behalf, defendant's trial counsel made a decision, in the exercise of professional judgment, not to call this witness ... Moreover, counsel had a sound reason for not calling the codefendant, who, in his plea allocution, had implicated defendant in the drug sale.

*Sheard*, 145 A.D.3d at 476–77 (citations omitted).

To establish a claim for constitutionally deficient assistance of counsel, the party challenging the conviction must show that (1) the counsel's representation falls "below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Further, a court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689.

Importantly, "actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689); *see also, United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial"); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (defense counsel's decision whether "to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation"); *Jones v. Hollins*, 884 F. Supp. 758, 765-66 (W.D.N.Y. 1995) ("the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation ... the habeas court will not second-guess trial strategy simply because the chosen strategy has failed") (citations omitted), *affirmed*, 89 F.3d 826, 1995 WL 722215 (2d Cir. 1995).

In the context of federal habeas review, "[t]he standards created by *Strickland* and [AEDPA (28 U.S.C. § 2254(d))] are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations and internal quotation marks omitted). The Supreme Court has instructed that "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* In federal habeas review, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Defense counsel's decision not to call Rodriguez as a witness is a prime example of the type of sound trial strategy that cannot be the basis for an ineffective assistance of counsel claim. As defense counsel explained to the court before trial, calling Rodriguez would have been detrimental to Sheard because Rodriguez had pleaded guilty and inculpated Sheard during his plea allocution. (H. at 38.) Defense counsel's decision was both sensible and far from prejudicial. There is no reasonable probability that Rodriguez testimony could have changed the case's outcome because Rodriguez had allocuted and inculpated Sheard in the crime and Rodriguez could have been easily impeached had he given exculpatory testimony at odds with his allocution.

***11** Accordingly, habeas relief on the grounds of ineffective assistance of counsel is not warranted. *See Ryan v. Rivera*, 21 F. App'x 33, 35 (2d Cir. 2001) (rejecting petitioner's ineffective assistance of counsel claim based on counsel's failure to call witnesses when counsel concluded that the witnesses "were not credible or that their testimony would harm [petitioner]"); *Santana v. Capra*, 284 F. Supp. 3d 525, 542 (S.D.N.Y. 2018) (rejecting petitioner's ineffective assistance of counsel claim because there were strategic reasons for his defense counsel not to call certain witnesses; state court's decision rejecting petitioner's argument was therefore not an unreasonable application of federal law); *Montalvo v. Annetts*, No. 02 Civ. 1056, 2003 WL 22962504, at *26 (S.D.N.Y. Dec. 17, 2003) (no ineffective assistance of counsel because petitioner "may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result").

**Conclusion**

For the foregoing reasons, I recommend that the Petition for writ of habeas corpus be DENIED and the case be DISMISSED. Petitioner's remaining arguments, to the extent not addressed herein, have been considered by the Court and found to be without merit.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Andrew L. Carter, Jr., United States Courthouse, 40 Foley Square, Room 435, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, Room 1960, New York 10007. **Failure to file timely objections will result in a waiver of objections and will preclude appellate review.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5847151

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7050432
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lance ELY, Petitioner,
v.
John B. LEMPKE, Respondent.

No. 09 Civ. 5836(RA)(HBP).
|
Oct. 18, 2012.

*REPORT AND RECOMMENDATION*

PITMAN, United States Magistrate Judge.

***1** TO THE HONORABLE RONNIE ABRAMS, United States District Judge,

I. *Introduction*

Petitioner Lance Ely seeks, by his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an Order vacating a judgment of conviction imposed on November 27, 2003 after a jury trial, by the Supreme Court of the State of New York, New York County (Grella, J.), for one count of burglary in the second degree, in violation of New York Penal Law Section 140.25(2) (Petition for a Writ of Habeas Corpus, filed Jun. 25, 2009 (Docket Item 2) ("Petition") at 1). Pursuant to that judgment, petitioner was sentenced as a persistent violent felony offender to a indeterminate term of imprisonment of twenty years to life. Petitioner is currently incarcerated pursuant to that judgment.

For the reasons set forth below, I respectfully recommend that the petition be denied.

II. *Facts*

A. *Facts Giving Rise to Petitioner's Conviction*

Petitioner's conviction arises from a burglary that took place in March 2003. The evidence offered at trial established the following facts.

On March 28, 2003, Donna Bubash resided in a fifthfloor apartment located in lower Manhattan (Tr. [1] 27). At approximately 2:00 p.m ., Bubash came out of the bathroom of her apartment and discovered petitioner in her bedroom, holding her purse (Tr. 28–29). Bubash asked petitioner to identify who he was and why he was there, and he replied that he was a messenger (Tr. 29). Upon further inquiry, however, petitioner asked Bubash to let him leave, promising not to "do this again" (Tr. 32). Bubash took her purse back from petitioner, and escorted him out of her apartment (Tr. 30–31). Petitioner was detained by construction workers from a neighboring apartment until the police arrived (Tr. 36–37, 111–12, 120). In petitioner's shoulder bag, the police found a screwdriver and an employee identification card from a messenger service for which petitioner had formerly worked (Tr. 113–16, 122–23).

1 "Tr." refers to the trial transcript.

Petitioner was charged with burglary in the second degree possession of burglar's tools in violation of New York Penal Law Sections 140.25(2) and 140.35, respectively (Petition 1; Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus, filed Dec. 14, 2009 (Docket Item 7) ("Opp'n Memo.") at 2).

B. *Trial Court Proceedings*

Petitioner's trial began on September 15, 2003 (Tr. 1). The prosecution's case largely consisted of testimony establishing the foregoing events. Petitioner presented no evidence is his defense (Tr. 196–97).

The jury found petitioner guilty of burglary in the second degree (Tr. 308).[2]

2 The possession of burglar's tools charge was dismissed on defendant's motion prior to summations (Tr. 212–13).

On November 17, 2003, petitioner appeared for sentencing (S. Tr.[3] 1). The prosecutor submitted a statement that petitioner had been previously convicted of two or more felonies (S. Tr. 2–3). Petitioner did not dispute his prior felony convictions, arguing instead that the sentencing proceeding was illegal under *Apprendi v. New Jersey,* 530 U.S. 466 (2000), because the Court was relying on information not presented to the jury in determining his sentence (S. Tr. 3–4). The Court, rejecting petitioner's arguments, determined that petitioner was a persistent violent felony offender and sentenced him to an indeterminate term of twenty years to life (S. Tr. 14–16).

3 "S. Tr." refers to the sentencing transcript.

C. *Post–Conviction Proceedings*

1. *Direct Appeal*

***2** Petitioner, assisted by counsel, appealed his conviction to the Appellate Division of the Supreme Court for the First Department. Petitioner asserted three claims on appeal:

1. Appellant was denied his due process right to a fair trial by the prosecutor's pervasive misconduct in (a) mischaracterizing the defense, vouching for the People's witness, and expressing his personal belief in appellant's guilt; (b) introducing testimony tending to establish appellant's propensity to commit burglary and exploiting it during his summation. U.S. Const. Amend. XIV; N.Y.S. Const. Art I, § 6.

2. Appellant's sentence of twenty years to life imprisonment as a persistent violent felon pursuant to P.L. § 70.08 and C.P.L. § 400 .16 violated his rights to notice of the charges against him, to a jury trial and to due process of law, as the enhanced sentence was premised upon the existence of two violent predicate convictions, were the existence of the prior convictions was neither submitted to a jury not contained in an indictment. U.S. Const. Amends. VI & XIV; N.Y. Const., Art 1, §§ 2, 6, Art. VI, § 18; *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

3. In light of appellant's tragic family history and his failure to cause anyone physical harm during the commission of a crime, appellant's sentence of 20 years of life is excessive.

(Brief for Defendant–Appellant, dated April 2006 ("Pet.App.Br."), annexed as Exhibit A to Declaration in Opposition to the Writ of Habeas Corpus, filed Dec. 14, 2009 (Docket Item 8) ("Opp'n Decl.") at 2).

The Appellate Division affirmed petitioner's conviction on November 27, 2007, stating, in pertinent part:

> The court properly exercised its discretion in denying defendant's mistrial motion, made on the ground that a portion of the prosecutor's summation shifted the burden of proof. The remarks in question were responsive to defendant's summation and did not mislead the jury as to the appropriate burden of proof. As to defendant's remaining summation claims, and his related

evidentiary argument, there was nothing in the prosecutor's conduct that was so egregious as to warrant reversal (see *People v. Overlee,* 236 A.D.2d 133 [1997], lv. denied 91 N.Y.2d 976 [1998]; *People v. D'Alessandro,* 184 A.D.2d 114, 118–119 [1992], *lv denied* 81 N.Y.2d 884 [1993] ).

Defendant's constitutional challenge to the procedure under which he was adjudicated a persistent violent felony offender is without merit (see *Almendarez–Torres v. United States,* 523 U.S. 224 [1998] ). We perceive no basis for reducing the sentence.

*People v. Ely,* 45 A.D.3d 466, 466, 845 N.Y.S.2d 734, 734 (2007).

Petitioner, again assisted by counsel, sought leave to appeal to the New York Court of Appeals (Letter to the Honorable Judith S. Kaye, dated Dec. 7, 2007, annexed as Exhibit D to Opp'n Decl., at 1). The Court of Appeals denied petitioner's application without opinion on March 26, 2008. *People v. Ely,* 10 N.Y.3d 810, 886 N.E.2d 809, 857 N.Y.S.2d 44 (2008).

2. *Motion to Vacate and Motion to Re-sentence*

***3** By a *pro se* motion dated August 13, 2007, filed in New York Supreme Court, petitioner sought to vacate the judgment of the Trial Court pursuant to New York Criminal Procedure Law Sections 440.10 and 440.30 (Notice of Motion to Vacate Judgment Pursuant to CPL § 440.10 & 440.30, dated Aug. 13, 2007 ("Pet. Mot. to Vacate"), annexed as Exhibit F to Opp'n Decl., at 1). Petitioner articulated his claims in this motion as follows:

(i) no probable cause was shown during the preliminary hearing concerning justification for continued incarceration due to a lack of prima facie evidence [*sic* ] (CPL § 140.30[4] & CPL § 70.10[1][2]; and CPL § 190.30;

(ii) the Prosecutor as a matter of law did not have legal control and jurisdiction over a "bona fide" "Complainant Affiant" claiming to be a victim as required by section 37–a, and 39 of the General Construction Law;

(iii) that as a result of the prosecution willfully and knowingly making a direct presentation before the grand jury with less than hearsay information which could not be corroborated as required, and such evidence having no probative value the Grand Jury Proceedings are defective and [l]egally inadequate as a matter of law to sustain a vote to indict. See CPL 210.35(5); and 70.10[1]; and

(iv) the Prosecutor committed prosecutorial misconduct in violation of their code of Ethics and defendant right of access to section 440.10, and 440.30 [*sic* ];

(v) and the court's imposed surcharge must be made null and void when no record exist[s] to substantiate any victim or gain from the commission of a crime [*sic* ] the defendant is alleged to have benefit from in absence of a required hearing [*sic* ] (CPL § 400.40[1] ), and remission of any imposed fine, restitution, reparation or surcharge must be adjusted accordance with section 430 .20, subd. (2).

(Pet. Mot. to Vacate at 2).

In a separate motion, dated August 16, 2007 and also filed in New York Supreme Court, petitioner sought re-sentencing pursuant to New York Criminal Procedure Law Sections 420.30(2) and 420.10(1) (Notice of Motion for Re–Sentence Pursuant to CPL § 420.30(2), dated Aug. 16, 2007 ("Pet. Mot. to Re-sentence"), annexed as Exhibit G to Opp'n Decl., at 1). Petitioner realleged the fifth ground from his motion to vacate, namely, that the imposition of a mandatory surcharge of $210.00 without an administrative hearing was an error, and requested that the surcharge be remitted back to him (Pet. Mot. to Re-sentence at 1).

In a decision dated February 15, 2008, the Supreme Court (Pickholz, J.) denied petitioner's motion to remit the mandatory surcharge and crime assistance fee of $210.00, holding that it was not a "fine" for purposes of New York Criminal Procedure Law Section 400.30 and, thus, no hearing was required (Decision, dated Feb. 15, 2008, annexed as Exhibit I to Opp'n Decl., at 1–2). In a separate decision dated February 28, 2008, the Supreme Court (Pickholz, J.) denied the remainder of the claims raised in petitioner's motion to vacate because petitioner "could have raised each of these claims upon appeal, as they are apparent

from the face of the record" (Decision, dated Feb. 28, 2008, annexed as Exhibit H to Opp'n Decl., at 3). Alternatively, the Court denied the claims as meritless (Decision, dated Feb. 28, 2008, annexed as Exhibit H to Opp'n Decl., at 4).

***4** Petitioner's application for leave to appeal from these two decisions was denied by the Appellate Division without opinion on July 1, 2008. *People v. Ely,* 2008 N.Y. Slip. Op. 76499(U) (1st Dep't July 1, 2008). On August 28, 2008, the Court of Appeals denied petitioner's application for leave to appeal from the Appellate Divisions's decisions. *People v. Ely,* 11 N.Y.3d 736, 894 N.E.2d 658, 864 N.Y.S.2d 394 (2008).

3. *Writ of Error Coram Nobis*

On June 26, 2009, petitioner filed a *pro se* petition for a writ of error coram nobis in the Appellate Division, First Department (Notice of Application for Writ of Error Coram Nobis, dated June 19, 2009, annexed as Exhibit N to Opp'n Decl., at 1). Petitioner alleged that his appellate counsel was ineffective for neglecting to raise three issues: (1) the failure to remove a juror who had demonstrated a "strong bias" against petitioner by "making faces and expressing other behaviors indicative of bias," (2) the Trial Court's refusal to entertain petitioner's arguments about why he wanted to replace his trial counsel, and (3) that the failure of the prosecution to disclose fingerprint reports from the crime scene violated its obligations under *People v. Rosario,* 9 N.Y.2d 286, 290–91, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961) and *Brady v. Maryland,* 373 U.S. 83 (1963) (Memorandum of Law in Support of Writ of Error Coram Nobis ("Coram Nobis Memo."), dated June 19, 2009, annexed as Exhibit N to Opp'n Decl., at 2–7). On October 29, 2009, the Appellate Division denied the petition without opinion. *People v. Ely,* 2009 N.Y. Slip. Op. 87159(U) (1st Dep't Oct. 29, 2009). The Court of Appeals denied leave to appeal on January 21, 2010. *People v. Ely,* 13 N.Y.3d 940, 922 N.E.2d 919, 895 N.Y.S.2d 330 (2010).

D. *The Pending Petition*

Petitioner, proceeding *pro se,* filed the pending petition on June 25, 2009, asserting claims drawn from both his appellate brief and his motion to vacate (Petition 7–8). Petitioner argued that (1) he was denied the due process right to fair trial by prosecutorial misconduct; (2) his sentence as a persistent violent felony offender violated the Sixth Amendment under *Apprendi;* (3) his sentence was excessive due to his "tragic family history" and failure to cause anyone physical harm during a crime; (4) no probable cause was shown during the preliminary hearing determining whether his continued incarceration was justified; (5) the prosecutor did not have control over a "bona fide complainant affiant"; (6) the prosecution "committed prosecutorial misconduct in violation of their code of ethics and defendant [*sic* ] right of access to section § 440.10 & 440.30"; and (7) the mandatory surcharge of $210 .00 imposed at sentencing was improper (Petition 7–8).

In a motion dated November 20, 2009, petitioner moved to "stay and/or amend" his petition to assert several new claims, chief among them a claim that his rights under the Confrontation Clause of the Sixth Amendment were violated by the prosecution's failure to call two members of the New York Police Department's ("NYPD") Evidence Collection Team as witnesses to testify about fingerprint analysis conducted at the crime scene (Notice of Motion for Stay and/or Amend Petition Under Fed. R. Civ. Proc. 15(a), filed Nov. 25, 2009 (Docket Item 6) ("Pet. Mot. to Amend") at 5). Petitioner argued that in light of *Melendez–Diaz v. Massachusetts,* 557 U.S. 305 (2009), a Confontation Clause case decided after his original petition was filed that petitioner claimed "established a clarification of constitutional law that applies retroactively," a stay of the habeas proceedings was warranted to allow for the exhaustion of the claim in state court (Memorandum of Law in Support of Pet. Mot. to Amend, filed Nov. 25, 2009 (Docket Item 6) ("Pet. Mot. To Amend Mem.") at 1–2).

***5** Petitioner also sought to amend his habeas corpus petition to include several additional claims, including (1) an allegation of juror misconduct in violation of New York Criminal Procedure Law Section 270.35; (2) a claim that the Trial Court improperly disregarded his desire for new counsel; (3) a claim that the prosecution committed *Rosario* and *Brady* violations that were "entwined" with the Confrontation Clause claim; (4) a reiteration of the claim that his sentence as a persistent violent felony offender violated the Sixth Amendment, and (5) a claim that his sentence violated the Eighth Amendment and "recent public policy consideration[s]" (Pet. Mot. to Amend at 6–7). Respondent opposed petitioner's motion on December 16, 2009 (Docket Item 10).

On April 16, 2010, respondent submitted a letter application requesting that the decision on petitioner's habeas corpus petition be held in abeyance in light of the New York Attorney General's plan to seek rehearing *en banc* of the Second Circuit's decision in *Besser v. Walsh,* 601 F.3d 163 (2d Cir.2010), which held that New York's persistent felony offender statute ("PFO Statute"), the statute under which petitioner was sentenced, was unconstitutional under the Sixth Amendment (Letter from Respondent, dated Apr. 15, 2010 (undocketed), at 1–2). On April 22, 2010, I granted respondent's application to hold the matter in abeyance "pending the resolution of the petition for rehearing *en banc"* of the *Besser* decision (Docket Item 11).

On April 30, 2010, the Second Circuit granted *en banc* review of the *Besser* decision.

On September 13, 2010, the Honorable Paul A. Crotty, United States District Judge, to whom this matter was then assigned, issued an Order, which stated, in pertinent part:

> In light of the memo-endorsement issued by Magistrate Judge Henry Pitman April 22, 2010, the Clerk of Court is directed to terminate the Petitioner's motion (document # 6) to stay and/or motion to correct the Petition under FRCP 15(a). The motion is subject to reinstatement pending the resolution of the petition for rehearing *en banc* of the decision in *Besser v. Walsh,* Docket No. 07–1599pr.

(Docket Item 12).

On October 21, 2010, in *Portalatin v. Graham,* 624 F.3d 69, 94 (2d Cir.2010) (*en banc), cert. denied,* 131 S.Ct. 1691 (2011), the Second Circuit vacated the panel opinion in *Besser,* and held that the New York PFO Statute was constitutional.

Petitioner never moved to reinstate his motion to stay and/or amend after the petition for rehearing *en banc* was resolved, in accordance with Judge Crotty's September 13, 2010 Order. Thus, the claims described therein have been abdandoned. Nevertheless, due to petitioner's *pro se* status, the absence of prejudice to respondent, and in the interest of completeness, I shall address all of petitioner's claims below.

III. *Analysis*

A. *Standard of Review*

Before a federal court can issue a writ of habeas corpus, a petitioner must overcome a "difficult to meet[ ] ... and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt ." *Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1398 (2011) (citations and internal quotation marks omitted). Specifically, habeas relief may be granted only when the state court's decision:

> ***6** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

28 U.S.C. § 2254(d).

The Supreme Court has explained the alternative standards set forth in subparagraph one as follows:

> First, we have explained that a decision by a state court is “contrary to” our clearly established law if it “applies a rule that contradicts the governing law set forth in our cases” or if it “confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.” *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). See also *Early v. Packer,* 537 U.S. 3, 7–8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*per curiam* ) ....
>
> Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an “unreasonable application” of clearly established law. As we have explained:
>
>> “[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. See *Bell v. Cone,* 535 U.S. 685, 698–699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams, supra,* at 411, 120 S.Ct. 1495. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.” *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (*per curiam* ).

*Price v. Vincent,* 538 U.S. 634, 640–41 (2003); *accord Waddington v. Sarausad,* 555 U.S. 179, 190 (2009); *Brown v. Payton,* 544 U.S. 133, 141 (2005); *see also Lockyer v. Andrade,* 538 U.S. 63, 70–72 (2003); *Bierenbaum v. Graham,* 607 F.3d 36, 47–48 (2d Cir.2010); *Hoi Man Yung v. Walker,* 468 F.3d 169, 176 (2d Cir.2006); *Hawkins v. Costello,* 460 F.3d 238, 242–43 (2d Cir.2006); *Brown v. Artuz,* 283 F.3d 492, 500–01 (2d Cir.2002).

In addition to the definition of “unreasonable application” set forth above, a state court may unreasonably apply Supreme Court precedent “if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a context in which the rule reasonably should apply.” *Serrano v. Fischer,* 412 F.3d 292, 296–97 (2d Cir.2005). “Unreasonableness is determined by an ‘objective’ standard.” *Gersten v. Senkowski,* 426 F.3d 588, 607 (2d Cir.2005), *quoting Williams v. Taylor,* 529 U.S. 362, 409 (2000); *Hawkins v. Costello, supra,* 460 F.3d at 242–43.

Both the “contrary to” and “unreasonable application” clauses “restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence.” *Williams v. Taylor, supra,* 529 U.S. at 412; *accord Parker v. Matthews,* ––– U.S. ––––, ––––, 132 S.Ct. 2148, 2155–56 (2012). “[C]learly established [f]ederal law ... refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.” *Carey v. Musladin,* 549 U.S. 70, 74 (2006) (internal quotation marks omitted); *accord Thaler v. Haynes,* 559 U.S. 43, ––––, 130 S.Ct. 1171, 1173 (2010) (“A legal principle is ‘clearly established’ within the meaning of this provision only when it is embodied in a holding of this Court.”); *see Greene v. Fisher,* 132 S.Ct 38, 44 (2011). “That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context.” *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.2002); *accord Davis v. Grant,* 532 F.3d 132, 140 (2d Cir.2008). “A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent.” *Yung v. Walker,* 341 F.3d 104, 110 (2d Cir.2003); *accord DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002).

***7** A ruling that is clearly erroneous is not necessarily a ruling that constitutes an unreasonable application of federal law. *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003) (The “objectively unreasonable” and “clear error” standards “are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness.”); *Davis v. Grant,* 532 F.3d 132, 140 (2d Cir.2008); *Cotto v. Herbert,* 331 F.3d 217, 248 (2d Cir.2003). However, “ ‘the increment [of error beyond clear error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.’ “ *Brisco v. Ercole,* 565 F.3d 80, 88 (2d Cir.2009), *quoting Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000).

To be entitled to the deferential standard of review under either sub-paragraph of subsection 2254(d), the state courts must have resolved the petitioner's claims “on the merits.” *Cotto v. Herbert, supra,* 331 F.3d at 230; *see also Ryan v. Miller,* 303 F.3d

231, 245 (2d Cir.2002) ("[I]n order for this deferential standard of § 2254 to apply, we must first determine that the state court considered [petitioner's claim] on its merits."); *Sellan v. Kuhlman,* 261 F.3d 303, 309–10 (2d Cir.2001).

The Second Circuit has instructed habeas courts to "classify" a state court decision as either: (1) "fairly appearing to rest primarily on federal law or to be interwoven with federal law"; or (2) "fairly appearing to rest primarily on state procedural law." *Jimenez v. Walker,* 458 F.3d 130, 145 (2d Cir.2006). "If the state court's decision falls into the first category, and does not 'contain a clear statement of reliance on a state procedural bar,' the decision must be treated as having been made on the merits." *Mateo v. Fishkill Corr. Fac.,* No. CV04–3420 (DGT), 2007 WL 2362205 at *5 (E.D.N.Y. Aug. 14, 2007), *quoting Jimenez v. Walker, supra,* 458 F.3d at 138. To make this classification, courts in this circuit examine "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." *Jimenez v. Walker, supra,* 458 F.3d at 145 n. 16.

Here, upon examining these three factors, I conclude that the Appellate Division adjudicated the merits of petitioner's prosecutorial misconduct claim when it found that "[t]he court properly exercised its discretion in denying defendant's mistrial motion, made on the ground that a portion of the prose-cutor's summation shifted the burden of proof," and that as to "defendant's remaining summation claims, and his related evidentiary argument, there was nothing in the prosecutor's conduct that was so egregious as to warrant reversal." *People v. Ely, supra,* 45 A.D.3d at 466, 845 N.Y.S.2d at 734. Although the language is slightly conclusory, it does address the substance of petitioner's claim and does not remotely suggest that the decision rests on a procedural basis. My conclusion is not altered by the fact that the Appellate Division did not explicitly refer to the Fourteenth Amendment, or relevant federal case law. *See Sellan v. Kuhlman, supra,* 261 F.3d at 312 (noting that a state court decision may be deemed on the merits "even if the state court does not explicitly refer to ... relevant federal case law"); *Cheng Kang Shi v. Connolly,* 06 CV 2093(NG)(RLM), 2007 WL 4380276 at *6 (E.D.N.Y. Dec. 13, 2007) ("AEDPA's deferential standard of review applies even if the state court did not explicitly refer to either the federal claim or to relevant federal case law.") (internal quotation marks omitted). I also conclude that the Appellate Division adjudicated the merits of petitioner's *Apprendi* claim when it found that "Defendant's constitutional challenge to the procedure under which he was adjudicated a persistent violent felony offender is without merit," and cited relevant federal case law. *People v. Ely, supra,* 45 A.D.3d at 466, 845 N.Y.S.2d at 734, *citing Almendarez–Torres v. United States,* 523 U.S. 224 (1998).

***8** Because the Appellate Division adjudicated petitioner's prosecutorial misconduct claim and *Apprendi* claim on the merits, the Appellate Division's decision on this claims are entitled to the deferential standard of review set forth in 28 U.S.C. § 2254(d).

1. *Prosecutorial Misconduct Claim* [4]

4 Respondent concedes that petitioner's prosecutorial misconduct claim is exhausted (Opp'n Memo. at 19).

Petitioner first asserts that misconduct by the prosecutor violated his Due Process right to a fair trial (Petition 7; Pet.App. Br. at 34–50). Specifically, petitioner claims that during summation, the prosecution mischaracterized the defense and shifted the burden of proof by stating that defense counsel had conceded that petitioner was knowingly and unlawfully in Bubash's apartment:

> [PEOPLE]: You see burglary in the second degree has elements and I am required to prove those elements to you beyond a reasonable doubt.
>
> I am not going to instruct you on them. I am just going to go through them one by one. That's the law. That's where I choose to start. So I have to prove first of all, that the [petitioner] knowingly and unlawfully entered a dwelling, all right. That's a non-issue, all right.
>
> [DEFENSE]: Objection. T
>
> HE COURT: Overruled.

[PEOPLE]: No question that apartment 5–C is a dwelling. That's where Ms. Donna Bubash makes her residence. That's where Eve Gardner makes her residence. That's where they live and that's where they work.

No question that the entry to the apartment was unlawful. Ms. Bubash sat up there and told you that he didn't have permission or authority to.

[DEFENSE]: Objection, judge.

THE COURT: It's argument. But ultimately, it's going to be there jury's decision as to what the facts are.

[PEOPLE]: It's conceded by the defense that the [petitioner] was in the apartment. So again, there is no question that he entered the apartment and entered sort of understates what he did.

(Tr. 244–45; Petition 7).

Petitioner also argues that the prosecution “denigrated” defense counsel by commenting negatively on his emphasis in summation on testimonial inconsistencies. Petitioner cites the following portion of the prosecution's summation in support of this argument:

[PEOPLE]: Inconsistencies among witnesses. [Defense counsel] made a lot of that and allow me to address it. This case does not turn on whether Donna Bubash had a towel around her head; had a towel around her body. It doesn't turn on whether Eve Gardner let the police up; doesn't turn on whether how many people were situated in the lobby; how many construction workers those are ....

The arguments about inconsistencies are really designed to take your focus away from what really went on inside of the apartment ....

(Tr. 255–56; Petition 7).

Petitioner next cites the following passage and argues that the prosecution improperly vouched for the credibility of Bubash by stating that in order to acquit defendant, the jury would have to believe that Bubash was lying:

[PEOPLE]: And here is what's really the heart and meat of this case: For you to find the [petitioner] not guilty in this case, you have to believe that Donna Bubash is lying.

***9** [DEFENSE]: Objection.

[PEOPLE]: Not mistaken.

[DEFENSE]: Objection.

THE COURT: Overruled.

(Tr. 257; Petition 7).

Relying on the following comments, petitioner then argues that the prosecutor expressed a personal belief in petitioner's guilt:

[PEOPLE]: [Petitioner] has got a right to a fair trial and he got a fair trial.

[DEFENSE]: Objection, judge.

THE COURT: Overruled.

[PEOPLE]: Fair trial also—with a fair trial also comes a fair verdict, a verdict means the truth and the truth in this case is that this man is guilty of burglary in the second degree and you should find him so.

Thank you.

(Tr. 260–61; Petition 7).

Finally, petitioner argues that throughout the trial, the prosecution improperly elicited testimony regarding the screwdriver and expired employee ID recovered from petitioner's bag, and then improperly "exploited" this testimony in summation in a manner that suggested that petitioner had a propensity to commit criminal acts (Petition 7; Pet.App. Br. at 40–44). For example, during summation the prosecution stated:

[PEOPLE]: The screwdriver, what is he doing carrying a screwdriver? It's used to tighten screws, to loosen screws, to take things apart.

It's not used by messengers, okay. Messengers carry radios. Messengers carry bags and he did have a bag.

Messengers carry chains to secur[e] bicycles and things of that sort. You ever hear of a messenger carrying a screwdriver, no because they don't because he wasn't there as a messenger, okay. The screwdriver is something that you use if you want to pry open a door, pry open a window, to gain access to something that's locked. That's why the screwdriver was in the bag; more physical evidence of his intent to commit a crime.

Luckily for him. [DEFENSE]: Objection.

THE COURT: Overruled.

(Tr. 249).

A prosecutor's comments or argument during trial will justify habeas relief only when they "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986), *quoting Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974); *Bossett v. Walker, supra,* 41 F.3d at 829 (2d Cir.1994) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus 'is the narrow one of due process, and not the broad exercise of supervisory power.' "), *quoting Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990), *quoting Darden v. Wainwright, supra,* 477 U.S. at 181. *Accord Greer v. Miller,* 483 U.S. 756, 765 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' "), *quoting United States v. Bagley,* 473 U.S. 667, 676 (1985).

In order to justify federal habeas relief, a petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments ... had a substantial and injurious effect or influence in determining the jury's verdict. Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994), *quoting Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993); *Escobar v. Senkowski,* 02 Civ. 8066(LAK) (THK), 2005 WL 1307939 at *16 (S.D.N.Y. May 26, 2005) (same), *quoting Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998).

***10** When a prosecutor is found to have engaged in improper conduct, Courts in this Circuit have considered the following non-exhaustive factors in assessing whether prosecutorial misconduct resulted in actual prejudice to a criminal defendant: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." *Bentley v. Scully, supra,* 41 F.3d at 824, *citing Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991); *see also United States v. Millar,* 79 F.3d 338, 343 (2d Cir.1996); *Floyd v. Meachum, supra,* 907 F.2d at 355; *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981). These mitigating factors are present here.

Here, the prosecution's statements during summation were not improper. First, the prosecution's use of the phrase "non-issue" to refer to certain elements of burglary was clearly meant to convey the strength of the evidence against petitioner, and not a suggestion that any element would not have to be proven beyond a reasonable doubt. Indeed, immediately after the prosecution used the phrase, it proceeded to discuss at length the testimony that established each element of the crime (Tr. 245–61). Second, the prosecution's comment on the defense's reliance on inconsistencies in testimony cannot be fairly said to have "denigrated" defense counsel; the statements were directed at defense counsel's arguments, not at him personally, and there was simply no disparaging, excessively rhetorical, or even mildly abusive language that suggests otherwise. Moreover, it is not improper for an attorney to argue that his or her adversary's arguments are a diversionary tactic. *See United States v. Lee,* 123 F. App'x 439, 441 (2d. Cir2005); *Everett v. Fischer,* 00–CV6300(NG), 2002 WL 1447487 at *3 (E.D.N.Y. July 3, 2002). Third, the prosecutor's statement that acquittal would require the jury to "believe that Donna Bubash is lying" was permissible argument in light of the nature of the case and defense counsel's preceding summation, which attacked Bubash's credibility. As the Trial Court correctly noted, the case was not one of mistaken identity-petitioner did not dispute that he was inside the apartment with Bubash—and thus, the Court was within its discretion in allowing the prosecution to emphasize this aspect of the case in its arguments:

> [THE COURT]: Let's say that the [petitioner] for argument's sake testified and let's say he said that he worked for a certain company on that day? Well, then the argument would be he either did or he didn't. He is not mistaken about that. He is either telling the truth or he isn't and along those lines, I let that argument stand.

(Tr. 268–69). Finally, the petitioner's argument that the prosecutor injected his personal beliefs into his summation is untenable. The passage petitioner cites contains no use of the pronoun "I" or any other rhetorical device that would imply the prosecutor was attempting to bolster the case with his own views or the prestige of his office. Thus, the Trial Court was correct in overruling all of defense counsel's summation objections on the ground that the prosecution was engaging in permissible argument (Tr. 244–61), and in re-emphasizing this point in denying petitioner's post-summation motion for a mistrial (Tr. 266–70). *See United States v. Miller,* 116 F.3d 641, 682–83 (prosecutor's comment that defendants were "guilty on all counts," made at the conclusion of summation, did not constitute improper vouching).

***11** The prosecution's elicitation of testimony relating to the screwdriver and the ID card, and subsequent reference to the items during summation, were also not improper attempts to demonstrate petitioner's criminal propensity. The Trial Court denied suppression of the contents of petitioner's bag, including the screwdriver and the ID card, and explicitly noted that the prosecution was "at liberty to elicit testimony with regard to the search and seizure of the bag and its contents" (Tr. 2–3). Thus, it was well within the bounds of fair argument for the prosecutor to elicit testimony about these items, and to argue during summation that petitioner was carrying these items, for which no reasonable explanation was offered, for criminal purposes.

However, even assuming, *arguendo,* that the prosecutor's statements were improper, when viewed in the context of the defense argument that preceded them and given the mitigating factors set forth below, these comments individually and cumulatively did not substantially prejudice petitioner and, thus, do not warrant habeas relief. *United States v. Modica, supra,* 663 F.2d at 1181 ("A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant.").

First, the prosecutor's statements was not severe. The allegedly improper comments were brief and relegated entirely to summation, an area in which the prosecution enjoys broad leeway. *United States v. Edwards,* 342 F.3d 168, 181 (2d Cir.2003) ("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation."), *quoting United States v. Zackson,* 12 F.3d 1178 (2d Cir.1993). In addition, the Appellate Division found that the prosecution's alleged burden-shifting statement was a fair response to defense counsel's summation, and that there was nothing in the prosecutor's remaining conduct "that was so egregious as to warrant reversal." *People v. Ely, supra,* 45 A.D.3d at 466, 845 N.Y.S.2d at 734; *accord Tankleff v. Senkowski, supra,* 135 F.3d at 253 ("[T]he severity of the prosecutor's misconduct in [petitioner's] case was mitigated

by the brevity and fleeting nature of the improper comments."); *Escobar v. Senkowski, supra,* 2005 WL 1307939 at *15 ("[A] prosecutor's improper comments during summation must be more than short and fleeting, but must instead be so numerous and, in combination, so prejudicial that a new trial is required.") (internal quotation marks omitted). Brief and limited instances of improper argument by the prosecution during its summation do not ordinarily warrant habeas relief. *Donnelly v. DeChristoforo, supra,* 416 U.S. at 646 ("isolated passages" of prosecutor's argument, while improper, did not merit habeas relief); *Kaiser v. New York,* 394 U.S. 280, 281 n. 5 (1969) (same).

Second, the Trial Court instructed the jury both before and at several points during summations that each party's closing statement was merely argument and that the jury could accept or reject these arguments (Tr. 226–27, 245, 247, 258, 270). The Trial Court also provided a detailed charge to the jury on each element of burglary in the second degree (Tr. 293–96). A jury is "presumed to follow their instructions[,]" *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), and the record discloses no reason why this presumption should not apply here. *See Wicks v. Miller,* 05 Civ. 5341(JGK), 2007 WL 1434992 at *6 (S.D.N.Y. May 15, 2007) (Koeltl, D.J.) (jury not unduly influenced by prosecutor's comments concerning the evidence during opening statement where trial court instructed jury that only its recollection of the evidence controlled).

***12** Third, petitioner's conviction was certain absent the prosecutor's comment because the prosecution presented substantial evidence of petitioner's guilt. Bubash testified that she found petitioner inside her bedroom holding her purse, and that he falsely claimed to be a courier delivering a package (Tr. 28–30). Although petitioner claimed to work for Federal Express, he had no uniform or any other documentation to support this contention, and soon told Bubash that he would not "do this again" (Tr. 29, 32). A carpenter who was working in the next apartment and the arresting officer offered testimony as to petitioner's failure to offer any credible explanation for his presence in the building (Tr. 108–41). The arresting officer offered additional testimony about the items recovered from petitioner's bag, which included a six inch, flat head screwdriver, a tool commonly used in burglaries (Tr. 113). Finally, petitioner's former manager at Supreme Systems, a courier service, testified that petitioner had been terminated as a courier two months prior to the incident in question (Tr. 180–92). Thus, given the overwhelming evidence of guilt presented at trial, coupled with the fact that the prosecutor's comments were extremely limited, petitioner has failed to established that, if the prosecutor's arguments were improper, they had a substantial or injurious effect or influence on the jury's verdict. *See Bentley v. Scully, supra,* 41 F.3d at 825 ("Because of the compelling evidence in the prosecution's case against [petitioner], as well as the fact that the prosecutor's summation comments were both brief and isolated, we find that [petitioner] has failed to demonstrate that the prosecutor's misconduct had a substantial or injurious effect on the jury's verdict.").

Finally, when analyzing the prosecution's improper argument during summation for possible substantial or injurious effect or influence on the jury's verdict, the prosecution's comments cannot be examined in isolation. Rather, the prosecution's arguments must be reviewed in the context of the defense's summation that preceded it. *See, e.g., Shannon v. Senkowski,* 00 Civ. 2865(NRB), 2000 WL 1683448 at *7 (S.D.N.Y. Nov. 9, 2000) (Buchwald, D.J.) ("In determining the unfairness caused by a prosecutor's improper comments, courts must consider the comments in the broader context of the entire argument before the jury." (internal quotation marks omitted)); *see also Greer v. Miller, supra,* 483 U.S. at 765–66, *quoting Darden v. Wainwright, supra,* 477 U.S. at 179 ("It is helpful as an initial matter to place [the prosecution's] remarks in context.... The prosecutors' comments must be evaluated in light of the defense argument that preceded it...."). Improper argument by the prosecution during summation—although not excused—is less likely to be found actually prejudicial to the trial's fairness where the defense's summation invites the prosecution's response. "The idea of 'invited response' is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Darden v. Wainwright, supra,* 477 U.S. at 182; *see also Escobar v. Senkowski, supra,* 2005 WL 1307939 at *14 (noting "that where the defense's summation invites a particular response from the prosecution, such a response is less likely to jeopardize the trial's fairness"). Here, the defense's summation specifically raised the issue of intent, suggesting that petitioner, given his voluntary departure from Bubash's apartment once confronted, lacked the intent to commit burglary (Tr. 235). This, in turn, invited the prosecution to proffer some explanation in response during its summation. Indeed, the Appellate Division, in addressing petitioner's burden-shifting claim, noted that "[t]he remarks in question were responsive to defendant's summation and did not mislead the jury as to the appropriate burden of proof." The defense's summation also attacked Bubash's credibility and raised other testimonial inconsistences amongst the prosecution's witnesses (227–40), further inviting a response.

***13** Thus, there was nothing improper in the prosecution's closing argument. Even if there were, when viewed in the context of the defense argument that preceded it, the prosecution's arguments did not have a substantial and injurious effect on the trial's fairness, and thus do not warrant habeas relief.

2. *Apprendi Claim* [5]

5 Respondent concedes that petitioner's *Apprendi* claim is exhausted (Opp'n Memo. at 20).

Petitioner's next ground for habeas relief is that the sentence imposed on him pursuant to New York's PFO Statute violated his Sixth Amendment right to a jury trial, on the theory that the sentencing judge engaged in impermissible judicial factfinding in determining that petitioner was a persistent felony offender (Petition 7; Pet.App. Br. at 50–55).

In *Portalatin v. Graham, supra,* 624 F.3d at 72, decided after petitioner filed his petition, the Second Circuit, sitting *en banc,* unequivocally upheld the constitutionality of New York's PFO Statute. Thus, it is now clear that New York's PFO Statute does not violate *Apprendi. Jones v. Heath,* 10 Civ. 8644(RJS)(FM), 2012 WL 2673649 at *2 (S.D.N.Y. July 5, 2012) (Sullivan D.J.) ("[T]here is no question that *Portalatin* remains the law of this Circuit and binding on this Court."); *Garvin v. Artist,* 08 Civ. 5285(PAC)(FM), 2012 WL 1428904 at *6 (S.D.N.Y. Apr. 25, 2012) (Crotty D.J.); *Mason v. Duncan,* 02 Civ. 5729, 2011 WL 2518964 at *2 (S.D.N.Y. June 23, 2011) (Wood, D.J.).

Thus, petitioner's claim that his sentence under New York's PFO Statute violated the Sixth Amendment cannot provide a basis for relief.

3. *Excessive Sentence Claim*

Petitioner's next ground for habeas relief is that the sentence imposed on him was excessive (Petition 7; Pet.App. Br. at 56–60).

In his habeas petition and appellate brief, petitioner does not specify the Constitutional right he believes has been violated by his "excessive" sentence. Rather, Petitioner's appellate brief argues only that the sentence was excessive because petitioner has a troubled family history and has never caused anyone physical harm during the commission of any crime. Petitioner's habeas petition and appellate brief do not, however, contend that his sentence violates any right protected by federal law. Petitioner did not, therefore, properly exhaust his state court remedies with respect to any constitutional claim concerning his sentence, and his state law claim that his sentence should be reduced in the interests of justice is not cognizable. *See Stallings v. Woods,* 04 CV 4714(RLM), 2006 WL 842380 at *22 (E.D.N.Y. Mar. 27, 2006), *citing Medina v. Greene,* 03 Civ. 8646(DC), 2004 WL 2809196 at *4 (S.D.N.Y. Dec. 7, 2004) (Chin, then D.J., now Cir. J.) (petitioner "did not fairly present the excessive sentence claim in federal constitutional terms" by appealing to the Appellate Division's power under N.Y.Crim. Proc. Law § 440.15, to reduce an excessive sentence in the interest of justice); *Rivera v. Greiner,* 272 F.Supp.2d 197, 201 (E.D.N.Y.2003); *see also White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) (*per curiam* ), *citing McCleskey v. Zant,* 499 U.S. 467 (1991); *and Rose v. Lundy,* 455 U.S. 509 (1982).

***14** Although petitioner has not explicitly argued either here or in state court that his sentence violated his rights under the United States Constitution, even if I read the petition as raising an Eighth Amendment claim, as petitioner proposes in his motion to amend, there is no merit to this claim. [6] A sentence violates the Eighth Amendment when the sentence is "grossly disproportionate" to the crime committed or when the sentence imposed "shocks the collective conscience of society." *United States v. Gonzalez,* 922 F.2d 1044, 1053 (2d Cir.1991); *see Kennedy v. Louisiana,* 554 U.S. 407, 420–21 (2008); *Atkins v. Virginia,* 536 U.S. 304, 311 (2002); *see also Lockyer v. Andrade, supra,* 538 U.S. at 73–76; *Harmelin v. Michigan,* 501 U.S. 957, 1001 (1991); *United States v. Snype,* 441 F.3d 119, 152 (2d Cir.2006); *United States v. Romano,* 825 F.2d 725, 731 (2d Cir.1987); *Pressley v. Bennett,* 235 F.Supp.2d 349, 368–69 (S.D.N.Y.2003) (Berman, D.J.); *Calderon v. Keane,* 97 Civ. 2116(RCC) (JCF), 2002 WL 1205745 at *14 (S.D.N.Y. Feb. 21, 2002) (Francis, M.J .) (Report & Recommendation), *adopted,* 2003 WL 22097504 (S.D.N.Y. Sept. 9, 2003) (Duffy, D.J.); *Sutton v. Herbert,* 39 F.Supp.2d 335, 337 (S.D.N.Y.1999) (Conner, D.J.).

6 Although any federal claim concerning petitioner's sentence is unexhausted, I may, nevertheless, consider the claim on the merits to deny the claim. 28 U.S.C. § 2254(b)(2).

Petitioner was convicted of burglary in the second degree, a class C felony, which required the Trial Court to sentence him as a persistent violent felony offender to an indeterminate term of incarceration with a minimum of between sixteen and twenty-five years and a maximum of life. *See* N.Y. Penal Law §§ 140.25(2); 70.08; 70.02(1)(b); 70.45(2)(e); N.Y.Crim. Proc. Law § 400.16. Petitioner was ultimately sentenced to a term of twenty years to life (Petition 1). A sentence within the range established by state law, as the sentence here clearly was, is ordinarily not subject to an Eighth Amendment challenge. *See White v. Keane, supra,* 969 F .2d at 1383 ("No federal constitutional issue is presented where ... the sentence is within the range prescribed by state law."); *Diaz v. Herbert,* 317 F.Supp.2d 462, 479–80 (S.D.N.Y.2004) (Marrero, D.J.); *Mayo v. Burge,* 02 Civ. 10192(NRB), 2003 WL 21767767 at *6 (S.D.N.Y. July 30, 2003) (Buchwald, D.J.); *Brown v. Goord,* 02 Civ. 2122(NRB), 2002 WL 31093611 at *5 (S.D.N.Y. Sept. 13, 2002) (Buchwald, D.J.); *Espinal v. Barkely,* 95 Civ. 1214(HB), 1996 WL 673833 at *1 (S.D.N.Y. Nov. 20, 1996) (Baer, D.J.); *Rodriguez v. O'Keefe,* 96 Civ.2094(LLS), 1996 WL 428164 at *7 (S.D.N.Y. July 31, 1996) (Stanton, D.J.), *aff'd mem.,* 122 F.3d 1057 (2d Cir.1997).

As stated by the Supreme Court, a habeas court will find that a state-law sentence is "grossly disproportionate" and violates the Eighth Amendment only "in the 'exceedingly rare' and 'extreme' case ." *Lockyer v. Andrade, supra,* 538 U.S. at 73, *quoting Harmelin v. Michigan, supra,* 501 U.S. at 1001; *accord Ewing v. California,* 538 U.S. 11, 21 (2003); *United States v. Snype, supra,* 441 F.3d at 152; *Whitlatch v. Senkowski,* 344 F.Supp.2d 898, 905–07 (W.D.N.Y.2004); *Vasquez v. Walker,* 01 Civ. 8032(AKH), 2004 WL 594646 at *5 (S.D.N.Y. Mar. 25, 2004) (Hellerstein, D.J.); Ayala v. People, 03 Civ. 2762(AKH), 2004 WL 527035 at *5 (S.D.N.Y. Mar. 16, 2004) (Hellerstein, D.J.); *Williams v. Philips,* 02 Civ. 5811(DC), 2003 WL 21961127 at *8 (S .D.N.Y. Aug. 18, 2003) (Chin, then D.J., now Cir. J.). Other courts have reviewed sentences imposed pursuant to recidivist sentencing statutes for comparable or less serious offenses and have uniformly upheld such sentences as consistent with the Eighth Amendment. *Ewing v. California, supra,* 538 U.S. 11 (sentence of 25 years to life imposed on recidivist for stealing three golf clubs not cruel and unusual); *Lockyer v. Andrade, supra,* 538 U.S. 77 (sentence of 25 years to life for stealing $150 worth of videotapes not cruel and unusual); *Rummel v. Estelle,* 445 U.S. 263 (1980) (sentence of life imprisonment for third-time felon who had, over the course of nine years, committed three larcenies with loss amounts of $80.00, $28.36 and $120.75, respectively, not cruel and unusual punishment).

***15** Thus, petitioner's excessive sentence claim does not provide any basis for habeas corpus relief.

4. *Confrontation Clause Claim*

Petitioner's next ground for habeas relief is that the prosecution's failure to call two members of the NYPD Evidence Collection Team to testify regarding a possible fingerprint report violated the Confrontation Clause of the Sixth Amendment as construed by *Melendez–Diaz v. Massachusetts, supra,* 557 U.S. at 305 (Pet. Mot. to Amend at 6–7). Because this claim was never raised in state court, it is likely barred from habeas corpus review. Even assuming, however, that the claim was preserved, it is entirely without merit.

At some point during trial, communication between the prosecution and defense counsel revealed that two members of the NYPD Evidence Collection Team, Officers Stewart and Alfani, had dusted the crime scene for fingerprints after petitioner's arrest (Tr. 148–49). A memo book entry of Officer Stewart, indicating "negative results," or that no fingerprints had been lifted, was turned over to the defense during trial (Tr. 155–56). The prosecution was unable to ascertain, after a search was conducted, whether any additional documentation, such as a fingerprint report, existed (Tr. 148–73). To resolve this evidentiary lacuna, the prosecution and defense entered into a stipulation that no fingerprints had been found in Bubash's apartment. [7] Neither Officer Stewart nor Officer Alfani was called to testify by the prosecution, and no fingerprint-related materials were ever offered into evidence by the prosecution.

7 The full stipulation was read to the jury as follows:

> [PEOPLE]: Ladies and gentlemen, if a police officer from the New York City Police Department Evidence Collection Team would have testified here, that officer would say that the areas of apartment 5–C including People's No. 9, in evidence, the bag, were analyzed for fingerprint evidence and that no identifiable fingerprints were found.

(Tr. at 196).

Petitioner argues that the prosecution's failure to call Officers Stewart and Alfani prevented "the defense from exploring the fingerprint report and memo book," items that were "exculpatory and material to petitioner's guilt or innocence" (Pet. Mot. to Amend Mem. at 2). Petitioner further argues that the failure to call the officers as witnesses "prevented the defense from exploring the possibility that the analysts lacked proper training or had poor judgment or from testing their 'honest [*sic* ], proficiency, and methodology' " (Pet. Mot. to Amend Mem. at 2)

In *Melendez–Diaz,* a narcotics case, the Supreme Court held that the admission of certificates of laboratory analysis, in lieu of the live testimony of the analysts who prepared them, violated a defendant's Sixth Amendment right to be confronted with the witnesses against him. *Melendez–Diaz v. Massachusetts, supra,* 557 U.S. at 307–09. The certificates of laboratory analysis, which were sworn to before a notary public and detailed the results of tests conducted on substances recovered from the defendant, were held to be within the "core class of testimonial statements" contemplated by *Crawford v. Washington,* 541 U.S. 36 (2004). *Melendez–Diaz v. Massachusetts, supra,* 557 U.S. at 310. The Court ultimately held that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits." *Melendez–Diaz v. Massachusetts, supra,* 557 U.S. at 329.

***16** Petitioner ignores the fact that *no* fingerprint evidence—either testimonial or documentary—was offered against him. As noted above, due to the prosecution's difficulty in ascertaining whether a fingerprint report even existed, the prosecution and defense stipulated that no fingerprint evidence was recovered from the scene of the crime, a stipulation that actually favored petitioner. Thus, since no hearsay evidence concerning fingerprints was offered against petitioner, there is no Confrontation Clause issue.

Therefore, petitioner's Confrontation Clause claim cannot serve as a basis for habeas corpus relief.

5. *Rosario and Brady Claims*

Petitioner next asserts are that the prosecution violated his rights under *People v. Rosario,* [8] *supra,* 9 N.Y.2d at 290–91, 173 N.E.2d at 884, 213 N.Y.S.2d at 452, and *Brady v. Maryland, supra,* 373 U.S. at 83, by failing to turn over a report of fingerprint analysis conducted at the crime scene (Pet. Mot. to Amend at 6–7).

8 In *People v. Rosario,* the New York Court of Appeals held, as a matter of state law, that a criminal defendant is entitled to the prior statements of the prosecution's witnesses in order to determine if the testimony of such witnesses in court departs from their prior statements. The holding in *Rosario* has been codified in N.Y.Crim. Proc. Law § 240.45.

First, to the extent petitioner is asserting a *Rosario* violation he has alleged only a state law claim which is not even cognizable in a federal habeas corpus proceeding. *See Landy v. Costello,* 141 F.3d 1151, 1151 (2d Cir.1998) ("To the extent that this claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under state law."); *see also Bynum v. Duncan,* 02 Civ. 2124(RWS), 2003 WL 296563 at *9 n. 5 (S.D.N.Y. Feb. 12, 2003) (Sweet, D.J.); *Clark v. Portuondo,* 00 Civ. 2491(DAB)(RLE), 2002 WL 31553502 at *2–*3 (S.D.N.Y. Nov. 13, 2002) (Ellis, M.J.) (Report & Recommendation); *Johnson v. Filion,* 232 F.Supp.2d 98, 100 (S .D.N.Y.2002) (Berman, D.J.); *Senor v. Greiner,* 00–CV–5673JG, 2002 WL 31102612 at *12 (E.D.N.Y. Sept. 18, 2002); *Johnson v. State,* 01 Civ. 4219(GEL), 2002 WL 1974048 at *1–*2 (S.D.N.Y. Aug. 26, 2002) (Lynch, then D.J., now Cir. J.).

Petitioner's *Brady* claim must also be rejected. The standards applicable to a collateral attack on a conviction based on a putative *Brady* violation were succinctly set forth by the Honorable Lewis A. Kaplan, United States District Judge, in *Lamberti v. United*

*States,* 22 F.Supp.2d 60, 66–67 (S.D.N.Y.1998), *aff'd without published opinion* sub nom., *Badalamenti v.. United States,* 201 F.3d 430 (2d Cir.1999):

> In order to establish a *Brady v. Maryland* violation, the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material. A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." As for the materiality requirement, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome' of the case."

***17** (footnotes and citations omitted). *See also Banks v. Dretke,* 540 U.S. 668, 691 (2004); *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999); *Tankleff v. Senkowski,* 135 F.3d 235, 250–51 (2d Cir.1998); *Leake v. Senkowski,* 01 Civ. 7559(SHS)(GWG), 2004 WL 1464889 at *19 (S.D.N.Y. June 30, 2004) (Gorenstein, M.J.) (Report & Recommendation).

Here, the Trial Court conducted an extensive colloquy with counsel, in which it became apparent that it was unlikely that fingerprints were lifted from the crime scene, or that a fingerprint report even existed (Tr. 148–73). For example, the prosecutor made the following representation to the Court:

> [PEOPLE]: It's my understanding that there were no lifts taken at all and I base that conclusion on an entry in a memo book that I discovered after this issue arose yesterday. And I also base that conclusion after a phone call to the print laboratory where these prints that if they are lifted, they are compared to see if there is a match or to identify the person who left the print and they have no record of any prints being submitted.
>
> So I think we know what happened here. I think they went to the apartment, the police that is, went to the apartment and they dusted for fingerprints and they didn't lift anything.
>
> THE COURT: Okay.
>
> [PEOPLE]: And there may or may not be a report about that. So that's where we stand.

(Tr. 149–50). The prosecution went on to describe the steps that had been taken to locate a fingerprint report, and the fact that none had been located (Tr. 154–55). After hearing from counsel, the Court noted that "it appear[ed] that no report was generated" (Tr. 159) and "the absence of [petitioner's] fingerprints ... [is] not *Brady* material" (Tr. 161). It goes without saying that there is no duty under *Brady* to furnish or create exculpatory information that does not exist. *Caswell v. Racetti,* 11–CV–0153 MAT, 2012 WL 1029457 at *11 (W.D.N.Y. Mar. 26, 2012). Even if a fingerprint report did exist, however, the issue was resolved by the favorable stipulation cited above. The stipulation, which stated that "no fingerprints were found" at the scene of the crime, completely negates any claim of prejudice by the petitioner (Tr. at 196).

Thus, neither petitioner's *Rosario* claim nor his *Brady* claim afford a basis for relief.

#### 6. *Substitution of Counsel Claim*

Petitioner next claims that he is entitled to habeas corpus relief because the Trial Court refused to allow him to articulate his desire for new counsel (Pet. Mot. to Amend at 6).

The standards applicable to a substitution of counsel claim were succinctly set forth by the Honorable Michael A. Telesca, United States District Judge, in *Muhammad v. Artus,* 08–CV–0216 (MAT), 2010 WL 3092165 at *5 (W.D.N.Y. Aug. 5, 2010):

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. However, "the right to choose one's own counsel is not absolute." *United States v. Jones,* 381 F.3d 114, 119 (2d Cir.2004) (citations omitted). Rather, "[t]he Sixth Amendment guarantees a criminal

> defendant an effective advocate, not necessarily the advocate of his or her choosing." *Id.* (citation omitted). "Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel." *United States v. Schmidt,* 105 F.3d 82, 89 (2d Cir.1997).
>
> ***18** Whether or not to permit substitution of counsel is within the discretion of the trial judge and turns on the facts of the case. *See McKee v. Harris,* 649 F.2d 927, 931 (2d Cir.1981). It is not sufficient for a defendant simply to request a new lawyer. "[A] defendant seeking substitution of assigned counsel ... must afford the court with legitimate reasons for the lack of confidence." *McKee,* 649 F.2d at 932. " 'In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict.' " *Id.* at 931 (quoting *United States v. Calabro,* 467 F.2d 973, 986 (2d Cir.1972)).
>
> In evaluating whether a trial court abused its discretion in denying a defendant's motion for substitution of counsel, the Second Circuit has looked at the following factors: the timeliness of the defendant's motion; adequacy of the trial court's inquiry into the defendant's complaint about counsel; and whether the attorney/client conflict was " 'so great that it had resulted in total lack of communication preventing an adequate defense.' " *United States v.. Simeonov,* 252 F.3d 238, 241 (2d Cir.2001) (quoting *Morris v. Slappy,* 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)); *accord United States v. John Doe No. 1,* 272 F.3d 116, 122 (2d Cir.2001).

*Muhammad v. Artus, supra,* 2010 WL 3092165 at *5.

At several points during trial, petitioner expressed dissatisfaction with his trial counsel (Tr. 2, 5–10, 173–77). However, at no point did petitioner provide evidence of legitimate reasons for the substitution of counsel, such as a conflict of interest or a complete breakdown of communication. Although petitioner did have a right to proceed without incompetent counsel, there is simply no evidence to suggest that his trial counsel was incompetent; indeed, after petitioner's trial counsel read a prepared statement from petitioner to the Court alleging various misconduct, the Court commended defense counsel on his performance:

> THE COURT: I find that [defense counsel's] representation of the defendant has been performed on the highest level of competency and advocacy, been knowledgeable and zealous trial advocate [*sic* ].
>
> He's made all the arguments, motions, objections and actions that I would have anticipated were appropriate in the defense of the defendant and there is nothing in the application that was just made that is of a factual or evidentiary nature that substantiates any of the complaints, charges, or criticisms that the defendant has leveled in this matter.

(Tr. at 173–77). The Court went on to construe petitioner's written statements as a motion for a mistrial, which it denied (Tr. 176–77). There is no indication in the record that petitioner ever made a formal application to substitute his trial counsel, or that his trial counsel prevented him from doing so. Even if petitioner's written statement could be construed as a motion to substitute counsel, however, in light of the laudatory comments cited above and the absence of evidence to the contrary, its denial was not an abuse of discretion.

***19** Thus, petitioner cannot obtain habeas relief on the ground that he was denied the right to substitute his trial counsel.

B. *Petitioner's Procedurally Barred Claims*

A number of petitioner's other claims must be rejected because they are procedurally barred.

A habeas petitioner's constitutional claim can be procedurally barred if it has not been asserted in state court proceedings in accordance with state procedural requirements and the state courts rely on that violation of state procedural requirements to reject the claim. As the Court of Appeals for the Second Circuit has explained:

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

> The independent and adequate state ground doctrine first arose in the context of direct appeals to the Supreme Court from final judgments of the state courts. Under that doctrine the Supreme Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Moreover, "[t]his rule applies whether the state law ground is substantive or procedural." *Id.*
>
> * * *
>
> The doctrine also applies in the context of federal courts reviewing applications for a writ of habeas corpus .... [I]nvoking principles of comity and federalism ... federal habeas courts faced with an independent and adequate state ground of decision defer in the same manner as does the Supreme Court on direct review.
>
> *Garcia v. Lewis,* 188 F.3d 71, 76 (2d Cir.1999); *see also Beard v. Kindler,* 558 U.S. 53, ——, 130 S.Ct. 612, 614 (2009) ("A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (inner quotations omitted); *Cone v. Bell,* 556 U.S. 449, —— 129 S.Ct. 1769, 1780 (2009) (same); *Bierenbaum v. Graham,* 607 F.3d 36, 47–48 (2d Cir.2010) (same); *Cotto v. Herbert,* 331 F.3d 217, 238–39 (2d Cir.2003); *Rhagi v.. Artuz,* 309 F.3d 103, 106 (2d Cir.2002), *citing Coleman v. Thompson, supra,* 501 U.S. at 729–31 ("[I]t is settled law that an independent and adequate state law ground for a state court conviction cannot be disturbed on habeas."); *Brown v. State of New York,* 04–CV–1087 (NG)(VVP), 2006 WL 3085704 at *2 (E.D.N.Y. Oct. 30, 2006) ("When a habeas corpus petitioner defaults a federal claim in state court ... by failing to preserve the claim for state appellate review ..., the independent and adequate state ground doctrine bars federal habeas corpus review."); *Rivera v. Moscicki,* 03 Civ. 5810(SAS), 2005 WL 2347840 at *2 (S.D.N.Y. Sept. 22, 2005) (Scheindlin, D.J.) ("A federal court generally may not review a state court decision that expressly relies on a procedural default as an independent and adequate state ground for dismissal.").

***20** Dismissal of a claim on the ground that consideration of the merits is precluded by an adequate and independent state procedural ground is appropriate where the last reasoned state court decision expressly relies on a state procedural bar:

> In *Harris [v. Reed,* 489 U.S. 255 (1989) ], the Court held that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris,* 489 U.S. at 263, 109 S.Ct. 1038 (internal quotation marks omitted). We apply the *Long/Harris* presumption to the last "reasoned state judgment" .... *See Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

*Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000). *See also Galarza v. Keane, supra,* 252 F.3d at 637 ("We have repeatedly stated that in order for federal habeas review to be procedurally barred, a state court must actually have relied on a procedural bar as an independent basis for its disposition of the case, and the state court's reliance on state law must be unambiguous and clear from the face of the opinion.").

As long as the state court relies on a procedural bar as an independent basis for its decision, a claim will be procedurally barred on federal habeas review even where a state court addresses the merits of the claim in the alternative. As the Court of Appeals for the Second Circuit has noted:

> This court has held that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim ." *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990); *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding"); *Wedra v. Lefevre,* 988 F.2d 334, 338–39 (2d Cir.1993).

*Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996). *See also Robles v. Superintendent of Elmira Fac.,* 07 Civ. 596(LBS), 2007 WL 2600857 at *3 n. 3 (S.D.N.Y. Aug. 30, 2007) (Sand, D.J.); *Ashley v. Burge,* 05 Civ. 4497(JGK), 2006 WL 3327589 at *5 n. 5 (S.D.N.Y. Nov. 3, 2006) (Koeltl, D.J.).

However, even where the last reasoned decision of the state court expressly rejects a federal constitutional claim on a state procedural ground, federal habeas corpus review will not be precluded if (1) the state procedural ground is not independent and adequate, *see Jimenez v. Walker,* 458 F.3d 130, 138 (2d Cir.2006); *Monroe v. Kuhlman,* 433 F.3d 236, 241–42 (2d Cir.2006); *Cotto v. Herbert, supra,* 331 F.3d at 238–39; (2) there is cause for and prejudice from petitioner's failure to assert his claims in accordance with state procedural law, or (3) a failure to consider the claim would result in a fundamental miscarriage of justice. *Schlup v. Delo,* 513 U.S. 298, 324–27 (1995); *Coleman v. Thompson, supra,* 501 U.S. at 748–50; *Harris v. Reed,* 489 U.S. 255, 262 (1989); *Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005). To establish a fundamental miscarriage of justice, a habeas petitioner must show that a constitutional violation probably resulted in his conviction despite his actual innocence. *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Sweet v. Bennett,* 353 F.3d 135, 141 (2d Cir.2003) ( [A] "habeas petitioner may avoid [a procedural] default ... by showing ... that failure to consider the claim will result in miscarriage of justice, *i.e.,* the petitioner is actually innocent.").

***21** Here, the New York Supreme Court rejected the claims petitioner made in his motion to vacate, including his lack of probable cause claim, his "bona fide complainant affiant" claim, and his prosecutorial ethics claim, finding that petitioner "could have raised each of these claims upon appeal, as they are apparent from the face of the record," and citing New York Criminal Procedure Law Section 440.10(2)(c), [9] which precludes motions to vacate based on claims that could have been raised on direct review (Decision, dated Feb. 28, 2008, annexed as Exhibit H to Opp'n Decl., at 3–4).

9 New York Criminal Procedure Law Section 440.10(2)(c) provides that a court must deny a motion to vacate a judgment when:

> Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.

Because the Appellate Division and the Court of Appeals both subsequently denied petitioner leave to appeal without opinion, *People v. Ely,* 2008 N.Y. Slip Op. 76499(U) (1st Dep't Jun. 26, 2008); *People v. Ely, supra,* 11 N.Y.3d at 736, 894 N.E.2d at 658, 864 N.Y.S.2d at 394, the New York Supreme Court was the "last state court rendering a judgment" on this claim. *Harris v. Reed, supra,* 489 U.S. at 262; *see Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) ( "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim [are presumed to] rest upon the same ground."). Thus, the New York Supreme Court's rejection of petitioner's claims gives rise to a procedural bar to federal habeas review.

There can be no question that New York Criminal Procedure Law Section 440.10(2)(c) constitutes an adequate and independent ground for the denial of petitioner's claims. *Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008); *Aparicio v. Artuz,* 269 F.3d 78, 93; *Davis v. Mantello,* 42 F. App'x 488, 490 (2d Cir.2002); *Felton v. Muzzuca,* 98 Civ. 4567(RJS), 2012 WL 4462009 at *7 (S.D.N.Y. Sept. 27, 2012) (Sullivan, D.J.).

Petitioner could overcome this procedural bar by demonstrating either (1) cause for and prejudice from petitioner's failure to assert his claim in accordance with state procedural law or (2) that a failure to consider the claim would result in a fundamental miscarriage of justice. *Schlup v. Delo, supra,* 513 U.S. at 324–27; *Coleman v. Thompson, supra,* 501 U.S. at 748–50; *Harris v. Reed, supra,* 489 U.S. at 262; *Green v. Travis, supra,* 414 F .3d at 294. Petitioner has not, however, even attempted to meet either standard.

Accordingly, petitioner's lack of probable cause claim, his “bona fide complainant affiant” claim, and his prosecutorial ethics claim should be dismissed as procedurally barred.

C. *Petitioner's Other Non–Cognizable State Law Claims*

Petitioner's remaining claims do not provide a basis for habeas corpus relief because they allege violations of state law and do not allege a violation of any federally protected right.

It is fundamental that habeas corpus relief is available in federal court only when an individual is incarcerated in violation of a federally protected right. 28 U.S.C. § 2254(a); *Swarthout v. Cooke,* ––– U.S. ––––, ––––, 131 S.Ct 859, 861 (2011) (“The habeas statute unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.” (internal quotation marks omitted)); *Howard v.. Walker,* 406 F.3d 114, 121 (2d Cir.2005) (noting that a claim that a conviction was obtained in violation of state law is not cognizable in federal court); *see also Adams v. Greiner,* 02 Civ. 6328(GEL), 2004 WL 912085 at *2 (S.D.N.Y. Apr. 29, 2004) (Lynch, D.J .) (“Habeas corpus is not an extension of the appeals process in the state court. Rather, it is a remedy for violations of a defendant's rights under the federal constitution, and a very narrow remedy at that.”). Violations or errors of state law or procedure generally do not constitute grounds for habeas review. *Swarthout v. Cooke, supra,* 131 S.Ct at 861; *Estelle v. McGuire,* 502 U.S. 62, 68, *citing Lewis v. Jeffers,* 497 U.S. 764, 780 (1990) *and Pulley v.. Harris,* 465 U.S. 37, 41 (1984).

1. *Juror Misconduct Claim*

***22** Petitioner claims that the court erroneously failed to discharge a juror who was making faces at him, in violation of New York Criminal Procedure Law Section 270.35 (Pet. Mot. to Amend at 6). However, such a claim is purely one of state law, and is thus not cognizable on federal habeas corpus review. *Faria v. Perez,* 04–CV–2411 (RRM), 2012 WL 3800826 at *11–*12 (E.D.N.Y. Sept. 2, 2012) (allegedly sleeping juror); *Linnen v. Poole,* 766 F.Supp.2d 427, 469 (W.D.N.Y.2011) (“Habeas courts in this Circuit have routinely rejected claims that a trial court improperly delegated its duties under C.P.L. § 270.35 on the basis that such claims involve only a matter of state procedural law and do not present a federal constitutional question.”); *Williams v. LaClair,* 08 Civ. 11354(SAS)(JCF), 2010 WL 129810 at *4 (S.D.N.Y. Jan. 13, 2010) (Scheindlin, D.J.) (adopting Report & Recommendation of Francis, M.J .).

Thus, petitioner's juror misconduct claim cannot provide a basis for habeas corpus relief. [10]

10 It is also likely that petitioner's juror claim is moot, given that, during petitioner's trial, defense counsel withdrew any objection as to the alleged misbehaving juror:

> [DEFENSE]: Judge, I have had discussions with the defendant regarding the juror who he though might have made a face at him at one point.
>
> After yesterday's session, she appeared to be—we are not making any application as to her. We are satisfied with her as a sworn juror.
>
> We are not asking that she be relieved, removed. I am sorry.

(Tr. at 177–78).

2. *Improper Fines Claim*

Petitioner also claims that certain mandatory fees, totaling $210 .00, were imposed on him in violation of New York Criminal Procedure Law Section 400.30, which requires fines to be based upon the gain or benefit that the defendant derived from the crime (Petition 8). Plainly, this claim is purely one of state law, and is thus not cognizable on habeas corpus review. Additionally, “[s]ince petitioner is not ‘in custody’ because of his non-payment, or inability to pay, the mandatory assessment fee, habeas corpus relief is unavailable.” *Hendricks v. Senkowski,* 92 Civ. 320(LBS), 1993 WL 33417 (S.D.N.Y. Feb. 4, 1993) (Sand, D.J.), *citing* 28 U.S.C. § 2254(a).

Thus, petitioner's fees claim cannot serve as a basis for habeas corpus relief. [11]

11 The claim is also without merit. As the New York Supreme Court explained:

> CPL 400.30 requires the sentencing court to hold a hearing in order to determine the extent of the gain prior to imposing the fine. The mandatory surcharge and crime victim assistance fee are not fines within the meaning of CPL 400.30, however, and have nothing to do with the amount of gain that a defendant may have derived. They are, rather, fixed fees which are set by statute (see Penal Law 60.35). The statute does not require the sentencing court to hold a hearing prior to imposing the fees.

(Decision, dated Feb. 15, 2008, annexed as Exhibit I to Opp'n Decl., at 1–2).

IV. *Conclusion*

Accordingly, for all the foregoing reasons, I respectfully recommend that the petition be denied in all respects.

In addition, because petitioner has not made a substantial showing of the denial of a constitutional right, I also recommend that a certificate of appealability not be issued. 28 U.S.C. § 2253. To warrant the issuance of a certificate of appealability, "petitioner must show that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Middleton v. Attorneys Gen.,* 396 F.3d 207, 209 (2d Cir.2005) (*per curiam* ) (citation and internal quotation marks omitted); *see also Love v. McCray,* 413 F.3d 192, 195 (2d Cir.2005) (*per curiam* ). For the reasons set forth above, I conclude that there would be no difference of opinion among reasonable jurists that petitioner's federal rights were not violated.

I further recommend that certification pursuant to 28 U.S.C. § 1915(a)(3) not be issued because any appeal from this Report and Recommendation, or any Order entered thereon, would not be taken in good faith. *See Coppedqe v. United States,* 369 U.S. 438, 445 (1962).

V. *Objections*

***23** Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Ronnie Abrams, United States District Judge, 500 Pearl Street, Room 620, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Abrams. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS ***WILL*** RESULT IN A WAIVER OF OBJECTIONS AND ***WILL*** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v.Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–238 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7050432

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 544070
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lance ELY, Petitioner,
v.
John B. LEMPKE, Respondent.

No. 09 Civ. 5836(RA)(HBP).
|
Feb. 11, 2013.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

RONNIE ABRAMS, District Judge.

***1** The Court hereby adopts the thorough and well-reasoned Report and Recommendation of Magistrate Judge Pitman, dated October 18, 2012, to which no objection has been filed. Accordingly, the petition for a writ of habeas corpus is denied and the action is dismissed with prejudice. The parties' failure to file written objections, after Judge Pitman warned that such failure would result in a waiver of objections and would preclude appellate review, precludes appellate review of this decision. *See Caidor v. Onondaga County,* 517 F.3d 601 (2d Cir.2008).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 544070

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1974048
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph JOHNSON, Petitioner,
v.
STATE of New York, Respondent.

No. 01 CIV. 4219(GEL).
|
Aug. 26, 2002.

**Synopsis**
Following conviction by a jury for unlawful possession of cocaine and a firearm, prisoner sought writ of habeas corpus. The District Court, Lynch, J., held that: (1) testimony given by detective at prior civil trial in which defendant's landlord sought to evict him could not have been Brady material that prosecution should have given to defendant in connection with subsequent criminal trial; (2) detective's alleged "testimony" in support of a search warrant application, including answers that detective might have given in response to questions by the magistrate issuing the warrant, was not Brady material that prosecution should have given to defendant; and (3) prosecutorial misconduct that occurred when prosecutor mentioned photographs taken during execution of search warrant and the $563 seized from defendant, despite knowing that both items had been lost and could not be introduced into evidence and despite judge's order not to mention the photographs, was not prejudicial to defendant.

Petition denied.

West Headnotes (5)

**[1]** **Habeas Corpus** Discovery and Disclosure

Rosario claim, which refers to requirement that prosecution make available its witnesses' prior statements in their entirety to defendant for purposes of cross-examination, is one of state law that is not subject to review under a petition for a federal writ of habeas corpus.

7 Cases that cite this headnote

**[2]** **Criminal Law** Diligence on Part of Accused; Availability of Information

Testimony given by detective at prior civil trial in which defendant's landlord sought to evict defendant could not have been Brady material that prosecution should have given to defendant in connection with subsequent criminal trial, where defendant, who was present at the civil trial and personally cross-examined detective in that proceeding, was fully aware of the contents of the testimony.

**[3]** **Criminal Law** Other Particular Issues

Detective's alleged "testimony" in support of a search warrant application, including answers that detective might have given in response to questions by the magistrate issuing the warrant, was not Brady material that prosecution should have given to defendant, where the minutes of the proceeding were no longer available, and nothing even remotely suggested that detective said anything that would have been useful to the defense.

1 Case that cites this headnote

[4] **Criminal Law** Evidence Excluded

**Criminal Law** Matters Not Sustained by Evidence

Alleged prosecutorial misconduct that occurred when prosecutor mentioned photographs taken during execution of search warrant and the $563 seized from defendant, despite knowing that both items had been lost and could not be introduced into evidence and despite judge's order not to mention the photographs, was not prejudicial to defendant, where defense counsel, seeking to undermine credibility of police investigation, cross-examined detective about loss of photos, and trial court instructed jury that it could draw adverse inference against prosecution from the failure to introduce the money into evidence.

1 Case that cites this headnote

[5] **Criminal Law** Failure to Call Witness or Produce Evidence

Trial court's failure to give missing witness instruction regarding prosecution's failure to call other police officers who participated in search was not error, where the testimony made clear to jury that other witnesses were available, and defense counsel was free to argue to jury that prosecution's failure to call the witnesses undermined prosecution's case.

1 Case that cites this headnote

**Attorneys and Law Firms**

Joseph Johnson, pro se, for petitioner.

Eliot Spitzer, Attorney General of the State of New York, (Nicola N. Grey, Assistant Attorney General, of counsel), for respondent.

OPINION AND ORDER

LYNCH, District J.

***1** Joseph Johnson seeks habeas corpus, challenging his conviction by a jury for unlawful possession of cocaine and a firearm and his resulting sentence of one to three years in prison.[1] Johnson argues that he was denied a fair trial because of the withholding of prior statements of witnesses, prosecutorial misconduct, and the failure of the trial court to give a missing witness instruction. Because he has not shown any violation of his federal constitutional rights, the petition will be denied.

1 Johnson was sentenced on June 6, 1994. Although he has now completed his sentence, because he did not begin serving it until the completion of his direct appeal, he was in custody when the instant petition was filed.

I. *Facts*

The evidence of Johnson's guilt was overwhelming. Johnson was arrested in an apartment where the police, executing a search warrant, found four triple-beam scales and several crack pipes all containing cocaine residue, a jar of lactose, a 9 mm. handgun, and a plastic bag containing 1800 milligrams of cocaine. Johnson admitted to the police that he lived in the apartment, and his name was on the mail box. Police also recovered personal items and identification belonging to Johnson from the bedroom of the apartment.

II. *Procedural Issues*

The State argues that this Court should not reach the merits of any of Johnson's claims, because he did not exhaust the remedies available to him in the state courts, as required by 28 U.S.C. § 2254(b)(1)(A). More specifically, the State points out that all of Johnson's arguments on his direct appeal were made in terms of state law, and that he therefore failed to present any argument in terms of federal constitutional law.

In fact, Johnson's pro se petition raises in this Court precisely the same arguments he made through counsel on his direct appeal, and phrases them no more in specifically federal terms here than he did in the state courts. Because Johnson's claims closely resemble claims that could be made under federal law, and because the rejection of the state-law claims under identical or more liberal state law makes clear that the state courts would correctly find no merit to the analogous federal claims, it is more efficient to address Johnson's arguments on the merits than to waste the time of the state courts by requiring exhaustion. This more efficient course is explicitly permitted by 28 U.S.C. § 2254(b)(2).

III. *Johnson's Arguments*

A. *Rosario* Claims

**[1]** Johnson's first argument is that he was "prejudiced by the People's failure to provide *Rosario* materials." (Pet. at 5.) The reference is to *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), which requires the prosecution to make available its witnesses' prior statements in their entirety to a defendant for purposes of cross-examination. The Appellate Division rejected this argument, in the following terms:

> We reject defendant's claim that the [trial] court failed to properly and sufficiently address four *Rosario* claims. We agree with the court that two of the statements did not constitute *Rosario* material. In another instance, defendant received the remedy he requested and, in the final instance, he chose not to make a sufficient record and sought no sanction.

***2** *People v. Johnson,* 257 A.D.2d 439, 439, 684 N.Y.S.2d 513, 514 (1st Dep't 1999).

*Rosario* announces a principle of discovery under state law that is not required by the Constitution. Thus, it is well settled that a *Rosario* claim is "one of state law that is not subject to review under a petition for a federal writ of habeas corpus." *United States ex rel. Butler v. Schubin,* 376 F.Supp. 1241, 1247 (S.D.N.Y.1974), *aff'd,* 508 F.2d 837 (2d Cir.1975). Construing Johnson's pro se complaint liberally, it could be understood to raise a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), since Johnson alleges that he was hampered in cross-examining a witness, Detective Warren Lockley, by the unavailability of certain prior statements. But Johnson makes no showing that the prosecutor wrongfully suppressed any prior witness statements that were in the government's possession, let alone that any of the statements in question were materially exculpatory, or would have cast the slightest doubt on Lockley's testimony.

**[2]** Johnson's habeas petition refers to two prior statements made by Lockley. The first was testimony given by the detective at a civil trial in which Johnson's landlord sought to evict him. The trial court found that this was not *Rosario* material because it was never in the possession of the prosecutor and apparently no longer existed at the time of the trial. But whatever the ruling as a matter of state law, the civil trial testimony could not have been *Brady* material since Johnson, who not only was present at the civil trial but personally cross-examined Lockley in that proceeding, was fully aware of the contents of the testimony.

**[3]** The second statement referenced in the petition is Lockley's "testimony" in support of a search warrant application. The reference is not to Lockley's affidavit, which was available to the defense, but to answers he may have given in response to questions by the magistrate issuing the warrant. In rejecting an attack on the warrant, the state court found that the minutes of the proceeding were no longer available, and the trial judge further found that in his long experience on the bench, police officers rarely gave substantive testimony in such proceedings. At any rate, there is nothing in the record that remotely suggests that Lockley said anything in seeking the warrant that would have been useful to the defense, or that casts any doubt on the court's finding that the statement was not in the possession of the prosecution.[2]

2 Though Johnson refers to "an extraordinary amount of *Rosario* violations" (Pet. at 5), these are the only statements referred to specifically in the petition. On direct appeal, he raised two other *Rosario* claims. With respect to the third, the judge granted the extraordinary remedy of striking the witness's entire testimony because certain material had not been turned over. There was no showing that any of the material was impeaching or exculpatory, and as the witness's testimony was stricken, no prejudice could have resulted. The Appellate Division ruled that the fourth matter had not properly been preserved, and this independent state-law ground of decision precludes habeas review.

Accordingly, Johnson's *Rosario* claims provide no basis for finding a violation of constitutional rights.

B. Prosecutorial Misconduct

**[4]** Johnson argues that the prosecutor's "conduct throughout the trial was prejudicial" to his defense. But none of the incidents referred to in the petition or in Johnson's brief on direct appeal, taken singly or together, constitute the sort of " 'egregious misconduct ... amount[ing] to a denial of constitutional due process" ' that alone raises a federal constitutional issue. *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). *See also Blissett v.. LeFevre,* 924 F.2d 434, 440 (2d Cir.1991) (same).

***3** Specifically, Johnson objects that in his opening statement, the prosecutor mentioned photographs taken during the execution of a search warrant and money ($563) seized from the defendant, despite knowing that both items had been lost and could not be introduced into evidence, and indeed despite an order from the judge not to mention the photographs. However, the judge gave the specific curative instruction requested by the defense. Moreover, the defendant could not have been prejudiced by the mention of the photos, as the defense counsel, seeking the obvious tactical benefit of undermining the credibility of the police investigation, cross-examined Lockley about the taking and loss of the photos. The trial court also instructed the jury that it could draw an adverse inference against the prosecution from the failure to introduce the money into evidence. Particularly given the modest sum involved, it is difficult to see how the defendant could have been prejudiced.

To succeed in a habeas claim based on prosecutorial misconduct, the petitioner must demonstrate "that he suffered actual prejudice because the prosecutor's [conduct] had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v.. Scully,* 41 F.3d 818, 824 (2d Cir.1994). Johnson can come nowhere near such a showing. The evidence against him was overwhelming; the prosecutor's actions, while regrettable, were not terribly prejudicial; and the trial court took prompt and effective curative actions. There is no basis for disturbing the judgment.

C. Missing Witness Instruction

**[5]** Johnson argues that it was error for the trial court not to give a missing witness instruction regarding the prosecution's failure to call the other police officers who participated in the search. But an error with respect to jury instruction presents only a question of state law unless the error was so serious that it deprived defendant of a fair trial. *Sams v. Walker,* 18 F.3d 167, 171 (2d Cir.1994). *See also Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Appellate Division found that the failure to give the instruction was not erroneous at all. *People v. Johnson,* 257 A.D.2d at 439–40, 684 N.Y.S.2d at 514. Any claim that the failure to give the instruction at issue here "so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), would be frivolous. The

testimony made clear to the jury that other witnesses were available, and defense counsel was free to argue to the jury that the prosecution's failure to call the witnesses undermined the prosecution's case.

CONCLUSION

For the foregoing reasons, the petition for habeas corpus is denied. As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 111–13 (2d Cir.2000).

***4** SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1974048

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7053582
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Petitioner,
v.
J. COLVIN, Superintendent, Mid-State Correctional Facility, Respondent.

No. 9:13-cv-01247-JKS
|
Signed 12/05/2016

**Attorneys and Law Firms**

Bruce Flynn, Elmira, NY, pro se.

Paul B. Lyons, Thomas B. Litsky, New York State Attorney General—New York Office, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior United States District Judge

***1** Bruce Flynn, a New York state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Flynn is in the custody of the New York State Department of Corrections and Community Supervision and incarcerated at Elmira Correctional Facility. Respondent has answered the Petition, and Flynn has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On October 14, 2009, Flynn was charged with second-degree burglary, second-degree criminal use of a firearm, second-degree unlawful imprisonment, and second-degree menacing. On January 6, 2010, Flynn appeared before the Clinton County Court to plead guilty to second-degree burglary and second-degree criminal use of a firearm in full satisfaction of all outstanding charges. On direct appeal of his conviction, the New York Appellate Division described the following facts underlying the charges against Flynn and his subsequent guilty plea:

> In October 2009, in relation to an incident involving his former paramour, [Flynn] was arrested and arraigned in Town Court. At that time, [Flynn] was apparently represented by attorney Marcia Moss, who apparently had been assigned to him by Town Court. The following week, an indictment was filed and [Flynn] was charged with burglary in the second degree, criminal use of a weapon in the second degree, unlawful imprisonment in the second degree and menacing in the second degree. When [Flynn] was arraigned in County Court, he stated to the court that he did not want Moss to represent him, and he submitted an application for assigned counsel as an indigent. County Court determined that, based on his income, [Flynn] was not eligible for assigned counsel as an indigent; the court then entered a plea of not guilty on [Flynn's] behalf and directed [Flynn] to seek retained counsel. At a subsequent appearance, [Flynn] submitted a second application for assigned counsel, which was denied by the court. At [Flynn's] next appearance, after [Flynn] stated that he had been unable to secure counsel because he had been denied access to the telephone and writing materials, County Court adjourned the matter and directed that [Flynn] be provided with access to a telephone and writing materials. The court also ordered [Flynn] to undergo a psychiatric evaluation pursuant to [New York Criminal Procedure Law ("CPL") ] article 730.

> In late November 2009, County Court arranged for attorney Matthew Favro to represent [Flynn], although the record is not clear as to how that came about. [Flynn] thereafter appeared in court with Favro and confirmed that he had accepted Favro as his attorney. The following month, after reviewing the report of the CPL article 730 examination, County Court found [Flynn] fit to stand trial and Favro thereafter filed various motions and notices on [Flynn's] behalf, including a notice of an affirmative defense of mental disease and defect. Ultimately, on January 6, 2010, [Flynn]—still represented by Favro—pleaded guilty to burglary in the second degree and criminal use of a weapon in the second degree in full satisfaction of the indictment and waived his right to appeal. On [Flynn's] behalf, during the plea hearing, Favro withdrew the notice of an affirmative defense of mental disease and defect.
>
> ***2** Throughout January 2010, [Flynn] sent various pro se requests to County Court, including a request to withdraw his plea and a request to have Favro removed as his counsel, although [Flynn] subsequently withdrew those motions. At a subsequent appearance, however, [Flynn], Favro and attorney Edward Narrow executed a consent to change attorneys so that Narrow could represent defendant. Narrow then requested an adjournment of the sentencing and filed a motion to withdraw [Flynn's] plea. County Court denied the motion and thereafter sentenced [Flynn] in accordance with the plea agreement to concurrent prison terms of 10 years, with 2½ years of postrelease supervision, for each of his convictions.

*People v. Flynn*, 939 N.Y.S.2d 16, 167-68 (N.Y. App. Div. 2012).

Through counsel, Flynn appealed his conviction, arguing that the trial court should have granted his motion to withdraw his plea. According to Flynn, Moss's representation of him was not properly terminated until he personally retained Narrow. He therefore alleged that everything that occurred between his arraignment in county court in October 2009 and his retention of Narrow in February 2010—including the entry of his guilty plea—was done in violation of his right to counsel because Moss was not present. Flynn contended that Favro's representation of him did not cure his deprivation of counsel because it was "not achieved through any recognized practice" and, in any event, Favro's representation was ineffective. Flynn also filed a *pro se* supplemental brief arguing that he was denied his right to counsel at arraignment. The Appellate Division unanimously affirmed the judgment against Flynn in its entirety in a reasoned opinion issued on February 23, 2012. *Flynn*, 939 N.Y.S.2d at 169. Flynn filed a counseled application for leave to appeal, which was summarily denied on August 9, 2012. *People v. Flynn*, 975 N.E.2d 918, 918 (N.Y. 2012).

Proceeding *pro se*, Flynn moved to vacate the judgment under CPL § 440.10. In that motion, Flynn argued that: 1) Moss was ineffective because she failed to arrange for Flynn to testify before the grand jury; 2) Favro did not provide competent advice regarding the State's plea offer or make a record of Moss's alleged deficiencies; 3) Flynn was denied his right to testify in the grand jury; 4) Flynn was denied his right to obtain private counsel; 5) the prosecution altered a cassette recording made by Flynn when they transferred that recording to CD; 6) his guilty plea was not voluntary, knowing, or intelligent; and 7) the prosecution committed a *Brady*[1] violation. The county court denied the motion on both procedural grounds and on the merits in a reasoned, unpublished opinion issued on April 11, 2011. Flynn sought leave to appeal. The Appellate Division granted the leave application and appointed counsel to represent Flynn on appeal. By letter dated August 29, 2011, Flynn advised that court that he wished to withdraw that appeal. The Appellate Division granted Flynn's request to withdraw and discontinue that appeal.

1 *Brady v. Maryland*, 373 U.S. 83 (1963). The term "*Brady*" is a shorthand reference to the rules of mandatory discovery in criminal cases under federal law.

Flynn then filed a second *pro se* CPL § 440.10 motion, in which he contended that: 1) the search of his home was invalid; 2) the county court "failed" him by appointing Favro and allowing him to withdraw Flynn's affirmative defense of mental disease or defect and not holding a hearing on his motion to withdraw his plea; 3) the prosecution withheld *Brady* material; and 4) Favro was ineffective for a variety of reasons. The county court denied the motion on both procedural grounds and on the merits. Flynn sought leave to appeal and to expand the record. The Appellate Division denied the requests without comment on April 25, 2013.

***3** Again proceeding *pro se*, Flynn filed a motion for a writ of error coram nobis in the Appellate Division on the ground that he had received the ineffective assistance of appellate counsel. According to Flynn, appellate counsel Alexander Lesyk was ineffective because he did not raise claims that: 1) the police violated Flynn's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), by questioning him after he invoked his right to counsel; 2) the police perpetrated fraud because they did not list a cassette tape on the consent form; 3) the police coerced him to sign the consent-to-search form by depriving him of his medication for diabetes; and 4) counsel Favro was ineffective because he: a) advised Flynn that the cassette tape constituted damaging evidence that could be used against him at trial, b) did not move to suppress the tape, and c) did not consult with independent mental health professionals about Flynn's fitness to stand trial. The Appellate Division summarily denied the motion by order dated August 10, 2012. Flynn sought reargument, alleging that certain inmate law clerks who had helped draft his motion were extorting him and retaliating against him by filing defective papers. The Appellate Division denied reargument on June 27, 2013. Flynn then filed a motion to renew and reargue, which was also denied without comment on July 17, 2013. Flynn also filed a separate "motion for voiding writ of error coram nobis," which the Appellate Division likewise denied on August 21, 2013. Flynn sought leave to appeal the denial of his coram nobis motion, which the Court of Appeals denied on November 19, 2012. *People v. Flynn*, 981 N.E.2d 289, 289 (N.Y. 2012).

Flynn timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on July 31, 2013. 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Flynn raises a number of grounds for relief. For ease in referring to Flynn's claims, the Court will follow the liberal construction and renumbering of claims used in Respondent's answer; namely, Flynn argues that: 1) he was denied his right to testify before the grand jury; 2) he was denied his right to counsel at his arraignment; 3) he was denied due process when counsel Moss conducted his preliminary hearing in his absence; 4) he was denied his right to counsel when the police questioned him after his arrest; 5) his guilty plea was unlawfully induced; 6) counsel Favro was ineffective for a number of reasons; 7) the prosecution failed to turn over exculpatory information and withheld *Rosario*[2] material; 8) the court denied him poor person status to prevent him from hiring an investigator and obtaining an independent mental health examination; 9) he involuntarily signed a consent-to-search form; 10) his waiver of the right to appeal was unknowing and involuntary because counsel did not explain the consequences of that waiver; 11) his right to counsel was violated because, after Favro was assigned to represent him, he had to appear in court without Favro for purposes of determining whether he qualified for the appointment of counsel; 12) he was denied his right to counsel because Moss represented him when the court assigned Favro to represent him; 13) he was denied due process because counsel did not ask for, and the trial court did not order, a competency hearing before he pled guilty; and 14) the trial court abused its discretion when it denied without conducting a hearing Flynn's motion to withdraw his guilty plea.

2 *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961). The term "*Rosario*" is a shorthand reference to the rules of mandatory discovery in criminal cases under New York law.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

***4** In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### A. Exhaustion

Respondent correctly contends that Flynn has failed to exhaust a number of his claims. This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). Exhaustion of state remedies requires the petition to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365-66. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used. *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005). To be deemed exhausted, a claim must also have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). Further, "when a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation omitted); *see also Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 2001).

Flynn did not present the following claims to the Court of Appeals: 1) the county court denied him poor person status to prevent him from hiring an investigator and obtaining an independent mental health examination; 2) his waiver of the right to appeal was unknowing and involuntary because counsel did not explain the consequences of that waiver; 3) he was denied due process because counsel did not ask for, and the trial court did not order, a competency hearing before he pled guilty; 4) his right to counsel was violated because, after Favro was assigned to represent him, he had to appear in court without Favro for purposes of determining whether he qualified for the appointment of counsel; 5) he was denied due process when counsel Moss conducted

his preliminary hearing in his absence; 6) he was denied his right to testify before the grand jury; and 7) counsel Favro was ineffective for failing to challenge the sufficiency of the evidence. Likewise, although he claimed on direct appeal that the county court abused its discretion when it denied his motion to withdraw his guilty plea and without holding a hearing and that he was denied his right to counsel because Moss represented him when the court assigned Favro, he raised these claims with reference only to state law and did not raise them in federal constitutional terms.

***5** Accordingly, these claims are unexhausted. Further, his unexhausted claims are procedurally barred. *See Grey*, 933 F.2d at 120-21. Because Flynn may not now return to state court to exhaust these claims, the claims may be deemed exhausted but procedurally defaulted from habeas review.[3] *See Ramirez v. Att'y Gen.*, 280 F.3d 87, 94 (2d Cir. 2001).

3 This Court has the discretion, but is not obligated, to stay these proceedings and hold the unexhausted claims in abeyance pending exhaustion in the state courts. *Day v. McDonough*, 547 U.S. 198, 209 (2006); *Rhines v. Weber*, 544 U.S. 269, 275-76 (2005). Even if Flynn could establish the requisite good cause for failing to exhaust his claims, which does not appear from his filings, *Rhines* would still require that the Court deny his stay request because, as discussed *infra*, the claims are "plainly meritless." *Rhines*, 544 U.S. at 277. Likewise, a stay would be futile because, as discussed *supra*, a New York court would deny the claims as procedurally defaulted.

B. Merits

1. *Tollett* Bar

It is well settled that a guilty plea represents a "break in the chain of events which has preceded it in the criminal process," and a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). " 'He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.' " *United States v. Coffin*, 76 F.3d 494, 497 (2d Cir. 1996) (quoting *Tollett*, 411 U.S. at 267); *see United States v. Garcia*, 339 F.3d 116, 117 (2d Cir. 2003) ("It is well settled that a defendant who knowingly and voluntarily enters a guilty plea waives all non jurisdictional defects in the prior proceedings."). The *Tollett* bar also applies to "ineffective assistance claims relating to events prior to the guilty plea." *United States v. Coffin*, 76 F.3d 494, 498 (2d Cir. 1996); *see also People v. Thomas*, 768 N.Y.S.2d 519, 520 (N.Y. App. Div. 2003) (holding that a claim of ineffective assistance of counsel, based on counsel's failure to challenge the indictment, was waived as the alleged failures did not undermine the voluntariness of defendant's guilty plea).

By voluntarily pleading guilty, Flynn forfeited his right to bring claims premised on errors that the trial court made or actions that his counsel should have taken prior to the plea process. The *Tollett* bar thus forecloses the majority of claims raised in Flynn's Petition, including the following claims: 1) he was denied his right to testify before the grand jury; 2) he was denied his right to counsel at his arraignment; 3) he was denied due process when counsel Moss conducted his preliminary hearing in his absence; 4) he was denied his right to counsel when the police questioned him after his arrest; 6) counsel Favro was ineffective for a number of reasons; 8) the court denied him poor person status to prevent him from hiring an investigator and obtaining an independent mental health examination; 9) he involuntarily signed a consent-to-search form; 11) his right to counsel was violated because, after Favro was assigned to represent him, he had to appear in court without Favro for purposes of determining whether he qualified for the appointment of counsel; and 12) he was denied his right to counsel because Moss represented him when the court assigned Favro to represent him.

***6** Some district courts within this Circuit have opined that an individual's right to receive *Brady* material cannot be waived, however, notwithstanding the existence of a valid guilty plea. *See United States v. Sapia*, No. 02 CIV 649, 2002 WL 620483, at *9 n. 4 (S.D.N.Y. Apr. 18, 2002) (citation omitted), *remanded on other grounds Sapia v. United States*, 108 Fed.Appx. 661 (2d Cir. Aug. 4, 2004); *see also Brown v. Berbary*, No. 01-CV-6500, 2004 WL 1570258, at *4-5 (W.D.N.Y. June 16, 2004); *Fambo v. Smith*, 433 F.Supp. 590 (W.D.N.Y.) (passim), aff'd, 565 F.2d 233 (2d Cir. 1977). These courts have concluded that, where a *Brady* claim may be construed as an attack on the voluntariness of a defendant's plea, it survives the entry of his guilty plea.

*See Tollett*, 411 US. at 267. The Court will therefore also consider the merit of Ground 7, which alleges that a *Brady* violation affected the voluntariness of his plea.

2. Remaining Claims

The following claims fall outside the *Tollett* bar and will be addressed in turn: 5) his guilty plea was unlawfully induced; 7) the prosecution failed to turn over exculpatory information and withheld *Rosario* material; 10) his waiver of the right to appeal was unknowing and involuntary because counsel did not explain the consequences of that waiver; 13) he was denied due process because counsel did not ask for, and the trial court did not order, a competency hearing before he pled guilty; and 14) the trial court abused its discretion when it denied without conducting a hearing Flynn's motion to withdraw his guilty plea.

a. *Involuntary plea*

Flynn argues that his guilty plea was unlawfully induced, unknowing, and involuntary. When a guilty plea is not "voluntary and knowing, it has been obtained in violation of due process and is therefore void." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (citing *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). Because a guilty plea is a waiver of certain constitutional rights, it must be a voluntary, knowing, and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Id.* at 749.

Flynn alleges that he was lied to about the length and content of the tape recording of the incident and was not given a police incident report. But Flynn provides nothing more than his unsupported assertions in support of this claim. It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief. *See, e.g.*, *Skeete v. New York*, No. 1:03-CV-2903, 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17, 2003) ("[V]ague, conclusory and unsupported claims do not advance a viable claim for habeas corpus relief.").

Moreover, the Appellate Division reasonably concluded that Flynn's plea was voluntarily, intelligently, and knowingly made. The appellate court stated:

> Here, [Flynn] made no statements inconsistent with guilt, indicated that he understood that he was forfeiting various rights by pleading guilty and, through his attorney, acknowledged that he was waiving any potential affirmative defenses that may have been available to him. Although [Flynn] indicated that he was taking medication for his mental health disorder, he specifically stated that the medication did not affect his ability to understand the proceedings. In short, there is nothing on this record to indicate that [Flynn's] guilty plea was anything but knowingly, voluntarily and intelligently entered.

***7** *Flynn*, 939 N.Y.S.2d at 169 (citations and footnote omitted).

That conclusion is fully supported by the record, and precludes any relief on that claim here.

b. *Unknowing waiver of right to appeal*

Flynn next contends that his waiver of his right to appeal was invalid because his attorney did not inform him of the consequences of signing the waiver of appeal. The waiver form, however, indicates that he "discussed [the waiver of appeal] with [his] attorney,

and [was] advised of all [his] legal rights in this matter." In any event, Flynn appealed from his conviction, and the Appellate Division did not deem his appeal waived. *See Flynn*, 939 N.Y.S.2d at 166.

c. *Brady violation*

Flynn also alleges that the prosecution withheld evidence in violation of *Brady*. "To establish a *Brady* violation, a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose." *Mack v. Conway*, 476 Fed.Appx. 873, 876 (2d Cir. 2012) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

In support of his claim, Flynn identifies only a cassette tape recording that he made of the incident and which the police seized from his home. Contrary to Flynn's assertions, the record does not indicate that the prosecution withheld the tape. Indeed, in his second CPL § 440.10 motion, Flynn stated that his attorney had played a portion of that recording to him.

d. *Failure to hold competency hearing before accepting plea*

Flynn additionally contends that the trial court should have conducted a full competency hearing prior to accepting his guilty plea. "A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently.' " *Godinez v. Moran*, 509 U.S. 389, 398 (1993). The standard for determining competency to stand trial and competency to plead guilty are the same. *Id.* at 399. The determination turns on whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Id.* at 396 (citation omitted).

The Due Process Clause does not require a competency hearing in every case; a hearing is required only if the court has "reasonable cause" to believe that the defendant has a mental defect rendering him incompetent. *United States v. Nichols*, 56 F.3d 403, 414 (2d Cir. 1995); *see Pate v. Robinson*, 383 U.S. 375-76 (1966) (holding that the failure of a trial court to hold a competency hearing *sue sponte* may violate due process if there is sufficient evidence to cast doubt upon a defendant's competency). There are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Silverstein v. Henderson*, 706 F.2d 361, 369 (2d Cir. 1983) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)). "Reviewing courts should consider the indicia of incompetence that were before the trial judge, which may include a defendant's history of erratic or irrational behavior, bizarre courtroom conduct, defense counsel's expression of doubt about the client's competence, or medical reports." *Smith v. Rock*, 554 F. Supp. 2d 505, 519 (S.D.N.Y. 2008) (citations omitted).

***8** Here, two certified medical examiners interviewed Flynn and submitted examination reports pursuant to New York CPL Article 730 which indicated that Flynn did not as a result of mental disease or defect lack capacity to understand the proceedings against him or assist in his defense. Prior to accepting his plea, the court confirmed that, although Flynn was taking psychiatric medicine, it did not affect his ability to understand his defense counsel, the proceedings, and the nature of the plea agreement. Solemn declarations in open court carry a strong presumption of verity, and "[t]he subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). He also gave coherent and clear responses to the court's questioning during the plea allocution. Flynn did not exhibit any bizarre or irrational behavior which might have alerted the court to the possibility that he could not understand the proceedings or rationally aid in his own defense. Here, there are no indications, other than Flynn's own assertions after the fact, that he could not understand the proceedings or assist in his own defense. This claim therefore provides no basis for relief.

e. *Denial of motion to withdraw plea without conducting a hearing*

Finally, Flynn claims that the trial court erred in denying his motion to withdraw his plea without conducting a hearing. As discussed above, however, this Court rejects his claim that his plea was not voluntary, knowing, and intelligent, and relies upon the same reasoning in rejecting his claim with regard to his motion to withdraw his guilty plea. Furthermore, both federal and state precedent have established that a criminal defendant is not entitled as a matter of right to an evidentiary hearing on a motion to withdraw a guilty plea. *See Hines v. Miller*, 318 F.3d 157, 162 (2d Cir. 2003) (collecting cases); *see also Reed v. Brown*, No. 10 Civ. 3072, 2011 WL 498363, at *8-9 (S.D.N.Y. Feb. 14, 2011) (collecting cases). The Second Circuit determined in *Hines* that the failure to hold an evidentiary hearing on a motion to withdraw a guilty plea “does not offend a deeply rooted or ‘fundamental’ principle of justice.” *Hines*, 318 F.3d at 162; *see also Medina v. California*, 505 U.S. 437, 442-46 (1992) (“[W]e should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.”) (citations and internal quotation marks omitted).

Under AEDPA's deferential standards and the Supreme Court's decision in *Medina*, the Appellate Division's determination on direct appeal that the county court did not abuse its discretion in denying Flynn's motion to withdraw his guilty plea without holding a hearing was not an unreasonable application of clearly established federal law. Therefore, Flynn is not entitled to relief on this claim.

C. Evidentiary Hearing

Flynn further requests in his Traverse an evidentiary hearing on all of his claims. The Supreme Court made clear in *Pinholster* that “review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.” *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996). “Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.” *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (quoted with approval in *Pinholster*, 131 S. Ct. at 1401); *see Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (noting that the basic structure of federal habeas jurisdiction is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) (“[T]he state trial on the merits [should be] the ‘main event,’ so to speak, rather than a ‘tryout on the road’ for what will later be the determinative federal habeas hearing.”) “If the state-court decision ‘identifies the correct governing legal principle’ in existence at the time, a federal court must assess whether the decision ‘unreasonably applies that principle to the facts of the prisoner's case.’ ” *Pinholster*, 131 S. Ct. at 1399 (quoting *Williams*, 529 U.S. at 413). As the Supreme Court noted, “[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.” *Id.* Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary hearing is cabined by § 2254(e)(2), *id.* at 1400-01, which provides:

> ***9** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Flynn's request in this case does not meet that standard. Nor, based upon the record before this Court, can it be said that the state courts precluded him from developing the factual basis for his claim. *See Pinholster*, 131 S. Ct. at 1417 n.5 (Sotomayer, J., dissenting) (assuming that the majority did not intend to preclude an evidentiary hearing when the petitioner's ability to develop the facts was the fault of the state court itself). Moreover, AEDPA requires that, in addition to showing diligence in state court, a petitioner must allege a colorable claim for relief in order to obtain an evidentiary hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 474-45 (2007). As discussed above, Flynn has failed to assert a colorable claim for relief as to any of his claims. Accordingly, this Court also must deny Flynn's request for an evidentiary hearing.

## V. CONCLUSION

Flynn is not entitled to relief on any ground raised in his Petition and is not entitled to an evidentiary hearing.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7053582

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 9434482
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dewitt GIBSON, Petitioner,
v.
Dale ARTUS, Superintendent, Respondent.

No. 9:04–CV–820 (LEK).
|
March 21, 2008.

**Attorneys and Law Firms**

Dewitt Gibson, Moravia, NY, for the Petitioner.

Hon. Andrew M. Cuomo, Jennifer L. Johnson, Esquire, Ass't Attorney General, of Counsel, New York, NY, for the Respondent.

***MEMORANDUM–DECISION AND ORDER***

LAWRENCE E. KAHN, Senior District Judge.

**I. *Background***

**A. State Court Proceedings**

***1** According to the testimony adduced at trial, on December 16, 1999, C.O.[1] left her home around 8:00 a.m. for school. *See* Transcript of Trial of Dewitt Gibson, ("Trial Tr.") at R516.[2] C.O. was thirteen years old. *Id.* at R515. She saw Gibson, an acquaintance, and decided to walk with him. *Id.* at R517–20, R547–48. Gibson was thirty-six years old. *Id.* at R719.

1 Because the victim is a minor child, the Court will refer to her by her initials or as "the victim." N.Y. CIV. RIGHTS § 50(b).

2 The page numbers are those written on the bottom right hand corner of each page that begin with "R."

C.O. accompanied Gibson to the state lottery building in the City of Schenectady, Schenectady County. Trial Tr. at R520–21, R552–53. Gibson pulled C.O. into one of the stalls in the seventh floor men's room. *Id.* at R555–57, R605–06. Although C.O. told Gibson she did not want to go into the stall, he repeatedly told her it was "alright." *Id.* at R526–27. Gibson pulled C.O.'s pants down, and then pulled his own pants down and sat on the toilet. *Id.* at R526–27, R558–60, R605–07. C.O. tried to pull her pants back up, but Gibson told her, "Nope. It's all right." *Id.* at R527. Gibson turned C.O. around so that she faced the stall door and pulled her down on top of him. *Id.* at R 561–62. C.O. testified that Gibson then vaginally raped and anally sodomized her. *Id.* at R. 529–31, R562–65. As C.O. ran from the bathroom stall, Gibson told her not to tell anyone what had happened. *Id.* at R. 530–32.

C.O. went home and slept for approximately two hours. Trial Tr. at R 533–35. She did not shower or change her clothing. *Id.* at R573. When she woke, she told her sister what had happened, and her sister called the police. *Id.* at R 533, R572–75. C.O.'s mother confronted Gibson. *Id.* at R627–29. Gibson told her that he had sexual relations with one of her daughters, but did not specify which one. He also told her that there would be no evidence because he "pulled out before anything could have occurred." *Id.* at R628–29.

C.O. was taken to the hospital and examined by Carol Braungart, a clinical nurse specialist, who collected evidence for the sexual assault kit which was later submitted for laboratory analysis. Trial Tr. at R651–67, R814–19. Although the victim showed no signs of physical trauma during the examination, Braungart testified that a pelvic examination revealed “cervical motion tenderness,” indicating vaginal penetration. She also noted rectal tenderness. *Id.* at R660–62, R668–73.

That same day, Gibson appeared at the police station and gave a handwritten account of what transpired between he and C.O. Trial Tr. at R713–53. Gibson admitted that he walked with C.O. to the lottery building where he used the seventh floor men's room, but he denied any involvement in the sexual assault. *Id.*

Julie Mayo, a forensic scientist, found sperm in the victim's vaginal and anal smears. Trial Tr. at R919–21. John Brenner, another forensic scientist, quantified the DNA extracted from cuttings obtained from the vaginal and anal swabs, and from the controlled blood samples taken from C.O. and Gibson. *Id.* at R877–95. He generated profiles for each cutting, except from the vaginal swab, which did not contain enough DNA derived from the sperm to obtain a profile. *Id.* at R891. The DNA profile from the anal swab contained a mixture of non-sperm cells contributed by C.O. and sperm cells consistent with Gibson's DNA. *Id.* at R895–96. Stephen Swinton, Supervisor of DNA Services at the State Police Forensic Investigation Center, performed a statistical analysis of the mixed DNA profile and concluded that it was “93 trillion 830 billion times more likely” to be the result of contributions from C.O. and Gibson than from C.O. and a randomly selected male. *Id.* at R944–46.

***2** An indictment was returned charging Petitioner with Rape in the First Degree (N.Y. PENAL LAW § 130.35, Rape in the Second Degree (N.Y. PENAL LAW § 130.30), Sodomy in the First Degree (N.Y. PENAL LAW § 130.50), Sodomy in the Second Degree (N.Y. PENAL LAW § 130.45), and Endangering the Welfare of a Child (N.Y. PENAL LAW § 260.10) (two counts). [3] Petitioner was represented at trial by Assistant Public Defender Michael T. Horan, who conducted pretrial discovery and filed various motions on Gibson's behalf, including motions to suppress identification testimony and his December 16, 1999 statement to law enforcement agents. On February 26, 2001, the People made a pre-trial offer that required Gibson to enter a guilty plea to Attempted Rape in the First Degree, a class C-violent felony offense, in exchange for a sentence of sixteen years to life in prison. *See* Transcript of Pretrial Conference (“Pretrial Conf.”), 2/26/01, at R136–37. Gibson waived the *Wade* [4] / *Huntley* [5] hearings scheduled for that day in exchange for the prosecutor's promise to keep the plea offer open pending further negotiations. *Id.* at R137–39. Gibson ultimately rejected the offer.

3 Unless otherwise indicated, all references to the New York Penal Law are to McKinney 1998.

4 *United States v. Wade,* 388 U.S. 218 (1967). The purpose of a *Wade* hearing is to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive. *See Blas v. Herbert,* No. 02 Civ. 6257, 2003 WL 22480093, at *3 n. 2 (S.D.N.Y. Oct. 21, 2003).

5 *People v. Huntley,* 15 N.Y.2d 72 (1965). A *Huntley* hearing is conducted to determine whether a defendant's statements to the police must be suppressed on the grounds that he was subjected to custodial interrogation without the warnings required under *Miranda v. Arizona,* 384 U.S. 436 (1966). *See Harris v. New York,* 202 F.Supp.2d. 3, 4 & n. 3 (S.D.N.Y.2001); *see also* New York's Criminal Procedure Law (“CPL”) § 710.

Gibson was tried before a jury on the charges in Schenectady County Court with County Court Judge Richard C. Giardino presiding. The jury began its deliberations on April 16, 2001. Trial Tr. at R1082–116. During the course of those deliberations, Judge Giardino responded to several requests of the jury, including a request that the court re-instruct the jury members as to the elements of the charges brought against Gibson and the definition of the term “force.” *Id.* at R1090–1116, 1120–31. The jury returned a unanimous verdict in which it acquitted Gibson of first degree rape and sodomy and found him guilty of the remaining charges. *Id.* at R1139–45.

On June 27, 2001, Gibson appeared before Judge Giardino for a preliminary discussion regarding the prosecutor's motion to sentence him as a persistent felony offender under New York's Penal Law § 70.10. *Id.* at R1148–88. On July 16 and 17, 2001, a formal persistent felony offender hearing was held pursuant to New York's Criminal Procedure Law ("CPL") § 400.20. The prosecutor presented testimony that, prior to the incident from which his convictions stemmed, Gibson had sexual relations with the victim's fourteen-year-old sister. Sentencing Tr. at R1202–1211. The remainder of the prosecutor's evidence consisted of family court records showing Gibson was adjudicated a youthful offender, certificates of conviction for various felony and misdemeanor charges, documents relating to the revocation of Gibson's parole in past cases, and documents showing various disciplinary infractions during prior incarcerations. *Id.* at R1210–57. Defense counsel produced witnesses who testified that Gibson had a substance abuse problem but had taken steps to overcome it. *Id.* at R 1259–1304. Gibson also testified on his own behalf. *Id.* at R1190–1350.

***3** At the close of the hearing, the sentencing court found that the prosecutor proved that Gibson had been convicted of three prior felonies, consisting of a 1982 third degree burglary, a 1984 second degree assault, and a 1988 second degree burglary. Sentencing Tr. at R1345–46. Having found that the prior convictions existed, the court then made findings regarding whether Gibson's history and character warranted an enhanced sentence. The court noted that Gibson's parole had been revoked at least four times and that, based upon his convictions, he spent significant time in prison and county jails. *Id.* at R1347. It discounted evidence of family court matters in which Gibson was adjudicated a youthful offender, finding that these incidents were not relevant. *Id.* at R1219, 1346–47. It also discounted any incidents of problems occurring during prior periods of incarceration. *Id.* at 1349. The court noted that the People had proven Gibson's guilt of the charges before the court to a jury beyond a reasonable doubt. *Id.* at R1346. "[I]n mitigation," the court considered that Gibson had a substance abuse problem—a fact not in dispute—and stated that it was not "the primary factor" in determining Gibson's character and history. *Id.* at R1328, 1347–48. Although the prosecutor offered testimony of Gibson's sexual relationship with the victim's sister, the court made no findings regarding that testimony, and it was not a factor cited by the court in its reasoning for imposing an enhanced sentence. Instead, the court's primary focus was whether Gibson's history suggested that he would present a danger to the community in the future. *Id.* at R1330–32.

After weighing the evidence presented at the hearing, Judge Giardino determined that Gibson was a persistent felony offender and that his "history and character" and the "nature and circumstances of [Gibson's] criminal conduct indicate that extended incarceration and lifetime supervision will best serve the interests of the public." *Id.* at R1349. He sentenced Gibson to a term of fifteen years to life on each of his convictions for second degree rape and sodomy and ordered that the sentences run concurrently. *Id.* at 1351–52. He also sentenced Gibson to one-year terms on each count of endangering the welfare of a child, and those sentences merged with the sentences on the felony convictions. *Id* .

Gibson filed a motion to vacate his conviction pursuant to CPL § 440.10 on August 10, 2001. Dkt. No. 15, Ex. A. In the motion, Gibson argued that the prosecutor committed misconduct when she permitted the victim to falsely testify at grand jury that Gibson threatened her. The District Attorney opposed that motion, and on December 16, 2001, Schenectady County Court Judge Guy P. Tomlinson denied it. Dkt. No. 15, Exs. B, C. On September 10, 2002, the New York Supreme Court, Appellate Division, Third Department, granted Gibson's application for leave to appeal the denial of his motion. Dkt. No. 15, Ex. E.

***4** Gibson also appealed his conviction to the Third Department, arguing that: (1) the verdict was against the weight of the evidence; (2) the trial court committed reversible error when it failed to charge the jury on sexual abuse in the second degree as a lesser included offense; (3) Gibson was denied the right to confront witnesses against him when the trial court prohibited him from questioning the victim about an unrelated false rape accusation; (4) the prosecutor committed misconduct when she permitted the victim to falsely testify at grand jury that Gibson threatened her when the prosecutor knew the victim told a nurse he had not done so; (5) trial counsel was ineffective; and (6) the sentence was harsh and excessive. Dkt. No. 16, Ex. G. Gibson filed a supplemental *pro se* supplemental brief in which he claimed that his sentence violated the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466 (2000). Dkt. No. 17, Ex. I. The District Attorney opposed that appeal, and on December 11, 2003, the Appellate Division denied Gibson's appeal. *See People v. Gibson,* 2 AD3d 969 (N.Y.App.Div., 3d

Dept.2003).[6] On February 25, 2004, New York's Court of Appeals denied his application for leave to appeal to that court. *See* Dkt. No. 17, Ex. K, L; Dkt. No. 18, Ex. M; *People v. Gibson,* 1 N.Y.3d 627 (2004).

6 The Appellate Division found that since Gibson failed to address the issues raised in his CPL § 440.10 motion in his appeal, the appeal of the denial of that motion was "deemed abandoned." *Gibson,* 2 A.D.3d at 970 n. 1.

Ginson filed a state writ of error *coram nobis* in which he challenged the effectiveness of appellate counsel for failing to argue on appeal that the prosecutor knowingly relied upon perjured testimony by the victim in the grand jury and for failing to challenge his sentence under *Apprendi.* Dkt. No. 60, Ex. JJ. The writ was denied on April 13, 2006, and the New York Court of Appeals denied leave on June 28, 2006. *Id.*

On October 23, 2006, Gibson filed a second CPL § 440.10 motion in Schenectady County Court in which he claimed trial counsel was ineffective for (1) failing to inform him of the pending grand jury proceeding and failing to assist him in exercising his right to testify; (2) failing to file a speedy trial motion; (3) failing to move to dismiss the indictment because the prosecutor relied upon false testimony by the victim; (4) failing to object to defects in the indictment; (5) failing to preserve a challenge to his sentence under *Apprendi;* and (6) failing to move to dismiss the indictment because Gibson was denied a preliminary hearing. Dkt. No. 60, Ex. Z. County Court Judge Karen A. Drago denied the motion on May 15, 2007, and leave to appeal was denied on September 6, 2007. Dkt. No. 60, Exs. EE–HH.

**B. Proceedings in This Court**

Petitioner filed a petition for a writ of *habeas corpus* on July 14, 2004. *See* Dkt. No. 1. By Order filed August 18, 2004, this Court granted Gibson's application to proceed *in forma pauperis* and ordered the Respondent to file his response to the Petition. Dkt. No. 5. On February 24, 2005, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed a response and memorandum of law in opposition to the petition, along with the relevant state court records. *See* Dkt. Nos. 14–22. On April 12, 2005, Gibson filed a Traverse. Dkt. No. 25. Respondent filed a supplemental memorandum of law in opposition to the petition on June 21, 2005, and Gibson responded in a Supplemental Traverse filed August 2, 2005. Dkt. Nos. 26–27.

***5** On October 18, 2006, Gibson filed a motion to amend his petition to include additional ineffective assistance of counsel claims. Petitioner advised the Court that he had filed a motion to vacate his conviction pursuant to CPL § 400.10 in state court to address his "claims of trial counsel's ineffective assistance," and asked the Court to stay his federal *habeas* petition pending review by the state court of his section motion.[7] Dkt. No. 28. Respondent opposed the motions on November 7, 2006 and by Order dated February 12, 2007, this Court granted Gibson's motion to amend his petition and stayed this action pending resolution of the section 440 motion in state court. Dkt. No. 33.

7 Petitioner also informed the Court that "Schenectady County Court [had] granted [Petitioner] a hearing on the merits [of his CPL 440 motion] and assigned" counsel to represent him. *See* Dkt. No. 32.

On June 7, 2007, Gibson filed an Amended Petition. Dkt. No. 40. He attempted to file two additional amended petitions on September 17, 2007 and on October 5, 2007. Dkt. Nos. 44, 49. These submissions were stricken from the record by Orders dated September 24, 2007 and October 15, 2007, because Gibson did not first seek leave to file amended petitions. Dkt. Nos. 45, 51.

On October 23, 2007, Gibson wrote a letter to this Court advising that the section 440 motion was denied, and requesting that the stay be lifted. Dkt. No. 53. In an Order dated November 13, 2007, this Court granted Gibson's request, and ordered the Respondent to file his response to the Amended Petition. Dkt. No. 54. Gibson subsequently attempted to file another amended petition, but it was rejected by this Court in an Order dated December 3, 2007 because Gibson had not first sought leave to file it. Dkt. No. 55. On January 22, 2008, Respondent filed a response to the amended petition and an accompanying memorandum of law and additional relevant state court records. Dkt Nos. 59–61.

In his amended petition currently before this Court (Dkt. No. 40), Petitioner argues that: (1) the evidence was insufficient to support his convictions for second degree rape and sodomy; (2) he was denied due process of law when the trial court refused to instruct the jury on a lesser included offense; (3) his right to confront witnesses against him was denied when the trial court failed to permit him to cross-examine the victim regarding an alleged unrelated false accusation of rape; (4) the prosecutor committed misconduct when she did not correct the victim's grand jury testimony that Gibson threatened her; (5) the trial court's determination that he was a persistent felony offender violated the rule in *Apprendi v. New Jersey,* 530 U.S. 466 (2000); and (6) trial counsel was ineffective (Grounds Five and Seven). *See* Dkt. No. 40. [8]

8 Gibson's claims will be considered out of order for the sake of clarity.

**II. *Discussion***

**A. Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may award *habeas corpus* relief with respect to a claim adjudicated on the merits in state court only if the adjudication of the claim: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. [9] *Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006), *cert. denied* 127 S.Ct. 1267 (2007); *DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005) (citing 28 U.S.C. § 2254(d)), *cert. denied sub nom DeBerry v. Smith,* 546 U.S. 884 (2005). AEDPA also requires that in any such proceeding "a determination of a factual issue made by a State court shall be presumed to be correct [and][t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry,* 403 F.3d at 66; *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d Cir.2001).

9 It should be noted that "clearly established federal law" in this context "refers only to the holdings of the Supreme Court." *Rodriguez v. Miller,* 499 F.3d 136, 140 (2d Cir.2007), (citing *Williams v. Taylor,* 529 U.S. 362, 412 (2000)), *cert. denied* 2008 WL 102403 (U.S. Mar. 17, 2008).

***6** A state court decision violates the "contrary to" clause of section 2254(d)(1) when it "reaches a result opposite to the one reached by the Supreme Court on the same question of law or arrives at a result opposite to the one reached by the Supreme Court on a 'materially indistinguishable' set of facts.' " *Earley v. Murray,* 451 F.3d 71, 74 (2d Cir.2006) (citing *Williams v. Taylor,* 529 U.S. 362, 405–06 (2000)). A federal *habeas* court may only grant the writ under the "unreasonable application" clause of the section when the state court's decision "identifies the correct rule of law but applies that principle to the facts of the prisoner's case in an unreasonable way." *Earley,* 451 F.3d at 74 (citing *Williams,* 529 U.S. at 413). A federal court engaged in *habeas* review is not charged with determining whether the state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams,* 529 U.S. at 409; *see also Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001). Objectively unreasonable means " 'some increment of incorrectness beyond error' " is required in order to grant a federal *habeas* application. *Earley,* 451 F.3d at 74 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

If, however, a state court does not adjudicate a petitioner's federal claim "on the merits," the state court's decision is not entitled to AEDPA deference and instead, the federal *habeas* court must apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim. *See Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003) (citing *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001)).

**B. Substance of Gibson's Claims**

**1. Ground One—Weight and Sufficiency of the Evidence**

Gibson first argues that the evidence was insufficient to support his convictions for second degree rape and sodomy. Am. Pet. at Ground One. Respondent argues that to the extent that Gibson is asserting a claim that the verdict was against the weight of

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the evidence, that claim is not cognizable on *habeas* review. Respondent further argues that because Gibson did not challenge the sufficiency of the evidence against him in the state courts, this claim should be deemed exhausted but procedurally barred. Dkt. No. 14 at 14–16.

**i. Weight of the Evidence**

Petitioner's claims that there were inconsistencies in the victim's testimony, that there were "questions as to [the victim's] ability to understand an oath and competency to give sworn testimony," that she was a "troubled youth" who had "lied to her mother on numerous occasions and often skipped school," and that she suffered from an "attention deficit hyperactivity disorder" challenge the credibility of the victim and, thus, the weight that her testimony should have been given by the jury. *See, e.g., Garrett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (claim that witness testimony was incredible is not cognizable on federal *habeas* review because credibility determinations and how much weight to give testimony are within the province of the jury) (quoting *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). "Weight of the evidence" claims derive from New York Criminal Procedure Law ("CPL") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. CRIM. PROC. LAW § 470.15(5); *People v. Bleakley,* 69 N.Y.2d 490 (1987). Since weight claims are grounded in the state criminal procedure statute, they are not cognizable on *habeas* review. *See* 28 U.S.C. § 2254(a) (permitting federal *habeas corpus* review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990) (*habeas corpus* review not available to remedy alleged error of state law); *Hogan v. Livingston Corr. Fac.,* No. 05–CV–6440, 2007 WL 2907322, at *8 (W.D.N.Y. Oct. 3, 2007) ("Since a 'weight of the evidence' claim is purely a matter of state law, it is not cognizable on habeas review."); *Stein v. Artus,* No. 04–CV–0439, 2007 WL 2778914, at *7 (N.D.N.Y. Sept. 19, 2007) (Lowe.J) (same); *Welch v. Burge,* No. 03–CV–01423, 2007 WL 2028048, at *7 (N.D.N.Y. July 12, 2007) (Kahn, D.J., adopting Report–Recommendation of Magistrate Judge Victor E. Bianchini). To the extent that Gibson challenges the weight of the evidence, that claim must be denied.

**ii. Sufficiency of the Evidence**

***7** Gibson also argues in Ground One that the "People clearly failed to sustain their burden of proof beyond a reasonable doubt" because the jury acquitted him of the charges requiring force, there was no positive DNA test linking him to the assault, there were no signs of "trauma, bleeding, anal tear, redness or drainage in the complainant and no eyewitnesses. Am. Pet, Ground 1, at 1. These claims implicate the sufficiency of the evidence.

**a. Exhaustion**

An application for a writ of *habeas corpus* may not be granted until the prisoner has exhausted all remedies available in state court unless there is an "absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b). To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in the *habeas corpus* petition. Substantive exhaustion requires that a petitioner "fairly present" any constitutional claims to the highest state court in the same factual and legal context in which it appears in the *habeas* petition. *Baldwin v. Reese,* 541 U.S. 27, 29 (2004); *Fama v. Comm'r. of Corr. Servcs.,* 235 F.3d 804, 808 (2d Cir.2000); *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)); *Daye v. Atty. Gen. of New York,* 696 F.2d 186, 191 (2d Cir.1982); *Sweeney v. Superintendent, Watertown Corr. Fac.,* No. 06–CV–0663, 2007 WL 2176987, at *5 (E.D.N.Y. Jul. 27, 2007).

The petitioner must have presented the substance of his federal claims to the highest available court of the state. *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), *cert. denied,* 514 U.S. 1054 (1995) (citation omitted). The petitioner must assert the same legal theory, premising it on essentially the same body of facts. *Barton v. Fillion,* No. 03–CV–1377, 2007 WL 3008167, at *5 (N.D.N.Y. Oct. 10, 2007) (Hurd, J., adopting Report–Recommendation of Magistrate Judge Gustave J. DiBianco). Finally, the petitioner must have utilized the proper procedural vehicle so that the state court may pass on the merits of petitioner's claims. *Dean v. Smith,* 753 F.2d 239, 241 (2d Cir.1985); *Barton,* 2007 WL 3008167, at *5.

Gibson never presented a claim that the evidence was insufficient to the state courts either on direct appeal or in his two CPL § 440.10 motions to vacate his conviction. *See* Dkt. No. 15, Ex. A; Dkt. No. 16, Ex. G; Dkt. No. 17, Ex. K, Dkt. No. 60, Exs. Z & JJ. While he argued at length that the prosecutor failed to prove forced or consensual intercourse, that there was no proof of vaginal or anal trauma, and that the DNA evidence was contaminated and showed only that there had been sexual contact but did not prove penetration on direct appeal and in his leave application to the New York Court of Appeals, he did so in the context of a complaint that the verdict was against the weight of the evidence. Dkt. No. 16, Ex. G, at 35–47; Dkt. No. 17, Ex. K, at ¶¶ 5–21. The Appellate Division addressed only the weight claim. *Gibson,* 2 A.D.3d at 970–71 (holding that the "jury gave the evidence the proper weight."). Gibson did not alert the state courts to any separate, independent challenge to the sufficiency of the evidence, or to the federal nature of such a claim. It is therefore unexhausted.

**b. Procedural Bar**

***8** There is no longer a state court in which Gibson can raise his sufficiency claim. He cannot now fairly present this claim in a second direct appeal, since in New York a defendant is "entitled to one (and only one) appeal to the Appellate Division." *Aparicio,* 269 F.3d at 91. Since "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," *id.* (citing CPL § 440.10(2)(c)), petitioner cannot now properly raise a sufficiency claim, which is based on the record, by way of a section 440 motion. *Aparicio,* 269 F.3d at 91; *Bossett,* 41 F.3d at 829. New York law also allows a court to deny a motion to vacate conviction where a defendant has made a previous motion and was in a position to raise the claim but did not. CPL 440.10(3)(c). Since no remaining avenue exists in which Gibson could raise this claim, it is deemed exhausted but procedurally defaulted. *Coleman v. Thompson,* 501 U.S. 722, 732 (1991); *St. Helen v. Senkowski,* 374 F.3d 181, 183 (2d Cir.2004), *cert. denied* 543 U.S. 1058 (2005); *Aparicio,* 269 F.3d at 90; *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 170 (2d Cir.2000).

This Court may review Gibson's procedurally barred claim only if he demonstrates cause for the default and resulting prejudice, or that the failure of the federal court to review the claims will result in a "fundamental miscarriage of justice" *i.e.,* that he is innocent. *Calderon v. Thompson,* 523 U.S. 538, 559 (1998); *Coleman,* 501 U.S. at 748–750. To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule. *Coleman,* 501 U.S. at 753, *Restrepo v. Kelly,* 178 F.3d 634, 639 (2d Cir.1999). When a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal *habeas* relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *Long v. Lord,* No. 03–CV–0461, 2006 WL 1977435, at *6 (N.D.N.Y. Mar. 21, 2006) (McCurn, S.J.).

Petitioner has failed to establish cause for his failure to exhaust this claim, and has never argued, in either the state courts or this proceeding, that his appellate counsel rendered ineffective assistance by failing to fairly present his sufficiency claim on appeal.[10] Since Gibson has not established cause for his procedural default, the Court need not decide whether he suffered actual prejudice, because federal *habeas* relief is generally unavailable as to procedurally defaulted claims unless *both* cause and prejudice are demonstrated. *Stepney,* 760 F.2d at 45; *Staley v. Greiner,* No. 01–CV–6165, 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003) (citing *Stepney* ), *Pou v. Keane,* 977 F.Supp. 577, 581 (1997). Gibson also has not presented any new evidence to show that he is actually innocent. This aspect of the petition is therefore denied on this procedural basis. *Shulp v. Delo,* 513 U.S. 298, 327 (1995); *Spence,* 219 F.3d at 170.

10 Although Gibson filed a state *coram nobis* petition in which he challenged the effectiveness of appellate counsel, he did not claim therein that appellate counsel was ineffective for not challenging the sufficiency of the evidence on appeal. *See* Dkt. No. 60, Ex. JJ.

**c. The Merits**

***9** Even if the sufficiency claim was not procedurally barred, no relief would issue. A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden." *United States v. Quattrone,* 441 F.3d 153, 169 (2d Cir.2006); *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002). The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White,* 531 U.S. 225, 228–29 (2001); *Jackson v. Virginia,* 443 U.S. 307, 315 (1979). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390, 402 (1993) (emphasis in original). A *habeas* petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324; *see also Schlup,* 513 U.S. at 323 n. 38. The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor. *Jackson,* 443 U.S. at 319.[11] "When considering the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.' " *Ponnapula,* 297 F.3d at 179 (quoting *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999), *cert. denied* 528 U .S. 1170 (2000)).

11 The *Jackson* standard is clearly established federal law as determined by the Supreme Court. *See Huber v. Schriver,* 140 F.Supp.2d 265, 276 n. 5 (E.D.N.Y.2001) (citing *Francis S.,* 221 F .3d at 114) (other citation omitted); *see also Santana v. Kuhlmann,* 232 F.Supp.2d 154, 166–67 (S.D.N.Y.2002).

Under New York law, the state had to prove that Gibson was eighteen years or older and that he engaged in "sexual intercourse" and "anal sexual conduct" with the victim, who was less than fifteen years old. N.Y. PENAL LAW §§ 130.30(1); 130.45(1). "Sexual intercourse has its ordinary meaning and occurs upon any penetration, however slight." *Id.* at § 130.00(1). "Anal sexual conduct" includes contact between the penis and anus. *Id.* at § 130.00(2)(b).[12] The evidence established that the victim's date of birth was July 18, 1986, making her thirteen years old at the time of the incident. Trial Tr. at R515, 624. The evidence further established that Gibson's date of birth was September 18, 1963, making him thirty-six years old at the time of the incident. *Id.* at R719–20. The victim testified that Gibson penetrated her vagina and then her anus. *Id.* at R529–31, 565–68. Despite Gibson's claim to the contrary, the victim's testimony was corroborated by the emergency room nurse, who testified that she complained of anal tenderness and exhibited "cervical motion tenderness," indicating that there had been vaginal penetration. *Id.* at R651–64. When the victim's mother confronted Gibson about what took place with C.O., Gibson admitted he had sexual intercourse with her daughter, but claimed that there would be no evidence because "he pulled out before anything could have occurred ." *Id.* at R628–29. Finally, the DNA evidence established that an anal swab taken from the victim tested positive for sperm for which Gibson was determined to be the contributor. *Id.* at R893–96, 939–55. This evidence, in the light most favorable to the prosecution, was certainly enough to support Gibson's convictions. This claim is dismissed.

12 Petitioner does not appear to challenge his convictions for endangering the welfare of a child (2 counts).

**2. Ground Two: Failure to Charge a Requested Lesser Included Offense**

***10** Gibson claims in Ground Two of his petition that the trial court erred when it declined to charge the jury on second degree sexual abuse as a lesser included offense because there was no proof of intercourse and the evidence established only that there had been sexual contact. Dkt. No. 40. Respondent argues that this claim is without merit. Dkt. No. 14 at 17–20.

At the charge conference, counsel asked the trial court to charge the jury on second degree sexual abuse as a lesser included offense of second degree rape and sodomy. Trial Tr. at R1005. The trial court denied the request. *Id.* at 569. The Appellate Division affirmed, finding that it was possible to commit second degree rape and sodomy without also committing second degree sexual abuse. *Gibson,* 2 A.D.2d at 972. This decision is entitled to AEDPA deference.

Gibson's claim that the state court failed to give a requested lesser included offense charge is not cognizable on federal *habeas* review. *Beck v. Alabama,* 447 U.S. 625, 638, n. 14 (1980) (expressly reserving the question of whether due process requires a state court to charge lesser included offenses in non-capitol cases); *Jones v. Hoffman,* 86 F.3d 46, 48 (2d Cir.1996) ("a

claimed error in failing to include a lesser offense instruction in a non-capital case is not a cognizable claim in a habeas corpus proceeding."); *Minigan v. Donnelly,* No. 01–CV–026, 2007 WL 542137, at *27(W.D.N.Y. Mar. 30, 2007) ("Neither the Supreme Court nor the Second Circuit has held that a court's failure to instruct a jury on lesser included offenses in a non-capital case is a constitutional issue that may be considered in a habeas petition."); *Bonilla v. Cunningham,* No. 04–CV–4860, 2007 WL 13415, at *6 (E.D.N.Y. Jan. 2, 2007) ("Failure to charge a lesser-included offense is not cognizable in a federal habeas corpus proceeding ... Therefore, this court finds that the trial court's failure to submit the lesser-included charges was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"). Since no clearly established Supreme Court precedent requires an instruction of the lesser included offense of second degree sexual abuse, Gibson cannot establish that the Appellate Division's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See, e.g., Smith v. Barkley,* No. 99–CV–0257, 2004 WL 437470, at *6 (N.D.N.Y. Feb. 18, 2004) (Sharpe, M.J.) (explaining that since no clearly established Supreme Court precedent required a jury instruction on a lesser included offense of third degree assault, the petitioner was unable to establish that the Appellate Division's decision denying his claim on direct appeal was contrary to, or an unreasonable application of, clearly established Supreme Court precedent). Petitioner is not entitled to *habeas* relief for this claim.

***11** In any event, the refusal of the state court to charge the jury on second degree sexual abuse appears to have been correct under state law. Under New York law, a trial court "may submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater ....“ N.Y. CRIM. PROC. LAW § 300.50(1). A defendant seeking a lesser included offense charge must demonstrate that 1) "it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense," and 2) "there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater." *People v. Glover,* 57 N.Y.2d 61, 63 (1982) (*per curiam* ).

A person is guilty of second degree sexual abuse when he subjects a person to sexual contact when that person is younger than fourteen years old. N.Y. PENAL LAW § 130.60(2). "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party." *Id.* at § 130.00(3). The crime of sexual abuse thus requires proof of sexual gratification, but second degree rape and sodomy do not. *See, e.g., People v. Ford,* 76 N.Y.2d 868, 870 (1990) (first degree sexual abuse is not a lesser included offense of first degree sodomy because, unlike sexual abuse, it is "possible to commit the crime of sodomy without the actor having as a purpose the gratification of either party's sexual desire.") (citing *People v. Wheeler,* 67 N.Y.2d 960 (1986)); *People v. McLaurin,* 27 A.D.3d 1117, 1119 (N.Y.App.Div., 4th Dept.2006) (first degree sexual abuse is not a lesser included offense of first degree sodomy), *lv. denied* 7 N.Y.3d 759 (2006); *People v. Daniels,* 222 A.D.2d 1065 (N.Y.App.Div, 4th Dept., 1995) (trial court did not err in refusing to charge first degree sexual abuse as a lesser included offense of first degree rape because "the former requires proof of sexual gratification, but the latter does not."), *lv. denied* 87 N.Y.2d 972 (1996). At least one New York court has specifically held that second degree sexual abuse is not a lesser included offense of second degree rape. *See People v. Jones,* 133 A.D.2d 972, 974 (N.Y.App.Ct., 3d Dept.1987), *lv. denied* 70 N.Y.2d 956 (1988). This claim is dismissed.

### 3. Ground Three—Right to Confront the Victim

Gibson argues in Ground Three of his petition that the trial court's refusal to permit him to cross-examine the victim regarding an allegedly false, unrelated accusation of rape made six months after the incident for which Gibson was charged, deprived him of his right to confront his accuser. Respondent argues that this claim is without merit.

A defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings. *Pointer v. Texas,* 380 U.S. 400 (1965). The right to cross-examination is not, however, absolute, and a trial court may place reasonable limits on a defense attorney's cross-examination of a prosecution witness "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Young v. McGinnis,* 411 F.Supp.2d 278, 302 (E.D.N.Y.2006) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986) (citations omitted)). Cross-examination is not improperly curtailed if "the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata,* 916 F.2d 795, 806

(2d Cir.1990) (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.1980), *cert. denied* 499 U.S. 940 (1991)); *Howard v. Walker,* 406 F.3d 114, 129 (2d Cir.2005) (quoting *Davis v. Alaska,* 415 U.S. 308, 318 (1974)).

***12** Under New York law, a defendant seeking to cross-examine a victim about an alleged unrelated false accusation against another person is required to demonstrate "both that the accusation was " 'indeed false'," and (2) that the accusation was "such as to suggest a pattern casting substantial doubt on the validity of the charges made by the victim in this instance." *People v. Gifford,* 280 A .D.2d 967 (N.Y.App.Div., 4th Dept.2001) (quoting *People v. Mandel,* 48 N.Y.2d 952, 953 (1979), *cert. denied* 446 U.S. 949 (1980)), *lv. denied* 96 N.Y.2d 939 (2001). Gibson failed to make the requisite showing.

At trial, defense counsel asked that he be permitted to cross-examine the victim regarding an alleged false accusation of rape made by her against Charles Williams. Trial Tr. at R486–94. Counsel stated that he intended to call two witnesses, Charles Williams and Fawn Orlando, who would testify that the victim accused Williams of rape, and Williams refuted the claim. Trial Tr. at R542–44, 591–93. He expected the witnesses to testify that the victim acted in a way that "acknowledged that the allegation was false." *Id.* at R492. According to the prosecutor, however, the victim believed the accusation against Williams was true, even though she did not report it to police. *Id.* at R495–96.

The trial court was unpersuaded that Williams should be permitted to testify that he did not rape the victim, and allowed counsel time to investigate further in order to obtain additional proof that the accusation was false. *Id.* at R498. When counsel could not submit such proof, the trial court denied the request to cross-examine the victim on that point. *Id.* at R542–43, 591–93. It found that counsel had not satisfactorily shown that an actual "false rape accusation was made by this victim." Trial Tr. at R592. [13]

13 There was no other restriction placed upon the scope of cross-examination, and the record shows that defense counsel vigorously cross-examined the victim. Trial Tr. at R545–86, 595–603, 611–22.

The Appellate Division affirmed, finding that Gibson's "proffer of proof failed to sufficiently prove the falsity of the complaint or that the allegedly false complaint was 'suggestive of a pattern that cast doubt on the validity of, or bore a significant probative relation to, the instant charges.' " *Gibson,* 2 A.D.3d at 972 (quoting *People v. Sprague,* 200 A.D.2d 867, 868 (App.Div., 3d Dept.1994), *lv. denied* 83 N.Y.2d 877 (1994)). The Appellate Division's decision was not contrary to, or an unreasonable application of established federal law. *See McNear v. Herbert,* No. 02–CV–6033, 2005 WL 3018724, at *18 (W.D.N.Y. Oct. 26, 2005) ("Evidence of a victim's prior complaint of a sex crime does not come within the proscriptive scope of CPL 60.42; therefore, its admissibility rests within the discretion of the trial court. The preclusion of such questioning does not constitute an abuse of discretion where, as here, defendant made no showing that the prior allegation was false."); *Grant v. Demskie,* 75 F.Supp.2d 201, 221 (S.D.N.Y.1999) (where petitioner failed to offer proof that a prior accusation of sexual abuse allegedly made by the victim was "demonstrably false," trial court did not abuse its discretion when it refused to permit cross-examination on that point), *aff'd* 234 F.3d 1262 (2d Cir.2000); *People v. Breheny,* 270 A .D.2d 926, 927 (App.Div. 4th Dept.2000) (defendant failed to provide court with adequate factual basis for a proposed line of questioning regarding a false accusation of sexual misconduct where "[a]lthough defendant indicated that there were "witnesses", including his sister, who were prepared to testify that the victim made those accusations, defendant never clearly indicated what each of those witnesses would say and specifically who would testify that the accusations were false."), *lv. denied* 95 N.Y.2d 851 (2000). This ground is dismissed.

### 4. Ground Four—Prosecutor Presented False Testimony to the Grand Jury

***13** Petitioner asserts in Ground Four of his petition that he was denied due process of law by the prosecutor's failure to "notify the grand jury that the complainant testified falsely that Petitioner threatened her to coerce her to have sex with him." Dkt. No. 40 at Attach. p. 4. Respondent argues that this claim presents no federal question. Dkt. No. 14 at 23–24.

This Court agrees with Respondent. A prosecutor is not required to present exculpatory evidence to the grand jury. *United States v. Williams,* 504 U.S. 36, 55 (1992) (since the grand jury is not required to consider exculpatory evidence, prosecutor was not under a binding obligation to present it, and, accordingly, a federal court lacks the power to dismiss an indictment on the ground that the prosecutor did not present exculpatory evidence to the grand jury); *Jones v. Keane,* 250 F.Supp.2d 217, 232–

33 (W.D.N.Y.2002) ("requiring the prosecutor to present exculpatory evidence to the grand jury would impose an unnecessary burden on the grand jury system."). Thus, even if the victim made a prior inconsistent statement regarding whether Gibson threatened her, the prosecutor was under no obligation to advise the grand jury of that fact.

To the extent that Gibson is challenging the propriety of the grand jury proceedings, that claim also fails. The Second Circuit has explicitly held that a claim that the prosecutor failed to present exculpatory evidence to the grand jury is not cognizable on *habeas* review. *See Lopez v. Riley,* 865 F.2d 30, 32–33 (2d Cir.1989) ("[t]he particular claims of impropriety before the grand jury in this case concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" were all cured by petitioner's conviction by a jury at trial and, therefore, were not cognizable on *habeas* review); *Van Stuyvesant v. Conway,* No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S .D.N.Y. Sept. 7, 2007) (claim that false testimony was presented before the grand jury is not cognizable on *habeas* review) (citing *Lopez* ).

Gibson's subsequent acquittal by a jury of the charges requiring force, and his conviction of the remaining charges (T. 758–61), cured any arguable defects in the indictment process "because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt." *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504, at * 17 (S.D.N.Y. Dec. 17, 2003). *See United States v. Mechanik,* 475 U.S. 66, 69 (1986) ("[t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); *Davis v. Mantello,* 42 Fed. Appx. 488, 490–91 (2d Cir.2002) (summary order) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court."), *cert. denied sub nom Davis v. Filion,* 538 U.S. 986 (2003).

***14** To the extent that Gibson is alleging that the prosecutor knowingly allowed the victim to commit perjury during her grand jury testimony, this claim lacks merit. To establish prosecutorial misconduct premised upon the presentation of perjury, Gibson must first establish that perjury was committed; i.e. that the testimony was "actually, and intentionally, false." *Moore v. Greiner,* No. 02 Civ. 6122, 2005 WL 2665667, at * 13 (S.D.N.Y. Oct. 19, 2005). *See United States v. Dunnigan,* 507 U.S. 87, 94 (1993); *Dinsio v. Donnelly,* No. 03–CV–0779, 2007 WL 4226396, at *6–7 (N.D.N.Y. Sept. 25, 2007) (Bianchini, J), *adopted,* No. 03–CV–0779, 2007 WL 4226390 (N.D.N.Y. Nov. 26, 2007) (Kahn, D.J.); *Anekwe v. Phillips,* 05–CV–2184, 2007 WL 1592973, at *6 (E.D.N.Y. May 31, 2007). He must also establish that "the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Dinsio,* 2007 WL 4226396, at *7 (*quoting United States v. Agurs,* 427 U.S. 97, 103 (1976)).

Gibson has not established that the victim committed perjury during her grand jury testimony, much less that the prosecutor knew or had reason to know she was allegedly untruthful. At most, Gibson has pointed out an inconsistency between her grand jury testimony that he verbally threatened her, and her statement to a treating nurse that he did not. Inconsistencies in prior statements go to the weight to be accorded a witness' testimony by the finder of fact. *See Bradley v. West,* No. 03–CV–3212, 2005 WL 3276386, *14 (E.D . N.Y. Dec. 2, 2005) (a "witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake or faulty memory.") (internal quotation omitted). The Second Circuit has noted that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino,* 59 F.3d 353, 365 (2d Cir.1995), *cert. denied,* 517 U.S. 1187 (1996). Counsel was aware of the inconsistency and used it to cross-examine both the victim and the nurse at trial. Trial Tr. at R586, 668–70. The jury was able to assess the victim's credibility based on all of the evidence. Although the jury acquitted Gibson of the charges requiring force, testimony regarding threats, or the lack thereof, was not the only evidence of force presented to the grand jury. *See* Dkt. No. 15, Ex. A (victim's grand jury attached as "Exhibit A"). This claim is dismissed.

**5. Ground Six—Persistent felony offender statute and *Apprendi v. New Jersey,* 530 U.S. 466 (2000).**

Petitioner alleges in Ground Six of his petition that his sentence as a persistent felony offender under New York's Penal Law § 70.10 is unconstitutional because it violated his right to a jury trial as explained in *Apprendi,* and clarified by *Ring v. Arizona,* 536 U.S. 584 (2002). Am. Pet. at Attach p. 8–9. Respondent argues that this claim is without merit. Dkt. No. 14, at pp. 29–35.

***15** Gibson raised this claim in his *pro se* supplemental brief on appeal, claiming that his sentence violated the rule set forth in *Apprendi* because the enhanced sentence was based upon facts that were not charged in the indictment and that were not presented to a jury. *See* Dkt. No. 17, Ex. I. The Appellate Division rejected this claim, citing to *People v. Rosen,* 56 N.Y.2d 329, 334–35 (2001), *cert. denied* 534 U.S. 899 (2001). *Gibson,* 2 A.D.3d at 974. That decision is entitled to AEDPA deference.

**A. Clearly Established Supreme Court Precedent**

Gibson was sentenced on July 17, 2001 and his conviction became final on March 11, 2004. At that time, the Supreme Court's decisions in *Apprendi* and *Ring* were the most recent cases to explain the Supreme Court's Sixth Amendment jurisprudence. Accordingly, the "universe of 'clearly established Supreme Court precedent' " relevant to Gibson's claim consists of *Apprendi* and *Ring. Brown v. Miller,* 451 F.3d 54, 57 n. 1 (2d Cir.2006) ("Brown II") (citing *Brown v. Greiner,* 409 F.3d 523, 533–34 & n. 3 (2d Cir.2005) ( "Brown I"), *cert. denied* 127 S.Ct. 938 (2007); *Woods v. Poole,* No. 03–CV–5708, 2007 WL 4166042, at *1–2 (E.D.N.Y. Nov. 19, 2007). [14]

14 The Supreme Court further clarified the *Apprendi* rule in *Blakely v. Washington,* 542 U.S. 296 (2004), and *United States v. Booker,* 543 U.S. 220, 226–27 (2005). In *Blakely,* the Supreme Court held that Washington state's sentencing scheme was unconstitutional because it authorized one sentencing range based on a jury's findings alone and a higher range if the sentencing judge found "substantial and compelling reasons justifying an exceptional sentence." *Blakely,* 542 U.S. at 299, 304–05. In *Booker,* the Court held that the Sixth Amendment applied to the Federal Sentencing Guidelines and concluded that the provisions that made the guidelines mandatory should be excised. *Booker,* 543 U.S. at 226–27.
The Second Circuit has held that neither *Blakely* nor *Booker* apply retroactively on collateral review. *See Guzman v.. United States,* 404 F.3d 139, 144 (2d Cir.2005) (*Booker* ), *cert. denied* 546 U.S. 1035 (2005); *Green v. United States,* 397 F.3d 101, 102–03 (2d Cir.2005) (Blakely). *See Espinal–Martinez v. United States,* 499 F.Supp.2d 213, 216 (N.D.N .Y. Jul. 2, 2007) (Kahn, D.J.) (*Booker* ); *Garcia v. United States,* No. 04–CV–0465, 2004 WL 1752588, at *5 (N.D.N.Y. Aug. 4, 2004) (McAvoy, S.J.) ("[B]ecause *Apprendi* does not apply retroactively to collateral attacks and *Blakely* is an extension of *Apprendi, Blakely* is similarly limited to prospective application."). Accordingly, the decisions in *Blakely* (decided on June 24, 2004, three months after Gibson's conviction became final) and *Booker* do not impact upon the Court's decision in this case.

In *Apprendi,* the Supreme Court struck down a New Jersey hate crime statute that authorized an increased maximum sentence in circumstances where a judge determined that a defendant was motivated by racial discrimination. 530 U.S. at 482–85. The Supreme Court ruled that such a determination must be made by a jury and not by the sentencing court. *Id.* at 482–85, 492–97. The Court specifically held, however, that the jury trial right does not apply to sentence enhancements based *solely* on prior convictions. *Id.* at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis added).

The Supreme Court clarified its holding in *Ring,* where it considered the Sixth Amendment right to a jury trial in capital cases. Arizona's first degree murder statute set forth several aggravating facts and authorized the judge to sentence a defendant to death if he or she found that there was at least one aggravating fact and no "mitigating circumstances sufficiently substantial to call for leniency." *Ring,* 536 U.S. at 592–93 (citation and internal quotation marks omitted). The Supreme Court struck down the statute, holding that all defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. The court further noted that if a state statute authorizes an increased punishment that is contingent on the finding of a specified fact, that fact "must be found by a jury beyond a reasonable doubt." *Id.* at 602.

In sum, under *Apprendi,* and *Ring,* "a statute that merely mandates sentencing courts' consideration of defendants' histories, characteristics, and offenses falls into a different category than those that require the judicial finding of specific facts." *Witherspoon v. Woods,* 210 Fed. Appx. 115, 116 (2d Cir.2006) (summary order) (citing *Brown v. Miller,* 451 F.3d 54, 59 (2d Cir .2006) and *Brown v. Greiner,* 409 F.3d 523, 534–35 (2d Cir.2005)), *cert. denied sub nom Witherspoon v. Burge,* 127 S.Ct. 2438 (2007).

**B. Contrary to or an Unreasonable Application of Clearly Established Supreme Court precedent**

***16** New York's "persistent felony offender" statute provides for enhanced punishment for defendants who "stand convicted of a felony after having previously been convicted of two or more felonies." N .Y. PENAL LAW § 70.10(a). A defendant may be sentenced as a persistent felony offender if the sentencing court finds, after a hearing, (1) that the defendant has at least two prior felony convictions and (2) "is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest." N.Y. PENAL LAW § 70.10(2); CPL § 400.20(1). The prosecution bears the burden of proof at an enhancement hearing, and must prove "[m]atters pertaining to the defendant's history and character and the nature and circumstances of his criminal conduct" by a preponderance of the evidence. *Id.* § 400.20(5). When a court finds a defendant is a persistent felony offender, it is authorized to sentence the defendant as if he stood convicted of a class A–1 felony. *Id.* at §§ 70.10(2). Class A–1 felonies carry a minimum sentence of fifteen years and a maximum sentence of life in prison. N.Y. PENAL LAW § 70.00(2)(a) & (3)(a)(I). A sentencing court must set forth its reasons for imposing an enhanced sentence "in the record." *Id.* at § 70.10(2).

In rejecting Gibson's claim that his sentence violated the *Apprendi* rule, the Appellate Division cited to *People v. Rosen,* 96 N.Y.2d 329 (2001), *cert. denied* 534 U.S. 899 (2001). In that case, the New York Court of Appeals rejected the argument that the persistent felony offender statute violated *Apprendi* because "the sole determinate of whether a defendant is subject to enhanced sentencing as a persistent felony offender" was whether he or she had two predicate felony offenses. *Id.* at 335. Although the sentencing court must then consider other "enumerated factors" to form an opinion as to whether an enhanced sentence is warranted, the *Rosen* court found that by doing so, the sentencing court was simply "fulfilling its traditional role—giving due consideration to agreed-upon factors—in determining an appropriate sentence within the permissible statutory range." *Id.* citing *People v.. Farrar,* 52 N.Y.2d 302, 305–306 (1981). [15]

15 More recently in *People v. Rivera,* 5 N.Y.3d 61 (2005), *cert. denied* 546 U.S. 984 (2005), the New York Court of Appeals considered the effect of the Supreme Court's decision in *Blakely* on its prior determination in *Rosen* that the persistent felony offender statute did not violate *Apprendi.* The court affirmed its holding in *Rosen* and reiterated that proof of two prior felony convictions beyond a reasonable doubt is the "sole determinant of whether a defendant is subject to recidivist sentencing as a persistent felony offender" and no "further findings are required." *Rivera,* 5 N.Y.3d at 56–57(citing *Rosen,* 96 N.Y.2d at 335). Thus, under *Rivera,* "whether the second prong of the inquiry involves factfinding in the *Apprendi* sense is irrelevant, because the statutory maximum for *Apprendi* purposes does not rely in any way on that second prong. Any subsequent assessment of the history and character of the defendant or the nature and circumstances of the offense is used solely to determine where, within the enhanced statutory minimum and maximum, the sentence will be imposed." *Morris v. Artus,* No. 06 Civ. 4095, 2007 WL 2200699, at *9 (S.D.N.Y. July 30, 2007).

The Second Circuit evaluated the state court's analysis in *Rosen* and concluded that the New York Court of Appeals did not unreasonably apply *Apprendi* when it viewed the sentencing court's assessment as "something quite different from the fact-finding addressed in *Apprendi* and its predecessors." *Brown I,* 409 F.3d at 534–35. [16] It explained that the first determination required by the statute, that the defendant have two predicate felony convictions, "clearly falls within *Apprendi's* 'fact of a prior conviction exception" and was not the type of judicial factfinding prohibited under *Apprendi. Id.* at 534 (citing *Apprendi,* 530 U.S. 488–90). The Court further held that the second prong of the statute, requiring the sentencing court to determine whether the defendant's "history and character" and "nature of the offense" warrant an enhanced sentence, differed from the type of fact-finding prohibited in *Apprendi* because it does not "enumerate any specific facts that must be found by the sentencing court before it can conclude that the extended sentence is in the public's 'best interest'." *Brown I,* 409 F.3d at 534–35; N.Y. PENAL LAW § 70.10(2). Instead, the statute simply requires a "vague, amorphous assessment of whether, in the court's opinion", an extended prison term and supervision is in the public interest. *Id.* at 534.

16 Three separate appeals, of which *Rosen* was one, were consolidated by the Second Circuit in *Brown I.* 409 F.3d at 526 (*Rosen v. Walsh,* No. 02 CIV. 7782, 2003 WL 24208700 (S.D.N.Y. Jul. 21, 2003)). Rosen's writ of *habeas corpus* was granted by the Southern District of New York, and that decision was reversed in *Brown I.*

***17** More recently, a second panel of the Second Circuit followed the ruling in *Brown I,* concluding that the Supreme Court's decision in *Ring* did nothing to alter the result because the statutes at issue in *Apprendi* and *Ring* required the sentencing court to find some specific fact, and New York's statute required a more general assessment of the defendant's history and character. *Brown II,* 451 F.3d. at 55 ("[W]e hold ... following *Brown v. Greiner* ... that the state court did not unreasonably apply *Ring* in sentencing Brown as a 'persistent felony offender'...").

Because the law as it existed when Gibson's conviction became final (March 11, 2004) was that under *Apprendi* and *Ring,* this Court is bound by the decisions in *Brown I* and *Brown II. See Woods v. Poole,* 2007 WL 4166042, at *1 (E.D.N.Y. Nov. 19, 2007) (since, at the time of Woods' sentencing, *"Apprendi* and *Ring* were the most recent cases to explain the Supreme Court's Sixth Amendment jurisprudence," the Second Circuit's ruling in *Brown v. Miller* controlled); *Bailey v. Rivera,* 2007 WL 3120904, at *4 ("clearly established Federal law" means the holdings in effect at the time of the relevant state court decision); *Hernandez v. Conway,* 2005 WL 1606062, at *2 (S.D.N.Y. Jul. 7, 2005) (petitioner's "sentence became final in 2001, more than one year before the U.S. Supreme Court decided *Ring* in June of 2002 ... [t]herefore, the 'universe of clearly established federal law' applicable to this petition does not include *Ring,* but rather, just as in *Brown,* is 'limited to *Apprendi* and the cases that preceded it.') (citing *Brown I,* 409 F.3d at 534, n. 3).[17] Accordingly, the Appellate Division's determination that Gibson's sentence, imposed pursuant to the persistent felony offender statute, did not violate *Apprendi* was not contrary to or an unreasonable application of clearly established Supreme Court precedent as it existed when Gibson was sentenced and his conviction became final. Thus, just as in *Brown II,* Gibson is not entitled to relief, and this claim is dismissed.

17 The Court made it clear, in a footnote, that its evaluation in *Brown II* did not address the Supreme Court's decisions in *Blakely* and *Booker. Id.* at 59 n. 1. As is the case here, these decisions were rendered after Brown's conviction became final.

There is a split among district courts in the Second Circuit regarding the constitutionality of the persistent felony offender statute following the Supreme Court's rulings in *Blakely* and *Booker.* Some courts have held that there is nothing in the *Blakely* decision that "altered the rule of the road on prohibited judicial fact-finding." *West v. Breslin,* No. 06 Civ. 4167, 2008 WL 110947, at *8 (S.D.N.Y. Jan. 2, 2008); *see Morris v.. Artus,* No. 06 Civ. 4095, 2007 WL 2200699, at *7 (S.D.N.Y. July 30, 2007); *Phillips v. Artus,* No. 05 Civ. 7974, 2006 WL 1867386, at *6 (S.D.N.Y. Jun. 30, 2006); *Witherspoon v. Woods,* No. 04–CV–5528, 2006 WL 721510, at *4 n. 2 (E.D.N.Y. Mar. 6, 2006), aff'd 210 Fed. Appx. 115 (2d Cir.2006) (summary order), *cert. denied sub nom Witherspoon v. Burge,* 127 S.Ct. 2438 (2007). In support of that position, one court cited to the Supreme Court's recent decision in *Cunningham v. California,* 127 S.Ct. 856, 869 (2007) that *Apprendi* set forth "a bright line rule." *West,* 2008 WL 110947, at *8 & n. 5.

Other courts have found the statute unconstitutional under *Blakely. See Portalatin v. Graham,* 478 F.Supp.2d 385, 387–88, 391–92 (E.D.N.Y.2007) (petitioner's conviction became final in 2005 after *Blakely* was decided; the persistent felony offender statute violated the constitution because *"Apprendi* and *Blakely* make it clear that impermissible "factfindings" for Sixth Amendment purposes include generalized assessments of offenders as well as more specific factual determinations about offenses."*Id.* at 391–92;*Washington v. Poole,* 507 F.Supp.2d 342, 346–47, 350 (S.D.N.Y.2007) (while bound by *Brown I* and *Brown II,* which held that the persistent felony offender statute was not contrary to or an unreasonable application of clearly established federal law as it existed after *Apprendi* and Ring were decided but before *Blakely,* and *Blakely* and *Booker* had been decided by the time Washington's conviction became final in 2005, these decisions were relevant and the statute was unconstitutional under *Blakely* ).

The common thread linking *Portalatin* and *Washington,* however, is that *Blakely* and *Booker* had been decided when the respective petitioners challenged the constitutionality of their sentences. That is not the case here. Because *Blakely* and *Booker* do not apply retroactively, (*Guzman,* 404 F.3d at 144; *Green,* 397 F.3d at 102–03), *Portalatin* and *Washington* are inapposite.

**6. Ineffective Assistance of Trial Counsel**

**A. Ground Five**

In Ground Five of his petition, Petitioner argues that counsel was ineffective for: (1) failing to raise any significant defenses at trial; (2) failing to notify Gibson of his right to testify at the grand jury, and failing to notify the prosecutor of his intent to testify; (3) failing to object to the "prosecutor's violation of CPL 190.50(5)(c)"; (4) failing to properly cross-examine the prosecutor's witnesses; (5) conceding to the jury that Petitioner had sexual intercourse with the victim; (6) failing to hire an investigator; and (7) failing to hire a defense expert to dispute the DNA evidence. Am. Pet. Attach at 5–7. Respondent argues that these claims are without merit. Dkt. No. 14 at 24–29.

Petitioner raised these claims on direct appeal. The Appellate Division rejected them, finding that Gibson received "meaningful representation."[18] It noted that "defense counsel made appropriate pretrial and trial motions, vigorously cross-examined the People's witnesses, presented a defense witness, advanced cogent arguments in defendant's defense and employed a trial strategy which successfully secured acquittal of the charges of first degree rape and sodomy." *Gibson,* 2 A.D.3d at 973. The Appellate Division also ruled that, even assuming the record supported his claim that counsel failed to notify the People of his desire to testify before the grand jury, that "lapse does not, by itself, amount to ineffective assistance of counsel." *Id.* The Appellate Division's decision, which is entitled to AEDPA deference, was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

18 The interplay between the well-accepted standard for judging an attorney's performance under the Sixth Amendment and the prevailing test under New York law, particularly with respect to the prejudice prong of the controlling analysis, is an issue which has received increasing attention, with recent federal decisions reflecting some degree of tension between the two points of view. *See, e.g., Henry v. Poole,* 409 F.3d 48 (2d Cir.2005), *cert. denied,* 546 U.S. 1040 (2006). Prior to rendering its decision in *Henry,* the Second Circuit had previously held that the "meaningful representation" test applied by the New York courts is not "contrary to" the governing federal standards, for purposes of the AEDPA, even though the prejudice prong of its analysis is significantly less reaching than under its federal counterpart. *See, e.g., Henry,* 409 F.3d at 70 (citing *Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001), *Loliscio v. Goord,* 263 F.3d 178, 192–93 (2d Cir.2001) and *Eze v. Senkowski,* 321 F.3d 110, 122–24 (2d Cir.2003)). Whether that viewpoint will stand the test of time, particularly in light of the Supreme Court's decision in *Williams,* 529 U.S. 362 (2000), is subject to some doubt. *See Henry,* 409 F.3d at 68–72.

**i. Clearly Established Supreme Court Precedent**

***18** A claim of ineffective assistance of counsel is sustainable only if counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 686 (1984); *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992), *cert. denied,* 508 U.S. 912 (1993). In applying this test, a reviewing court must be "highly deferential" and presume that counsel's conduct falls within the range of reasonable performance. *Strickland,* 466 U.S. at 689; *see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003) ("the legal principles that govern claims of ineffective assistance of counsel" were established in Strickland); *Aeid v. Bennett,* 296 F.3d 58, 62–63 (2d Cir.2002), *cert. denied* 537 U.S. 1093 (2002); *Brown v. Artuz,* 124 F.3d 73, 79–80 (2d Cir.1997), *cert. denied* 522 U.S. 1128 (1998); *White v. Herbert,* No. 02–CV–439, 2006 WL 3728878, at *4 (N.D.N.Y. Dec. 15, 2006) (McCurn, S.J.).[19] Any counsel errors must be considered in the aggregate, rather than in isolation. *Lindstadt v.. Keane,* 239 F.3d 191, 199 (2d Cir.2001). The failure to make meritless arguments or objections cannot constitute ineffective assistance. *United States v. Arena,* 180 F.3d 380, 396 (2d Cir.1999), *cert. denied* 531 U.S. 811 (2000). There is a strong presumption that counsel rendered adequate assistance as courts give high deference to counsel, and Petitioner "must overcome the presumption that the challenged action 'might be considered sound trial strategy.' " *Gatto v. Hoke,* 809 F.Supp. 1030, 1038 (E.D .N.Y.1992) (quoting *Strickland,* 466 U.S. at 689), *aff'd mem.,* 986 F.2d 500 (2d Cir.1992); *see also Jackson v. Conway,* 448 F.Supp.2d 484, 492 (W.D.N.Y.2006). The Supreme Court has also recognized that a court need not necessarily address both components of the

Strickland inquiry; as that Court noted, "there is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland,* 466 U.S. at 697.

19 In *Williams v. Taylor,* the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]' " 529 U.S. at 391; *see also Sellan,* 261 F.3d at 309.

**ii. Contrary to, or an Unreasonable Application of, Supreme Court Precedent**

As the Appellate Division noted, a review of the record indicates that Gibson's trial counsel properly represented him in all respects. Counsel made appropriate motions, including a motion for trial order of dismissal at the close of the People's case and a motion for judgment notwithstanding the verdict, and vigorously cross-examined witnesses. Trial Tr. at R.142–80, 486–98, 545–603, 611–22, 632–47, 668–75, 682–88, 696–99, 732–68, 773, 806–09, 821–22, 857–69, 899–906, 935–37, 945–52, 953–55. Counsel also presented a witness on Gibson's behalf. *Id.* at R992–1002. Counsel's representation resulted in acquittal of the two most serious charges of the indictment. *Id.* at R1139–40.

***19** Nonetheless, Petitioner first claims that counsel presented no significant defenses and instead improperly conceded that he engaged in consensual sexual intercourse with the victim. This claim relates to counsel's tactical or strategic choices, which are "virtually unchallengeable." *Strickland,* 466 U.S. at 690; *Campbell v. Greene,* 440 F.Supp.2d 125, 150 (N.D.N.Y.2006) (McCurn, S.J.) (quoting *Nieves v. Kelly,* 990 F.Supp. 255, 264 (S.D.N.Y.1997)). The Second Circuit has held that "it is a reasonable strategy for a trial attorney to concede his client's guilt as to certain crimes in the hopes of obtaining an acquittal on more serious charges in an indictment." *Parker v. Duncan,* No. 03–CV–0759, 2007 WL 2071745, at *12 (N.D.N.Y. Jul. 17, 2007) (Kahn, D.J.) (citing *Farrington v. Senkowski,* 214 F.3d 237, 244 (2d Cir .2000) (sound trial strategy where defense counsel conceded defendant's guilt of certain crimes in an effort "to persuade the jury to acquit on the more serious charges"), *aff'd* No. 04–0562–pr., 2007 WL 4192013 (2d Cir. Nov. 28, 2007); *Brown v. Rick,* No. 01 CIV.4310 DC, 2003 WL 22801397, at *5 (S.D.N.Y. Nov. 25, 2003) (conceding petitioner's guilt of one crime while contesting guilt as to other charge constituted "a reasonable tactical decision"); *Nunez v. Miller,* No. 00 CIV 0966, 2001 WL 1773731, at *7 (E.D.N.Y. July 12, 2001) ("ample strategic reason" existed for defense counsel's concession that his client committed lesser included offense).

Counsel's concession at trial that Gibson engaged in sexual intercourse with the victim was clearly part of counsel's trial strategy of defending him against the most serious charges brought against him in the indictment, including first degree rape and first degree sodomy, both class B violent felony offenses. *See* N.Y. PENAL LAW §§ 70.02(1)(a); 130.30; 130.50. In support of that strategy, counsel gained concessions on cross-examination from the victim that Gibson did not force her into the building where the incident took place, that she did not object to linking her arm with Gibson's as they walked up the stairs toward the elevator, and that she did not scream or try to get away. *Id.* at R552–57. Counsel also elicited testimony from Carol Braungart, the examining nurse, that the victim had no bruises or cuts, no evidence of redness or trauma to the vaginal area, and no tearing or redness in the anal area. *Id.* at R670–73. He also called a defense witness, Gary Booker, who testified that he spoke to the victim prior to the incident. According to Booker, he asked Gibson what he was doing with the victim, and Booker told him that he could not "get rid of her." Trial Tr. at R993. Booker asked the victim why she was not in school, and the victim told him that she was grown and could do what she wanted. *Id.* at R994. Counsel argued these points to the jury in summation, stating that the crux of the case was whether there had been sex by "forcible compulsion." *Id.* at R1008–13. Counsel suggested that the victim had consented to vaginal intercourse but objected to anal penetration, and that was the reason she ran from the bathroom. *Id.* at R1018–29.

***20** Based on the record, counsel's strategic decision to concede certain charges and contest others was well within the wide range of reasonable professional assistance. In any event, in light of the overwhelming evidence that Petitioner engaged in sexual and anal intercourse with the victim, Petitioner cannot establish that but for counsel's strategy, the outcome of the case would have been different. The Appellate Division's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent, and it is therefore denied.

Gibson's claim that trial counsel was ineffective for not properly cross-examining the People's witnesses is also denied. The manner in which counsel conducted cross-examination is also a tactical decision and will not be second-guessed by a reviewing court unless there is no strategic justification for counsel's chosen course of action. *See United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature."); *Mathurin v. United States,* No. 01 Civ. 1374, 2007 WL 2589450, at *12 (S.D.N.Y. Sept. 5, 2007) ("[i]t is well established that the decision to engage in cross-examination and, if so, to what extent and in what manner, are tactical decisions that should not be second-guessed by the courts") (citing *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir.2002)); *Stallings v. Woods,* No. 04–CV–4714, 2006 WL 842380, at *18 (E.D.N.Y. Mar. 27, 2006) (decisions relating to the scope and manner of cross-examination "strategic in nature and generally will not support an ineffective assistance claim.") (quoting *Dunham,* 313 F.3d at 732). Here, the record shows, as the Appellate Division found, that counsel vigorously cross-examined witnesses. Trial Tr. at R545–86, R595–603, R611–18, R632–41, R668–75, 682–89, R696–99, R732–68, 773, R806–809, R821–22, 857–69, R899–906, 935–38, R945–51, R953–55.

Gibson's only specific complaint is that counsel did not cross-examine "nurse Braungart regarding her prior inconsistent states [sic] in her medical report regarding the pelvic exam of the complainant." Am. Pet. at Attach. p. 5. Gibson does not set forth what alleged inconsistencies counsel ignored, making it impossible to engage in meaningful review of this allegation. *See Brown v. New York,* No. 04–CV–1087, 2006 WL 3085704, at *7 (E.D.N.Y. Oct. 30, 2006) (vague and conclusory allegations are insufficient to state a viable claim for *habeas* relief); *Skeete v. New York,* No. 98–CIV–5384, 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17, 2003) ("vague, conclusory and unsupported claims do not advance a viable claim for habeas corpus relief."). In any event, as noted above, counsel elicited testimony favorable to Gibson during his cross-examination of Braungart, including testimony that the victim exhibited no obvious signs of trauma and that the outside and inside of the victim's anus was swabbed with the same rectal swab. Trial Tr. at R669–73, R682–88. This testimony lent support to counsel's later argument in summation that Gibson attempted to penetrate the victim's anus but he was unsuccessful. *Id.* at R1018–19, 1024–25.

***21** Gibson further claims that counsel was ineffective because he failed to hire an expert to "refute the DNA match claimed by the prosecution." Am. Pet. Attach. p. 7. "The decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on habeas review." *Savinon v. Mazucca,* 04 CIV 1589, 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005) (quoting *Stapleton v. Greiner,* 2000 WL 1207259, at *16 (E.D.N.Y. July 10, 2000) (citing *United States v. Kirsch,* 54 F.3d 1062, 1072 (2d Cir.), *cert. denied,* 516 U.S. 927 (1995)), *adopted,* 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006). Gibson's vague, conclusory claim does not provide this Court with any basis upon which to conclude that there was a witness who could have offered relevant and probative evidence to counter the DNA evidence offered by the prosecution. Under these circumstances, the decision of trial counsel not to call his own expert "cannot be considered objectively unreasonable" since Gibson "has only presented his vague hope that another expert might have reached a different result than the government expert." *Savinon,* 2005 WL 2548032, at *33 (quoting *Leaks v. United States,* 841 F.Supp. 536, 545 (S.D.N.Y.1994) (footnote omitted), *aff'd,* 47 F.3d 1157, *cert. denied,* 516 U .S. 926 (1995)). Similarly, Gibson cannot establish prejudice because he has not shown that a defense expert would have contradicted the prosecution's evidence. *See James,* No, 00 Civ. 8818, 2002 WL 1023146, at * 16 (S.D.N.Y. May 20, 2002) (rejecting petitioner's claim that trial counsel was ineffective in failing to obtain expert testimony where petitioner "provided no reason to believe that an ... expert hired by the defense would have offered any exculpatory testimony or indeed any testimony that differed from the Government expert"); *Murden v. Artuz,* 253 F.Supp.2d 376, 389 (E.D.N.Y. Sept. 7, 2001) (petitioner failed to show prejudice based on attorney's decision not to hire an expert where the petitioner did not "come forward with affidavits or other admissible evidence showing that there is an expert witness who would have testified" concerning issues that would have raised a reasonable doubt as to petitioner's guilt). This claim is also dismissed.

Gibson's claim that counsel was ineffective because he should have hired an investigator to locate possible witnesses is belied by the record. During the discussions regarding the victim's alleged unrelated false allegation of rape, the trial court gave counsel an opportunity to "make a call to your investigator" in order to locate proof that the allegation was indeed false. Trial Tr. at R 498.

Finally, Gibson's complaints that counsel did not (1) inform him of his right to testify before the grand jury; and (2) did not tell the prosecutor of his intent to testify at grand jury warrant no relief. In New York, a defendant's right to testify before the grand jury is not a federal constitutional right but, rather is a statutorily created right under CPL § 190.50(5)(a); *People v. Smith,* 87 N.Y.2d 715, 724 (1996). To the extent that Gibson claims that he was denied his right to testify before the grand jury, that claim is not cognizable on *habeas* review. 28 U.S.C. § 2254(a) (permitting federal *habeas* review only where a petitioner alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Lopez,* 865 F.2d at 32; *Welch v. Artuz,* 04–CV–205 S, 2007 WL 949652, at* 18 (W.D.N.Y. Mar. 29, 2007); *Lucius v. Filion,* 431 F. Supp 2d. 343, 346 (W.D .N.Y. May 23, 2006); *Staley,* 2003 WL 470568, at * 12. Gibson's argument that counsel failed to secure his grand jury testimony does not, therefore, amount to ineffective assistance. *Lucas v. Filion,* 431 F.Supp.2d 343, 348–49 & n. 2 (W.D.N.Y.2006); *Montalvo,* 2003 WL 22962504, at *24.

***22** Gibson's related claim, that counsel was ineffective for not moving to dismiss the indictment based upon deficiencies in the indictment process, also fails. Gibson's subsequent conviction by a jury (Trial Tr. at R1139–42) cured any arguable defects in the indictment process "because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt." *Montalvo,* 2003 WL 22962504, at *17. *See Mechanik,* 475 U.S. at 69 ("[t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."); *Davis,* 42 Fed. Appx. at 490–91 ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court."); *Staley,* 2003 WL 470568, at *12 ("any alleged defects in the state grand jury process are not cognizable on habeas review."). Gibson's claims of ineffectiveness relating to the grand jury process are dismissed.

### B. Ground Seven

In Ground Seven, Gibson raises additional claims of trial counsel ineffectiveness (labeled Parts A through F). Specifically, he argues that trial counsel: (A) failed to move to dismiss the indictment on speedy trial grounds; (B) failed to assist Gibson in exercising his right to testify before the grand jury; (C) failed to move to dismiss the indictment based upon false testimony of the victim regarding threats petitioner made to coerce her into having sexual intercourse; (D) failed to move to dismiss the indictment on grounds that it was defective; (E) failed to move to dismiss the charges against him because he was refused a preliminary hearing; and (F) failed to preserve a challenge to his sentence under the persistent felony offender statute. Respondent argues that these claims are untimely, procedurally barred and meritless. Dkt. No. 59 at 6–10, 17–24.

Petitioner raised these claims in a motion to vacate his conviction, filed on or about October 23, 2006. Dkt. No. 60, Ex. Z. The state court denied the motion. It first noted that the Appellate Division had rejected his ineffectiveness claim that trial counsel failed to secure his right to testify at grand jury and Gibson's claim that his sentence violated *Apprendi.* Dkt. No. 60, Ex. EE, at 1. On that basis, the court concluded that Gibson's claims that counsel was ineffective for not securing his right to testify at grand jury and for not objecting to his sentence under *Apprendi* were procedurally barred, citing to CPL 440.10(2)(a). *Id.* at 2. The court further concluded that Gibson's remaining claims were also procedurally barred because they were based upon the record and could have been raised on direct appeal, but were not, citing to CPL 440.10(2)(c). *Id.* at 2.

#### i. *Timeliness*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on federal *habeas* petitions that begins to run from the latest of several events, including the date on which the challenged state court conviction becomes final, the date upon which an impediment to filing created by State action in violation of the constitution or laws of the United States is lifted, the date on which the asserted constitutional right was newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review, and the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(A)-(D).

***23** The Second Circuit has held that for purposes of 28 U.S.C. § 2244, a state conviction becomes "final" when the time to seek certiorari to the United States Supreme Court has expired, which is ninety days after the date direct review of the case has

been completed by the highest court in the state. *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir.2001), *cert. denied* 534 U.S. 924 (2001); *Williams v. Breslin,* No. 03 CIV. 1848, 2004 WL 242447, at *1 (S.D.N.Y. Feb. 11, 2004). The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). "This tolling provision 'excludes time during which properly filed state relief applications are pending' but it does not restart the statute of limitations clock." *Williams v. Breslin,* 2004 WL 242447, at *2 (quoting *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000), *cert. denied* 531 U.S. 840 (2000)).

Petitioner's request for leave to appeal his conviction to the New York Court of Appeals was denied on February 25, 2004. His conviction became final for *habeas* purposes ninety days later on May 25, 2004. *See* 28 U.S.C. § 2244(d)(1)(A); N.Y. CRIM. PROC. LAW § 460.10(5). Petitioner had one year from that date, or until May 25, 2005, to file a federal *habeas* petition. Petitioner filed his original petition on June 28, 2004, which was timely. Dkt. No. 1.

On October 18, 2006, Gibson sought leave to amend his petition to include additional ineffectiveness claims and requested a stay of his *habeas* petition so that he could exhaust them in state court. Dkt. No. 28. Petitioner filed a CPL § 440 motion in Schenectady County Court on October 23, 2006. Dkt. No. 60, Ex. Z. The motion was denied on May 17, 2007, and leave to appeal was denied by the Appellate Division on September 6, 2007. Dkt. No. 60, Ex. GG–HH.

Gibson's amended *habeas* petition, in which he raised these newly exhausted ineffectiveness claims, was not filed until June 5, 2007, after the one year time period in which to seek *habeas* relief expired. 28 U.S.C. § 2244(d)(A). Had Gibson filed a post-conviction application prior to May 25, 2005, while the opportunity to seek *habeas* relief still existed, the pending application would have tolled the statute of limitations. 28 U.S.C. § 2244(d)(2). But Gibson is not entitled to tolling under Section 2244(d)(2) because he did not file his post-conviction motion until October 23, 2006, nearly seventeen months after the deadline to file the *habeas* petition had expired. Therefore, the filing of his post-conviction application did not restart the statute of limitations clock. *Williams v. Breslin,* 2004 WL 242447, at *2; *Davis v. McCoy,* No. 00 CIV. 1681, 2000 WL 973752, at *2 (S.D.N.Y. July 14, 2000).

Since Gibson's amended petition was not filed until after the one-year statute of limitations had run, he is required to show that it relates back to the claims in the timely filed petition within the meaning of Rule 15 of the Federal Rules of Civil Procedure. *Mayle v. Felix,* 545 U.S. 644, 664 (2005); *Fama,* 235 F.3d at 816; *Valerio v. Phillips,* No. 02–CV–903, 2007 WL 4191817, at *4 (W.D.N.Y. Nov. 21, 2007). The Supreme Court has rejected the proposition that a petitioner's "trial, conviction, or sentence" constitute the "conduct, transaction, or occurrence" contemplated by Fed.R.Civ.P. 15 because that would mean that all proposed amendments would "relate back" for purposes of Fed.R.Civ.P. 15(c). *Mayle,* 545 U.S. at 656, 657 ("[V]irtually any new claim introduced in an amended petition will relate back, for federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto."). Instead, in order for relation back to be approved, the original and amended petitions must "state claims that are tied to a common core of operative facts" (*Mayle,* 545 U.S. at 664) and must arise from "the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2). If the amended petition asserts a new ground for relief that is supported by facts that are different "in time and type" from those in the original pleading, the amended petition does not relate back. *Mayle,* 545 U.S. at 649–50, 657.

***24** As respondent apparently concedes, Gibson's claim in Part B that counsel was ineffective for failing to assist him in exercising his right to testify before the grand jury essentially repeats the same claim he initially asserted and therefore relates back to the June 2004 petition. *See* Dkt. No. 1, Dkt. No. 40, Ground Seven B. This claim has been reviewed and rejected elsewhere in this Decision and Order. *See supra* at pp. 25–27, 42–43.

This Court also finds that Gibson's claims in Part C (that counsel was ineffective failing to move to dismiss the indictment based upon the prosecutor's known use of false testimony of the victim during grand jury), and Part F (that counsel was ineffective for failing to preserve a challenge to his sentence under *Apprendi* ) also relate back to the original petition. Although these two claims are based upon a new theory of relief, they arise from the same "common core of operative facts" (*Mayle,* 545 U.S. at

664) as those set forth in Grounds Four and Six of his original *habeas* petition. *See Ford v. Phillips,* No. 03–CV–2077, 2007 WL 957536, at *17 (E.D.N.Y. Mar. 29, 2007) ("Although petitioner's claim asserts a new ground for relief (*i.e.,* ineffective assistance of counsel), it is not based on facts that differ in "both time and type" from those asserted in his original petition.") (quoting *Mayle,* 545 U.S. at 648); *Torres v. Girdich,* No. 04 Civ. 1512, 2006 WL 1230328, at *11 (S.D.N.Y. May 9, 2006) (claim that counsel ineffective for failing to object to the testimony of two police officers about narcotics packaging and marketing, and for failing to request a limiting instruction on that testimony, related back to the original petition where the underlying claims were originally pleaded); *Serrano v. Burge,* 2005 WL 2063765 at *4 (S.D.N.Y. Aug. 22, 2005) (ineffective assistance of counsel claim based upon the "same common core of operative facts as his original habeas petition" because "[a]lthough the ineffective assistance of appellate counsel claim [was] based on a new theory of relief," it arose from the "same facts as the original habeas petition."), *adopted,* 2005 WL 2170362 (S.D.N.Y. Sept. 8, 2005).

The three other ineffectiveness claims in Ground Seven, however, are wholly different from the originally pleaded claims. *See Mayle,* 545 U.S. at 664. There is no reference at all in Gibson's June 2004 petition to the ineffectiveness claims contained in Parts A (failure to raise a speedy trial challenge) and E (failure to move to dismiss the indictment because the trial court refused to hold a preliminary hearing). Dkt. No. 1. The same is true of the claim in Part D, that counsel was ineffective for not moving to dismiss the indictment because it was defective. Gibson claimed in his original petition that counsel "failed to challenge the legality of the indictment" and referred this Court to the claims more fully set forth in his Appellate Brief. Dkt. No. 1, Ground Four, Supporting Facts. A review of the Appellate Brief reveals that on direct appeal, Petitioner argued that the grand jury procedure used by the prosecutor was improper because notice was served on Gibson's attorney that the case would be presented to the grand jury on March 7, 2000, but the prosecutor did not present it until September 7, 2000, and trial counsel was ineffective for not moving to dismiss the indictment on that ground. Dkt. No. 16, Ex. G, at 66–67. Gibson did not argue, as he does now in Part D, that trial counsel should have moved to dismiss the indictment because it did not contain his name. Dkt. No. 40, Ground Seven, Part D.

***25** Since Gibson's claims in Parts A, D and E are sufficiently different from those in his original petition, they cannot be said to arise from the same "transaction, conduct or occurrence" as defined by the Supreme Court. *See Mayle,* 545 U.S. 644. These newly pled claims do not relate back, and are thus untimely. *See Veal v. United States,* No. 01 CIV. 8033, 2007 WL 3146925, at *6 (S .D.N.Y. Oct. 9.2007) (holding that petitioner's proposed amended claim that trial counsel was ineffective in failing to notify him of a plea offer did not "relate back" under Fed.R.Civ.P. 15(c) to petitioner's two original claims that trial counsel erroneously failed to move to dismiss certain counts of the indictment and failed to object to a particular jury instruction; finding that "[t]hese separate and distinct phases of the case were sufficiently different" to make them not arise out of the same "conduct or occurrence" and that the government could not have had "fair notice" of the new claims); *Porter v. Greiner,* No. 00–CV–6047, 2005 WL 3344828, at *10 (E.D.N.Y. Nov. 18, 2005) (newly pleaded claim that counsel was ineffective for failing to contest an allegedly erroneous jury charge did not relate back because none of the claims in the original petition were based on the jury charge in question).

A court may, in certain circumstances, excuse a petitioner's delay in filing a timely motion under the doctrine of equitable tolling. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.1996), *cert. denied* 531 U.S. 840 (2000); *Bellamy v. Fisher,* No. 05 CIV. 2840, 2006 WL 2051038, at *4 (S.D.N.Y. July 24, 2006). The doctrine should be used sparingly and only in rare circumstances. *Lawrence v. Florida,* 127 S.Ct. 1079, 1085 (2007). For equitable tolling to apply, petitioner must show " '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence,* 127 S.Ct. at 1085 (quoting *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)); *Belot v. Burge,* 490 F.3d 201, 205 (2d Cir.2007), *cert. denied* No. 07–7548, 2008 WL 423715 (Feb. 19, 2008). A petitioner claiming extraordinary circumstances must support that claim with evidence and not simply with "personal conclusions or assessments." *Bellamy,* 2007 WL 2051038, at *5 (citing *Mendez v. Artuz,* No. 99 CIV. 2472, 2000 WL 991336, at *2 (S.D.N.Y. Jul. 18, 2000) (holding that conclusory allegations do not meet the high burden required to justify tolling). A petitioner must also show that he was unable to pursue his legal rights during the entire period that he seeks to toll. *Barbosa v. United States,* No. 01 CIV. 7522, 2002 WL 869553, at *5 (S.D.N.Y. May 3, 2002).

Petitioner does not seek equitable tolling in this case, and has failed to demonstrate any extraordinary circumstances that prevented him from exhausting his ineffectiveness claims in Parts A, D and E prior to the expiration of the limitations period. These claims are untimely and are dismissed.

**ii. *The Timely Claims in Ground Seven are Procedurally Barred***

***26** Although the claims in Parts B, C and F (Dkt. No. 40 at Attach p. 10, 12–18) relate back to the original petition, they are also procedurally barred. Gibson raised each of these claims in his CPL § 440.10 motion. Dkt. No. 60, Ex. Z. The state court rejected Gibson's claim in Part B, that counsel was ineffective for not assisting him in exercising his right to testify before the grand jury, because the Appellate Division "specifically addressed and rejected" it. Dkt. No. 60, Ex. EE, at 2 (citing CPL § 440.10(2)(a)). The court also rejected Gibson's claim in Part F, that counsel was ineffective for not preserving a challenge to his sentence under *Apprendi,* because the Appellate Division found that Gibson's sentence did not violate *Apprendi. Id.* (citing CPL 440.10(2)(a)). Finally, the state court rejected Gibson's claim in Part C, that counsel failed to move to dismiss the indictment because it was based upon the known use of false testimony by the victim, because Gibson unjustifiably failed to raise this claim on direct appeal. *See* Dkt. No. 60, Ex. EE, at 2 (citing CPL 440.10(2)(c)).

The state court's rejection of Gibson's claim in Part C pursuant to CPL § 440.10(2)(c) rests upon an independent and adequate state ground and federal review of the claim is thus barred. *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993), *cert denied* 510 U.S. 1078 (1994); *Cruz. v. Berbary,* 456 F.Supp.2d 410, 419 (W.D.N.Y.2006); *Heron v. Coughlin,* No. 94–CV–1860, 2003 WL 21921267 at *2 (S.D.N.Y.2003); *Morales v. Sabourin,* No. 00 Civ. 8773, 2002 WL 32375006 at *12 (S.D.N.Y.2002). As noted above, this Court may review Gibson's procedurally barred claim only if he demonstrates cause for the default and resulting prejudice, or that the failure of the federal court to review the claim will result in a "fundamental miscarriage of justice" *i.e.,* that he is innocent. *Calderon,* 523 U.S. at 559; *Coleman,* 501 U.S. at 748–750.

Gibson has failed to allege or establish cause for his failure to raise this claim on direct appeal, and has never argued, in either the state courts or this proceeding, that his appellate counsel rendered ineffective assistance by failing to argue in the state courts that trial counsel was ineffective on this ground. *See* Dkt. No. 60, Ex. JJ. Since Gibson has not established cause for his procedural default, the Court need not decide whether he suffered actual prejudice. *Stepney,* 760 F.2d at 45; *Staley,* 2003 WL 470568, at *7. Although Gibson claims there was insufficient evidence of his guilt, he has not presented any new evidence that he is "actually innocent" of the crimes for which he was convicted. *See Schulp,* 513 U.S. at 327. The procedural default bars federal review of Gibson's claim in Part C.

Even if the claim was not barred, it would be dismissed. As noted above, a prosecutor is not required to present exculpatory evidence to a grand jury. *Williams,* 504 U.S. at 55; *Jones,* 250 F.Supp.2d at 232–33. Counsel cannot now be deemed ineffective for failing to make a meritless motion. *Arena,* 180 F.3d at 396.

***27** It is not clear that the state court's rejection of Gibson's claims in Parts B (that counsel was ineffective for failing to assist him in exercising his right to testify before the grand jury) and F (that counsel was ineffective for not preserving a challenge to his sentence under *Apprendi* ), are similarly barred. Each of these claims was denied by the state court under CPL § 440.10(2)(a) because they were "specifically addressed and rejected" by the Appellate Division. Dkt. No. 60, Ex. EE, at 2 (citing *Gibson,* 2A.D.3d at 973).

District courts within the Second Circuit disagree as to whether a state court's reliance on CPL § 440.10(2)(a) in denying a constitutional claim results in the procedural default of that claim on federal *habeas* review. *See, e.g., Cruz,* 2006 WL 2946946, at *8 (concluding that CPL § 440.10(2)(a) constitutes adequate and independent state ground resulting in procedural default of petitioner's federal *habeas* claims); *Hronopoulos v. Keane,* No. 98–CV–3221, 1999 WL 529559, at *4 (E.D.N.Y. Jul. 21, 1999) (finding that petitioner's claim was procedurally barred under CPL § 440.10(2)(a)); *Encarnacion v. Walker,* No. 96–CV–329, 1998 WL 34002608, at *4–5 (N.D.N.Y. Aug. 21, 1998) (Sharpe, J.) (identifying CPL §§ 440.10(2)(a) as adequate and independent state procedural rules), *adopted,* No. 96–329, Dkt. No. 17 (N.D.N.Y. Aug. 24, 1999) (Scullin, D.J.); cf. *Douglas v. Hollins,* No. 00 Civ. 7928, 2004 WL 187130, at * 6 n. 5 (S.D.N.Y. Jan. 29, 2004) (finding that state court ruling under CPL §

440.10(2)(a) "does not constitute a finding of procedural default that precludes federal habeas review of the merits"); *Guzman v. Couture,* No. 99 Civ. 11316, 2003 WL 165746, at *11 (S.D.N.Y. Jan. 22, 2003) ("A dismissal under § 440.10(2)(a) is not based on any procedural default. To the contrary, it is premised on a prior decision.") (quotations omitted); *Taylor v. Kuhlmann,* 36 F.Supp.2d 534, 546 (E.D.N.Y.1999) (same).

This Court need not, however, "untangle the complicated procedural bar issues" presented here because the claims in Parts B and F are "easily resolvable." *Soto v. Portuondo,* No. 02–CV–28, 2004 WL 2501773, at *5 (E.D.N.Y. Nov. 5, 2004) (quoting *Dunham,* 313 F.3d at 729–30 (internal quotations omitted)). This Court has already reviewed and rejected Gibson's claim in Part B that counsel was ineffective for failing to assist him in exercising his right to testify before the grand jury, and this claim is dismissed.

Gibson's claim in Part F, that counsel was ineffective for not preserving a challenge to his sentence under *Apprendi,* is also dismissed. The Appellate Division addressed Gibson's claim on direct appeal that his sentence violated the holding in *Apprendi,* even though counsel did not object to the sentence on this ground, and found the claim "meritless." *See* Dkt. No. 60, Ex. EE at 2; *Gibson,* 2 A.D.3d at 974. Since the Appellate Division reached the merits of this claim, Gibson cannot demonstrate prejudice, i.e., that but for counsel's failure to challenge his sentence under *Apprendi,* the outcome would have been different. *Strickland,* 466 U.S. at 687, 694 (absent prejudice, an ineffectiveness claim fails); *Wegman v. West,* No. 04–CV–312 S, 2007 WL 2789733, at *7 (W.D.N.Y. Sept. 24, 2007) ("This Court finds, rather, that any mistake by counsel in failing to object was harmless error, and did not amount to ineffective assistance" where petitioner failed to demonstrate that but for counsel's failure to object, the result would have been different).

### III. *Certificate of Appealability*

***28** Since the dismissal of some of Gibson's claims in Ground Seven is not based upon a consideration of the merits, a certificate of appealability is granted for the limited purpose of determining (1) whether the claims in Ground Seven, Parts A, D, and E "relate back" to his original petition; and, if they do not, (2) whether equitable tolling is appropriate under the facts presented in this particular case. *See Slack v. McDaniel,* 529 U.S. 473, 484–85 (2000) (when a petition is denied on procedural grounds without reaching the merits of the underlying constitutional claim, a certificate of appealability should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the district court was correct in its procedural ruling); *Muller v. Greiner,* No. 03–Civ–1844, 2004 WL 97687, at *4 (S.D.N.Y. Jan. 20, 2004), *aff'd* 2005 WL 1712964 (2d Cir.2005) (stating that because dismissal is not based on a consideration of the petition's merit, a certificate of appealability is appropriately granted for the limited purpose of determining whether equitable tolling is warranted.). **No certificate of appealability shall issue** with regard to Gibson's remaining claims because he has failed to make a substantial showing of a denial of a constitutional right therein. *See* 28 U.S.C. § 2253(c)(2) (1996).

***WHEREFORE,*** after reviewing Gibson's submissions and the relevant law, and for the reasons stated herein, the Court hereby

**ORDERS** that Gibson's petition for a writ of *habeas corpus* is **DISMISSED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of his Order on Gibson by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 9434482

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 11644017
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wigberto OSORIO, Petitioner,
v.
Supt. JOHNSON, Respondent.

9:21-cv-00708-BKS-TWD
|
Signed November 3, 2023

**Attorneys and Law Firms**

WIGBERTO OSORIO, Petitioner, pro se, 17-B-1928, Green Haven Correctional Facility, P.O. Box 4000, Stormville, NY 12582.

PRISCILLA I. STEWARD, ESQ., Assistant Attorney General, LETITIA JAMES, Attorney General for the State of New York, Attorney for Respondent, 28 Liberty Street, New York, NY 10005.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

***1** This matter has been referred for a report and recommendation by the Hon. Brenda K. Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Petitioner Wigberto Osorio ("Petitioner"), a New York State prisoner appearing *pro se*, seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) He is currently incarcerated at Green Haven Correctional Facility. *Id.* at 1. In 2017, following a trial by jury, Petitioner was convicted in Onondaga County Court of murder in the second degree, assault in the first degree, attempted kidnapping in the second degree, gang assault in the first degree, and criminal possession of a weapon in the third degree. State Court Record ("SR") 12.[1] He was sentenced, as a second felony offender, to an aggregate prison term of 25 years to life. *Id.* The Appellate Division, Fourth Department, affirmed the conviction on January 31, 2020, and the Court of Appeals denied leave to appeal on April 27, 2020. SR 605-06, 619. This action followed. (Dkt. No. 1.)

1 The State Court record can be found at Dkt. Nos. 11 and 11-1.

Petitioner contends he is entitled to federal habeas relief because (1) he was denied the effective assistance of trial counsel; (2) he was denied the effective assistance of appellate counsel; (3) he is actually innocent of the crimes of which he was convicted; and (4) the indictment was defective because of the false testimony of two prosecution witnesses at the Grand Jury. (Dkt. No. 1 at 6, 8, 9.) Respondent, through the State of New York, filed an answer to the petition, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 10, 11.) Respondent contends Petitioner's claim the Grand Jury proceedings were defective is meritless and not cognizable; his actual innocence claim is meritless and not cognizable; and his ineffective assistance of counsel claims are meritless and unexhausted. (Dkt. No. 10-1 at 15-26.) Petitioner then filed a traverse. (Dkt. No. 13.)

For the reasons that follow, the Court recommends the petition be denied and dismissed, and that no certificate of appealability be issued.

**II. BACKGROUND**

On August 1, 2014, at around 6:15 PM, brothers Juan Martinez and Edward Loraino were shot in the City of Syracuse, killing Martinez and severely injuring Loraino. (Dkt. No. 11-3 at 186-88.) On August 3, 2014, at 12:16 AM, Syracuse Police were dispatched to a shooting at 825 South Wilbur Street. (Dkt. No. 11-2 at 603-04.) When they arrived, the victim, Juan Fuentes Diaz was unconscious and not breathing. *Id.* at 604-07. Diaz later died. *Id.* at 618.

According to the trial testimony of the sole accomplice, Cesar Sanchez, Diaz was killed in retaliation for Martinez's death. *Id.* at 644-45. On the night of August 2, 2014, Jose Cruz-Rivera, Petitioner, Marcus Carrasquillo, and Ricky Santa drove around in a minivan looking for Diaz because they believed he was responsible for killing Sanchez, who was the brother of Cruz-Rivera's girlfriend. *Id.* at 639-45; (Dkt. No. 11-3 at 186). At around midnight, Petitioner's group found Diaz talking with Cesar Sanchez on the street. (Dkt. No. 11-2 at 639-40, 743, 769.) Petitioner, Carrasquillo, and Santa exited the van and beat Diaz with baseball bats. (*Id.* at 640, 644-45.) Cruz-Rivera then ordered Sanchez to put Diaz in the van. *Id.* at 646-47. When Sanchez was unable to do so, Cruz-Rivera pulled out a handgun and shot Diaz multiple times, killing him. *Id.* at 647-50.

**A. Pre-Trial Proceedings**

***2** An Onondaga County grand jury charged Petitioner with murder in the second degree, attempted kidnapping in the second degree, gang assault in the first degree, two counts of assault in the first degree, gang assault in the second degree, two counts of assault in the second degree, and criminal possession of a weapon in the third degree. SR 16-18. Prior to trial, Petitioner moved to dismiss the indictment on the grounds that the evidence was legally insufficient to support the indictment and that the proceeding was defective. SR 22. In a written decision issued on August 11, 2016, the court denied the motion. SR 22-23.

In a letter dated October 13, 2016, the prosecutor notified the defense and the court that she had met with Leslie Osorio, who testified before the grand jury and was scheduled to testify at trial. SR 93-94. Osorio admitted she had lied to avoid testifying. SR 93. Specifically, Osorio stated she had lied both in her statement to the police and in her grand jury testimony about Petitioner and Sanchez coming to her house after the murder with blood on their clothes, and Cruz-Rivera coming to her house with a gun. *Id.* Osorio stated her boyfriend, Ricardo Colberg, had coerced her into giving the false statements because he thought it would benefit him in an unrelated pending criminal case. *Id.* Osorio maintained, however, the other aspects of her statements and grand jury testimony were truthful, including that before the murder, Diaz had come to her house and soon thereafter Petitioner and Cruz-Rivera stopped by looking for Diaz. *Id.* Based on Osorio's disclosure, Petitioner renewed his motion to dismiss the indictment. SR 98-103. Petitioner argued Osorio's perjured testimony rendered the grand jury proceeding defective and, without her testimony, Sanchez's accomplice testimony was uncorroborated. *Id.*

The Court heard Petitioner's argument on the motion on October 17, 2016. (Dkt. No. 11-2 at 132-64.) The People argued dismissal was unwarranted because the People did not knowingly use perjured testimony, the People immediately advised defense counsel of the perjury, and even without that testimony, the evidence was legally sufficient to support each count of the indictment, and Sanchez's testimony was sufficiently corroborated. *Id.* at 141-46. Attorneys for Petitioner and Cruz-Rivera both argued that if Osorio had offered perjured testimony, then Sanchez also gave perjured testimony in providing the same account of having gone to Osorio's house after the murder with Petitioner, wearing bloody clothes. *Id.* at 150-58. However, the prosecutor claimed Sanchez denied lying to the grand jury when confronted with Osorio's recantation. *Id.* at 147.

The Court denied Petitioner's motion to dismiss the indictment, finding that the prosecution did not intentionally use perjured testimony, the remaining testimony provided legally sufficient evidence to support the crimes charged, and the integrity of the proceedings was not compromised. *Id.* at 160-61.

On April 22, 2017, two days before trial was set to begin, the prosecutor informed the defense and the Court she had met with Sanchez and again confronted him about Osorio's recantation of her grand jury testimony. SR 127. Sanchez admitted his grand jury testimony about going to Osorio's house with Petitioner after the murder with blood on their clothes was false. *Id.* He also claimed Colberg had told him to give this false information because Colberg believed it would help him in an unrelated criminal matter. *Id.* However, Sanchez claimed that the remainder of his testimony had been truthful. *Id.*

Based on Sanchez's disclosure, Petitioner renewed his motion to dismiss the indictment. SR 121-28. On April 24, 2017, the Court denied the renewed motion on the same grounds on which the initial motion was rejected: the People did not knowingly or negligently present perjured testimony to the grand jury, the remainder of the evidence was legally sufficient to support the charges, and the proceeding was not rendered defective. (Dkt. No. 11-2 at 193-94, 201.)

**B. Jury Trial**

***3** Petitioner's jury trial commenced on April 24, 2017, in Onondaga County Supreme Court. (Dkt. No. 11-2 at 177.) The People called Joshua Emmons, Donna Silkworth, Det. Steven Kilburn, Cesar Sanchez, and Leslie Osorio.

Joshua Emmons and Donna Silkworth lived in the area where Diaz was killed and witnessed portions of Diaz's murder from their homes. At around midnight, on August 3, 2014, Emmons was watching television when he "heard a lot of commotion outside" which he described as "[a] guy yelling" what sounded like "[n]o, please." (Dkt. No. 11-2 at 776.) He looked out his window onto South Wilbur Avenue and saw "a guy hitting another guy with a baseball bat." *Id.* at 777. The attacker, whose back was facing Emmons, wore all black with a hood over his head and was hitting the victim on his head, legs, and arms. *Id.* at 779.

Soon thereafter, another person, also dressed in black with his hood over his head, went to the back of a minivan, grabbed another baseball bat, and started hitting the victim. *Id.* at 780. Emmons could not see his face. *Id.* at 781. The attackers then tried to get the victim into a minivan by dragging him by his shirt and arms. *Id.* at 782. When that effort failed, another man who "looked like he got tired of it" pulled a gun from his waist area and shot the victim. *Id.* at 782, 785.

Additionally, Emmons saw one person sitting in the driver's seat of the van and another person sitting on its hood. *Id.* at 783. Emmons did not see a third person with a baseball bat. *Id.* at 802.

After seeing the shooter fire two or three shots, Emmons backed away from the window. *Id.* at 786. He then heard an additional six or seven shots. *Id.* at 786-87. Soon thereafter, he heard tires screeching and, when he looked out the window again, he saw the minivan driving toward Seymour Avenue. *Id.* at 787. The victim lay motionless on the sidewalk. *Id.* at 788.

Donna Silkworth lived near the corner of Amy Street and Seymour Avenue. *Id.* at 863. On August 3, 2014, Silkworth was sitting on her back porch when she saw three men walk past her house. *Id.* at 863, 865-66. They were "all pulling shirts down over their faces" and went into a backyard on Seymour Avenue. *Id.* at 864-66, 868. The men appeared to have weapons, at least one of which looked like a baseball bat and one that looked like a gun. *Id.* at 868-69. Silkworth then saw a white van with sliding doors pull up to the corner of Seymour Avenue and Amy Street, opposite her house. *Id.* at 869-70. Three or four men jumped out of the van. *Id.* at 871. Silkworth briefly lost sight of them but saw them return to the minivan and drive through Sakran Plaza. *Id.* at 872. The van then drove onto Amy Street before turning onto Wilbur Avenue. *Id.* at 873. Silkworth again lost sight of the van and, shortly afterward, heard multiple gunshots coming from the direction of Wilbur Avenue. *Id.* at 874. She went to the end of her driveway and saw the white van "heading up toward Burnet Park on Wilbur." *Id.*

On March 10, 2015, Det. Kilburn interviewed Petitioner in connection with Diaz's death. (Dkt. No. 11-3 at 251.) Petitioner denied any involvement with Diaz's murder. *Id.* at 251-54. Petitioner claimed because he had a curfew, he could not have been around when Diaz was killed. *Id.* at 256. He further denied being close with Martinez, although he admitted that he went to the hospital when Martinez died. *Id.* at 253-54. Petitioner acknowledged he and a few other people had gotten shirts made with Martinez's picture on them and he was present at a gathering commemorating Martinez's life. *Id.* at 254. Petitioner knew Martinez was close with Cruz-Rivera and suggested it was possible Diaz had set up Martinez to be killed. *Id.* at 256-57.

***4** Both Sanchez and Osorio testified about lying to law enforcement officers and to the grand jury. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) They admitted they falsely stated that after Diaz's death, Sanchez and Petitioner stopped by Osorio's house with blood on their clothes. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) Sanchez also falsely told the grand jury he saw Petitioner leave Osorio's house wearing a change of clothes. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) At trial, Sanchez

admitted he did not go to Osorio's house after the murder, and he did not see Petitioner after he left the scene in the minivan. (Dkt. No. 11-2 at 670, 680-82.)

Both Sanchez and Osorio testified the false accounts were furnished by Osorio's boyfriend, Ricardo Colberg. Sanchez encountered Colberg when he was in jail on unrelated charges. (Dkt. No. 11-2 at 670-73.) Osorio testified Colberg had coerced her into giving the false account by threatening her. (Dkt. No. 11-3 at 17-19.) She also believed that providing the false information would help Colberg get out of jail following his arrest on unrelated drug and weapon charges. *Id.* at 21-22.

**C. Petitioner's Case**

Petitioner called his father, Wigberto Osorio, Sr., and his brother, Christian Osorio, as witnesses. Wigberto Sr. testified on August 2, 2014, he was having a "family reunion" on the porch of his home at 211 Putnam Street because one of his neighbors had been killed. (Dkt. No. 11-3 at 326, 330-31.) Petitioner arrived at about 10 PM. *Id.* at 326, 329-31. Wigberto Sr. stated he and Petitioner entered the house at about 10:30 PM. *Id.* at 332-33. Petitioner then went to his bedroom while Wigberto Sr. remained awake in the living room until about 1 AM. *Id.* at 333.

Christian testified Petitioner and Wigberto Sr. were still out on the porch when he entered the house and went to his bedroom at around 10:30 PM. *Id.* at 348-51. Christian heard Petitioner go into his bedroom and fell asleep at about 11 PM. *Id.* at 354. Christian testified Petitioner was home at 8 AM when he woke up. *Id.* at 357.

**D. Verdict and Sentence**

As set forth above, Petitioner was convicted of murder in the second degree, attempted kidnapping in the second degree, gang assault in the first degree, assault in the first degree, and criminal possession of a weapon in the third degree. (Dkt. No. 11-3 at 566-68.)

On June 22, 2017, Petitioner was sentenced, as a second felony offender, to concurrent prison terms of 25 years to life for the murder conviction, 15 years, plus 5 years of post-release supervision for the attempted kidnapping conviction; 25 years, plus 5 years of post-release supervision for the assault and gang assault convictions; and 3½ to 7 years for the weapon conviction. (Dkt. No. 11-3 at 576-77.)

**E. Direct Appeal**

Petitioner filed a counseled brief in the Appellate Division, Fourth Department, arguing, *inter alia*, that (1) Sanchez's accomplice testimony establishing Petitioner's participation in the murder was not corroborated by other evidence and (2) the integrity of the grand jury proceedings was impaired by the false testimony of two prosecution witnesses. SR 424-518. The People filed an opposing brief, and Petitioner filed a reply brief. SR 519-82, 583-602.

The Appellate Division unanimously affirmed the judgment on January 31, 2002.[2] SR 605-06. The Court rejected Petitioner's claim that the accomplice testimony was insufficiently corroborated. *Id.* The Court found Petitioner's statements to the police demonstrated his motive to harm the victim, and that Petitioner, Cruz-Rivera, and another participant in the crime were close friends. *Id.* Other testimony established Petitioner, Cruz-Rivera, and two other participants were seen together just hours before the murder and Petitioner was holding a baseball bat and asking where Diaz was. *Id.* Further, "forensic evidence substantiated much of [Sanchez's] testimony, and testimony of eyewitnesses at and near the scene of the crime harmonized with [Sanchez's] testimony." *Id.* The Court thus concluded "the corroborative evidence tends to connect [Petitioner] with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth." *Id.* (internal quotation marks and citations omitted).

2 *People v. Osorio*, 179 A.D.3d 1512 (4th Dep't 2020).

***5** The Court also rejected Petitioner's grand jury claim, just as it had in Cruz-Rivera's appeal, because " 'inasmuch as the prosecutor did not knowingly offer perjured testimony and there was sufficient evidence before the grand jury to support the charges without considering the perjured testimony, dismissal of the indictment was not required.' " *Id.* (quoting *People v. Cruz-Rivera*, 174 A.D.3d 1512, 1513 (4th Dep't 2019)).

Petitioner filed a counseled application for leave to appeal to the New York Court of Appeals, asking the Court to review his claims that Sanchez's accomplice testimony was not sufficiently corroborated and that the integrity of the grand jury proceedings was impaired. SR 607-13. The People filed a letter opposing the application. SR 614-18. On April 27, 2020, the Court of Appeals denied leave to appeal. SR 619. [3]

3 *People v. Osorio*, 35 N.Y.3d 972 (2020).

### F. Coram Nobis Motion

Petitioner brought a *pro se* coram nobis motion alleging he was denied the effective assistance of appellate counsel because counsel failed to assert claims that: (1) trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses[ ] recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim"; (2) false testimony provided at the grand jury proceeding prejudiced Petitioner; (3) the witnesses were incredible and testified falsely; and (4) Petitioner is actually innocent. SR 620-636. The People filed an affirmation opposing the motion. SR 828-35. The Appellate Division summarily denied the motion on April 30, 2021. SR 838. Petitioner did not seek leave to appeal the denial of the motion.

## III. PETITION

In his petition for writ of habeas corpus, filed on May 20, 2021, Petitioner argues he is entitled to habeas relief because: (1) he was denied effective assistance of trial counsel; (2) he was denied effective assistance of appellate counsel; (3) he is actually innocent of the crimes of which he was convicted; and (4) the indictment was defective due to the false testimony of two prosecution witnesses at the grand jury proceedings. (Dkt. No. 1 at 6, 8, 9.)

## IV. ANALYSIS

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.' " *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' ") (quoting *Richter*, 562 U.S. at 103).

***6** Additionally, AEDPA foreclosed " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume the state courts' factual findings are correct unless a petitioner rebuts that presumption with " 'clear and convincing evidence.' " *Id.* at 473-74 (quoting § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

### B. Defective Indictment

Petitioner claims "JURISDICTION HAS BEEN LOST PURSUANT TO INDICTMENT AND GRAND JURY DEFECTIVENESS, PERJURY AND RECANTATION EVIDENCE PRESENTED AT THE GRAND JURY."[4] (Dkt. No. 1 at 9.) Construed liberally, Petitioner claims the indictment should be dismissed as defective because the integrity of the grand jury proceedings was impaired due to Osorio's and Sanchez's partially false grand jury testimony. (*See generally* Dkt. No. 1 at 85-105.) Respondent counters this claim is not cognizable and is meritless. (Dkt. No. 10-1 at 15-18.) The Court agrees with Respondent.

4 Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

In the first instance, to the extent Petitioner is challenging the propriety of the grand jury proceedings, including the prosecutor obtaining and proceeding on a "defective indictment," such claim fails. There is no federal constitutional right to a grand jury proceeding. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002). In New York, a grand jury indictment arises from the "State Constitution and other state laws ... and federal habeas relief may not be granted for violations of state law." *Robinson v. LaClair*, No. 09-CV-3501, 2011 WL 115490, at *8 (E.D.N.Y. Jan. 13, 2011). Therefore, "[c]laims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court." *Davis v. Mantello*, 42 F. App'x 488, 490-91 (2d Cir. 2002) (summary order), *cert. denied sub nom Davis v. Filion*, 538 U.S. 986 (2003); *see also Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S.D.N.Y. Sept. 7, 2007) (claim that false testimony was presented before the grand jury is not cognizable on habeas review) (citing *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989)); *Mayes v. Donnelly*, No. 03-CV-417, 2009 WL 2601106, at *9 (W.D.N.Y. Aug. 21, 2009) ("To the extent that Mayes is attempting to assert a claim that Anderson perjured himself when he testified before the grand jury, habeas relief is not warranted because the claim is not cognizable in this federal habeas proceeding[.]").

***7** Further, following a guilty verdict rendered by a petit jury, alleged deficiencies in a state grand jury proceeding are not cognizable on habeas review. *See Lopez*, 865 F.2d at 31; *Dunn v. Sears*, 561 F. Supp. 2d 444, 453 (S.D.N.Y. 2008). Thus, after a conviction, habeas relief is unavailable for claims of prosecutorial misconduct in the grand jury. *See Campbell v. Poole*, 555 F. Supp. 2d 345, 367-68 (W.D.N.Y. 2008); *Evans v. Poole*, No. 05 Civ. 5951, 2005 WL 2847769, at *1 (S.D.N.Y. Oct. 31, 2005).

Even if this claim was cognizable, it is ultimately meritless. Petitioner had previously argued "Sanchez's and Osorio's conspiracy to falsely implicate [Petitioner] to ensure his indictment [along with] their false Grand Jury testimony is the 'fraudulent conduct' undermining the integrity of the" Grand Jury proceedings—warranting dismissal of the indictment. (Dkt. No. 11-1 at 240-41.)

A grand jury proceeding is defective, and warrants dismissal of the indictment, "where the 'proceeding fails to conform to the requirements of CPL article 190 to such degree that the integrity thereof is impaired and prejudice to the defendant may

result.' " *People v. Sealy*, 181 A.D.3d 893, 894 (2d Dep't 2020), *lv denied*, 35 N.Y.3d 1070 (2020) (internal brackets and ellipses omitted) (quoting *People v. Huston*, 88 N.Y.2d 400, 409 (1996)); *see also People v. Moffitt*, 20 A.D.3d 687, 688 (3d Dep't 2005). "Dismissal of an indictment under CPL 210.35 (5) must meet a high test and is limited to instances of prosecutorial misconduct, fraudulent conduct[,] or errors which potentially prejudice the ultimate decision reached by the grand jury." *People v. Elioff*, 110 A.D.3d 1477, 1477 (4th Dep't 2013), *lv denied*, 22 N.Y.3d 1040 (2013) (internal quotation marks, brackets, and citations omitted). "While the defendant need not demonstrate actual prejudice before an indictment is considered defective, but rather, must merely show the 'possibility' of prejudice from the conduct of the prosecutor ... this possibility of prejudice must follow from *some* identifiable misconduct on the part of the prosecutor such as would have impaired the integrity of the Grand Jury process." *People v. Johnson*, 282 A.D.2d 309, 310 (1st Dep't 2001), *lv denied*, 96 N.Y.2d 903 (2001) (emphasis added) (internal citation omitted).

"As the Court of Appeals has stated, 'not every improper comment, elicitation of inadmissible testimony, impermissible question or mere mistake renders an indictment defective. Typically, the submission of some inadmissible evidence will be deemed fatal only when the remaining evidence is insufficient to sustain the indictment.' " *Elioff*, 110 A.D.3d at 1477-78 (quoting *Huston*, 88 N.Y.2d at 409); *see also People v. Miller*, 110 A.D.3d 1150, 1151 (3d Dep't 2013).

Here, although Osorio and Sanchez later admitted to lying during their Grand Jury testimony, the trial court found the People did not knowingly or negligently present perjured testimony to the Grand Jury. (Dkt. No. 11-2 at 193-94.) Moreover, the Fourth Department found "inasmuch as the prosecutor did not knowingly offer perjured testimony and there was sufficient evidence before the grand jury to support the charges without considering the perjured testimony, dismissal of the indictment was not required." SR 606 (internal quotation marks and citation omitted). Therefore, the Court recommends denying relief on this ground.

### C. Actual Innocence

***8** Petitioner contends he is entitled to habeas relief because he is actually innocent of all the crimes of which he was convicted. (Dkt. No. 1 at 8.) Specifically, Petitioner argues

> THERE EXIST MERITORIOUS CONSTITUTIONAL VIOLATIONS, ENOUGH TO ESTABLI SH A PRIMA FACIE SHOWING THAT A MISCARRIAGE OE JUSTICE HAS TAKEN PLACE ....
>
> THE PERTITIONER ASK THAT THIS COURT REVIEW THE ENTIRE TRIAL RECORD, STATEMENT'S, ARREST, DD'5'S, PERJURY/RECONTATION EVIDENCE, GRAND JURY PRESENTATION, FELONY COMPLAINT'S AND ALL ISSUES BROUGHT BY APPELLATE COUNSEL FOR ANY MERITABLE RELIEF, DE NOVO AND PURSUSANT TO A FUNDAMENTAL MISCARRIAGE OF JUSTICE STANDARD, WHICH HAS TAKEN PLACE.

*Id.*

Respondent asserts a freestanding claim of actual innocence is not cognizable, and even if it were cognizable, it is meritless. (Dkt. No. 10-1 at 18-19.) The Court agrees the claim is not cognizable, and further finds that even if such a claim were cognizable, Petitioner's allegations do not show he is actually innocent.

Although the Supreme Court has determined a federal habeas petitioner may assert a "gateway claim" of actual innocence to overcome the procedural default of a constitutional claim or to equitably toll AEDPA's statute of limitations, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 385-87, 392 (2013).

Even if a freestanding actual innocence claim were cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence

of the [Supreme] Court's decisions in [*Herrera v. Collins*, 506 U.S. 390] and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible," meaning the petitioner has supported it by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. The claim also must be "compelling," which requires the petitioner to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence." *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019) (citing *Schlup*, 927 F.3d 639).

Petitioner does not present any "new reliable evidence" and instead asks the Court to review the entire trial record, statements, arrest, perjury/recantation evidence, grand jury presentation, felony complaints, and all issues brought by Appellate Counsel to support his claim of actual innocence. (Dkt. No. 1 at 8.) However, such evidence cannot be considered "new" because the jury already heard and evaluated this evidence. *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (explaining "new" reliable evidence under *Schlup* is "evidence not heard by the jury"). Moreover, the jury is exclusively responsible for determining the credibility of the witnesses and resolving any inconsistencies in their testimony. *See*, *e.g.*, *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness'[s] credibility") (internal quotation marks and citation omitted). "[T]he fact that the jury may have chosen to credit less reliable aspects of the testimony of [Sanchez and Osorio], or to resolve inconsistencies in their testimony in favor of the prosecution, does not undermine the reliability of the jury's verdict." *Simmons v. McGinnis*, No. 04 CIV. 6150 PACDF, 2006 WL 3746739, at *11 (S.D.N.Y. Dec. 19, 2006) (citing *Bossett*, 41 F.3d at 830). Moreover, even assuming "the alleged testimonial inconsistencies could be construed as a due process claim of legally insufficient evidence, that still would be inadequate." *Smith v. Noeth*, No. 1:18-CV-00883 (JLS/MJR), 2023 WL 4936942, at *28 (W.D.N.Y. June 27, 2023), *report and recommendation adopted*, 2023 WL 4933981 (W.D.N.Y. Aug. 1, 2023). The Supreme Court has clearly stated actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "Because Petitioner cannot meet the demanding *Schlup* standard for a gateway claim of actual innocence, he necessarily cannot meet the more demanding hypothetical standard that the Supreme Court has said a freestanding claim of actual innocence would entail." *Smith*, 2023 WL 4936942, at *29. Therefore, the Court recommends denying relief on this ground.

### D. Ineffective Assistance of Counsel

***9** Petitioner claims he was denied effective assistance of trial and appellate counsel. (Dkt. No. 1 at 6.) Although he does not specify how his trial and appellate counsel were ineffective in his habeas petition, it appears he is basing the claims on the same grounds as his coram nobis motion. There, he argued appellate counsel was ineffective for failing to assert (1) trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses, recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim"; (2) false testimony at the Grand Jury proceedings was prejudicial to Petitioner; (3) the witnesses were "incredible on its face" and gave false testimony; and (4) the "evidence is severely circumstantial and a claim of actual innocence should have been preserved and/or mentioned in the interest of justice." SR 633-35.

Respondent argues Petitioner's ineffective assistance of trial and appellate counsel claims are both unexhausted and, ultimately, meritless. (Dkt. No. 10-1 at 19-26.) The Court agrees.

#### 1. Exhaustion

A federal court may not grant the habeas petition of a state prisoner unless it appears "the applicant has exhausted the remedies available in the courts of the State;" or that "there is either an absence of available State corrective process;" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts," to the highest court in the appropriate state. *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001); *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990).

As an initial matter, Petitioner's ineffective assistance of appellate counsel claim is barred because he failed to fully exhaust his remedies as to that claim. Although Petitioner timely filed a motion for a writ of error coram nobis with the Appellate Division, when the Appellate Division denied Petitioner's motion on April 30, 2021, Petitioner was required to further move for leave to appeal to the Court of Appeals in order to fully exhaust this claim. SR 838; *see Diaz v. Graham*, No. CV–07–5379 (SJF), 2011 WL 1303924, at *2 n.1 (E.D.N.Y. Mar. 31, 2011) (finding a habeas petitioner's claim for ineffective assistance of counsel remained unexhausted where the petitioner did not appeal to the Court of Appeals following the Appellate Division's denial of a writ of error coram nobis); *see also Fulcher v. Graham*, No. 14-CV-3910 (LDH), 2022 WL 523555, at *10 (E.D.N.Y. Feb. 22, 2022) (same).

Petitioner's ineffective assistance of trial counsel is also barred as unexhausted. Petitioner indirectly raised his ineffective assistance of trial counsel claim in state court through his coram nobis motion where he alleged *appellate* counsel had been ineffective for failing to raise the instances of alleged ineffectiveness by trial counsel. *See Allen v. Artus,* No. 6:17-CV-6074 CJS, 2020 WL 6785498, at *12 (W.D.N.Y. Nov. 18, 2020); SR 633-35.

Courts in this circuit have routinely held raising an ineffective assistance of appellate counsel claim in a coram nobis motion does not exhaust the underlying claims appellate counsel allegedly failed to raise. *See Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir. 2001) (concluding the petitioner's underlying claim was not exhausted through his coram nobis petition alleging ineffective assistance of counsel for failing to raise said claim); *Roberts v. Lamanna*, No. 19 CV 880 (AMD)(LB), 2020 WL 5633871, at *6 (E.D.N.Y. Aug. 31, 2020) (" '[C]ourts in this circuit have consistently recognized[ ] an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas.' ") (alterations in original) (citation omitted), *report and recommendation adopted*, 2020 WL 5633078 (E.D.N.Y. Sept. 21, 2020); *Zimmerman v. Burge*, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) ("a petition for a writ of error coram nobis does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel"); *Miller v. Chapplus*, No. 9:16-CV-512 (TJM/CFH), 2018 WL 2709228, at *9 (N.D.N.Y. Apr. 2, 2018), *report and recommendation adopted*, 2018 WL 2694425 (N.D.N.Y. June 5, 2018) (same). "In other words, no claim besides ineffective assistance of appellate counsel can be exhausted through an application for a writ of error coram nobis." *Allen*, 2020 WL 6785498, at *12. Therefore, Petitioner's ineffective assistance of trial and appellate counsel claims remain unexhausted.

**2. Merits**

***10** However, even if these claims were exhausted, they ultimately fail on the merits. To establish an ineffective assistance of counsel claim, the petitioner must show (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984).

Under the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689 (internal quotation marks and citations omitted). *See Richter,* 562 U.S. at 110 ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney") (internal quotation marks and citation omitted).

Under the second prong, to establish prejudice,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.

*Strickland,* 466 U.S. at 694. Here, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

As set forth above, Petitioner asserts his trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses[ ] recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim." SR 633-34. Despite Petitioner's claims, trial counsel twice moved to dismiss the indictment as defective due to Osorio's and Sanchez's false testimony at the Grand Jury proceedings. SR 98-103, 121-26. Further, trial counsel vigorously cross-examined Sanchez and Osorio at trial about their false testimony and argued at summation that the jury should not credit these witnesses' accounts. (Dkt. No. 11-2 at 700-04, 726-30, 757; Dkt. No. 11-3 at 50-54, 408-10, 418-31.) Therefore, Petitioner's claim he was denied ineffective assistance of trial counsel is unavailing. *See McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) ("[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance of counsel") (quoting *Strickland*, 466 U.S. at 689).

As noted above, Petitioner also argues his appellate counsel was ineffective for failing to bring claims asserting (1) trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses[ ] recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim"; (2) false testimony at the Grand Jury proceedings was prejudicial to Petitioner; (3) the witnesses were "incredible on its face" and gave false testimony; and (4) the "evidence is severely circumstantial and a claim of actual innocence should have been preserved and/or mentioned in the interest of justice." SR 633-35.

***11** "Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir. 1994) (*citing Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied,* 508 U.S. 912 (1993)). Petitioner may establish ineffective assistance of appellate counsel by demonstrating counsel omitted "significant and obvious" arguments in favor of those that "were clearly and significantly weaker." *Id.* at 533. Appellate counsel does not have a duty to advance every available non-frivolous argument, given that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

Petitioner's claims with regard to the ineffective assistance of appellate counsel are baseless. As to the first claim, trial counsel moved twice to dismiss the indictment based on Osorio's and Sanchez's false testimony, preserving the issue for appeal. SR 98-103, 121-28. Therefore, there was no basis for appellate counsel to assert trial counsel was ineffective on this issue.

As to Petitioner's second and third claims, appellate counsel did challenge the integrity of the Grand Jury proceedings based on Osorio's and Sanchez's false testimony. (Dkt. No. 1 at 85-105.) Further, appellate counsel asserted Osorio and Sanchez were not credible when arguing the corroborative evidence did not connect Petitioner to the charged crimes or harmonize with Sanchez's accomplice testimony. (Dkt. No. 1 at 60-73.) As appellate counsel "made the very arguments that petitioner asserts should have been made on direct appeal, there is no basis to conclude that counsel was ineffective on this ground." (Dkt. No. 10-1 at 26.)

Finally, Petitioner asserts appellate counsel should have argued he was actually innocent. Petitioner could move to vacate his judgment under N.Y. Crim. Proc. Law § 440.10(g) if

> [n]ew evidence [had] been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the [Petitioner] at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the [Petitioner]; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence.

As such, it is not the proper basis of a direct appeal. Further, as discussed *supra* in Section IV.C, Plaintiff has not presented any new evidence which would support his claim of actual innocence.

Therefore, the Court recommends dismissing Plaintiff's ineffective assistance of counsel claims as unexhausted and meritless.

## V. CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from ... the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." A court may only issue a certificate of appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2553(c)(2). Since Petitioner has failed to make such a showing with regard to any of his claims, the Court recommends that no certificate of appealability be issued. *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998).

## VI. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

***12 RECOMMENDED** that Petitioner's *pro se* petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED** that no certificate of appealability be issued; and it is further

**ORDERED** that the Clerk of the Court shall file and serve a copy of this Report-Recommendation and Order on the parties in accordance with the Local Rules, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

5 If you are proceeding *pro se* and are served with this Report-Recommendation & Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls

on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 11644017

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1635656
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wigberto OSORIO, Petitioner,
v.
Supt. JOHNSON, Respondent.

9:21-cv-708 (BKS/TWD)
|
Signed April 16, 2024

**Attorneys and Law Firms**

Petitioner pro se: Wigberto Osorio, 17-B-1928, Green Haven Correctional Facility, P.O. Box 4000, Stormville, New York 12582.

For Respondent: Letitia James, Attorney General for the State of New York, Priscilla I. Steward, Assistant Attorney General, 28 Liberty Street, New York, New York 10005.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, Chief United States District Judge:

**I. INTRODUCTION**

***1** On May 20, 2021, Petitioner pro se Wigberto Osorio, a New York State inmate, filed a petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) On December 23, 2021, Respondent filed a response accompanied by the state-court records related to the matter. (Dkt. Nos. 10–11.) Petitioner filed a reply on January 24, 2022. (Dkt. No. 13.) This matter was assigned to United States Magistrate Judge Thérèse Wiley Dancks who, on November 3, 2023, issued a Report-Recommendation and Order recommending that the petition be denied and dismissed. (Dkt. No. 14.) Magistrate Judge Dancks advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 14, at 25.)

Petitioner filed objections to the Report-Recommendation, (Dkt. No. 15), and requested an extension of time to file additional objections, (Dkt. No. 16). On November 28, 2023, the Court issued an order providing Petitioner with one additional opportunity to submit objections to the Court, (Dkt. No. 15), but nothing further was submitted by Petitioner. Respondent filed a response to Petitioner's objections. (Dkt. No. 17.) For the reasons set forth below, the Report-Recommendation is adopted in its entirety.

**II. STANDARD OF REVIEW**

The Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [Report-Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Molefe*, 602 F. Supp. 2d at 487. To the extent a party makes "merely perfunctory responses, argued in an attempt to engage the district court

in a rehashing of the same arguments" set forth in the original submission, the Court will only review for clear error. *Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

**III. DISCUSSION**

On May 3, 2017, Petitioner was convicted, following a jury trial, of murder in the second degree; assault in the first degree; attempted kidnapping in the second degree; gang assault in the first degree; and criminal possession of a weapon in the third degree. (Dkt. No. 11, at 14; Dkt. No. 14, at 1–2.) Petitioner received an aggregate prison term of twenty-five years to life. (Dkt. No. 11, at 14; Dkt. No. 14, at 2.) The Appellate Division, Fourth Department, affirmed Petitioner's conviction on January 31, 2020, and the Court of Appeals denied leave to appeal on April 27, 2020. (Dkt. No. 11-1, at 353–54; 367; Dkt. No. 14, at 2.)

***2** Petitioner subsequently filed a pro se coram nobis motion alleging he was denied effective assistance of appellate counsel. (Dkt. No. 11-1, at 368–84; Dkt. No. 14, at 10.) The Appellate Division, Fourth Department, denied the motion on April 30, 2021. (Dkt. No. 11-1, at 586; Dkt. No. 14, at 10.) Petitioner did not seek leave to appeal denial of the motion to the New York Court of Appeals. (Dkt. No. 14, at 10.)

The petition presently before the Court asserts three grounds for habeas corpus relief under 28 U.S.C. § 2254. (Dkt. No. 1.) Specifically, Petitioner argues that: (1) he was denied effective assistance of counsel at the trial and appellate levels; (2) he is actually innocent of the crimes of which he was convicted; and (3) the indictment was defective because of false testimony of two prosecution witnesses before the grand jury. (Dkt. No. 1 at 6, 8, 9.) After carefully considering each of these claims, Magistrate Judge Dancks recommended that the petition be denied. (Dkt. No. 14.) The Court assumes familiarity with the Report-Recommendation and the facts underlying the petition as summarized in the Report-Recommendation and considers Petitioner's objections in the context of each asserted ground for relief in turn.

**A. Ineffective Assistance of Counsel**

Petitioner argues he is entitled to habeas relief because he was denied effective assistance of trial and appellate counsel. (Dkt. No. 1 at 6.) Magistrate Judge Dancks indicated that Petitioner did "not specify how his trial and appellate counsel were ineffective in his habeas petition" but concluded that "it appears he is basing the claims on the same grounds as his coram nobis motion," in which Petitioner "argued appellate counsel was ineffective for failing to assert (1) trial counsel was ineffective for overlooking 'numerous issues of violated law related to the prosecution[']s key witnesses, recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim'; (2) false testimony at the Grand Jury proceedings was prejudicial to Petitioner; (3) the witnesses were 'incredible on its face' and gave false testimony; and (4) the 'evidence is severely circumstantial and a claim of actual innocence should have been preserved and/or mentioned in the interest of justice.' " (Dkt. No. 14, at 18–19 (alteration in original) (quoting Dkt. No. 11-1, at 381–83).) Magistrate Judge Dancks concluded that Petitioner's ineffective assistance of trial and appellate counsel claims are unexhausted. (Dkt. No. 14, at 19–20.) Specifically, Magistrate Judge Dancks found that Petitioner failed to exhaust his claim for ineffective assistance of appellate counsel because Petitioner did not appeal the Appellate Division's denial of his motion for a writ of error coram nobis to the Court of Appeals, and Petitioner failed to exhaust his claim for ineffective assistance of trial counsel by only "indirectly rais[ing] his ineffective assistance of trial counsel claim in state court through his coram nobis motion where he alleged *appellate* counsel had been ineffective for failing to raise the instances of alleged ineffectiveness by trial counsel." (*Id.*) Moreover, Magistrate Judge Dancks found that, even if Petitioner's ineffective assistance of counsel claims had been exhausted, neither the conduct of Petitioner's trial counsel nor the conduct of Petitioner's appellate counsel was deficient under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 671, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because Petitioner's trial counsel "twice moved to dismiss the indictment as defective due to Osorio's and Sanchez's false testimony at the Grand Jury proceedings" and "vigorously cross-examined Sanchez and Osorio at trial about their false testimony and argued at summation that the jury should not credit these witnesses' accounts" and because Petitioner's appellate counsel made certain arguments Petitioner asserted should have been made while the other arguments Petitioner asserted should have been made were not proper bases for appeal. (Dkt. No. 14, at 21–24.)

***3** Petitioner does not object to Magistrate Judge Dancks's determination that Petitioner's ineffective assistance of counsel claims are not exhausted. Petitioner does, however, request that "this Court deem the Error Coram Nobis Exhausted" because Petitioner was misinformed about the appealability of the denial of a motion for a writ of error coram nobis [1] and argues that review is proper under the fundamental miscarriage of justice standard. (Dkt. No. 15, at 1–2.)

1 Petitioner argues that a 2000 resource caused him not to file an appeal because "he was instructed it could not be done." (Dkt. No. 15, at 1). Petitioner correctly points out that, the fifth edition of *A Jailhouse Lawyer's Manual* prepared by the Columbia Human Rights Law Review, indicates that "a court's denial of [a] c*oram nobis* motion cannot be appealed to a higher court," *see* Columbia Human Rights Law Review, *A Jailhouse Lawyer's Manual* 179 & n.12 (5th ed. 2000) (citing *People v. Adams*, 82 N.Y.2d 773, 773, 603 N.Y.S.2d 991, 624 N.E.2d 175 (1993)). That proposition, however, is outdated. In 2002, New York criminal procedure law was amended to authorize appeals, by permission, to the New York Court of Appeals "from appellate orders granting or denying coram nobis relief based on claims of ineffective assistance or wrongful deprivation of appellate counsel." *See People v. Stultz*, 2 N.Y.3d 277, 281, 778 N.Y.S.2d 431, 810 N.E.2d 883 (2004) (citing N.Y. Crim. Proc. Law § 450.90); *see also* Columbia Human Rights Law Review, *A Jailhouse Lawyer's Manual* 167 & n.263 (12th ed. 2020) ("If your [coram nobis motion] is denied, you may appeal that decision to the Court of Appeals." (citing *Stultz*, 2 N.Y.3d at 281–85, 778 N.Y.S.2d 431, 810 N.E.2d 883)).

Procedurally defaulted habeas claims may be reviewed upon a showing of "cause for the default and prejudice ... [or] that failure to consider the claim will result in a miscarriage of justice." *See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 748–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). But the Court need not engage in such an analysis here because "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see also Aparicio*, 269 F.3d at 91 n.5 ("[The Antiterrorism and Effective Death Penalty Act of 1996] permits a habeas court to reject a claim on the merits notwithstanding the fact that it is unexhausted."); *Abuzaid*, 726 F.3d at 321 ("[Section] 2254(b)(2) authorized federal courts to deny the petition, regardless of whether the applicant exhausted his state court remedies."). Petitioner does not object to Magistrate Judge Dancks's finding that his ineffective assistance of counsel claims fail on the merits. The Court therefore reviews that finding for clear error and, having found none, adopts the recommendation that Petitioner's request for habeas relief on the grounds of ineffective assistance of trial and appellate counsel be denied.

### B. Actual Innocence

Petitioner argues that he is entitled to habeas relief because he is actually innocent of the crimes for which he was convicted. (Dkt. No. 1, at 8.) Magistrate Judge Dancks found that, "[e]ven if a freestanding actual innocence claim were cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner"—a question Magistrate Judge Dancks notes is not well settled —Petitioner has not met the standard for such a claim because Petitioner has not presented any new, reliable evidence but has instead presented only evidence already considered and evaluated by the jury, which "is exclusively responsible for determining the credibility of the witnesses and resolving any inconsistencies in their testimony." (Dkt. No. 14, at 16–18.) Magistrate Judge Dancks therefore recommended denying relief on this ground. (*Id.* at 18.) Petitioner appears to object to Magistrate Judge Dancks's recommendation by stating:

> ***4** This Magistrate Judges Report and Recommendation was received and does not resolve clearly, pending factual disputes on the merits, and after the State Courts Tailoring a legal ruling after rec[a]ntation events took place to make out an actual innocence claim/issue. The issue of perjury and actual innocence was deleted and the Court focused on the Integrity of the Grand Jury Presentation. A hearing is required. ... The Magistrate Judges Recommendation does nothing more than to rubberstamp the central the central, serious issue that was turned into a legal question[ ]by one lower court judges opinion. Moreover, the Appellate Counsel could not see his/her own legal issues and violations of

law? Yet, decided to adapt the lower courts rulings concerning the Integrity of The Grand Jury, and not Perjur[ ]ed, Recantation Evidence, Newly Discovered, inter-alia.

(Dkt. No. 15, at 3–4.) Petitioner also states that "[t]his Court should look at the Sufficiency and Weight elements as the Recantation and Perjur[ ]ed statement's affects the sufficiency of the charges indicted[;] [t]he lower Court did not address the weight of evidence after the Sufficiency was lost by recantation of key witness evidence[.]" (*Id.* at 3.)[2] These nonspecific objections fail to identify any particular finding from the Report-Recommendation that Petitioner contends is erroneous and appear instead to be general objections to Magistrate Judge Dancks's conclusions and a rehashing of previous arguments, (Dkt. No. 13, at 1–3.). Accordingly, the Court reviews the findings only for clear error. *See Ortiz*, 558 F. Supp. 2d at 45. Having carefully reviewed Magistrate Judge Dancks's analysis and recommendation for clear error and having found none, the Court adopts the recommendation that Petitioner's request for habeas relief on the grounds of actual innocence be denied.[3]

2 To the extent Petitioner asserts new claims related to his prison sentence, (*id.* at 2), or involving unreasonable application of clearly established federal law or unreasonable determination of facts that were not raised in his petition, (*id.* at 3), the Court will not consider them because "in habeas cases, courts will not consider any claims raised by a petitioner in his objections which were not raised in the petition." *Tripp v. Superintendent*, No. 21-cv-406, 2023 WL 7383170, at *5, 2023 U.S. Dist. LEXIS 200353 (N.D.N.Y. Nov. 8, 2023) (collecting cases); *see also Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." (citation omitted)); *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." (citation omitted)).

3 Petitioner does not object to Magistrate Judge Dancks's findings or recommendation with respect to Petitioner's request for relief on the grounds of a defect in the indictment. Accordingly, the Court reviews the findings in the Report-Recommendation as to this claim for clear error, and, having carefully reviewed Magistrate Judge Dancks's analysis and recommendation for clear error and having found none, the Court adopts the recommendation that Petitioner's request for habeas relief on the grounds of a defect in the indictment be denied.

### C. Evidentiary Hearing

Petitioner also requests an evidentiary hearing, arguing that Magistrate Judge Dancks's Report-Recommendation "does not resolve clearly[ ] pending factual disputes on the merits," but Petitioner does not identify any specific factual disputes or identify specific factual bases of any of his claims. (Dkt. No. 15, at 3–4.)

***5** "Federal courts sitting in habeas are not an alternative forum for trying facts ...." *Williams v. Taylor*, 529 U.S. 420, 437, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Thus, in general, "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). However, the habeas court has limited discretion to conduct an evidentiary hearing. *See id.* at 185, 131 S.Ct. 1388; 28 U.S.C. § 2254(e)(2). To be entitled to an evidentiary hearing on a factual basis not developed in state-court proceedings, a habeas petitioner must demonstrate, inter alia, that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *See* 28 U.S.C. § 2254(e)(2)(B).

Here, Petitioner has not met this standard because he has not identified any underlying factual dispute or the specific factual bases of any of his claims.[4] Thus, Petitioner has failed to demonstrate that facts underlying his claims would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offenses, and Petitioner is therefore not entitled to an evidentiary hearing. *See Schriro v. Landrigan*,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also Colon v. Kersey*, No. 17-cv-4671, 2018 WL 6258572, at *3, 2018 U.S. Dist. LEXIS 202761 (S.D.N.Y. Nov. 29, 2018) ("[B]ecause Petitioner has not established his actual innocence by clear and convincing evidence, there is no basis for the evidentiary hearing Petitioner seeks." (citing *McQuiggin v. Perkins*, 569 U.S. 383, 396, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013))); *Bethany v. Noeth*, No. 20-cv-6761, 2023 WL 3051248, at *9, 2023 U.S. Dist. LEXIS 71034 (W.D.N.Y. Apr. 24, 2023) ("As the Court previously discussed, [the petitioner's] unexhausted ineffectiveness claims ... are based on conclusory and unsubstantiated allegations, which are insufficient to warrant habeas relief or an evidentiary hearing."). Accordingly, Petitioner's request for an evidentiary hearing is denied.

4 Nor has Petitioner demonstrated that any of his claims relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence," *see* 28 U.S.C. § 2254(e)(2)(A), or that the state court precluded him from developing the factual basis for his claims, *see Pinholster*, 563 U.S. 170, 213 n.5, 131 S.Ct. 1388, 179 L.Ed.2d 557 (Sotomayer, J., dissenting).

**IV. CONCLUSION**

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation, (Dkt. No. 14), is **ADOPTED** in its entirety; and it is further

**ORDERED** that the petition is **DENIED** and **DISMISSED**; and it is further

**ORDERED** that no Certificate of Appealability ("COA") is issued because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2), and any further request for a COA must be addressed to the Court of Appeals, *see* Fed. R. App. P. 22(b); and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1635656

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4654258
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ricardo ZAYAS-TORRES, Petitioner,
v.
Daniel MARTUSCELLO, Respondent.

No. 9:18-CV-00526 (TJM/CFH)
|
Signed May 14, 2024
|
Filed May 15, 2024

**Attorneys and Law Firms**

Ricardo Zayas-Torres, 12-A-5707, Marcy Correctional Facility, P.O. Box 3600, Marcy, New York 13403, Petitioner pro se.

Attorney General for the State of New York, 28 Liberty Street, New York, New York 10005, Attorney for Respondent, PRISCILLA I. STEWARD, ESQ., Assistant Attorney General.

## REPORT-RECOMMENDATION AND ORDER [1]

1 This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

***1** Presently pending before the Court is a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by pro se petitioner Ricardo Zayas-Torres ("petitioner"). See Dkt. No. 1 ("Pet."). In October 2012, following a jury trial in the Albany County Supreme Court, petitioner was convicted of three counts of burglary in the second degree in violation of N.Y. Penal Law § 140.25(2), and one count of criminal possession of stolen property in the third degree in violation of N.Y. Penal Law § 165.50. See Pet. at 6-7; see also People v. Zayas-Torres, 40 N.Y.S.3d 599, 601 (App. Div. 2016). Petitioner was sentenced to fourteen years of imprisonment followed by five years of post-release supervision. See Pet. at 1; see also Zayas-Torres, 40 N.Y.S.3d at 601.

Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on grounds that (1) his statements to the police were involuntarily made and should have been suppressed; (2) the evidence seized pursuant to the search warrant should have been suppressed because the warrant was not supported by probable cause; (3) the evidence was legally insufficient to support his convictions and the jury's verdict was against the weight of the evidence; and (4) his trial counsel was ineffective. See Pet. at 2-5, 27-33. [2] Respondent opposed the petition. See Dkt. No. 11. Petitioner filed a traverse. See Dkt. No. 15. For the reasons that follow, it is recommended that the petition be denied.

2 Citations to the record are to the pagination generated by CM/ECF, located at the top of each page.

## I. Background [3]

3 The undersigned summarizes only the procedural history that is relevant to this Court's review of the habeas petition.

### A. The Prosecution's Case

On December 24, 2011, Gerald Masilang lived at 518 Washington Avenue in Albany, New York, in an apartment above a barbershop. See Dkt. No. 12-3 at 431-32. He left at around 1:00 A.M., but returned to his residence at around 9:30 P.M. on December 25, 2011. See id. at 433. Upon his return, he noticed that someone ransacked his apartment and stole various items, including his TV, laptop, clothes, sneakers, pots and pans, DVDs, and a pair of Louis Vuitton sunglasses. See id. at 436-37. Someone also broke into the barbershop below Masilang's apartment, cut the wires to several electronic hair cutting devices, and stole several hair trimmers and clippers. See id. at 441; see also Dkt. No. 15-1 at 3. In the evening hours of December 25, 2011, Officer Steven Silver arrived at 518 Washington Avenue to take a report of the burglary. See Dkt. No. 12-3 at 470. The owner of the barbershop said he suspected someone he knew as "Ricky" to be responsible for the burglaries, due to an ongoing disagreement between "Ricky" and several of the barbershop employees. See Dkt. 12 at 19.

On December 25, 2011, Ashley Pulluain and Sheldon Lee resided at 166 Western Avenue in Albany, New York. See Dkt. No. 12-3 at 401. That day, at around 12:00 P.M., they left their apartment to go to Utica, New York, and they returned to their apartment at around 11:00 P.M. See id. at 402-03. Upon their return, they realized that their residence had been broken into and they were missing their TV, laptop, Play Station 3, speakers, cologne, and a new camera that Pulluain had just received as a Christmas gift. See id. at 404-08. They called the police, and Officer Christopher Carriero responded to their call at around 11:17 P.M. See id. at 405, 479.

***2** A few weeks later, petitioner approached Joanna Hetman and asked her to sell a pair of Louis Vuitton sunglasses for him on commission. See Dkt. No. 12-4 at 39. Hetman had previously met petitioner because she lived less than a block away, at 359 Washington Avenue in Albany, New York, from the thrift store where petitioner worked. See id. at 34-35. Hetman regularly bought and sold antiques and jewelry, so she initially agreed to sell the sunglasses for petitioner. See id. at 40; see also Zayas-Torres, 40 N.Y.S.3d at 601. In petitioner's presence, she placed the sunglasses in a safe in her apartment and gave petitioner a receipt; however, she later called off the transaction and returned the sunglasses to petitioner. See Dkt. No. 12-4 at 43-46, 96; see also Zayas-Torres, 40 N.Y.S.3d at 601.

Petitioner called Hector Cuevas [4] early in the day on January 21, 2012, to tell him that he was going to break into Hetman's residence that evening. See Dkt. No. 12-4 at 146. Cuevas owned the thrift shop near Hetman's apartment, at 115 Lexington Avenue in Albany, New York, where he sold used items, such as antiques, TVs, gaming consoles, radios, computers, clothes, and did business with petitioner. [5] See id. at 136-37, 140. Cuevas also did business with Hetman, where she would take items from the store, put it on eBay, and then come back and pay him. See id. at 144.

4 The record reflects that Hector Cuevas is also known as "Carlos," "Carlito," and "Hector Colon." See, e.g., Dkt. No. 12-4 at 153, 174-75, 284.

5 Cuevas testified that he knew petitioner by the name of "Rick" because petitioner regularly came into the store. See Dkt. No. 12-4 at 200. Cuevas testified that, at some point prior to Christmas of 2011, petitioner "walked into the store and asked [Cuevas] if [he] buy[s] stuff." Id. at 138-39. Cuevas responded, "Yes, as long as they're not stolen." Id. at 140. Following that exchange, Cuevas would take trips to petitioner's house to look at some items that petitioner wanted to sell, and once the items were sold in the store, Cuevas would pay petitioner a percentage of the proceeds. See id. at 140-43.

On January 21, 2012, Hetman left for a friend's house and returned home at around 10:00 P.M. See Dkt. No. 12-4 at 30-31. When she returned, she noticed that the window was shattered in her living room; her safe was broken into; and that she was missing jewelry; including gold, bracelets, her grandmother's bracelet, a garnet ring; as well as her grandfather's pipe. See id. at 31-33. That evening, Officer Ryan Moore responded to her call regarding the burglary, and Hetman showed Officer Moore the different areas of the apartment where items were missing. See Dkt. No. 12-3 at 463-65. Hetman believed over 200 items were stolen. See Dkt. No. 12-4 at 56.

The following day, on January 22, 2012, Cuevas reported to the police that petitioner had broken into Hetman's apartment and stole [6] the jewelry. See Zayas-Torres, 40 N.Y.S.3d at 601. On January 24, 2012, at around 2:00 P.M., Detective William Van Amburgh and Detective Michael Bennett picked petitioner up and took him to the Detective's Office. See Dkt. No. 12-3 at 39-41. They read petitioner his Miranda warnings, petitioner acknowledged that he understood his rights, and they interviewed petitioner for about an hour. See id. at 22, 29-30; see also Dkt. No. 12-4 at 214. Detective Van Amburgh, Detective Bennett, and Detective John Coleman then executed a search warrant at petitioner's residence, 159 Western Avenue in Albany, New York, where they recovered some of the stolen items. See Dkt. No. 12-4 at 131, 206-07. The detectives then returned to the Office to finish interviewing petitioner, and petitioner eventually admitted "that he had taken property from two of the apartments and had assisted another individual in taking property from the third apartment." Zayas-Torres, 40 N.Y.S.3d at 601; see Dkt. No. 12-4 at 240; see also Dkt No. 11-1 at 12-13. These oral statements were videotaped. See Dkt. No. 12-4 at 398.

6 The affidavit accompanying the search warrant application provides that Detective Van Amburgh and Detective Bennett interviewed Cuevas, and "[d]uring that interview, [Cuevas] provided information about some property that [petitioner] sold him and attempted to sell him. He listed in detail[ ] about TVs, laptop computers and gaming systems. He provided a craigslist ad selling a Sony Playstation 3 and 7 video games. He stated that he posted this ad for [petitioner] for some property that [petitioner] wanted to sell. Furthermore, [Cuevas] handed over a duffle [sic] bag full of electric hair clippers and trimmers and an Acer brand laptop computer.... [Cuevas] further added that [petitioner] told him that he broke into a house across the street from his and then showed him the proceeds from that burglary." Dkt. No. 15-1 at 3. Detective Van Amburgh identified some of these items as being stolen from 518 Washington Avenue and 166 Western Avenue. See id. Cuevas also "provided information that [petitioner] told him that he broke into a house [at 359] Washington Ave[nue] and had a lot of jewelry to sell." Id.

***3** On January 27, 2012, the Albany County Grand Jury charged petitioner with three counts of burglary in the second degree, one count of grand larceny in the third degree, and one count of criminal possession of stolen property in the third degree. See Dkt. No. 12 at 8-12.

### B. The Defense's Case

"Petitioner ... testified at trial that he is 34 years old and that he resided at 159 Western Avenue for the past 9-years with his [girlfriend] and three kids." [7] Pet. at 22. "He worked at the thrift store on Lexington Avenue in Albany for close to a year." Id. Petitioner "helped out in the store" and "was paid daily in cash, [but t]he amount he was paid depended on what he sold." Id. at 22-23. Petitioner testified that he knew Hetman because she often came to the store to make purchases. See Dkt. No. 12-4 at 281-82. Petitioner further testified that Hetman once bought a computer tower from the store and, at Cuevas's direction, he carried it to her house "because it was heavy," but that was the only time he went to Hetman's house. Id. at 283, 285. Also, while working at the store, Cuevas directed petitioner to give Hetman a pair of Louis Vuitton sunglasses, which she took. See id. at 285. However, petitioner never went to Hetman's home to discuss the glasses and he never signed a receipt for them. See id.

7 Petitioner refers to his partner, whom he lived together with at 159 Western Avenue, as "his girlfriend" and "his wife." See, e.g., Pet. at 21-22. It is unclear whether petitioner and his partner are married. For the sake of consistency, the undersigned will refer to petitioner's partner as his girlfriend.

Petitioner testified that, at times in the past, he would go to the barbershop located at 518 Washington Avenue to get haircuts, but he stopped going there after a "little" dispute. Dkt. No. 12-4 at 280. He denied any involvement in the burglary at the barbershop and stated that he never entered the barbershop at a time that it was not open to the public. See id. at 281. Petitioner also denied entering the apartment across the street from him, at 166 Western Avenue, and stealing property. See id. at 286.

Petitioner acknowledged that the police recovered various stolen items from his house, but he claimed that he was holding the property for Cuevas. See Dkt. No. 12-4 at 286-87. He explained that, on January 2, 2012, Cuevas "came over and asked to store the items in [petitioner's] house because [the City of Albany] had to close the building" due to water damage in the basement. Pet. at 23; see Dkt. No.12-4 at 287. After a few days of keeping the items, petitioner's girlfriend "was upset about the property being in his house, so he contacted ... Cuevas to pick up the items." Pet. at 23. Cuevas "said he needed a few more days and then he would come and pick ... up [the items] in [his] van." Id. However, eventually Cuevas "told him the items were stolen." Id. at 24.

Petitioner further testified that, on January 24, 2012, police approached him in front of the thrift store and took him to the Detective's Office. See Pet. at 24. At the beginning of the interrogation, petitioner told the officers that he didn't commit the burglaries. See id. However, "[h]e later changed his story to protect his [girlfriend] and children as the police were pressuring him." Id. Specifically, Detective Van Amburgh "threatened [p]etitioner in arresting his girlfriend for constructive possession, and removing his children to CPS, if he did not cooperate." Id. at 22. Petitioner told them what Cuevas had informed him about the burglaries, and "pretended he was involved." Id. at 24. Petitioner "would have done anything to get his [girlfriend] and kids out of there as he did not want them involved in this mess." Id. "The defense rested at this point." Id.; see Dkt. No. 12-4 at 297.

### C. Suppression Hearing

***4** Petitioner filed a motion to suppress his videotaped police interview, as well as the physical evidence that was secured from his residence, alleging that there was no probable cause to support the search warrant. See Pet. at 27. On July 23, 2012, and July 26, 2012, Albany County Court Judge Stephen Herrick held a pretrial Dunaway/Mapp/Huntley hearing.[8] See Dkt. No. 12-3 at 8-48. Detective Van Amburgh testified at the hearing for the prosecution. See id. at 12-30. Detective Van Amburgh testified that "[a] short time after commencing the investigation" of the Christmas burglaries, "an informant came to see" him. Dkt. No. 12 at 19. "The informant reported that [petitioner] had approached him and asked him to sell numerous items the informant believed to be stolen[; t]he informant had with him a duffel bag containing some of the property given to him by [petitioner]." Id. at 19-20. "In the bag were a number of electric hair clippers [and t]he informant also reported that he had posted certain electronics for sale on Craig's List and had done so at [petitioner's] request." Id. at 20. "On or about January 24, 2012, Detective Van Amburgh confirmed with the owner of the barbershop that the electric hair clippers belonged to him and were among the items previously reported stolen." Id. "The electronics posted on Craig's List were also identified as stolen property." Id.

8 Such a hearing is held pursuant to: "(1) Mapp v. Ohio, 367 U.S. 643 (1961), to determine whether physical evidence sought to be used against [p]etitioner was obtained illegally; (2) Dunaway v. New York, 442 U.S. 200 (1979), to determine whether there was probable cause for [p]etitioner's arrest; and (3) People v. Huntley, 15 N.Y.2d 72 (1965), to determine whether any statements made by [p]etitioner should be suppressed." McKelvey v. Bradt, No. 13-CV-3527 (CM/DF), 2016 WL 3681457, at *4 n.3 (S.D.N.Y. July 6, 2016).

"Based upon the foregoing, Detective Van Amburgh prepared a search warrant application for [petitioner]'s residence located at 159 Western Avenue[.]" Dkt. No. 12 at 20; see Dkt. No. 15-1 at 1-6. "Prior to executing the warrant, Detective Van Amburgh ... took [petitioner] into custody on a charge of possession of stolen property." Dkt. No. 12 at 20. Petitioner "was transported to the Albany South Station where he was given Miranda warnings[, and he] indicated that he understood the warnings, waived his rights, and agreed to speak with the detective." Id. "Petitioner's interview was video taped." Id. The defense called no witnesses. See Dkt. No. 12-3 at 46. Following the hearing, the trial court reserved on petitioner's motion to suppress his videotaped confession, as well as the physical evidence seized by the police. See id. at 47.

On October 3, 2012, Judge Herrick issued a decision and order denying petitioner's motion to suppress in all respects. See Dkt. No. 12 at 18-23. As for petitioner's statements made during the police interview, Judge Herrick found that "as a matter of fact, that [petitioner] acknowledged and waived his Miranda rights," so his "statement[s were], therefore, voluntary." Id. at 23. Judge Herrick also found that the search warrant was sufficient because Cuevas' "reliability was adequately established by the hair clippers, identified as stolen property, that [Cuevas] turned over to Detective Van Amburgh and reported to have received from [petitioner] along with the Craig's List posting of property identified as stolen." Id. at 22.

### D. Verdict and Sentencing

A jury trial took place from October 15, 2012, to October 19, 2012. See Dkt. No. 12-3 at 107; see also Dkt. No. 12-4 at 371. On October 19, 2012, petitioner was found guilty of three counts of burglary in the second degree, a class C violent felony, in violation of N.Y. Penal Law § 140.25(2) and one count of criminal possession of stolen property in the third degree, a class D felony, in violation of N.Y. Penal Law § 165.50. See Dkt. No. 12 at 14; see also Zayas-Torres, 40 N.Y.S.3d at 601. Petitioner was acquitted of the grand larceny charge. See Dkt. No. 12-1 at 152; see also Zayas-Torres, 40 N.Y.S.3d at 601. A judgment of conviction was entered on December 14, 2012, sentencing petitioner to an aggregate prison term of fourteen years with five years of post-release supervision. See Dkt. No. 12-1 at 161-72; see also Zayas-Torres, 40 N.Y.S.3d at 601.

### E. Direct Appeal

***5** Petitioner's appellate counsel filed a brief on December 1, 2015, in the New York State Supreme Court, Appellate Division, Third Department, arguing that: (1) the jury's verdict was against the weight of the evidence and must be set aside; (2) petitioner's oral statements to the police were involuntarily procured and should have been suppressed; (3) the search warrant was defective as a matter of law as it was not supported by probable cause; and (4) the sentence imposed was harsh and excessive, and must be reduced. See Dkt. No. 12-1 at 175-230; see also Zayas-Torres, 40 N.Y.S.3d at 601-05.

Petitioner also filed a pro se supplemental brief on July 22, 2016, arguing that: (1) the "trial counsel was ineffective for not attacking [petitioner's] confession under Dunaway" and "for not objecting and preserving for appeal the confession and tangable [sic] items seized from [the] search warrant"; (2) petitioner's confession and the items seized were not admissible under the Fourth Amendment or Dunaway; (3) the indictment was "defective" and his conviction was "constitutionally infirm"; (4) the District Attorney's Office violated the ABA Model Rules of Professional Conduct; (5) petitioner was "extorted of his fundamental and due process equal protection rights of both [the] federal and state constitution[s]"; and (6) the court lacked subject matter jurisdiction. Dkt. No. 1-1 at 28; see Dkt. No. 1-1 at 22-66; see also Dkt. No. 12-1 at 262-67, 281-325.

In a Decision and Order dated October 27, 2016, the Appellate Division denied petitioner's direct appeal and affirmed the trial court's December 14, 2012, judgment of conviction. See Zayas-Torres, 40 N.Y.S.3d at 605. The Appellate Division held that (1) petitioner's trial counsel did not render ineffective assistance; (2) petitioner was not improperly coerced into a confession and his statements to the police were voluntary; (3) the warrant to search petitioner's home was supported by probable cause; (4) sufficient evidence supported petitioner's convictions and the jury's verdict was not against the weight of the evidence; and (5) petitioner's sentence was not harsh or excessive. See id. at 601-05; see also Pet. at 2.

On May 17, 2017, petitioner filed a motion seeking leave to appeal to the New York Court of Appeals. See Pet. at 2-3; see also Dkt. No. 12-1 at 339-40. "Petitioner raised every ground he raised [before] the Appellate Division[, Third Department] on his direct appeal[.]" Pet. at 3. The Court of Appeals summarily denied petitioner's motion on October 26, 2017. See id. at 2; see also People v. Zayas-Torres, 30 N.Y.3d 984 (2017).

### F. Motion to Vacate

On May 26, 2017, petitioner filed a pro se motion to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law ("CPL") § 440.10. See Pet. at 3; see also Dkt. No. 1-2 at 2-19; Dkt. No. 12-1 at 341-53. Specifically, petitioner argued ineffective assistance of his trial counsel, who "failed to request a Darden-Hearing to challenge the credibility of informant Hector Cuevas,"[9] failed to "address the criminal history of [Cuevas] during cross-examination at trial," and "failed to challenge the veracity of the [search] warrant which lacked probable cause to arrest." Pet. at 3; see Dkt. No. 12-1 at 341-53; see also Dkt. No. 12-3 at 1-4. On August 3, 2017, Albany County Judge William A. Carter denied plaintiff's motion because (1) petitioner had raised his ineffective assistance of counsel claim on direct appeal, and (2) petitioner's claims were "generic and speculative" and "amount[ed] to no more than an unspecified disagreement with his trial counsel's strategies and/or tactics." Dkt. No. 1-1 at 18-20; see Dkt. No. 12-2 at 77-79. On August 18, 2017, petitioner moved for leave to appeal Judge Carter's decision under CPL § 460.15. See Dkt. No. 12-2 at 54-64. The Appellate Division summarily denied petitioner's motion on October 11, 2017. See id. at 83.

9 A Darden hearing is a state court procedure in criminal cases where, "when evaluating a motion to suppress, the court may conduct an ex parte, in camera examination of a confidential informant without disclosing the informant's identity to the defendant." People v. Cook, 34 N.Y.3d 412, 422 (2019) (citing People v. Darden, 34 N.Y.2d 177, 181 (1974), disapproved of by People v. Belton, 50 N.Y.2d 447 (1980)). A Darden hearing is warranted "where there is insufficient evidence to establish probable cause apart from the testimony of the arresting officer as to communications received from an informer." Darden, 34 N.Y.2d at 181.

## II. Discussion

### A. Standard of Review

***6** Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "when a state court has already ruled on the merits of the habeas petitioner's claim," the petitioner "must show that decision was either (1) 'contrary to' or an 'unreasonable application of' clearly established federal law, as determined by the decisions of th[e Supreme] Court, or (2) based on an 'unreasonable determination of the facts' presented in the state-court proceeding." Brown v. Davenport, 596 U.S. 118, 125 (2022) (quoting 28 U.S.C. § 2254(d)). This is a "difficult to meet" and "highly deferential standard" for evaluating state-court rulings, which "demands that state-court decisions be given the benefit of the doubt[.]" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

"A claim is 'adjudicated on the merits' if the state court ruled on the substance of the claim rather than on a procedural ground." Jordan v. Lamanna, 33 F.4th 144, 150 (2d Cir. 2022) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)). A state court "decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the [it] decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' " Id. (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "A decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.' " Id. (quoting Williams, 529 U.S. at 413). "A writ cannot be granted 'simply because ... the relevant state-court decision applied clearly established federal law erroneously or incorrectly[ ]"; "[r]ather, whether a decision is 'contrary to' or an 'unreasonable application of' clearly established federal law is a 'substantially higher threshold' than mere incorrectness." Id. (citations omitted). Further, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). If the state court did not decide a claim "on the merits," the pre-AEDPA standard of review applies,

and both questions of law and mixed questions of law and fact are reviewed de novo. Washington v. Shriver, 255 F.3d 45, 55 (2d Cir. 2001).

### B. Petitioner's Statements to the Police

Petitioner argues that his statements to the police were involuntarily procured and should have been suppressed. See Pet. at 2. Petitioner specifically alleges that "[a] careful review of the totality of the circumstances in this case, clearly demonstrates that [his] statements were unlawfully obtained only after his will was overborne, and his freedom of choice critically impaired." Id. at 27. Petitioner claims that the police: (1) "used threats and trickery" as well as "coercive" and "deceptive methods" during the custodial interrogation to secure a confession, such as threatening to arrest his girlfriend and place his children with child protective authorities if he did not take responsibility for the stolen items recovered from his apartment; and (2) "never read [him] his Miranda warnings" and "denied him access to an attorney." Id. at 28-30. Respondent points out that "[t]he Appellate Division rejected petitioner's claim[s] on the merits," and argues that, "because the Appellate Division's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court law," petitioner is not entitled to habeas relief. Dkt. No. 11-1 at 21.

#### 1. Voluntariness

***7** The test of a confession's voluntariness considers "the totality of all the surrounding circumstances" to determine " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)); see Green v. Scully, 850 F.2d 894, 902 (2d Cir. 1988) ("In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."). "The inquiry into the circumstances surrounding the confession, including the length and circumstances of the interrogation and a defendant's prior experience with the legal system, is 'purely factual, and the state court's answer to it is afforded a presumption of correctness' under 28 U.S.C. § 2254(e)(1)." Kent v. Smith, No. 9:05-CV-0785 (LEK/DRH), 2007 WL 2907350, at *6 (N.D.N.Y. Oct. 4, 2007) (quoting Holland v. Donnelly, 216 F. Supp. 2d 227, 231 (S.D.N.Y. 2002), aff'd, 324 F.3d 99 (2d Cir. 2003)).[10] "When determining whether a statement was voluntary, state courts frequently must resolve conflicts in the testimony of police and defendants." Id. In these circumstances, "the law is clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record." Ortiz v. Artuz, 113 F. Supp. 2d 327, 338 (E.D.N.Y. 2000) (citing Miller v. Fenton, 474 U.S. 104, 117 (1985)), aff'd, 36 F. App'x 1 (2d Cir. 2002) (summary order).

10 All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to petitioner.

"In light of petitioner's suppression hearing in state court and his appeal to the Appellate D[ivision], petitioner's claim was adjudicated on the merits and this Court must defer to the state court's decision on petitioner's ... claim." Russell v. Heath, No. 10-CV-0585 (TCP), 2013 WL 5726190, at *11 (E.D.N.Y. Oct. 18, 2013). Thus, petitioner "bears the burden of overcoming the presumption of correctness by showing, by clear and convincing evidence, that the state court was wrong." Kent, 2007 WL 2907350, at *6; see Colon v. Ercole, No. 09-CV-5168 (LTS/AJP), 2010 WL 9401, at *31 (S.D.N.Y. Jan. 4, 2010) (collecting cases and noting that the determination of whether a defendant "was 'coerced' into giving his confessions by police is a matter of historical fact subject to the presumption of correctness"), report and recommendation adopted, 2010 WL 3767079 (S.D.N.Y. Sept. 27, 2010).

Testimony from the suppression hearing and the trial demonstrates the following. On January 24, 2012, at about 2:30 P.M., Detective Van Amburgh and Detective Bennett brought petitioner to the Detective's Office. See Dkt. No. 12-3 at 17-18. Prior

to talking about the substance of the investigation, Detective Van Amburgh read petitioner his Miranda warnings. See id. at 21. Detective Van Amburgh testified, "We have an Albany Police Department defendant's statement form. On the top of that portion is the Miranda rights verbatim. I read that to him as I had a conversation with him, read it from that form." Id. at 27. Detective Van Amburgh then specifically explained that, at 4:04 P.M.,

> I advised Mr. Torres he had a right to remain silent. Anything he said could and will be used against him in a court of law. I advised him that he had a right to speak to a lawyer and have one with him while he's being questioned. If he cannot afford a lawyer, one could be appointed to represent him before any questioning, if he so desired one. At that time I then asked him if he understood his rights. He verbally acknowledged that he did. Then I asked him if he would continue talking to us about what we wanted to talk about with him. At that point he said yes.

Id. at 28; see id. at 30. Detective Van Amburgh and Detective Bennett continued to interview petitioner between 4:00 P.M. and 5:00 P.M. See Dkt. No. 12 at 450. At around 5:00 P.M., the detectives left to execute the search warrant. See id. After executing the search warrant at petitioner's residence, they returned to the Detective's Office at around 8:00 P.M. to finish interviewing petitioner. See id. at 460. During this second interview, Detective Van Amburgh's interviewing technique changed "[a] little bit" as he told petitioner "that[,] in addition to the fact that [his girlfriend] could face charges, that then the[ir] children would go into Children Protective Services." Id. at 462-63. After he told petitioner this, petitioner admitted to committing the burglaries and "was descriptive in his answers about how he entered residences and the property that he took." Id. at 466.

***8** In rejecting petitioner's claim that the police improperly coerced his confession, the Appellate Division explained,

> Defendant asserts that police improperly coerced him to make this admission by threatening to arrest his girlfriend and place his children with child protective authorities if he did not take responsibility for the presence of the stolen items in the apartment. However, the girlfriend resided with defendant in the apartment where the stolen items were found, and, thus, the warning that she might be implicated was not deceptive. It is well established that police are free to capitalize on a defendant's sense of shame or reluctance to involve his family in a pending investigation absent circumstances which create a substantial risk that [he] might falsely incriminate himself[.]

Zayas-Torres, 40 N.Y.S.3d at 602 (internal quotation marks and citations omitted). The Appellate Division concluded that, "[u]nder the totality of the circumstances presented, we agree with County Court that no substantial risk of false incrimination was present and the People met their burden to prove that defendant's statements were voluntary[.]" Id.

Although

> "no federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement," neither the Second Circuit nor the Supreme Court has "squarely addressed whether threats to charge third-parties amount to coercion."

United States v. Zimmerman, 480 F. Supp. 3d 446, 455-56 (E.D.N.Y. 2020) (quoting United States v. Mullens, 536 F.2d 997, 1000 (2d Cir. 1976), and Lewis v. Graham, No. 13-CV-933 (MAT), 2018 WL 3819557, at *4 (W.D.N.Y. Aug. 10, 2018)) (additional citations omitted). However, "several other circuits and district courts within this circuit have held that 'such a threat does not render a confession involuntary if the police have probable cause to arrest the family member and thus could lawfully carry out the threat.' " Rodriguez v. Warden of Clinton Corr. Facility, No. 13-CV-3505 (ERK/LB), 2014 WL 7177894, at *6

(E.D.N.Y. Dec. 16, 2014) (quoting United States v. Ortiz, 943 F. Supp. 2d 447, 456-57 (S.D.N.Y. 2013)); see also United States v. Miller, 450 F.3d 270, 272 (7th Cir. 2006), abrogated on other grounds by Kimbrough v. United States, 552 U.S. 85 (2007); United States v. Johnson, 351 F.3d 254, 263 (6th Cir. 2003); Thompson v. Haley, 255 F.3d 1292, 1296-97 (11th Cir. 2001); Allen v. McCotter, 804 F.2d 1362, 1364 (5th Cir. 1986); United States v. Serrano, 937 F. Supp. 2d 366, 376 (E.D.N.Y. 2013); United States v. Ortiz, 499 F. Supp. 2d 224, 232-33 (E.D.N.Y. 2007). Moreover, "[t]he use of trickery, deception, or some form of ruse is a common practice, and does not automatically render a confession involuntary." Thomas v. Mason, No. 1:17-CV-626 (DJS), 2023 WL 2709730, at *10 (N.D.N.Y. Mar. 30, 2023) (citing United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991), and Whitlatch v. Senkowski, 344 F. Supp. 2d 898, 903 (W.D.N.Y. 2004)).

As the Appellate Division explained, because petitioner's girlfriend resided in the apartment with petitioner, where the police found stolen items, "the warning that she might be implicated was not deceptive." Zayas-Torres, 40 N.Y.S.3d at 602. This is because, as respondent argues, "[t]he police could have charged her at least with criminal possession of stolen property." Dkt. No. 11-1 at 23; see, e.g., United States v. Memoli, 333 F. Supp. 2d 233, 238 n.3 (S.D.N.Y. 2004) (finding a confession voluntary where the defendant's girlfriend, whom police threatened to arrest, was "liable for arrest for, at the very least, constructive possession of illegal firearms" because she lived at the apartment with the defendant where the illegal firearms were found). Thus, although petitioner reiterates that it was unlawful for the police to use such "deceptive methods," the Appellate Division's determination was not contrary to, or an unreasonable application of, clearly-established federal law. Pet. at 30; see Zayas-Torres, 40 N.Y.S.3d at 602; see also Rodriguez, 2014 WL 7177894, at *6 ("On these facts, the trial judge's ultimate legal conclusion that the confession in this case was voluntary does not constitute a violation of clearly established federal law. As such, there is no basis for granting habeas relief on this ground."). Accordingly, it is recommended that plaintiff's claim for habeas relief on this ground be denied.

### 2. Miranda Warnings

***9** "Prior to questioning, a suspect 'must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " J.D.B. v. North Carolina, 564 U.S. 261, 269 (2011) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). When police conduct an initial interrogation following so-called "Miranda warnings," police need not provide additional Miranda warnings during a subsequent interrogation of the same subject "unless the circumstances changed so seriously that [the suspect's] answers no longer were voluntary, or unless [the suspect] no longer was making a 'knowing and intelligent relinquishment or abandonment' of [the suspect's] rights." Wyrick v. Fields, 459 U.S. 42, 47 (1982); see United States v. Martinez, 916 F. Supp. 2d 334, 351 (E.D.N.Y. 2013) (recognizing Wyrick as the controlling authority "on the issue at hand: namely, whether a first and only Miranda warning would be sufficient to validate a second short-time later interview"); see also United States v. Banner, 356 F.3d 478, 480 (2d Cir. 2004) ("It is well established that once an arrested person has received a proper Miranda warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning.") (citations omitted), vacated on sentencing grounds sub nom. Forbes v. United States, 543 U.S. 1100 (2005).

It is clear from the transcript of the suppression hearing, as well as from Judge Herrick's decision, "that the trial court considered the circumstances surrounding petitioner's statements to police." Hall v. Rock, No. 9:10-CV-130 (NAM/ATB), 2011 WL 2432920, at *4 (N.D.N.Y. Apr. 18, 2011), report and recommendation adopted, 2011 WL 2432921 (N.D.N.Y. June 16, 2011); see Dkt. No. 12-3 at 8-28; see also Dkt. No. 12 at 18-23. As detailed above, the testimony from Detective Van Amburgh established that petitioner was " 'fully informed of, understood, and waived his Miranda rights before any questioning commenced.' " Zayas-Torres, 40 N.Y.S.3d at 602 (quoting People v. Carter, 33 N.Y.S.3d 577 (2016)); see discussion supra Subsection II.B.1. The trial court's holding, affirmed by the Appellate Division, that petitioner's confession was not obtained involuntarily, is not contrary to, or based on, unreasonable applications of federal precedent. See, e.g., Perro v. Reid, No. 87-CV-1966, 1990 WL 27152, at *4 (E.D.N.Y. Mar. 7, 1990) ("The undisputed evidence in this case shows that petitioner was arrested with probable cause, was advised of his right to remain silent and of his right to counsel and was granted permission to make phone calls to his attorney, friends and members of his family.... Thus, the [petitioner's] confession and the waiver of Miranda rights was

voluntary and supported by the record.”), aff'd, 923 F.2d 842 (2d Cir. 1990). “Nor is the state court determination unreasonable based on the facts presented to the trial court.” Hall, 2011 WL 2432920, at *4 (concluding that, where the interviewing officer testified that he read the petitioner his Miranda warnings, the state court reasonably determined that the petitioner's statements were not obtained involuntarily). Therefore, petitioner's claim for habeas relief, based on the alleged violations of his Miranda rights, is without merit. Thus, it is recommended that his claim to habeas relief on this ground be denied.

### C. Validity of Search Warrant

Petitioner claims that “the search warrant was defective as a matter of law as it was not supported by probable cause” because it was based solely on statements from Cuevas, who is an unreliable confidential informant. [11] Pet. at 2; see id. at 31-32. Petitioner argues that “due to the absence of probable cause,” “all evidence seized therein following this illegally obtained search warrant [should have been] suppressed” and, thus, “the conviction entered against petitioner must be reversed and charges dismissed.” Id. at 31-32; see Dkt. No. 15 at 5. Respondent contends that “[t]he Court should dismiss petitioner's claim as it is precluded from habeas review pursuant to Stone v. Powell, 428 U.S. 465 (1976).” Dkt. No. 11-1 at 25.

11 Contrary to petitioner's assertions, Cuevas was not a confidential informant because “the warrant application included the signed and sworn statement of a fully identified witness.” Zayas-Torres, 40 N.Y.S.3d at 602; see Dkt. No. 15-1 at 6. As the Appellate Division found, “ ‘[the] sworn statement of an identified member of the community attesting to facts directly and personally observed by him [or her] is in and of itself sufficient to support the issuance of a search warrant[.]’ ” Zayas-Torres, 40 N.Y.S.3d at 602 (quoting People v. David, 652 N.Y.S.2d 324, 326 (App. Div. 1996)).

***10** Petitioner's arguments are a challenge to the state court's application of the exclusionary rule under the Fourth Amendment, which guarantees “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. CONST. AMEND. IV. In Stone v. Powell, however, the Supreme Court held that “where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.” 428 U.S. at 494-95; see Pina v. Kuhlmann, 239 F. Supp. 2d 285, 289 (E.D.N.Y. 2003) (“It is well settled that [Fourth Amendment] claims are not cognizable for habeas corpus review where a State has provided a full and fair opportunity to litigate this issue.”); see also Parker v. Ercole, 582 F. Supp. 2d 273, 286 (N.D.N.Y. 2008). Following Stone, review of Fourth Amendment claims in habeas petitions is permissible only: “(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.” Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977)); see also Ramdeo v. Phillips, No. 04-CV-1157 (SLT/RLM), 2007 WL 1989469, at *27 (E.D.N.Y. Jul. 9, 2007) (“Since petitioner has failed to show a lack of State corrective procedures or a breakdown in the underlying process, this claim for habeas relief must be denied.”).

#### 1. New York's Corrective Procedures

“New York has a corrective procedure for Fourth Amendment violations, which is facially adequate.” Baptiste v. Ercole, 766 F. Supp. 2d 339, 359 (N.D.N.Y. 2011) (citing CPL art. 710, and Capellan, 975 F.2d at 70 n.1); see Evans v. Giambruno, No. 00-CV-5980 (NRB), 2000 WL 1876642, at *1 (S.D.N.Y. Dec. 26, 2000) (“It is well-settled that New York State provides for a full and fair opportunity to litigate a Fourth Amendment claim.”) (citing Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991)). “Under CPL [art.] 710, a defendant may move to suppress evidence he claims was unlawfully obtained when he has ‘reasonable cause to believe that such [evidence] may be offered against him in a criminal action.’ ” Miles v. Smith, No. 9:05-CV-1200 (LEK), 2008 WL 1809401, at *6 (N.D.N.Y. Apr. 21, 2008) (quoting Huntley v. Superintendent, Southport Corr. Fac., No. 00-CV-191, 2007 WL 319846, at *7 (N.D.N.Y. Jan. 30, 2007), and citing CPL § 710.20).

"Here, petitioner availed himself of New York's corrective procedures when he filed a motion to suppress the evidence" seized due to the search warrant. Ladd v. Bradt, No. 08-CV-6025 (MAT), 2011 WL 334211, at *4 (W.D.N.Y. Jan. 31, 2011); see Dkt. No. 12 at 18-23. As detailed above, Judge Herrick held a suppression hearing on July 23, 2012, and July 26, 2012, and denied petitioner's motion on October 3, 2012. See Dkt. No. 12-3 at 8-48; see also Dkt. No. 12 at 18-23. Petitioner again raised his claim to the Appellate Division on direct appeal, and the Appellate Division denied his claim on the merits. See Zayas-Torres, 40 N.Y.S.3d at 602-03 ("[T]he warrant application included the signed and sworn statement of a fully identified witness[; t]he information contained in that statement arising from the firsthand observations of that witness was sufficient to provide the issuing court with probable cause to believe that defendant had committed the burglaries and that the stolen property identified in the application would be found in defendant's home."); see also Ladd, 2011 WL 334211, at *4 ("Furthermore, petitioner litigated his Fourth Amendment claims in the state appellate court, which considered his claims and rejected them on the merits. Accordingly, petitioner received an opportunity for full and fair litigation of his Fourth Amendment claims in state court, and he is now precluded from further review in this habeas proceeding."). Thus, it cannot be said that New York "provided no corrective procedures at all to redress [petitioner's] alleged fourth amendment violations." Capellan, 975 F.2d at 70.

### 2. "An Unconscionable Breakdown"

***11** An "unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." Cappiello v. Hoke, 698 F. Supp. 1042, 1050 (E.D.N.Y. 1988) (noting such examples as bribing of trial judge, government's knowing use of perjured testimony, or use of torture to extract a guilty plea), aff'd, 852 F.2d 59 (2d Cir. 1988); see Capellan, 975 F.2d at 70 (observing that an "unconscionable breakdown" must entail some sort of "disruption or obstruction of a state proceeding"). The focus of the inquiry regarding whether there has been an "unconscionable breakdown" must be on "the existence and application of the corrective procedures themselves" rather than on the "outcome resulting from the application of adequate state court corrective procedures." Capellan, 975 F.2d at 71; see Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief.... [T]he bar to federal habeas review of Fourth Amendment claims is permanent and incurable absent a showing that the state failed to provide a full and fair opportunity to litigate the claim[.]").

Here, petitioner took full advantage of the available state process by litigating his Fourth Amendment claims through his motion to suppress, on direct appeal, and again through his motion to vacate his judgment of conviction. See Pet. at 27; see also Dkt. No. 12-1 at 175-230, 262-67, 281-325, 341-53. His disagreement with the outcome of the state courts' rulings "is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72; see Gates, 568 F.2d at 840 ("Stone v. Powell ... holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts."); see also Watkins v. Perez, No. 05-CV-477 (GEL), 2007 WL 1344163, *23 (S.D.N.Y. May 7, 2007) (holding that without more, rejection by state appellate court of the petitioner's Fourth Amendment claims, is not an "unconscionable breakdown" in the state's corrective process, and noting that a "habeas court cannot grant relief simply because it may disagree with the state court's resolution of the claim.").

Finally, petitioner appears to argue that he was not afforded a full and fair opportunity to litigate his Fourth Amendment claim in the state courts because trial counsel "failed to challenge the veracity of the ... warrant which lacked probable cause." Pet. at 3; see discussion infra Subsection II.E. Even if true, that claim is insufficient to establish the sort of unconscionable breakdown necessary for the Court to address petitioner's Fourth Amendment claims. See Crenshaw v. Superintendent, Five Points Corr. Fac., 372 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (finding the petitioner's "assertions that the state courts were incorrect and defense counsel incompetent do not constitute the sort of 'breakdown' " that would permit habeas review of a Fourth Amendment claim); see also Shaw v. Scully, 654 F. Supp. 859, 865 (S.D.N.Y. 1987) ("Where petitioners have either taken advantage of an opportunity to present Fourth Amendment claims or deliberately bypassed the procedure ... courts within this circuit have refused to equate ineffective assistance of counsel with unconscionable breakdown.") (citations omitted); Allah v. Le Fevre,

623 F. Supp. 987, 991-92 (S.D.N.Y. 1985) (rejecting a habeas claim that ineffective assistance of counsel can constitute an "unconscionable breakdown," and stating that "it is plain from the majority opinion in Gates that the Court of Appeals had something other than ineffective assistance of counsel in mind when it speculated that an unconscionable breakdown in state process might permit federal habeas review") (citing Gates, 568 F.2d at 840).

Therefore, because New York State provided petitioner with a corrective procedure to redress his Fourth Amendment claims, and because he has not demonstrated that an "unconscionable breakdown" occurred in the courts below, it is recommended that his claim for habeas relief on Fourth Amendment grounds be denied. Gates, 568 F.2d at 840.

### D. Sufficiency and Weight of Evidence

***12** Petitioner argues that his conviction was not supported by legally-sufficient evidence "to show [he] knowingly, and with intent to deprive, had criminal possession of stolen property." Pet. at 39. Petitioner also claims that "[t]he jury's verdict was against the weight of the evidence, and must be set aside" because the verdict "was based on an unreasonable determination of the facts in light of the evidence presented [at trial]." [12] Id. at 2, 5. Respondent points out that the Appellate Division, on direct appeal, "rejected [petitioner's legal sufficiency] claim, holding that it was unpreserved for appellate review because petitioner did not raise that specific claim at trial." Dkt. No. 11-1 at 27. Respondent argues that: (1) "[t]he court's rejection of petitioner's claim as unpreserved establishes an adequate and independent state law ground for its decision, and petitioner has failed to establish any exception to justify reaching the merits of his claim"; and (2) "[i]n any event, petitioner's legal sufficiency claim has no merit." Id. at 27-28.

12 "Although legal sufficiency and weight of the evidence are related, the two standards each require a discrete analysis." Sincere M. v. New York Off. of Mental Hygiene, 409 F. Supp. 3d 70, 76 n.1 (E.D.N.Y. 2018). "For an appellate court to conclude that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial." Id. (citing Bleakley, 508 N.E.2d 672 (1987)). "To determine whether a verdict is supported by the weight of the evidence, conversely, the appellate court must analyze whether the trier of fact failed to give the evidence the weight it should have been accorded during trial." Id.

#### 1. Procedural Bar

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991) (citations omitted), holding modified on other grounds by Martinez v. Ryan, 566 U.S. 1 (2012). "In the context of federal habeas review, if a state prisoner's federal challenge was not addressed in state court because the prisoner failed to meet a state procedural requirement, federal habeas review is barred." Davis v. Racette, 99 F. Supp. 3d 379, 387 n.3 (E.D.N.Y. 2015) (citing Coleman, 501 U.S. at 730). A state court need not directly cite a state procedural rule in its decision so long as it makes a "plain statement" that "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (citation omitted). "A procedural rule is considered adequate if it is firmly established and regularly followed by the state in question." Davis v. Walsh, 08-CV-4659 (PKC), 2015 WL 1809048, at *9 (E.D.N.Y. Apr. 21, 2015) (internal quotation marks and citation omitted). "To be independent, the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case[.]" Id. (internal quotation marks and citation omitted).

Here, the Appellate Division held that petitioner's "legal insufficiency argument [was] unpreserved, as he did not raise these specific arguments in his general motion for a trial order of dismissal." Zayas-Torres, 40 N.Y.S.3d at 603. "The Appellate Division's statement that the claim was 'unpreserved' is sufficient to establish that it was relying on the procedural bar as an independent ground in disposing of this issue[, and t]he procedural bar applies even where, as here, the court makes an alternative

ruling on the merits." Rolling v. Fischer, 433 F. Supp. 2d 336, 345 (S.D.N.Y. 2006) (citations omitted). Further, although the New York Court of Appeals issued a summary order denying leave to appeal on petitioner's direct appeals, "where 'the last reasoned opinion on the claim explicitly imposes a procedural default' "—as the Appellate Division's holding did here—"a federal habeas court will 'presume[ ] that a later decision rejecting the claim did not silently disregard that bar and consider the merits.' " Id. (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)) (additional citation omitted). Thus, "the procedural default relied upon by the Appellate Division constituted an 'independent' state law ground for the decision." Id.; see Cotton v. Graham, No. 17-CV-650 (LJV/HBS), 2020 WL 6875251, at *2 (W.D.N.Y. Nov. 23, 2020) (holding that the pro se habeas petitioner's "insufficient-evidence claim [wa]s procedurally barred" where the Appellate Division "clearly and expressly found that [the petitioner] failed to preserve his insufficient-evidence claim for appellate review" because he "failed to renew his motion for a trial order of dismissal after presenting evidence") (internal quotation marks and citations omitted).

***13** "Once it is determined that a claim is procedurally barred under state rules, a federal court still may review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate the failure to consider the claim will result in a miscarriage of justice." Osbourne v. Health, 12-CV-1138 (JFB), 2015 WL 1548947, at *8 (E.D.N.Y. Apr. 8, 2015) (citing Coleman, 501 U.S. at 750). "A miscarriage of justice is demonstrated [only] in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent." Id. (citation omitted); see Rolling, 433 F. Supp. 2d at 347 (explaining that, to establish a " 'fundamental miscarriage of justice,' a petitioner must demonstrate 'actual innocence.' ") (quoting Harris, 489 U.S. at 262).

Here, petitioner has made no showing of "actual innocence," nor advanced any arguments demonstrating cause or prejudice that would excuse the default. Calderon v. Thompson, 523 U.S. 538, 558-59 (1998); see Walker v. Artus, 117 F. Supp. 3d 228, 238 (E.D.N.Y. 2015) ("Petitioner has alleged neither cause, nor prejudice, nor a miscarriage of justice in his habeas petition."), aff'd, 716 F. App'x 34 (2d Cir. 2017) (summary order). Moreover, as discussed infra, the Appellate Division rejected petitioner's legal insufficiency claims on the merits, when discussing the merits of his weight of the evidence claim, so he cannot demonstrate that he was prejudiced by the procedural bar. See discussion infra subsection II.D.2; see also McFadden v. Graham, No. 1:18-CV-00865 (MAT), 2019 WL 4016160, at *7 (W.D.N.Y. Aug. 25, 2019) ("McFadden has not attempted to demonstrate cause for the default and prejudice attributable thereto, or that he is factually, as opposed to legally, innocent. In any event, as Respondent notes, the Appellate Division examined the merits of McFadden's legal insufficiency claim on direct appeal, despite the lack of a timely and specific motion for a trial order of dismissal. Therefore, McFadden cannot demonstrate that he was prejudiced by counsel's omissions.); Ali v. Unger, No. 6:13-CV-6210 (MAT), 2014 WL 257270, at *9 (W.D.N.Y. Jan. 23, 2014) (concluding that the petitioner was not prejudiced by any procedural bar because "the Appellate Division examined the merits of [the petitioner]'s legal insufficiency claim notwithstanding the lack of preservation"). Thus, petitioner's claim that the evidence against him was legally insufficient, is procedurally barred. See Pet. at 2, 5, 39. It is, therefore, recommended that petitioner's legal insufficiency claim be denied as subject to an unexcused procedural default.

## 2. Merits

"Even putting aside the adequate and independent state law grounds," petitioner's legal insufficiency claim lacks merit. Rios v. Kaplan, No. 1:17-CV-00314 (LTS/SDA), 2019 WL 13400101, at *10 (S.D.N.Y. July 23, 2019), report and recommendation adopted, 2023 WL 4348353 (S.D.N.Y. July 5, 2023). After determining that petitioner's claim was unpreserved, the Appellate Division went on to explain that, "[n]evertheless, our weight of the evidence analysis necessarily involves an evaluation of whether all elements of the charged crimes were proven beyond a reasonable doubt at trial." Zayas-Torres, 40 N.Y.S.3d at 603-04. The Appellate Division summarized that,

> at trial, the victims testified that the property found by police in defendant's apartment included televisions, speakers and other items that they identified as property stolen from their homes. The victim whose safe was broken into stated that her stolen jewelry was worth between $7,000 and $10,000. The

> thrift shop owner testified that defendant offered to sell him video games and other electronic items that corresponded with some of the stolen items, and that he saw televisions corresponding with the stolen items in defendant's home. He further stated that a broken television found by police in his thrift shop had been brought there by defendant, who said that he had dropped it. Other testimony established that this television had been stolen from one of the victims and was not broken before it was stolen, and the remote control that operated it was found in defendant's apartment. The thrift shop owner further described the telephone call in which defendant told him that he had broken into one of the apartments and had stolen jewelry. The video recording of the police interview was admitted into evidence, in which defendant admitted that he had entered two of the apartments through windows, had assisted a third party in burglarizing the third apartment and had taken jewelry and electronics. Defendant's account during this interview included accurate details about the thefts that police testified they had not communicated to him.

***14** Id. at 604. The Appellate Division also summarized petitioner's testimony:

> He claimed that he did not know that the property found in his apartment was stolen, stating that it came from the thrift shop and that he was storing it at the owner's request. He further testified that he worked in the thrift shop on commission—which the thrift shop owner denied—and that the owner had directed him to arrange to have the customer sell the Louis Vuitton sunglasses. He denied the customer's testimony that he had gone to her apartment to arrange the sale of the sunglasses; however, a receipt from the transaction was found in his wallet.

Id. The Appellate Division concluded that, "[d]eferring to the jury's credibility determinations and viewing the evidence in a neutral light, we are persuaded that the verdict is not against the weight of the evidence." Id.

Although petitioner conclusorily alleges that there was insufficient evidence to support his conviction, he has not established that the Appellate Division's alternative holding is contrary to, or an unreasonable application of, clearly-established federal precedent. See, e.g., Sincere M. v. New York Off. of Mental Hygiene, 409 F. Supp. 3d 70, 76 n.1 (E.D.N.Y. 2018) ("For an appellate court to conclude that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial.") (citing People v. Bleakley, 508 N.E.2d 672 (1987)); see also Rios, 2019 WL 13400101, at *10 ("Based on the foregoing evidence, there were valid lines of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury that Rios intended to kill Grullon by shooting at her repeatedly. Thus, the Appellate Division's affirmance was not objectively unreasonable."). Accordingly, it is alternatively recommended that petitioner's claim for habeas relief on grounds of legal insufficiency be denied on the merits.

As for petitioner's weight of the evidence claim, such a claim derives from CPL § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." CPL § 470.15(5). "Thus, a 'weight of the evidence' argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles." Echevarria-Perez v. Burge, 779 F. Supp. 2d 326, 333 (W.D.N.Y. 2011) (quoting Bleakley, 508 N.E.2d at 675). "Since a 'weight of the evidence claim' is purely a matter of state law, it is not cognizable on habeas review." McClelland v. Kirkpatrick, 778 F. Supp. 2d 316, 335 (W.D.N.Y. 2011) (citing 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"), and Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.")).

***15** "Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding." Hernandez v. Conway, 485 F. Supp. 2d 266, 275 (W.D.N.Y. 2007) (collecting cases, including Ex parte Craig, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence"), aff'd, 263 U.S. 255 (1923); Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (same); Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (same); Garbez v. Greiner, No. 01-CV-9865 (LAK/GWG), 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002) ("[B]y raising a 'weight of the evidence' argument, [petitioner] does not present to this Court a federal claim as required by 28 U.S.C. § 2254(a). Instead, [petitioner] raises an error of state law, which is not available for habeas corpus review.")) (additional citations omitted). Thus, it is further recommended that petitioner's weight of the evidence claim be denied as not cognizable in this habeas proceeding.

### E. Ineffective Assistance of Counsel

Petitioner argues that he suffered a denial of effective assistance of counsel at trial. See Pet. at 3; see also Dkt. No. 15 at 2-4. He contends that his trial counsel (1) failed to challenge Cuevas' credibility or address Cuevas' criminal history; (2) "failed to challenge the veracity of the [search] warrant which lacked probable cause"; and (3) had a conflict of interest, because he "represented ... Cuevas in a previous case and was aware if [sic] [Cuevas'] untrustworthiness." Pet. at 3. Respondent asserts that "[t]he Appellate Division and the County Court rejected these respective claims, and as those decisions reasonably applied clearly established Supreme Court law, petitioner is not entitled to habeas relief." Dkt. No. 11-1 at 34.

The standard applicable to ineffective assistance of counsel ("IAC") claims is "highly demanding" and "rigorous." Kimmelman v. Morrison, 477 U.S. 365, 382 (1986); Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). To prevail on an IAC claim, petitioner must meet a two-pronged test: (1) he "must show that counsel's performance was deficient," such that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance"; and (2) he must show "that the deficient performance prejudiced the defense," in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-94 (1984). "[An] IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011).

Strickland instructs a court to "indulge a strong presumption that counsels' conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, 466 U.S. at 689 (quoting Michael v. State of Louisiana, 350 U.S. 91, 101 (1955)). The Supreme Court recognized in Strickland that "there are countless ways to provide effective assistance in any given case," and that even the "best criminal defense attorneys would not defend a particular client the same way." Id. Thus, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Id. at 690.

The AEDPA requires a federal habeas court to give deference to a state court's ruling on claims of ineffective assistance of counsel. See Harrington v. Richter, 562 U.S. 86, 101 (2011) ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself."). Thus, when ineffective assistance claims are considered under the AEDPA, the reviewing court affords a "doubly" deferential standard regarding the state court opinion. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, when § 2254(d) applies, "[t]he pivotal question" for the federal habeas court "is whether the state court's application of the Strickland standard was unreasonable." Richter, 562 U.S. at 101.

***16** Here, petitioner "cannot satisfy the Strickland test in the first instance, much less show that the state court applied Strickland 'in an objectively unreasonable manner.' " Santiago v. Artus, No. 15-CV-2361 (AMD), 2018 WL 4636949, at *6 (E.D.N.Y. Sept. 27, 2018) (quoting Contant v. Sabol, 987 F. Supp. 2d 323, 330 (S.D.N.Y. 2013) ("Where, as here, a petitioner seeks habeas review of an ineffective-assistance-of-counsel claim under the test announced in Strickland, review is 'doubly

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

deferential.' ")); see Singletary v. Bell, No. 21-CV-02366 (HG), 2022 WL 3682224, at *4 (E.D.N.Y. Aug. 25, 2022). The Appellate Division explicitly rejected petitioner's claim that trial "counsel was ineffective for failing to obtain suppression of [petitioner's] statement on the ground that the police lacked probable cause for his arrest." Zayas-Torres, 40 N.Y.S.3d at 603. The Albany County Court, in reviewing plaintiff's motion to vacate his judgment of conviction, again rejected petitioner's IAC claims. See Dkt. No. 12-2 at 77-79.

First, petitioner claims that counsel's failure to request a Darden Hearing [13] to challenge the credibility of Cuevas, or to address Cuevas' criminal history, constitutes ineffective assistance. See Pet. at 3; see also Dkt. No. 15 at 4. However, to the contrary, as noted by respondent, counsel conducted an extensive cross-examination of Cuevas regarding his credibility and criminal history. See Dkt. No. 11-1 at 38; see, e.g., Montgomery v. Wood, 727 F. Supp. 2d 171, 187 (W.D.N.Y. 2010) (" 'The conduct of examination and cross examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken.' ") (quoting Eze v. Senkowski, 321 F.3d 110, 127 (2d Cir. 2003)). During the cross-examination, counsel asked Cuevas about various arrests, prior bad acts, and criminal convictions. See Dkt No. 12-4 at 174-88. For example, the following exchange occurred:

Q: Mr. Cuevas, ... back in May of 2002, you committed an assault on a woman; isn't that right?

A: I was arrested on an assault, but I didn't commit assault. You know the case very well.

Q: And, Mr. Cuevas, back in October of 1988, you lived in the Bronx, right?

A: Yes, I was born and raised in the Bronx.

Q: And back then, you were involved in possession of stolen property; isn't that right? ...

A: Was it a vehicle?

Q: I don't know, Mr. Cuevas. You tell me.

A: Okay. It was a car that I bought and it was reported stolen.

Q: And, Mr. Cuevas, you pled guilty in that case, correct?

A: I believe I did....

Q: Okay. Mr. Cuevas, in October of 1989, again in the Bronx, you were in possession of a weapon, correct?

A: Yes, sir.

Q: And that weapon was a gun, correct?

A: Yes.

Q: And you didn't possess a license or a permit to have that gun, did you?

A: No.

Q: Mr. Cuevas, in 1993 you were living in the Albany, New York, area; is that right?

A: Yes.

Q: And back in June of 1994 -- well, back in 1994, you were involved in selling drugs; is that right?

A: Yes. You was my attorney at the time....

Q: The fact that I was your lawyer, does that change the fact that you were selling drugs? ...

A: No it doesn't.

Q: And, in fact, not only in 1993 were you selling drugs, but in 1994 you were selling drugs as well; isn't that right, Mr. Cuevas?

A: Yes....

Q: Mr. Cuevas, in the year 2000, again, Albany, New York, you were involved in possession of drugs; isn't that right?

A: Yes.

Q: And in December of 2002 in Albany, you were involved in giving a phoney name when you came in contact with the police, correct?

A: No. What name was that?

Q: You pled guilty to it, didn't you?

A: To what?

Q: December 18, 2002, to be exact, you pled guilty to giving the police a phoney name....

***17** A: I have two licenses: One with Hector Colon, which is my mother's maiden name; and one with Hector Cuevas, which is my father's name.

Q: So when you came in contact with the police, you gave them a different name?

A: No, they searched me and found both licenses in my pocket.

Q: And as a result of that incident that you just talked about, you pled guilty to criminal impersonation, correct?

A: Yes, and paid a fine.

Id. at 174-82. Counsel proceeded to elicit that Cuevas had been charged with various felony offenses, and as a result of his cooperation in petitioner's case, the charges were reduced to misdemeanor offenses to be resolved without any jailtime. See id. at 193-96. Counsel also elicited that Cuevas uses various names and aliases. See id. at 174-82. Although petitioner vaguely asserts that his trial counsel "failed to prove that ... [Cuevas] lacked credibility and was therefore unreliable," Dkt. No. 15 at 3, petitioner does not explain "what more counsel should have done." Brown v. Lawler, No. CV 09-2565, 2010 WL 11463158, at *7 (E.D. Pa. Jan. 19, 2010) (rejecting the petitioner's habeas claim based on IAC grounds because "[t]rial counsel elicited testimony from the DNA expert helpful to petitioner's case [and the p]etitioner does not explain what more counsel should have done"), report and recommendation adopted, 2016 WL 6033231 (E.D. Pa. Oct. 13, 2016); see also Cumberland v. Graham, 08-CV-4389 (LAP/DF), 2014 WL 2465122, at *39 (S.D.N.Y. May 23, 2014) ("Under Strickland, the performance of [counsel] should not be found to have been constitutionally deficient where, even if he did not use every possible avenue to impeach [the witness's] credibility, he nonetheless conducted a cross-examination that brought out an important discrepancy."); Brown v. Brown, 847 F.3d 502, 514 (7th Cir. 2017) ("Pursuit of unsuccessful arguments ... does not show ineffective assistance of counsel.").

13 As discussed supra, "[a] Darden hearing is used to challenge the actual existence and reliability of any confidential informer who provided information that served as the basis for probable cause for a defendant's arrest." Gomez v. Miller, No. 9:19-CV-1571 (TJM), 2021 WL 5446979, at *4 n.5 (N.D.N.Y. Nov. 22, 2021) (citations omitted); see discussion supra note 9. However, because Cuevas was not a confidential informant, the Court was not required to establish his reliability or basis of knowledge through a Darden hearing. See Daly v. Lee, No. 11-CV-3030 (JFB), 2014 WL 1349076,

at *15 (E.D.N.Y. Apr. 4, 2014) (explaining that, because the "petitioner's arrest was based on his identification as the perpetrator of the ... crimes by [named witnesses], who were not confidential informants," "petitioner never had a legal entitlement to a Darden hearing").

Second, petitioner claims that counsel failed to challenge the veracity of the search warrant. See Pet. at 3; see also Dkt. No. 15 at 3. However, the Appellate Division found that this claim is baseless because counsel did indeed move for suppression of the search warrant. See Dkt. No. 11-1 at 36. As the Appellate Division concluded,

> [t]he record belies defendant's claim that his counsel failed to raise an appropriate challenge to his warrantless arrest; the joint Dunaway/Mapp/Huntley hearing was conducted at defense counsel's behest. The hearing testimony established, among other things, that defendant's arrest was based upon the thrift shop owner's statement to police that defendant had supplied him with certain items that proved to be stolen property. Defense counsel actively cross-examined the People's witnesses, in an attempt to establish that this evidence was unreliable. Despite counsel's efforts, County Court concluded that police had probable cause to arrest defendant without a warrant, and we find no error in that determination.

***18** Zayas-Torres, 40 N.Y.S.3d at 603. Thus, "[c]ounsel cannot be deemed ineffective for failing to assert a claim that he had in fact raised." Dkt. No. 11-1 at 36; see Paulino v. Miller, No. 20-CV-5067 (MKV/BCM), 2023 WL 6379776, at *14 (S.D.N.Y. Sept. 13, 2023) (rejecting the petitioner's claim that his counsel was ineffective for failing to raise an argument when the counsel did, in fact, raise that argument), report and recommendation adopted, 2023 WL 6387017 (S.D.N.Y. Sept. 29, 2023).

Finally, petitioner claims that counsel had a conflict of interest because he "represented ... Cuevas in a previous case and was aware if [sic] [Cuevas'] untrustworthiness." Pet. at 3. "[A] criminal defendant's Sixth Amendment right to counsel includes a right to conflict-free representation." Graham v. Ricks, No. 9:02-CV-0303, 2004 WL 768579, at *8 (N.D.N.Y. Apr. 7, 2004) (citing Wood v. Georgia, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest")). "A court must disqualify counsel or seek a waiver of conflict-free representation from a defendant if it finds that counsel has a conflict of interest." Lyle v. Artuz, No. 03-CV-5155 (CBA), 2006 WL 1517750, at *19 (E.D.N.Y. May 31, 2006). On the other hand, "[i]f the court discovers no genuine conflict, it has no further obligation." U.S. v. Perez, 325 F.3d 115, 125 (2d Cir. 2003).

Here, at an October 2, 2012, court appearance, counsel addressed the issue of the potential conflict. See Dkt. No. 12-3 at 82. Counsel told the court that he represented Cuevas in an unrelated case "approximately 20 years ago," and that he had explained to petitioner that petitioner could ask the court to appoint a new attorney. Id. at 83-84. The court then discussed the matter with petitioner directly, and the following exchange took place:

> THE COURT: [D]o you understand that if you believe that there is a conflict, and I don't know the details of this, but assuming that [counsel] represented this person several to many years ago, theoretically he could have some knowledge of that person that could be of assistance to you in terms of cross-examining that individual. However, on the other hand, he may know information that from that individual that might not be helpful to you, I'll just leave it that way, but you have considered all of these options?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: And are you comfortable with your continued representation by [counsel]?
>
> PETITIONER: Yes, Your Honor.
>
> THE COURT: All right. And so it's your intention to proceed to trial with [counsel] as your attorney?

PETITIONER: Yes, Your Honor.

THE COURT: And you're not asking to have an opportunity to get new counsel, correct?

PETITIONER: Yup, correct.

Id. at 84-85. Given the foregoing exchange, it appears that petitioner's waiver of his right to conflict-free counsel was made "knowingly and intelligently." Simpson v. Melecio, No. 9:20-CV-36 (MAD/DJS), 2022 WL 19296994, at *4 (N.D.N.Y. June 13, 2022) (rejecting the petitioner's IAC claim for habeas relief because "[a]fter being made aware of the potential issue [of the conflict of interest] and its ramifications, [the p]etitioner knowingly and intelligently decided to continue having counsel represent him[; t]hus, [the p]etitioner waived any potential conflict of interest on the part of counsel"), report and recommendation adopted, 2023 WL 2665463 (N.D.N.Y. Mar. 28, 2023). Therefore, the Appellate Division's conclusion that "counsel provided meaningful representation" was neither contrary to nor an unreasonable application of federal precedent. Zayas-Torres, 40 N.Y.S.3d at 603 (citations omitted). Accordingly, it is recommended that petitioner's claim for habeas relief on IAC grounds be denied.

## III. Conclusion

***19** **WHEREFORE**, for the reasons set forth herein, it is hereby:

**RECOMMENDED**, that the petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that no certificate of appealability be issued with respect to any of petitioner's claims as petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 72. [14]

14 If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4654258

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4651817
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ricardo ZAYAS-TORRES, Petitioner,
v.
Daniel MARTUSCELLO, Respondent.

No. 9:18-CR-0526 (GTS/CFH)
|
Signed November 1, 2024

**Attorneys and Law Firms**

Ricardo Zayas-Torres, Marcy, NY, Pro Se.

Priscilla I. Steward, New York State Attorney General, New York, NY, for Respondent.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge [1]

1 The Hon. Thomas J. McAvoy originally presided over this matter. The case has since be reassigned to the undersigned.

***1** Petitioner filed a petition for a writ of *habeas corpus* in this action pursuant to 28 U.S.C. § 2254, seeking to vacate his burglary conviction entered in the Supreme Court of Albany County, New York. (Dkt. No. 1.) In his petition, petitioner contends that the conviction violated his rights under the Constitution because (1) the trial court permitted the introduction of statements and evidence that should have been suppressed under the Fourth Amendment, (2) the evidence at trial was insufficient to convict him, and (3) his trial counsel was ineffective in a way that prejudiced him. (*Id.*) The Court referred the matter to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In his Report-Recommendation, issued on May 15, 2024, Magistrate Judge Hummel recommends that the Court deny the petition and decline to issue a certificate of appealability. (Dkt. No. 27.) More specifically, Magistrate Judge Hummel finds that nothing in the state-court proceedings represented an unreasonable application of clearly established federal law or an unreasonable determination of the facts as presented in the state-court proceeding: New York courts provided Petitioner an opportunity to suppress evidence and statements, and the state-court decisions on those issues could clearly survive the deferential standard of review that applies to a federal *habeas corpus* proceeding. (*Id.*) In any event, Magistrate Judge Hummel finds, even if Petitioner's challenge to the sufficiency of the evidence could survive a procedural bar, the evidence presented at trial—which included evidence that Petitioner possessed evidence stolen during burglaries at residences to which he had connections—was sufficient to support his conviction; and nothing indicated that his trial attorney's performance fell below an objective standard of reasonableness, or that he was prejudiced in a way that meets the standard for a federal *habeas* action. (*Id.*) Finally, because reasonable jurists could not disagree about the merits of the Petition, Magistrate Judge Hummel recommends that the Court decline to issue a certificate of appealability. (*Id.*)

Petitioner has not filed an Objection to the Report-Recommendation, and the time for such objections has expired. (*See generally* Docket Sheet.) After carefully examining the record, this Court has determined that the Report-Recommendation is not subject to attack for clear error, and the Court will accept and adopt the Report-Recommendation for the reasons stated therein.

**ACCORDINGLY**, it is

**ORDERED** that Judge Hummel's Report-Recommendation (Dkt. No. 27) is **ACCEPTED** and **ADOPTED** in its entirety, and the Petition for a writ of habeas corpus is **DENIED** and **DISMISSED**; and it is further

**ORDERED** that the Court declines to issue a certificate of appealability, because Petitioner cannot make a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4651817

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4267851
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dante D. MAJOR, Petitioner,
v.
Jamie LAMANNA, Respondent.

9:18-cv-0418 (DNH/TWD)
|
Signed 09/03/2021

**Attorneys and Law Firms**

DANTE D. MAJOR, Petitioner, pro se, 13-B-0181, Green Haven Correctional Facility, P.O. Box 4000, Stormville, NY 12582.

HON. LETITIA JAMES, Attorney General of the State of New York, Attorney for Respondent, 28 Liberty Street, New York, NY 10005, OF COUNSEL: MARGARET A. CIEPRISZ, ESQ., Ass't Attorney General.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

***1** This matter has been referred for a Report and Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c). Presently before this Court is the second amended petition of *pro se* Petitioner Dante D. Major, seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2255. (Dkt. No. 35.) Respondent opposes the petition. (Dkt. Nos. 62, 63.) The state court record was filed under separate cover. (Dkt. No. 64.) Petitioner filed a reply. (Dkt. No. 69.) For the reasons that follow, the Court recommends that the petition be denied and dismissed.

## I. BACKGROUND

Respondent has included a detailed description of the facts and procedural history of this case. (Dkt. No. 62 at 5-22.[1]) The Court summarizes and supplements the facts as necessary for clarity and to discuss the grounds raised by Petitioner.

1 Citations to page numbers in the filings refer to the pagination CM/ECF automatically generates. Excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected unless indicated.

### A. Indictment

In March 2012, Petitioner was indicted on four counts, all relating to alleged distribution of oxycodone within Otsego County. (Dkt. No. 64-1 at 92-93.) In Count One, he was charged with operating as a major trafficker, and it was alleged that, as a profiteer, he sold a narcotic drug on one or more occasions between July 1 and December 31, 2011, and the proceeds of those sales had an aggregate value of $75,000 or more. *Id*. at 92. In Count Two, he was charged with first degree criminal possession of a controlled substance on December 19, 2011. *Id*. Counts Three and Four charged third degree possession of a controlled substance on October 13, 2011. *Id*. at 92-93.

### B. Trial

In October 2012, Petitioner proceeded to a jury trial before the Hon. Brian D. Burns of Otsego County Court. Petitioner was represented by Michael Jacobs, Esq. The Otsego County District Attorney ("DA") John Muehl, Esq. [2] was for the People. The bulk of the testimony against Petitioner was provided by nine cooperating witnesses: Christine Ramsell, Kevin Baker, Sara Baker, Shelby Mochrie, Crystal Gonsalves, Clarence Vanier, Jeffrey Vollkommer, Kate Joslyn, and Scott Burns. Two Otsego County Jail inmates and an auditor for the Oneida Indian Nation Gaming Commission also testified for the People. Numerous law enforcement personnel testified regarding their investigations, surveillance, execution of search warrants, chain of custody, and forensics. As summarized by the Appellate Division, Third Department:

> Following a lengthy investigation by numerous law enforcement agencies into narcotics trafficking in Otsego County, [Petitioner] was charged with various crimes arising from his alleged possession and sale of significant quantities of oxycodone powder between July and December 2011.... The trial testimony established [Petitioner] sold large quantities of oxycodone to Christin[e] Ramsell and Clarence Vanier who would, in turn, sell or distribute the drugs to others in the Otsego area.

***2** *People v. Major*, 143 A.D.3d 1155, 1158 (3d Dep't 2016). [3]

2 The Court refers to Attorney Muehl as the Otsego DA, the district attorney, and the prosecutor throughout the Report-Recommendation.

3 Ramsell and Vanier, who operated independently of one another, were investigated by two separate agencies. *Id*. The Otsego County Sheriff's Office ("OCSO") investigated Ramsell's operation. The New York State Police ("NYSP") investigated Vanier's drug distribution. The separate investigations by the two law enforcement agencies culminated in the execution of search warrants on two different dates: (1) the OCSO executed its search warrant at Ramsell's house on October 13, 2011; (2) and the NYSP executed and searched the homes of Vanier, Vollkommer, and Burns on December 20, 2011.

Ramsell testified that she first met Petitioner in February or March of 2011. She bought oxycodone from Petitioner on behalf of a drug dealer, who paid Ramsell "$250 to pick it up each time." (Dkt. No. 64-6 at 144.) But when that drug dealer went to jail in mid-July 2011, Ramsell began buying oxycodone directly from Petitioner. *Id*.

Ramsell estimated that between July and October 2011, she bought oxycodone from Petitioner approximately every seven to ten days. *Id*. at 150-511. During each purchase, Ramsell paid $10,000 to Petitioner for 66 grams of oxycodone. *Id*. at 146-48. She explained that "[n]ormally you get 50 grams [for $10,000] but [Petitioner] threw in an extra." *Id*. at 147. Ramsell and her boyfriend, Luke MacCracken would use the 16 grams of oxycodone themselves and sell the rest. *Id*. at 150-51.

In July 2011, Ramsell lived in a former boyfriend's house on Heritage Hill Road ("Heritage Hill") with MacCracken and two friends, Sara Baker and her boyfriend Eric Jones. *Id*. at 145. All four, and two additional friends, Kevin Baker and his girlfriend Shelby Mochrie, participated in Ramsell's drug operation by counting money, packaging, and selling. *Id*. at 149. When Ramsell needed a fresh supply of oxycodone, she called Petitioner and "he'd show up" and bring the oxycodone powder to her in a plastic bag. *Id*. at 147. Ramsell and Petitioner always exchanged the drugs and money in private. After Petitioner would leave, Ramsell and her friends would repackage the bulk oxycodone for individual sale. The group would "set up an assembly line to bag out and get ready for distributing," measuring a small amount of powder into glassine envelopes that they would then sell for $20 each. *Id*. at 150, 157, 280-82, 285, 385-90, Dkt. No. 64-7 at 34, 56-58, 69-70.

Sara Baker testified that Petitioner came to Heritage Hill approximately 20 times between July and early September 2011. (Dkt. No. 64-7 at 33-34.) Petitioner would pick Ramsell up, and, when Ramsell returned, she "had a plastic baggy of the powder

and when it was gone, [Ramsell] would meet with [Petitioner,] and then she would come back and it would be full again and she'd get everything ready to sell it." *Id*. at 51.

In early September 2011, Ramsell, MacCracken, Sara Baker, and Eric Jones were asked to leave Heritage Hill. On September 7, 2011, and the four moved to a mobile home in Wells Bridge, New York that Petitioner owned ("Wells Bridge"). Ramsell testified that "there was no agreement" on rent, and when asked if she did anything for Petitioner while living at the house, she responded that "I just bought and sold drugs." (Dkt. No. 64-6 at 154.) Ramsell continued to pay Petitioner $10,000 for 66 grams of oxycodone. *Id*. at 148.

***3** Ramsell testified that at first, Petitioner would bring the oxycodone with him to Wells Bridge, but then Petitioner "brought a big bag of it to the house and after that he would just weigh it out." Petitioner kept the bag in Ramsell's room underneath the dresser. *Id*. at 153-56. She explained that if she wanted some, she "would have to call him up or he'd stop by, just tell him I need more," then Petitioner "would weigh it out and [she] would buy it." *Id*. at 156. The bag of oxycodone hidden beneath Ramsell's dresser belonged to Petitioner; Ramsell could not take or sell any of it until she had purchased it from Petitioner. *Id*.

Shelby Mochrie testified that she saw Petitioner at Wells Bridge about three times and he brought drugs to the house once. (Dkt. No. 64-7 at 59, 68.) Sara Baker also saw Petitioner frequently at Wells Bridge. Petitioner would arrive early in the morning, Sara Baker would wake Ramsell up, and Petitioner would meet with Ramsell either in Ramsell's bedroom or [Petitioner] would tell us to go in our bedrooms or whatever." *Id*. at 35.

Kevin Baker, in addition to working on the assembly line packaging the oxycodone for sale, sold oxycodone for Ramsell. (Dkt. No. 64-6 at 282-84.) From approximately July to mid-October 2011, Kevin Baker would sell between 10 and 20 bundles—between 100 and 200 glassine bags of oxycodone—a day. *Id*. at 283. Ramsell charged Kevin Baker $150 per bundle; he would re-sell each bundle for either $200 or $250. He estimated that during this time period he sold approximately $2000 in oxycodone every day. *Id*. at 284.

Crystal Gonsalves testified that she met Petitioner, whom she referred to as "D", in August 2011. (Dkt. No. 64-7 at 80-81, 84.) From August through October 2011, Gonsalves purchased oxycodone from Ramsell, MacCracken, and Jeffrey Vollkommer for her personal use. *Id*. at 85-87. She testified she went with Petitioner to Ramsell's house on Heritage Hill once. *Id*. at 85. While there, Gonsalves saw Ramsell "bagging up the Oxy powder and D sitting there." *Id*. Gonsalves also went with Petitioner to Wells Bridge on two occasions. *Id*. at 80-81. In late August 2011, she went with Petitioner to Wells Bridge. On the way, Petitioner gave her oxycodone, which she snorted in the car. *Id*. at 83. Once at Wells Bridge, she "did a couple more lines of Oxy" that Petitioner had retrieved from the bedroom. *Id*. Gonsalves went with Petitioner to Wells Bridge a second time to pick up money from Ramsell, who was then living there. When they got there, Gonsalves and Petitioner went into the living room and Ramsell started to give Petitioner money. Petitioner stopped her, saying " 'not here' and they went to the bedroom." *Id*. at 83. Gonsalves did not see what happened in the bedroom. She eventually asked Petitioner where he was getting his supply of oxycodone from and she was told "Covidien[4] is a great place." *Id*. at 89.

4 "Covidien, a healthcare company, had a plant located in Hobart, New York, where oxycodone was manufactured, according to a January 15, 2013, newspaper article in an Oneonta newspaper, which also discussed Petitioner's criminal case." (Dkt. No. 62 at 10 n.13.) *See also* https://www.thedailystar.com/news/local_news/police-drugsstolenfromcovidien/article_98b19309-3de8-55ed-8250-f286997e353d.html (last visited Sept. 3, 2021).

In total, Ramsell testified she made approximately 10 purchases at Heritage Hill and 8 to 10 purchases at Wells Bridge. She continued to purchase oxycodone powder from Petitioner until October 13, 2011, when the OCSO executed a search warrant at Wells Bridge and she was arrested. (Dkt. No. 64-6 at 158.) Between July and October 13, 2011, Petitioner sold Ramsell at least $90,000 worth of oxycodone. *Id*. at 150-52, 154, 158, 166.[5]

5 The $90,000 figure is based on Ramsell purchasing $10,000 in oxycodone from Petitioner every 10 days during the 90-day period between July 15, 2011, and October 13, 2011. Ramsell also estimated, however, that she made 30 purchases in total from Petitioner. (Dkt. No. 64-6 at 161-62.) This discrepancy may be due to Ramsell's inclusion of the times that she picked up oxycodone on behalf of a drug dealer who went to jail in July 2011.

***4** OCSO Investigator Michael Ten Eyck testified that Ramsell and MacCracken had become suspects in a narcotics investigation conducted by its office following undercover buys of oxycodone powder that was traced back to the pair. (Dkt. No. 64-5 at 157-58.) During the execution of the search warrant at Wells Bridge on October 13, 2011, police recovered oxycodone powder, glassine bags, U.S. currency, marijuana, and various weapons and ammunition, including a pistol and rifle found in Ramsell's bedroom. (Dkt. No. 64-5 at 160-61, Dkt. No. 64-6 at 23, 34-35.) A large bag containing approximately 84 grams of oxycodone was found in Ramsell's bedroom underneath the dresser. (Dkt. No. 64-5 at 161-63; Dkt No. 64-6 at 65; Dkt. No. 64-8 at 58.) Ramsell testified that this oxycodone belonged to Petitioner, and was the supply from which Petitioner would measure out the amount he would sell to Ramsell. (Dkt. No. 64-6 at 159.) Also in Ramsell's bedroom police found a bundle—ten glassine envelopes—of oxycodone. (Dkt. No. 64-5 at 162-63, 167.) Ramsell testified that the bundle of oxycodone belonged to her as she had already purchased these drugs from Petitioner. (Dkt. No. 64-6 at 160.)

Petitioner also sold oxycodone through Clarence Vanier, also known as "C," Petitioner's friend for "17 years plus." (Dkt. 64-7 at 123-24.[6]) Prior to July 2011, Vanier had sold cocaine, but never sold oxycodone until Petitioner came to his house, brought "Oxy powder", and told him they could "make a lot of money from this. It's white gold." *Id*. at 166. Thereafter, Petitioner dropped off a supply of oxycodone at Vanier's house, and it was Vanier's job to get the oxycodone "sold." *Id*. at 126. Vanier, in turn, gave the oxycodone to his friend, Jeffrey Vollkommer to sell. *Id*. at 126-30. Vollkommer would sell the oxycodone, and return to Vanier's home with the proceeds. *Id*. at 130, 194. Vollkommer paid Vanier $190 per gram for the oxycodone, which would go to Petitioner. *Id*. at 202. Vanier testified he was compensated for his "services" in "cash" by Petitioner. *Id*. at 130-32. When Petitioner picked up the money for the oxycodone that Vollkommer had sold, Petitioner would pay Vanier with a portion of the proceeds. Petitioner also gave Vanier gambling money when they went to the Turning Stone Casino together. Between July and December 2011, Petitioner paid Vanier between $15,000 and $20,000 for selling the oxycodone Petitioner had supplied him. *Id*. at 132. (Dkt. No. 64-7 at 123-24, 126, 128, 130, 132, 166, 194, 201.)

6 Vanier testified Petitioner was "like family. When I say like family, at one point I would have gave my life for him and vice versa, like family." (Dkt. No. 64-7 at 129.) He further stated it was "very difficult" for him to testify at Petitioner's trial. *Id*.

Vanier estimated that Petitioner supplied him with approximately 600 grams of oxycodone between July 1 and December 20, 2011. *Id*. at 125. Petitioner gave Vanier 50 to 100 grams in July, 100 to 150 grams in August, approximately 100 grams in September, 100 grams in October, and approximately 300 grams on December 19, 2011, a "[c]ouple hours" before a search warrant was executed at his home on December 20, 2011. *Id*. at 125, 127-31. Vanier did not testify regarding whether Petitioner supplied him with any oxycodone in November. *See id*.

Vollkommer, who was addicted to oxycodone, began selling it in July 2011 to support his addiction. (Dkt. No. 64-7 at 200-01.) He sold approximately three-quarters of what he picked up from Vanier and used the rest himself. *Id*. at 202. Vollkommer saw Petitioner, who he called "D" at Vanier's house one time when Vollkommer was picking up a supply of oxycodone. Petitioner gave Vanier a "baggie with some powder in it." *Id*. at 202-03. He also testified that he tried to buy oxycodone directly from Petitioner once when he was at a bar with Vanier and Petitioner in July 2011, but the price was too high, and the deal was never consummated. *Id*. at 194-9, 201-03.

Kate Joslyn also referred to Petitioner as "D". At the time of trial, she was incarcerated for selling oxycodone. She met Vanier through Petitioner and had been to Vanier's home between five and ten times, each time with Petitioner. Joslyn testified that she "copped drugs in Wells Bridge." *Id*. at 235.

***5** Scott Burns, a friend of Vollkommer's, testified that he met Petitioner in Oneonta in August 2011 and bought 16 grams of oxycodone powder for $3,300 directly from Petitioner. (Dkt. No. 64-7 at 247.) After this one time purchase, Burns purchased oxycodone from Vollkommer. *Id*. at 246-48; Dkt. No. 64-8 at 11.

On December 20, 2011, the NYSP executed a search warrant at Vanier's home at 5:41 a.m. (Dkt. No. 64-6 at 84; Dkt. No. 64-1 at 522.) NYSP Investigator Gregory Ellison and others recovered approximately 307 grams of oxycodone from Vanier's basement. (Dkt. No. 64-6 at 85; Dkt. No. 64-8 at 94, 97-98.) Vanier testified that he had obtained this supply of oxycodone from Petitioner a "[c]ouple hours" before the police executed the search warrant. (Dkt. No. 64-7 at 130-31.)

The People also offered the testimony of two Otsego County Jail inmates, Russell Stell and Leo Szymanski. Petitioner told Russell Stell that "he was involved in selling oxy powder and [that Ramsell and MacCracken] used to work for him" selling oxycodone. (Dkt. No. 64-8 at 22.) Stell knew MacCracken because he had previously shared a cell with him. *Id*. at 24.

Leo Szymanski, who called Petitioner "D", testified that Petitioner told him he and Vanier "were partners." *Id*. at 137. Stell testified that Petitioner and Vanier, who was also incarcerated at the jail, "were going back and forth about who's blaming who and whose mistake it was and how [Petitioner] left Clarence hanging." *Id*. at 136. Petitioner told Szymanski that he had told Vanier "to stop doing what he's doing. It's getting hot, and he should have took a vacation like he did, like [Petitioner] did, that he should have went away." *Id*. at 137, 143.

Petitioner also told Szymanski about the various property he owned, including a "big property" in Hobart and property in Wells Bridge. *Id*. at 138-39. Petitioner said that he had been planning to rent Wells Bridge, but that "he knew a girl name Christine and she needed a place to stay, so he put Christine in there" and that she and "her boyfriend Luke" moved in "and that's where the oxycodone and cocaine was, and he had them there as like distributing ...." *Id*. at 139.

Petitioner told Szymanski that he traveled to places "where rich people" would go, and that he also spent a lot of time at casinos "with the proceeds from the drugs ... he would take his team there ... they would do VIP things ... That's how the proceeds from the [drug] money, it would become legitimate ... It would be legitimate funds as winnings, so he would be able to claim it." (Dkt. No. 64-8 at 137-38.) Petitioner also explained to Szymanski the steps he took to try to insulate himself from criminal liability. Petitioner would do business only with "the person he was doing the business with. He would have what he called like a cushion in between. This way, they couldn't get him for distributing." *Id*. at 138-39.

Lastly, an auditor for the Oneida Indian Nation Gaming Commission, which oversees the regulatory compliance of the Turning Stone Resort and Casino, testified regarding Petitioner's gambling activity at the Turning Stone Casino. (Dkt. No. 64-9 at 5-6.) Petitioner had a "Diamond Card account," a loyalty program that rewarded and kept track of each transaction the patron made at the casino. *Id*. The auditor testified that between July 1 and December 31, 2011, Petitioner's total "buy-in"—the amount that Petitioner "brought to the table" when he gambled at the Turning Stone Casino—was $611,050. *Id*. at 15-17. Petitioner's total losses during this period were $91,450. *Id*. at 17.

***6** Petitioner did not testify. Clarence Vanier's wife, Melody Vanier, testified on behalf of the defense that Petitioner did not have a key to her house and that she had a home security system to which Petitioner did not have access. *Id*. at 49-50. She denied seeing Petitioner with "zip lock bags of powder" or seeing him give any such bags to her husband. *Id*. at 50.

### C. Verdict and Sentence

On October 19, 2012, the jury found Petitioner guilty as charged of operating as a major trafficker, first degree criminal possession of a controlled substance (the oxycodone recovered from Vanier's home on December 20, 2011), and two counts of third degree criminal possession of a controlled substance (the oxycodone recovered underneath Ramsell's dresser at Wells Bridge on October 13, 2011). (Dkt. No. 64-1 at 94-95; Dkt. No. 64-10 at 5-8.)

On January 19, 2013, the court sentenced Petitioner, as a second felony drug offender with a prior violent conviction, to an aggregate prison term of from 55 years to life as follows: from 20 years to life for operating as a major trafficker (Count One); a determinate 15 year term to be followed by 5 years of post-release supervision for first degree criminal possession of a controlled substance (Count Two), and two determinate 10 year terms for third degree criminal possession of a controlled substance (Counts Three and Four) to be followed by 3 years of post-release supervision. (Dkt. No. 64-1 at 122.) Each sentence was imposed consecutively. *Id*.

**D. CPL § 330.30 Motion**

Petitioner filed a motion to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30, arguing, in relevant part, that the jury should have been instructed that certain cooperating witnesses were accomplices as a matter of law and that the three drug possession charges were lesser included offenses of the operating as a major trafficker charge. (Dkt. No. 64-1 at 96-108.) The trial court denied Petitioner's motion. *Id*. at 118-21.

**E. Direct Appeal**

In a counseled brief to the Appellate Division, Third Department, Petitioner raised five claims on direct appeal: (1) the trial court erred in denying the defense request for an accomplice instruction regarding all of the cooperating witnesses; (2) the trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions; (3) the trial court improperly precluded cross-examination regarding the ownership of objects found near the powder in the Wells Bridge house; (4) consecutive sentences were improper; (5) the sentence was harsh and excessive. (Dkt. No. 64-1 at 1-47.)

The Third Department modified Petitioner's sentence to run the two third degree criminal possession counts concurrently (Counts Three and Four), reducing Petitioner's sentence to an indeterminate term of from 45 years to life, and otherwise affirmed the judgment of conviction. *People v. Major*, 143 A.D.3d 1155, 1156-58 (3d Dep't 2016). On January 26, 2017, the New York Court of Appeals denied Petitioner's counseled leave application raising each of the grounds raised in his appellate brief. (Dkt. No. 64 at 203-11); *People v. Major*, 28 N.Y.3d 1147 (2017).

**F. CPL § 440.10 Motion**

In 2018, Petitioner filed a *pro se* motion to vacate his conviction pursuant to CPL § 440.10 (the "440.10 motion") on the grounds that: (1) the prosecution committed misconduct by failing to disclose: (a) exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), (b) witness statements that should have been turned over pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961), and (c) the cooperation agreements of Vollkommer, Vanier, Ramsell, and Szymanski; (2) the prosecution committed misconduct and the indictment was defective because Vanier testified falsely in the grand jury and at trial that Petitioner was his drug supplier; (3) newly discovered evidence—the search warrant application for the warrants executed on December 20, 2011, at the homes of Vanier, Vollkommer, and Burns (the "Vanier search warrant application"), and transcribed intercepted wiretapped communications—would have changed his trial's outcome; and (4) he was deprived of his federal and state constitutional rights to the effective assistance of counsel at trial. (Dkt. No. 64-1 at 212-56.)

***7** Petitioner filed a *pro se* supplemental affidavit adding the claim that his "Confrontation Clause and fair trial rights" were denied because the prosecution withheld and failed to preserve recorded post-arrest interviews of Vollkommer and Burns that the NYSP destroyed in 2014. *Id*. at 559-63.

On June 4, 2018, Judge Burns (the "440 court"), denied Petitioner's motion. (Dkt. No. 64-1 at 586-589.) Petitioner then filed a motion to renew his 440.10 motion. *Id*. at 590-650, 653-55. On June 29, 2018, the 440 court denied Petitioner's motion to renew. *Id*. at 656-57. Petitioner then sought leave to appeal, *id*. at 658-95, which, on December 4, 2018, was denied by the Third Department, *id*. at 696. Petitioner then sought reconsideration, which was similarly denied by the Third Department on January 24, 2019. *Id*. at 697-710.

**II. THE PETITION**

In Petitioner's *pro se* second amended federal habeas petition, originally filed March 23, 2018, Petitioner contends that he is entitled to habeas relief because: (1) the trial court erred in refusing to give an accomplice witness instruction as to all cooperating witnesses; (2) the trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions; (3) the trial court improperly precluded cross-examination regarding the ownership of objects found near the powder in the Wells Bridge house; (4) consecutive sentences were improper; (5) the sentence was harsh and excessive; (6) the prosecution committed misconduct when it intentionally suppressed *Brady* material (7) the prosecution committed misconduct when it intentionally failed to preserve *Brady* material; (8) the prosecution knowingly allowed a key prosecution witness to testify falsely, when it knew the testimony to be false and failed to correct it; (9) he found newly discovered evidence, which if produced at trial, would have produced a different outcome in the proceeding; (10) his trial counsel was ineffective; (11) the trial court unreasonably denied without a hearing his 440.10 motion; (12) the trial court erroneously failed to address Petitioner's *Brady's* claims in his motion to renew the 440.10 motion, basing its decision entirely on a *Rosario* analysis; and (13) the cumulative effect of all the foregoing violations deprived Petitioner of the right to due process. (*See generally* Dkt. No. 35.)

**III. STANDARD OF REVIEW**

**A. Exhaustion**

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, ... thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quotation marks and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id*.; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

**B. Merits**

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241. Relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *DiGuglielmo v. Smith*, 366 F.3d 130, 136-137 (2d Cir. 2004).

***8** The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254

> unless the adjudication ... (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts," or if the state court identifies the appropriate legal standard, but unreasonably applies it to the facts of the petitioner's case. *Williams v. Taylor*, 529 U.S.412 413 (2000). The lower court may not grant the writ if it concludes "in its independent judgment" that the state-court decision applied clearly established federal law erroneously or incorrectly; rather, the application must also be unreasonable. *Id*. at 411.

In order for the application to be "unreasonable," there must be "some increment of incorrectness beyond error," but that increment may not be too great, otherwise habeas relief would be limited to those state court decisions that are "so far off the mark as to suggest judicial incompetence." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). A state court's decision must stand as long as "fairminded jurists could disagree on the correctness ... of the decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted). In addition, factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In order to apply this standard under the AEDPA, the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings. 28 U.S.C. § 2254 (d)(1); *see also Day v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## IV. DISCUSSION

### A. Ground One: Jury Charge

Petitioner claims the trial court erred in refusing to instruct the jury that Kevin Baker, Sara Baker, Shelby Mochrie, Crystal Gonsalves, Jeffrey Vollkommer, Kate Joslyn, and Scott Burn were accomplices as a matter of law. (Dkt. No. 35 at 6, 12-13.) Respondent argues Petitioner's jury instruction claim fails to allege a violation of his federal constitutional rights, and is thus not cognizable on habeas review. (Dkt. No. 62 at 22-23. [7])

7 Respondent also argues that even if Petitioner's jury charge claim were construed to allege a violation of his federal constitutional rights, such a claim would be unexhausted, because he failed to raise it in federal constitutional terms in state court (Dkt. No. 64-1 at 25-33) and, because this would be a record-based claim, procedurally defaulted. (Dkt. No. 62 at 23 n.7.) *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(1)(A); CPL § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); *Ramirez v. Attorney General*, 280 F.3d 87, 94 (2d Cir. 2001). The Court nonetheless may deny the claim on the merits and with prejudice. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). This is particularly true where the grounds raised are meritless. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).

***9** "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The adequacy of a state court's jury instructions is generally a matter of state law. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

" 'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.' " *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)). Failure to give a properly requested jury charge does not by itself violate a petitioner's right to due process. *Id*. at 541 ("A mere error of state law does not deny a defendant his right to due process."). "For an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction violates due process.' " *Id*. (quoting *Cupp*, 414 U.S. at 147).

Petitioner's claim is based on the accomplice corroboration requirement under New York State law, CPL § 60.22. (Dkt. No. 35 at 12-13.) On direct appeal, the Appellate Division determined "County Court properly charged the jury that only Ramsell and

Vanier, as purchasers of the drugs at issue, were accomplices as a matter of law." *Major*, 143 A.D.3d at 1158. The Appellate Division explained:

> Notwithstanding the fact that several of the witnesses at issue were either offered immunity from prosecution or had cooperated with the People in exchange for less stringent treatment of their own illegal conduct, [Petitioner] has not shown that any of the seven witnesses who were not charged as accomplices as a matter of law participated in a criminal offense based upon the facts and conduct constituting the crime as operating as a major trafficker ... [W]hile these witnesses admittedly engaged in criminal conduct following [Petitioner's] sale of oxycodone to Ramsell and Vanier, such conduct was not "based upon the same or some of the same facts or conduct which constituted the offense charged." In other words, the facts and conduct constituting the crime of operating as a major trafficker did not involve any possession or sale of drugs in which the challenged witnesses participated ... As the seven cooperating witnesses at issue were not accomplices as a matter of law, County Court properly refused to so charge the jury.

*Id.* at 1157-58 (internal citations omitted).

This Court is bound by that determination. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT & T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law[.]"). A determination of state law by a state intermediate appellate court is also binding in a federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629-30 & n. 3 (1988) (noting that state appellate court's determination of state law is binding and must be given deference).

***10** In addition, there is no federal constitutional rule requiring the corroboration of accomplice testimony. *Caminetti v. United States*, 242 U.S. 470, 495 (1917) ("there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them"); *see Young v. McGinnis*, 411 F. Supp. 2d 278, 297 (E.D.N.Y. 2006) ("[f]ederal law does not require a coconspirator charge to the jury requiring corroborating evidence[.]"), *aff'd*, 319 F. App'x 12, 13 (2d Cir. 2009) ("[R]egardless of whether there was a violation of state law in denying [the petitioner's] request for an accomplice-corroboration instruction, there was no violation of federal law, let alone of any federal constitutional right.") (summary order); *see also United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) ("Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency[.]"), *cert. denied, Rivera v. United States*, 528 U.S. 875 (1999).

Accordingly, the trial court's decision not to instruct the jury on accomplice liability as to all of the cooperating witnesses did not violate Petitioner's federal constitutional right to a fair trial. *See Romero v. Napoli*, No. 08 CIV 8380, 2013 WL 3583724, at *15 (S.D.N.Y. July 15, 2013), *report-recommendation adopted*, 2013 WL 6170636 (S.D.N.Y. Nov. 25, 2013) ("Thus, even if [CPL §] 60.22 was violated, such a violation cannot be a basis for federal habeas corpus relief."); *Player v. Artus*, No. 06 CV 2764, 2007 WL 708793, at *5 (E.D.N.Y. Mar. 6, 2007) (finding the petitioner's claim that the trial court violated his due process rights by failing to conclude that three witnesses were his accomplices, and failing to instruct the jury that a defendant may not be convicted solely upon the uncorroborated testimony of an accomplice witness, "sounds in state law exclusively, and does not present a federal due process claim."); *Williams v. Marshall*, No. 09 Civ. 7411, 2011 WL 2175810, at *14 (S.D.N.Y. Mar. 30, 2011) (accomplice-corroboration claim is "purely an artifact of New York statutory law" and does not implicate due process).

Therefore, the Court recommends denying and dismissing ground one of the petition.

### B. Ground Two: Jury Note Inquiry

Petitioner contends "[t]he trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions." (Dkt. No. 35 at 14-16.) Respondent argues that to the extent that Petitioner raises a Sixth Amendment claim that he was denied the right to an impartial jury, the Appellate Division did not unreasonably apply Supreme Court precedent in denying this claim on the merits. (Dkt. No. 62 at 24-27. [8] )

8 Respondent also contends Petitioner does not clearly raise a cognizable federal claim by asserting that the trial court erred by not individually questioning the jurors regarding their note. (*See* Dkt. No. 62 at 24 n.8.) However, as discussed *supra*, the Court may deny this claim on the merits and with prejudice. *See* Point IV.A.n.4.

On the morning of the third day of trial, Judge Burns notified the attorneys that he had received a note from the jury, signed by the foreperson, stating:

> The defendant's attorney is making inappropriate facial and eye gestures at us. It is as though he is trying to lead the jury and influence us.

(Dkt. No. 64-6 at 273-74.) The court stated it would remind the jurors to decide the case objectively and free of emotion toward the parties and directed defense counsel to remain at counsel table during the rest of his examination of the witnesses. *Id*. at 274-75. Defense counsel responded that the note presented "enough of an issue so perhaps you should voir dire the individual jurors with regard to this issue and see if this is such a severe problem that somebody is unable to sit because they have been so affected it creates a problem for my client." *Id*. at 275-76. The prosecutor countered that if any juror had been unable to sit, the foreperson would have said so explicitly. *Id*. at 276. The court agreed with the prosecutor, ruling no further inquiry was necessary because the jury was "aware of their ability to communicate" with the court and that the note did not contain any explicit declaration that "there were so offended by this ... that they couldn't decide the case." *Id*.

***11** When the jury returned to the courtroom, the court informed them that it had addressed the issue raised in the note with the attorneys and then instructed the jury as follows, in relevant part:

> I would remind each of you jurors that you have promised to decide this case fairly and impartially ... [I]f anything ... any of the attorneys have said or the manner in which they are speaking has made you uncomfortable, ... put that out of your mind .... You're to decide this case based on the facts before you. If, as we proceed through this trial, any of you individually find that you've become so aggravated or hostile based on anything that anyone, any of the attorneys has said or done to the point where you can't be fair in this case any longer and you're going to make a decision based on who you like better, so to speak, you need to let me know and you can do that just by sending a note out. But unless I hear that from you, I will trust you to do your oath, to decide this case fairly and impartially based on the evidence and not on anything else.

*Id*. at 277.

Here, Petitioner contends the trial court should have conducted an "inquiry," but does not cite any federal law in support of this argument. (Dkt. No. 35 at 14-15.) In asserting this claim on direct appeal, Petitioner cited to New York State case law, with primary reliance placed on the case of *People v. Buford*, 69 N.Y.2d 290 (1987)[9] and CPL § 270.35(1).[10] (Dkt. No. 64-1 at 33-38.) The Appellate Division, in rejecting Petitioner's arguments, held:

> County Court providently exercised its discretion in denying [Petitioner's] request to conduct an inquiry of the jurors after receiving a note indicating that defense counsel was making "inappropriate facial and eye gestures at [them] as though he is trying to lead ... and influence [them]." When a sworn juror's comments or actions raise a question concerning his or her ability to be impartial, the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Here, the note did not indicate impartiality on behalf of any of the jurors. Rather, it merely

> expressed irritation with the mannerisms and/or behavior of counsel, which—by itself—would not be a basis for discharge. Thus, a *Buford* inquiry was not required and County Court's instructions to all the jurors to disregard the manner of the attorneys and to alert the court if they believed they could not be fair and impartial for any reasons, including the conduct of either attorney, were sufficient.

*Major*, 143 A.D.3d at 1156-57 (internal citations omitted).

9 In *Buford*, the New York Court of Appeals "create[d] a framework by which trial courts could evaluate sworn jurors who, for some reason during the trial, may 'possess[ ] a state of mind which would prevent the rendering of an impartial verdict.' " *People v. Mejias*, 21 N.Y.3d 73, 79 (2013) (quoting *Buford*, 69 N.Y.2d at 298).

10 New York law provides that where a trial court "finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror." N.Y. Crim. Proc. Law § 270.35(1).

***12** To the extent Petitioner claims that he is entitled to habeas relief because the trial court should have made a *Buford* inquiry under New York state law, as discussed above, federal habeas corpus relief is not available for state law errors that do not rise to the level of a violation of federal laws or the Constitution. 28 U.S.C. § 2254(a); *see Estelle*, 502 U.S. at 67-68. Moreover, as noted above, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. at 76. Here, inasmuch as the Appellate Division found a *Buford* inquiry was not required, *Major*, 143 A.D.3d at 1156-57, this Court is bound by that determination. Thus, Petitioner's *Buford* claim does not provide grounds for habeas relief.

To the extent Plaintiff's "inquiry" claim does implicate federal constitutional issues, the Court agrees with Respondent that the claim should be denied. (Dkt. No. 62 at 24-27.) "[A]ll the Constitution guarantees is that a defendant be tried by an 'impartial jury.' " *Garcia-Lopez v. Fischer*, No. 05 Civ. 10340, 2007 WL 1459253, at *13 (S.D.N.Y. May 17, 2007) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1964)), *as amended* (May 18, 2007); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.").

Notably, the note was read in open court, Petitioner was made aware of its contents, and defense counsel was permitted to offer suggestions on how the jury's concerns should be addressed. Moreover, as the Appellate Division determined, "the note did not indicate impartiality on behalf of any of the jurors. Rather, it merely expressed irritation with the mannerisms and/or behavior of counsel, which—by itself—would not be a basis for discharge." *Major*, 143 A.D.3d at 1156. "Absent such evidence of bias on the part of [any of the jurors] petitioner's habeas claim fails." *Paulino v. Griffin*, No. 16-CV-3839, 2019 WL 9362540, at *13 (S.D.N.Y. Aug. 26, 2019), *report and recommendation adopted*, 2020 WL 1673248 (S.D.N.Y. Apr. 6, 2020), *appeal dismissed*, No. 20-1578, 2020 WL 8361770 (2d Cir. Dec. 23, 2020), *cert. denied*, 141 S. Ct. 1447 (2021) (citation omitted).

Here, Petitioner articulates no basis for inferring bias from the conduct of any juror, and the record reveals none. *See, e.g.*, *Garraway v. Goord*, No. 04-CV-1281 (LEK/DRH), 2007 WL 1593057, at *4 (N.D.N.Y. Jan. 5, 2007) ("Garraway does not claim that the juror was actually biased; he simply argues that she may have been biased and that the judge's refusal to question her about her interactions with law enforcement agents was a violation of his fundamental rights."), *report and recommendation adopted*, 2007 WL 1593057, (N.D.N.Y. May 31, 2007), *aff'd*, 324 F. App'x 98 (2d Cir. 2009). Given the circumstances, there is no reason to believe there was actually any juror bias, and the trial court's actions were sufficient to avoid any prejudice.

For all these reasons, the trial court's decision not to conduct an "inquiry" was therefore neither "contrary to, [n]or involv[ing] an unreasonable application of, clearly established Federal law," or "based on an unreasonable determination of the facts in light of the evidence presented" before it. 28 U.S.C. § 2254(d). Accordingly, the Court recommends denying and dismissing ground two of the petition.

### C. Ground Three: Limitation on Cross-Examination

Petitioner next argues the trial court "erred in precluding defense counsel from cross-examining Investigator Michael Ten Eyck regarding ownership of items, including a gun and a billy club, found near the alleged oxycodone powder in the Wells Bridge property." (Dkt. No. 35 at 16-17; Dkt. No. 64-1 at 38-43.) On direct appeal, the Appellate Division rejected this claim, stating:

> ***13** [Petitioner] also claims that his cross-examination of a police witness was improperly curtailed. Mindful that the scope and extent of cross-examination is committed to the sound discretion of the trial court, we discern no abuse of discretion here. In any event, any error in that regard would be harmless beyond a reasonable doubt in light of the overwhelming evidence of [Petitioner's] guilt.

*Major*, 143 A.D.3d at 1158-59. The Court finds that the Appellate Division's decision reasonably rejected Petitioner's argument and was not contrary to, nor an unreasonable application of, federal law.

A defendant in a state criminal prosecution has a right, guaranteed by the Sixth and Fourteenth Amendments to the Constitution, "to be confronted with the witnesses against him." U.S. Const. Amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 401 (1965) (holding that the Sixth Amendment Confrontation Clause is made applicable to the states by the Fourteenth Amendment). However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Moreover, the preclusion of the cross-examination "must not have been harmless, that is, it must have had a substantial and injurious effect or influence in determining the jury's verdict." *Alvarez v. Ercole*, 763 F.3d 223, 230 (2d Cir. 2014).

Here, Petitioner has failed to show that the court abused its wide discretion in limiting the cross-examination of Investigator Ten Eyck. During trial, defense counsel sought to ask Investigator Ten Eyck whether the police had tried to obtain fingerprints from a shotgun, pistol, and glassine bags found near the oxycodone powder they recovered in Ramsell's bedroom when executing the search warrant at Wells Bridge. (Dkt. No. 64-6 at 26-27.). The prosecutor objected on relevancy grounds because Petitioner was charged with possessing only the oxycodone, not any of the items found nearby. *Id*. at 27. Defense counsel responded that because it was a constructive possession case, ownership of the items near the drugs was relevant. *Id*. The trial court sustained the objection and precluded the inquiry as irrelevant. *Id*. at 28. [11]

11 In so doing, the court further explained, "You can ask questions about the powder if you wish, but these items that were seized, it's not, and I want the jury to understand, it's not even alleged that Mr. Major possessed these firearms or this, I believe it's called a billy club or some kind of dagger. So any questions relating to them really are not relevant." (Dkt No. 64-6 at 28.) Stated differently, the court found the probative value of the seized items, i.e. weapons, would have been outweighed by the risk of prejudice, and jury confusion.

Here, Petitioner contends, as he did on direct appeal, that "[t]he court took an excessively narrow view of the relevance of these objects, finding that any questions relating to them were not relevant because Petitioner was not charged with possessing them." (Dkt. No. 35 at 16; *see also* Dkt. No. 64-1 at 38.) Petitioner argues this was error because:

> ***14** (1) the ownership of objects found in close proximity to the powder was probative of the ownership of the powder itself; (2) guns and weapons are tools of the narcotics trade and ownership of such weapons

was thus probative of who was really dealing drugs from the Wells Bridge house; and (3) ownership of the guns might have shed light on Ramsell's motive to falsely implicate Petitioner.

*Id*. at 39. As noted above, the Appellate Division considered and rejected this argument on the merits. *Major*, 143 A.D.3d at 1158-59.

Given these circumstances, the Appellate Division reasonably rejected Petitioner's claim. Whether the items recovered from Wells Bridge were sent to be fingerprinted was irrelevant and lacked probative value because the prosecution was not contesting that those items belonged to the occupants of the house, Ramsell and MacCracken, as opposed to Petitioner. Moreover, the court's instruction indicates concerns of the prejudicial nature of the weapons. *Id*. at 28. [12]

12 In any event, later in his cross-examination, defense counsel returned to the topic, asking whether Investigator Ten Eyck had sent the recovered shotgun, pistol, scales, money, and oxycodone powder to the FBI lab in Washington for fingerprinting. (Dkt. No. 64-6 at 33-34.) This time, the prosecutor did not object, and Investigator Ten Eyck answered the question. He submitted some items to the lab for fingerprinting, but not the scales, pistol, or the shotgun. *Id*.

Further, Respondent argues there is no merit to Petitioner's claim that by precluding the question, he could not present the defense theory that if Ramsell and MacCracken owned the weapons, and they were not supplied by Petitioner, the "jury might infer that they were dealing drugs independently rather than through" Petitioner. (Dkt. No. 35 at 16-17; Dkt. 62 at 30.) The Court agrees. Ramsell testified the pistol belonged to MacCracken and that the glassine bags were hers. (Dkt. No. 64-6 at 160, 215.) Thus, the defense had a basis for arguing that since he did not own the pistol or the glassine bags, and there was no evidence that he owned the shotgun, Petitioner did not own the drugs found near these items on October 12, 2011.

Based on the foregoing, the Appellate Division's finding that the trial court had not abused its discretion in curtailing the cross-examination, and alternatively that any possible error was harmless beyond a reasonable doubt, was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Therefore, the Court recommends denying and dismissing ground three of the petition.

**D. Ground Four: Consecutive Sentences**

Petitioner argues that the sentences for Counts Two, Three, and Four of the indictment, in which he was charged with possessing oxycodone, should have been imposed to run concurrently with the sentence for his major trafficking conviction charged in Count One of the indictment. (Dkt. No. 35 at 18-19; Dkt. No. 64-1 at 43-47. [13]) However, in his traverse, Petitioner "abandon[s]" this claim. (Dkt. No. 69 at 1.)

13 As discussed, Petitioner raised this argument on direct appeal and the Appellate Division modified Petitioner's sentence to run the two counts of third degree criminal possession of a controlled substance concurrently "as both arose out of a single possession of oxycodone on October 13, 2011, reducing Petitioner's prison term to an indeterminate term of from 45 years to life, and otherwise found "no basis upon which to reduce the sentence imposed." *Major*, 143 A.D.3d at 1160. Petitioner does not challenge that aspect of the decision.

***15** There is no "constitutionally cognizable right to concurrent, rather than consecutive, sentences." *United States v. McLean*, 287 F.3d 127, 136 (2d Cir. 2002) (quoting *United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001)). "Whether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review." *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) (citations omitted). The imposition of consecutive sentences violates the Eighth Amendment " 'only under extraordinary circumstances.' " *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) (quoting *Salcedo v. Artuz*, 107 F. Supp. 2d 405, 414 (S.D.N.Y. 2000)). Petitioner has not alleged that such extraordinary circumstances

exist in this case, only a disagreement over the interpretation of state law. Such claims are not redressable in a federal habeas corpus proceeding. In any event, as noted, Petitioner has abandoned this claim. (Dkt. No. 69 at 1.)

In light of the foregoing, the Court recommends denying and dismissing ground four of the petition.

**E. Ground Five: Excessive and Harsh Sentence**

Petitioner next argues his sentence was harsh and excessive. (Dkt. No. 35 at 19-20.) However, Petitioner also "abandon[s]" this claim" in his traverse. (Dkt. No. 69 at 1.) In rejecting this claim, the Appellate Division determined:

> County Court thoroughly set forth its reasons for imposing a lengthy sentence, including the substantial quantities of oxycodone supplied by [Petitioner], the harm that [Petitioner's] conduct caused to the affected individuals and the community, [Petitioner's] lack of remorse or insight into the consequences of his actions and his extensive criminal history—which included convictions for a violent felony as well as numerous drug-related crimes.

*Major*, 143 A.D.3d at 1160.

When a petitioner's sentence is within the statutory range of the corresponding crime he was convicted of, no federal constitutional issue cognizable on habeas review is presented. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *see also Garrett v. Smith*, No. 05-CV-3374, 2006 WL 2265094, at *12 (E.D.N.Y. Aug. 8, 2006) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law.") (quoting *White*, 969 F.2d at 1383).

Here, Petitioner's sentence, as modified, of 20 years to life for operating as a major trafficker, 15 years for the first degree drug possession count, and 10 years for the third degree drug possession counts falls within the limits set by the New York State legislature, and thus Petitioner's excessive sentence claim provides no grounds for federal habeas relief.[14] *See Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Rodriguez v. Griffin*, No. 16 Civ. 1037, 2018 WL 6505808, at *24 (N.D.N.Y. Dec. 11, 2018) (consecutive sentences for major trafficker conviction and drug sales "provides no grounds for federal habeas relief" even though maximum possible sentences were imposed). Additionally, Petitioner has since "abandon[ed]" this claim as indicated in his traverse. (Dkt. No. 69 at 1.)

14 In New York, the trial court was authorized to impose a maximum indeterminate life term with a minimum sentence of not less than 15 years nor more than 25 years for Petitioner's conviction for operating as a major trafficker. (PL §§ 70.00(2)(a); 70.00(3)(a)(i); 70.71(5)(b).) The court was authorized to impose a determinate prison term of between 15 and 30 years for his first degree drug possession conviction and between 6 and 15 years for each of his third-degree drug convictions. (PL §§ 70.71(4)(b)(i); 70.70(4)(b)(i).)

***16** In light of the foregoing, the Court recommends denying and dismissing ground five of the petition.

**F. Ground Six: Prosecutorial Misconduct—Suppression of *Brady* Material**

Petitioner argues, as he did in his 440.10 motion, that the prosecutor violated *Brady* by failing to disclose (1) the application for the warrants executed on December 20, 2011, at the homes of Vanier, Vollkommer, and Burns (the "Vanier SWA"); (2)

the summaries of intercepted wiretap communications of Vanier, Vollkommer, and Burns, (the "wiretaps"); and (3) the "full cooperation agreement[s]" with Vanier, Vollkommer, Ramsell, and Szymanski. (Dkt. No. 35 at 20-30. [15] )

15 Petitioner submitted to the 440 court the Vanier SWA (Dkt. No. 64-1 at 261-315) and the transcribed wiretaps (*id*. at 326-414). The Vanier SWA contains summaries of some of the wiretapped communications. *See id*. at 272-306.

In denying Petitioner's 440.10 motion, the 440 court concluded that the prosecution had committed no misconduct. (Dkt. No. 64-1 at 586-89.) Noting that "[i]t is undisputed that the Otsego County District Attorney's Office was not involved in the investigation of Clarence Vanier, who was ultimately prosecuted by federal prosecutors," and that the Otsego DA's office was not the prosecutor's office that had presented the search warrant application for Vanier's home to a judge, the court concluded that the alleged *Brady* material "was not within the People's control nor was it exculpatory." *Id*. at 587.

The court held Petitioner had failed to establish a *Rosario* violation, concluding that Petitioner had "failed to meet his burden in all aspects and, further, [that] his contentions are either not supported by any evidence or are squarely contradicted by the record evidence." *Id*. The court concluded that all of Petitioner's remaining *Brady* and *Rosario* claims also were meritless. *Id*.

With respect to Petitioner's newly-discovered evidence claim— excerpts of the wiretaps and Vanier SWA—the court concluded that "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of [Petitioner's] guilt at trial, there is no basis to vacate the conviction based upon the newly discovered evidence." *Id*. at 588.

Lastly, the court concluded that Petitioner's ineffective assistance of trial counsel claims lacked record support and "that in view of the totality of circumstances" Petitioner received the effective assistance of counsel. *Id*.

Petitioner filed a motion to renew his 440.10 motion based on his receipt of various police reports regarding the chain of custody of the CDs of the post-arrest interviews of Vollkommer and Burns and of the recordings of the wiretaps between Vanier, Vollkommer, and Burns. *Id*. at 590-605. Petitioner also provided the court with a NYSP incident report prepared by Investigator Hamilton relating to his investigation of Vanier, Vollkommer, and Burns, which, he contended, was "further undisclosed *Rosario* material which relates to the direct testimony of Inv. Hamilton." *Id*. at 595-96. Petitioner renewed the arguments made in his initial 440 motion, and responded to the People's opposition. *Id*. at 596-605. The district attorney filed an opposition asserting that the "new facts" Petitioner had submitted merely established that the recorded interviews and wiretap communications were in the custody of the NYSP, but that this failed to provide a basis for challenging the 440 court's decision. *Id*. at 651-52. Petitioner filed a reply to the People's opposition. *Id*. at 653-55.

***17** In an August 6, 2018, decision and order, the 440 court concluded that even if Petitioner established through the newly-submitted documents that the prosecution had failed to disclose *Rosario* material, any such failure to disclose "did not contribute to the verdict." *Id*. at 656-57.

### 1. The Vanier SWA and Wiretapped Communications

As noted above, Ramsell and Vanier operated independently of one another and were investigated by two separate agencies. During the investigation of Ramsell, OCSO worked in conjunction with several other agencies, but not the NYSP. OCSO Investigator Ten Eyck was, however, aware that NYSP had its own "parallel investigation," but the two agencies were not working together. (Dkt. No. 64-6 at 8-9.) NYSP Investigator Hamilton, who led NYSP's investigation of Vanier, confirmed at trial that he did not communicate with OCSO Investigator Ten Eyck regarding Vanier's investigation. (Dkt. No. 64-5 at 129; Dkt No. 64-6 at 87.)

The Otsego County District Attorney's Office, which prosecuted Petitioner, was involved in OCSO's investigation of Ramsell, but had no involvement in NYSP's investigation of Vanier and his drug operation. As the Otsego DA explained at trial, "[t]here

was no cooperation whatsoever between [the NYSP] and DEA Syracuse and Otsego County Sheriff's Department and DEA Albany.... The investigation of Clarence Vanier was completely separate from the [Ramsell] investigation in Wells Bridge." (Dkt. No. 64-4 at 102.) The district attorney, in his opposition to Petitioner's 440.10 motion, also explained that his office was not involved in the NYSP's investigation or prosecution of Vanier and that Vanier was prosecuted federally, not by his office. (Dkt. No. 64-1 at 574.)

OCSO Investigator Ten Eyck prepared the search warrant application for Ramsell's home at Wells Bridge. NYSP Investigator Hamilton prepared the Vanier SWA. During trial, defense counsel requested copies of both applications, noting that both Ten Eyck and Hamilton were witnesses at trial. (Dkt. N. 64-2 at 93-102.) The court ordered the district attorney to turn over the application for Ramsell's home (Wells Bridge). (Dkt. No. 64-6 at 19.) However, the court did not require the Vanier SWA to be turned over, but instead ordered the district attorney to obtain and review it for exculpatory material. On October 16, 2012, after trial had begun, the district attorney received Hamilton's affidavit for the Vanier SWA, reviewed it, and informed the court and counsel that it contained no exculpatory information. *Id*. at 113-14, 175-76. The district attorney also provided the affidavit to the court for its review, though the record does not appear to reflect anything with respect to the court's review of the affidavit. [16]

16 The transcript reads, in relevant part:

THE COURT: Mr. Muehl, you can hand that up, though, just so that the record's clear that there's been an independent examination for any Brady material.

Mr. MUEHL: And if you decide.

THE COURT: If there is, I'll order it disclosed.

MR. MUEHL: If you decide for whatever reasons to disclose, I'll turn it over.

(Dkt. No. 64-6 at 176.)

As part of NYSP's investigation of Vanier, Investigator Hamilton had obtained warrants to wiretap the phones of Vanier, Vollkommer, and Burns beginning in late September 2011. (Dkt. No. 64-1 at 270.) Hamilton included summaries of some of the intercepted communications in his affidavit for the Vanier SWA. *Id*. at 270-306. The district attorney, in his opposition to Petitioner's 440.10 motion, stated he knew nothing about the existence of the wiretaps until he reviewed the Vanier SWA on October 16, 2012, and nothing that he read in the affidavit—including the summaries of the wiretaps—was exculpatory. *Id*. at 575.

***18** It is undisputed that the Vanier SWA and intercepted wiretapped communications in question was not disclosed prior to trial. Petitioner states he received this material from Vollkommer in May of 2017. (Dkt. No. 35 at 22.) Petitioner claims "[t]he suppressed evidence contains dates and times of transactions between Vanier and his true supplier, as well as transactions between Vanier and Vollkommer. Hence the failure of the prosecution to turn over this crucial information allowed the perjured testimony of Clarence Vanier and his associates to go unchecked. Petitioner was subsequently prejudiced by the non-disclosure of this material by the prosecution." *Id*.

Respondent argues the 440 court's denial of Petitioner's prosecutorial misconduct claim did not incorrectly apply Supreme Court precedent because the Vanier SWA contained no exculpatory evidence, the wiretap communications were not in the Otsego DA's possession, and did not, in any event, contain information that had to be disclosed under *Brady*. (Dkt. No. 62 at 40-60.)

Prosecutors must disclose to an accused exculpatory information in their possession that is favorable to the defense and material to guilt or punishment, *Brady*, 373 U.S. at 87, and evidence affecting the credibility of a witness, where the reliability of the witness could determine guilt or innocence, *Giglio v. United States*, 405 U.S. 150, 154 (1972). Such evidence is "material," and thus must be disclosed, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

A *Brady* violation consists of three factors: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Simpson v. United States*, 693 F. App'x 33, 34 (2d Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Here, Petitioner contends these documents "contain[ ] dates and times of transactions between Vanier and his true supplier, as well as transactions between Vanier and Vollkommer." (Dkt. No. 35 at 23.) Petitioner argues that with this information, he would have been able to establish "that on all the dates those transactions were being conducted between Vanier and his drug supplier, and Vanier and Vollkommer, [Petitioner] was no where in the vicinity prior to, during, or after the exchanges." *Id*. However, as the 440 court reasonably found neither the Vanier SWA nor the wiretaps were subject to disclosure under *Brady*, and, with respect to the wiretaps, the Otsego DA had neither actual nor constructive possession of them and, therefore, the district attorney did not fail in his disclosure obligation. (*See* Dkt. No. 62 at 43-48.)

First, none of the wiretap summaries contained in the Vanier SWA reveals transactions between Vanier and any oxycodone supplier, let alone an oxycodone supplier other than Petitioner. [17] Indeed, as Petitioner states, the bulk of wiretaps were between Vanier and Vollkommer, primarily discussing arrangements for Vollkommer to drop off money to Vanier to obtain a new supply of drugs. Although Petitioner contends that he was "out of town" when the transactions discussed took place, as Respondent points outs, that did not preclude Petitioner from having supplied Vanier before he "left town."

17 As to the summary of the December 5, 2011, call between Vanier and his wife Melody, during which Vanier was in New York City purchasing drugs from a "new supplier" it was reasonable to assume Vanier was purchasing cocaine, not oxycodone, from this suppler. (Dkt. No. 64-1 at 302.) On two previous wiretap summaries it was indicated Vanier would travel to New York City to purchase cocaine for Vollkommer. *See id*. at 284-85, 288. As Respondent points out, even had the December 5, 2011, wiretap summary been disclosed, it likely would not have helped Petitioner. According to Petitioner's own "alibi records," he appears to have been in New York City at exactly the same time as Vanier. A review of Petitioner's CapitalOne credit card statement, reflects a charge of $782.65 on December 4, 2011, for a one night stay at the W Hotel in Times Square, departing on December 5, 2011. (*See* Dkt. No. 64-1 at 943.) The cell phone records he submitted also reflect a one-night stay in New York City at this time. *Id*. at 447. Further, given Vanier's testimony that he was from Brooklyn, and went to Brooklyn to pick up cocaine, (Dkt. No. 64-7 at 151), and his testimony that he and Petitioner "went down and picked up a whole lot," of cocaine, *id*. at 153-54, the jury reasonably could have concluded that the two were together during a drug-buying trip.

***19** Second, as set forth above, the evidence at trial demonstrated that Petitioner was not involved in the day-to-day movement of the oxycodone once he had supplied Vanier and he intentionally created a buffer before between himself and the day to day operations to insulate himself from criminal liability. Simply put, the summaries and the transcribed wiretap summaries provided no proof that someone other than Petitioner was Vanier's source of oxycodone. [18]

18 While Petitioner highlights certain transcribed wiretaps to support his *Brady* claims, specifically a conversation between Vanier and Vollkommer on October 18, 2011, and communications between Vanier and Vollkommer on December 17-18, 2011, the Court agrees with Respondent that when the summaries of the calls are viewed in their entirety, they do not contain materially exculpatory information. (Dkt. No. 35 at 25-26; Dkt. No. 62 at 54-58.) In fact, the calls could be read to inculpate, rather than exculpate, Petitioner. *See id*. at 62 at 56.

Third, the conduct underlying the major trafficking charge occurred over a six-month period, and the trial evidence never established on what particular dates Petitioner supplied Vanier with oxycodone, except for the last time that occurred a "[c]ouple hours" before Vanier's house was searched. [19] As the district attorney was not aware of Petitioner's "out of town" travel schedule during the relevant time, the summaries in the Vanier SWA would not have been deemed exculpatory. In any event, the records Petitioner submitted to the 440 court concerning his travels fail to establish that he could not have supplied Vanier with

oxycodone. As Respondent accurately summarizes, portions of the records reflect that Petitioner was within driving distance of Vanier's home when he claims to have been away. (*Compare* Dkt. No. 32 at 24-26 *with* Dkt. No. 62 at 46-49.)

19 The last summary of the wiretaps contained in the Vanier SWA took place on December 14, 2011, and the last transcribed intercepted communications presented to the state court occurred on December 19, 2011, at 08:05:11. (Dkt. No. 64-1 at 306, 414.) Thus, there is no exculpatory evidence related to the evening of December 19, or early hours of December 20, 2011, when Vanier testified Petitioner supplied the approximate 300 grams of oxycodone a "[c]ouple hours" before the warrant was executed. (Dkt. No. 64-7 at 131.)

In sum, even if the district attorney had known about Petitioner's alleged alibi—and there is no evidence that he did—nothing in the Vanier SWA would have been exculpatory in light of the alibi evidence. Thus, there is no indication that Petitioner was prejudiced as a result of his failure to obtain the material at issue.

Nor has Petitioner established the materiality of the undisclosed information. The standard for materiality is not whether the undisclosed information might in some way have been helpful for the defense. *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976). *Brady's* materiality standard is meant to "ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675; *see United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (the "essential purpose" of *Brady* is to "ensur[e] the reliability of [a] criminal verdict"). Thus, consistent with *Brady's* focus on the reliability of verdicts, a prosecutor's failure to turn over exculpatory or impeachment evidence is a *Brady* violation rising to the level of constitutional error only when this failure "undermine[s] confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (citing *Bagley*, 473 U.S. at 678) (vacatur required where verdict is not "worthy of confidence"). Even if the undisclosed information contained some information that might have been helpful to the defense, the failure to disclose it would not have violated *Brady* if it did not impact the outcome of trial. *Bagley*, 473 U.S. at 675 n.7.

***20** First, the non-disclosure of the Vanier SWA does not undermine confidence in the jury's verdict on the major trafficking charge. As discussed, the trial evidence established that Petitioner regularly supplied Vanier and Ramsell with large quantities of oxycodone, and that the total proceeds from these transfers during the charged period easily exceeded $75,000. Nothing in the wiretap summaries casts any doubt on Vanier's testimony that Petitioner regularly supplied him with oxycodone, in the large quantities to which he testified. Instead, the wiretaps support the prosecution's evidence that Vanier received large quantities of oxycodone, that he would give it to Vollkommer, and Vollkommer would sell it to others before giving Vanier the proceeds. Moreover, none of the undisclosed wiretap summaries has any relevance to the overwhelming evidence regarding Petitioner's sale of oxycodone to Ramsell. Thus, Petitioner's convictions for Counts One, Three, and Four were supported by sufficient evidence.

Second, and as the 440 court found, the Otsego DA never had possession of the NYSP wiretaps of Vanier, Vollkommer, and Burns, and had no knowledge they existed until reading the summaries in the Vanier SWA during trial. That finding of fact is entitled to deference, which Petitioner fails to rebut by clear and convincing evidence. *See* § 2254(e)(1). To be sure, under certain circumstances a prosecutor's disclosure duty under *Brady* applies to evidence not in the prosecutor's actual possession. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, "the propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.' " *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (citing *United States v. Morrell*, 524 F.2d 550, 555 (2d Cir. 1975)).

Here, the trial evidence established that the NYSP investigation of Vanier was independent of the Otsego DA's office prosecution of Petitioner and NYSP Investigator Hamilton was not an "arm" of the prosecutor. And because the Otsego DA's investigation of Christine Ramsell was entirely separate from the NYSP investigation of Vanier, Vollkommer, and Burns, the Court agrees with Respondent that the knowledge NYSP had of the existence and contents of the wiretaps cannot be imputed to the Otsego DA's office. (*See* Dkt. No. 62 at 51-54.) In any event, as set forth above, the disclosure of the wiretaps was not required under *Brady*.

Third, as set forth above, the 440 court determined "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of [Petitioner's] guilt at trial, there is no basis to vacate the conviction based upon the newly discovered evidence." (Dkt. No. 64-1 at 588.) As discussed, "[w]ith impeachment evidence, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *James*, 603 F. Supp. 2d at 485 (quotation marks and citation omitted); *see also United States v. Santos*, 486 F. App'x 133, 135-36 (2d Cir. 2012) (citing *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required ... when the suppressed impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.")); *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (internal quotations marks omitted)). When undisclosed impeachment evidence is "possibly useful to the defense," but "not likely to have changed the verdict," the undisclosed impeachment evidence is "not material in the *Brady* sense." *Blalock v. Smith*, No. 08 CIV. 7528, 2012 WL 3283439, at *11 (S.D.N.Y. Aug. 13, 2012) (quoting *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Giglio*, 405 U.S. at 154) (quotation marks omitted)). In this case, the jury was aware of the credibility of Vanier, Vollkommer, and Burns, all of whom were being prosecuted federally.

***21** Lastly, Petitioner further claims that had the Otsego DA disclosed the wiretaps he could have provided an alibi to prove that he could not have dropped off the 300 grams of oxycodone police found at Vanier's house. (Dkt. No 35 at 26-27.) However, the wiretap summaries do not reveal when Petitioner dropped off the oxycodone on December 19, 2011; Vanier's testified to this, and therefore, Petitioner could have presented his alibi defense upon hearing this testimony. Thus, the undisclosed information would not have impacted the outcome of Petitioner's conviction for Count Two.

Based on the foregoing, Petitioner has failed to show that the district attorney violated *Brady* in failing to turn over the Vanier SWA or transcribed wiretap summaries.

### 2. Cooperation agreements

Petitioner additionally argues that the prosecution failed to disclose the "full" cooperation agreements of Vanier, Vollkommer, Russell, and Szymanski. (Dkt. No. 35 at 27-30.) In its discussion of Petitioner's prosecutorial misconduct claims, the 440 court "examined the remaining arguments as they relate to *Brady* and *Rosario* and likewise find them to be without merit." (Dkt. No. 64-1 at 587.) Thus, the AEDPA deference applies. *See Aparicio v. Artuz*, 269 F. 3d 78, 94 (2d Cir. 2001); *accord Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Before trial, the district attorney disclosed in an October 5, 2012, letter to the defense all of the agreements made with prosecution witnesses in return for their truthful testimony. (Dkt. No. 64-1 at 578, 584-85; Dkt. No. 64-2 at 96-97.) Relevant to this claim, the district attorney stated that Vanier "received a seven year sentence in his federal prosecution. I agreed not to prosecute the state possession charges in exchange for his cooperation." (Dkt. No. 64-1 at 584.) The district attorney's letter made no mention of any agreement with Ramsell, Vollkommer, or Szymanski. *See id.* at 584-85. Ramsell, Vollkommer, and Szymanski all testified they were receiving nothing from the district attorney in return for their testimony.

With respect to Ramsell, she testified that although the district attorney originally had made an offer of six months in a drug treatment facility in return for her cooperation, this offer was revoked, after her grand jury testimony but before trial, and no new offer was made after she committed new crimes following her arrest. (Dkt. No. 64-6 at 405-06; Dkt. No. 64-1 at 578-79.) Here, Petitioner surmises that she must have received a "secret" agreement because she ultimately received no jail time when she was sentenced for her crimes, which was "a better deal than what had been stated with the original cooperation agreement." *Id*. (Dkt. No. 35 at 29.)

Vollkommer testified that he had pled guilty in federal court and was expecting a sentence ranging from seven-and-a half to twenty years. As part of his plea agreement, he was required to testify at Petitioner's trial. Vollkommer further stated that the Otsego County district attorney had made him no offer in return for his cooperation. (Dkt. No. 64-7 at 193, 204-05.) However, Petitioner claims to have learned after trial from Vollkommer himself that the Delaware County district attorney agreed not to prosecute Vollkommer for an overdose death that occurred in Vollkommer's home in 2011, which was never charged, “contingent on Vollkommer's cooperation with the Federal authorities and this included testifying against” Petitioner. (Dkt. No. 35 at 27.) According to Petitioner, “[t]he promise of not being charged with the overdose death that occurred at his home gave Vollkommer a powerful incentive to give less than truthful testimony regarding [Petitioner].” *Id*. Ultimately, Vollkommer received a three year term of probation and six months of weekend Intermittent Confinement. *Id*. at 28.

***22** When Szymanski testified at Petitioner's trial, he had pled guilty to aggravated unlicensed operation of a motor vehicle, which was pending sentencing. He was expecting a sentence of from one and one third to four years. He also testified that the district attorney had made him no promise in return for his cooperation. (Dkt. No. 64-8 at 135, 142.) Petitioner claims a secret agreement existed despite this testimony because after trial Szymanski was sentenced to one year, not the minimum of one and one third. (Dkt. No. 35 at 29.)

As to Vanier, Petitioner claims the district attorney failed to reveal “the full scope” of Vanier's cooperation agreement. *Id*. at 28. He further claims Vanier ultimately received a five-year sentence in federal court and, as part of his cooperation against Petitioner, state charges were dropped “against both Vanier and his wife.” *Id*. He also claims the district attorney failed to correct Vanier's “false and misleading” testimony concerning his cooperation agreement. *Id*.

In his opposition to Petitioner's 440 motion, the district attorney confirmed that he had offered Ramsell, Vollkommer, and Szymanski nothing in exchange for their testimony. (Dkt. No. 64-1 at 578.) The district attorney confirmed that Ramsell had originally been promised a six-month treatment in return for her testimony, but the offer was withdrawn. The district attorney noted Ramsell's conviction subsequently was reduced to a lesser charge after she completed a judicial diversion program in 2014, but stated that this had nothing to do with Ramsell's 2012 trial testimony. *Id*. at 578-79. As to Vollkommer, the district attorney stated he was not aware of any agreement that Vollkommer may have made with the Delaware County District Attorney's Office. *Id*. at 578. With respect to Szymanski, the district attorney stated that Szymanski's attorney after trial asked for a recommendation of a sentence of one year, and the district attorney agreed, but no such consideration had been offered prior to trial. *Id*.

With regard to Vanier, the district attorney stated it was his understanding that, after being advised by Vanier's federal court attorney, Vanier had entered a guilty plea and was going to receive a seven-year sentence of imprisonment. Based on that fact and his cooperation, the district attorney dismissed the charges pending against him in Oneonta Town Court. After Petitioner's conviction and at the request of Vanier's federal attorney, the district attorney provided an affidavit that outlined Vanier's cooperation, which was presented in federal court as part of a request for a lesser sentence. The district attorney was not asked for the affidavit until after Petitioner had been convicted. As to Vanier's wife Melody, the district attorney stated he had never intended to prosecute her (because he had no evidence of his wife's involvement in the drug trade). *Id*. at 578.

As discussed above, “[t]o establish a *Brady* violation, a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose.” *Mack*, 476 F. App'x at 876 (citing *Strickler*, 527 U.S. at 281-82). As noted, the 440 court denied this claim, which the Court finds involved no unreasonable determination of the facts, and was neither contrary to, nor an unreasonable application of, Supreme Court precedent. (Dkt. No. 64-1 at 587.)

Here, Petitioner has failed to establish that any undisclosed cooperation agreements with Vanier, Vollkommer, Ramsell, or Szymanski existed.[20] There can be no *Brady* violation for failure to disclose evidence that does not exist. *See Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (“[T]he mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.”). Further, the Second Circuit held that the fact that a witness received a benefit, such as a reduced sentence, does not establish that prior to the defendant's trial, the prosecutor had promised leniency to the witness. *See Shabazz*

*v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003); *see also Breedlove v. Berbary*, No. 09-CV-6297, 2011 WL 3439261, at *4 (W.D.N.Y. Aug. 5, 2011) (finding the petitioner's sole basis for his belief in the existence of such agreements was that shortly after petitioner was convicted, the two witnesses were released from jail speculative and insufficient to overcome the presumption of correctness accorded to the state court's ruling that no cooperation existed). Petitioner thus fails to sustain his burden of proof to show that exculpatory material existed and was withheld at the time of trial. *See, e.g.*, *Chandras v. McGinnis*, No. 01 Civ. 2519, 2002 WL 31946711, at *5 (E.D.N.Y. Nov. 13, 2002) ("[T]here must be some evidence of an agreement or understanding between [the prosecutor] and [the witness] for a *Giglio* violation to have occurred. In the absence of credible evidence contradicting the [prosecutor's] denials, [the defendant's] claims of prosecutorial misconduct are meritless."); *Gonzalez v. Bennett*, No. 03 Civ. 1444, 2007 WL 2982219, at *2 (S.D.N.Y. Oct. 10, 2007) (dismissing the petitioner's *Brady* claim because he failed to show "that a cooperation agreement ever existed between the prosecution and its witness").

20 Petitioner also claims the district attorney did not disclose documents filed in Vanier's federal case relating to Vanier's agreement. (Dkt. No. 35 at 28.) However, the district attorney was not involved in the federal prosecution of Vanier and, in any event, it appears the plea agreement at issue was filed on the docket on April 26, 2012, and thus publicly available. *See United States v. Vanier*, No. 3:12-cr-00210 (TJM), ECF Dkt. No. 3. "If the defendant has information but fails to use due diligence to make use of it, the defendant cannot later claim that the government 'suppressed' evidence." *Hill v. West*, 599 F. Supp. 2d 371, 390 (W.D.N.Y. 2009) (citing *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)). According to Vanier's plea agreement, he admitted to distributing 800 grams of oxycodone and 180 grams of cocaine with "co-conspirators with initials JV, DM, and others" between January and December 2011. *See United States v. Vanier*, No. 3:12-cr-00210 (TJM), ECF Dkt. Nos. 2, 4. To the extent Petitioner objects that defense was not made aware of the district attorney's post-trial memorandum submitted to the federal court regarding Vanier's cooperation at Petitioner's trial, the memorandum did not exist at the time, and, consequently was not suppressed under *Brady*.

***23** Further, Petitioner has not established that any allegedly undisclosed cooperation agreement would have been material within the meaning of *Brady*. The Supreme Court has held that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. As discussed, in order to establish materiality, Petitioner must show that the evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Shabazz*, 336 F.3d at 162 (citations and quotation marks omitted). Additionally, "[w]ith impeachment evidence, 'where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.' " *James v. United States*, 603 F. Supp. 2d 472, 485 (E.D.N.Y. 2009) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)).

Here, defense counsel cross-examined each of these witnesses about their agreements—or lack thereof—and Petitioner has failed to show that any additional undisclosed consideration existed and that it would have impacted the outcome of the trial. As noted, the credibility of Vanier, Ramsell, Vollkommer, and Szymanski was subject to attack through vigorous cross-examination and despite any confusion or "misleading" statements about Vanier's plea agreement, including any undisclosed benefits his wife received, the jury was well aware that he was facing a great deal of jail time in federal court and that he hoped to get a sentence of only seven years. The jury was well aware that Vanier might have an incentive to curry favor with the district attorney in order to help himself out in the federal case. *See Hemphill v. Senkowski*, No. 02 CIV. 7093, 2004 WL 943567, at *12 (S.D.N.Y. May 3, 2004) (failing to disclose cooperation agreement is "only reversible errors if it undermines the confidence in the outcome of the trial"). In sum, Petitioner has failed to establish that the prosecutor failed to disclose the "full cooperation" agreements at issue in violation of *Brady*.

Thus, in light of the foregoing, the 440 court's rejection of Petitioner's claim was not contrary to *Brady*. Accordingly, the Court recommends denying and dismissing ground six of the petition.

### G. Ground Seven: Prosecutorial Misconduct—Failure to Preserve *Brady* Material

Petitioner also argues, as he did in his supplemental 440.10 motion, [21] that the prosecutor committed misconduct by failing to provide to the defense tape recordings of Vollkommer and Burns that the NYSP made of interviews conducted with the U.S. Attorney's Office on December 20, 2011, and then allowed the tapes to be destroyed after trial. (Dkt. No. 35 at 30-33.) Although the 440 court did not mention this aspect of Petitioner's *Brady* claim, (Dkt. No. 64-1 at 587), as set forth above, the 440 court's decision nevertheless constitutes an adjudication on the merits and the AEDPA deference applies. *See Aparicio*, 269 F. 3d at 94.

21 Specifically, Petitioner argued "the prosecution committed misconduct when it allowed *Brady/Rosario* material to be destroyed by New York State Police[ ]." (Dkt. No. 64-1 at 559-64.) The Court notes *Rosario* claims are state law claims, not founded on either the federal constitution or federal laws, and therefore, are not cognizable in a federal habeas proceeding. *See Young v. McGinnis*, 411 F. Supp. 2d 278, 329 (E.D.N.Y. 2006); *Randolph v. Warden*, *Clinton Corr. Facility*, No. 04 CIV. 6126, 2005 WL 2861606, at *5 (S.D.N.Y. Nov. 1, 2005) ("the failure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law").

As discussed, to establish a *Brady* claim, the petitioner must satisfy three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

***24** Here, Petitioner has provided no evidence that the recordings were in fact exculpatory or that they would impeach the testimony of Vollkommer or Burns. As Respondent points out, Petitioner himself states that he "can only speculate as to the exculpatory and impeaching nature of the statements contained therein ...." (Dkt. No. 62 at 67, quoting Dkt. No. 35 at 31.) However, a habeas petitioner's "mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief." *Mallet*, 432 F. Supp. 2d at 377; *see also Bell v. Napoli*, No. 08-CV-9900, 2010 WL 8039333, at *21 (S.D.N.Y. Aug. 24, 2010) (rejecting *Brady* claim based on unproduced surveillance tape as unduly speculative where the petitioner never saw the surveillance tape at issue and could only speculate about what it showed), *report and recommendation adopted*, 2011 WL 6097729 (S.D.N.Y. Dec. 7, 2011).

Nor has Petitioner demonstrated prejudice to the non-disclosure or failure to preserve them post trial. Even if defense counsel had been able to impeach Vollkommer and Burns with prior statements made on the date of their arrest, there is no reasonable probability of a different verdict given the testimony of Vanier and Ramsell and the other corroborating evidence. Moreover, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *James*, 603 F. Supp. 2d 472, 485 (E.D.N.Y. 2009).

Thus, the 440 court's denial of this claim was not an unreasonable application of clearly established law.

To the extent Petitioner argues a destruction of evidence claim as a violation of due process apart from the *Brady* claim, that claim must also fail. (Dkt. No. 69 at 28-31.) Such a claim requires the showing of bad faith from the government. *See United States v. Tyree*, 279 F. App'x 31, 33 (2d Cir. 2008) (citing *Arizona v. Youngblood*, 488 U.S. 51, 56-68 (1988); *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Here, the record does not support the conclusion that the NYSP "acted in bad faith" in destroying the evidence. Rather, the tapes were destroyed two years after Petitioner's trial, after the two witnesses had been sentenced in their federal cases. (*See* Dkt. No. 62 at 68-70.) Contrary to Petitioner's contention that the "only logical conclusion" is that the "state suppressed these recording[s] and allowed them to be destroyed because they were favorable to his defense" such claim is speculative and unsupported by the record before the state court. Thus, the alleged post-trial destruction does not rise to the level of a due process violation. *See Licausi v. Griffin*, 460 F. Supp. 3d 242, 265 (E.D.N.Y. 2020).

Lastly, Petitioner makes a cursory argument that "the destruction of this evidence has effectively stripped [Petitioner] of his right to confront adverse witnesses" in violation of the Confrontation Clause. (Dkt. No. 35 at 31.) However, "because the recordings were never introduced at trial, [Petitioner's] asserted violation of his confrontation clause claim due to their destruction is baseless." *Margengo v. Conway*, 342 F. Supp. 2d 222, 223 n.5 (S.D.N.Y. 2004). Thus, this claim fares no better.

Based on the foregoing, the 440 court's decision denying this claim was not "beyond the possibility of fairminded disagreement." *Richter*, 562 U.S. at 102. Accordingly, the Court recommends denying and dismissing ground seven of the petition.

**H. Ground Eight: Prosecutorial Misconduct—False Testimony**

Petitioner also contends, as he did in his 440.10 motion, that the prosecutor "knowingly allowed a key prosecution witness to testify falsely, when it knew the testimony to be false, and failed to correct" and thus was deprived of his due process rights to a fair trial. (Dkt. No. 35 at 33-36.) Construed liberally, Plaintiff claims the prosecutor committed misconduct by allegedly permitting Vanier to testify falsely in the grand jury and failed to correct the perjury, proceeding to trial on an indictment that was defective due to the allegedly perjured testimony, and, thereafter allowing Vanier to testify falsely at trial. *Id*.[22] The Court finds Petitioner's claims do not warrant habeas relief.

22 Petitioner also reiterates his claims that the prosecution engaged in "misconduct" by withholding crucial *Brady*/*Rosario* material, discussed above, *see* Point IV.F. (Dkt. No. 35 at 33-35.)

***25** In the first instance, to the extent Petitioner is challenging the propriety of the grand jury proceeding, including the prosecutor obtaining and proceeding on a "defective indictment", that claim fails. There is no federal constitutional right to a grand jury proceeding. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002). In New York, a grand jury indictment arises from the "State Constitution and other state laws ... and federal habeas relief may not be granted for violations of state law." *Robinson v. LaClair*, No. 09-CV-3501, 2011 WL 115490, at *8 (E.D.N.Y. Jan. 13, 2011). Therefore, "[c]laims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court." *Davis v. Mantello*, 42 F. App'x 488, 490-91 (2d Cir. 2002) (summary order) *cert. denied sub nom Davis v. Filion*, 538 U.S. 986 (2003); *see also Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S.D.N.Y. Sept. 7, 2007) (claim that false testimony was presented before the grand jury is not cognizable on habeas review) (citing *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989)); *Mayes v. Donnelly*, No. 03-CV-417, 2009 WL 2601106, at *9 (W.D.N.Y. Aug. 21, 2009) ("To the extent that Mayes is attempting to assert a claim that Anderson perjured himself when he testified before the grand jury, habeas relief is not warranted because the claim is not cognizable in this federal habeas proceeding[.]").

Further, following a guilty verdict rendered by a petit jury, alleged deficiencies in a state grand jury proceeding are not cognizable on habeas review. *See Lopez v. Riley*, 865 F.2d 30, 31 (2d Cir. 1989); *Dunn v. Sears*, 561 F. Supp. 2d 444, 453 (S.D.N.Y. 2008). Thus, after a conviction, habeas relief is unavailable for claims of prosecutorial misconduct in the grand jury. *See Campbell v. Poole*, 555 F. Supp. 2d 345, 367-68 (W.D.N.Y. 2008); *Evans v. Poole*, No. 05 Civ. 5951, 2005 WL 2847769, at *1 (S.D.N.Y. Oct. 31, 2005).

Next, Petitioner contends Vanier testified falsely in the grand jury and at trial by presenting himself as a "middleman" in the drug operation between Petitioner and Vollkommer, and that the Petitioner owned the oxycodone found at Vanier's home on December 20, 2011. (Dkt. No. 35 at 33-35.) Petitioner bases his perjury claim on the wiretap summaries included in the Vanier SWA, the transcribed transcripts, and "physical evidence," which he asserts contradicts Vanier's testimony and the prosecutor withheld in violation of *Brady*/*Rosario*. *Id*. Although the 440 court did not directly address this aspect of Petitioner's misconduct in its decision, the court stated that it had "examined [Petitioner's] remaining arguments as they relate to *Brady* and *Rosario* and likewise find them to be without merit." (Dkt. No. 64-1 at 587.) The 440 court reasonably concluded that the prosecutor committed no misconduct.

"Perjury is committed when a witness 'gives false testimony concerning a material matter with the willful intent to provide false testimony.' " *Velazquez v. Poole*, 614 F. Supp. 2d 284, 333 (E.D.N.Y. 2007) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). "To establish prosecutorial misconduct premised upon the presentation of perjury, [petitioner] must first establish that perjury was committed; i.e. that the testimony was 'actually, and intentionally, false.' " *Gibson v. Artus*, No. 04-CV-820 (LEK), 2008 WL 9434482, at *14 (N.D.N.Y. Mar. 21, 2008) (alternation in original) (collecting cases), *aff'd*, 407 F. App'x 517 (2d Cir. 2010). A petitioner "must also establish that 'the prosecution knew, or should have known, of the perjury,"

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and “there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.” *Id*. (citations omitted). Thus, under a due process analysis, a conviction must be set aside where “(1) ‘the prosecution knew, or should have known, of the perjury,’ and (2) ‘there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.’ ” *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959))).

***26** Here, Petitioner has neither established that Vanier's testimony was actually and intentionally false nor that the prosecution knew or had reason to know that Vanier was allegedly committing perjury. First, as pointed out by Respondent and as detailed above, the record demonstrates the prosecutor did not know about and had not seen the complete wiretap transcriptions at the time of trial. Thus, to the extent that materially conflicted in any way with Vanier's testimony, if any, the prosecutor would not have known about it, and, therefore, the prosecution did not knowingly present false testimony. (Dkt. No. at 62 at 72-73.)

With respect to the wiretap summaries contained in the Vanier SWA, which the prosecutor received via facsimile mid-trial and turned over to the court, Petitioner has not established that Vanier committed perjury based on their content. *Id*.

Finally, Petitioner's contention that “physical surveillance” by law enforcement “directly contradicted the testimony” of Vanier regarding Petitioner having supplied him with oxycodone lacks any support. (Dkt. No. 35 at 34-35.) Petitioner's theory appears to be that law enforcement was constantly watching Vanier's home, and yet never saw Petitioner there, so, therefore, Vanier lied about Petitioner coming to his house and dropping off oxycodone. *Id*. The Court agrees with Respondent that this premise is false. (Dkt. No. 62 at 72-73.)

No evidence at trial suggested that Vanier's home was under regular surveillance and Vanier testified that Petitioner periodically came to his house to drop off oxycodone and to collect money. Contrary to Petitioner's assertion, evidence that no law enforcement officer happened to see Petitioner at Vanier's home does not establish that Petitioner did not go to Vanier's home. Further, Kate Joslyn testified she went with Petitioner to Vanier's house between five and ten times during the relevant time period. (Dkt. No. 64-7 at 235.)

At most, Petitioner's claim is simply an attack on the witness's credibility, but this Court must defer to the jury's credibility findings concerning Vanier's testimony. *See Bellezza v. Fischer*, No. 01-CV-1445, 2003 WL 21854749, at *15 (E.D.N.Y. Aug. 6, 2003) (holding that, on collateral review, a federal habeas court “must presume that the jury resolved any questions of credibility in favor of the prosecution”) (internal quotation marks and citation omitted).

For all these reasons, Petitioner cannot sustain a claim that the prosecutor knowingly presented false testimony to the grand jury or at trial. This Court finds Petitioner's claim that the prosecutor engaged in misconduct by offering Vanier's testimony is without merit. Accordingly, the Court recommends denying and dismissing ground eight of the petition.

### I. Ground Nine: Newly-Discovered Evidence

Petitioner contends that “there is newly discovered evidence, which if produced at trial, would have produced a different outcome in the proceedings.” (Dkt. No. 35 at 36-38.) Specifically, Petitioner claims:

> There can be no mistake that the evidence describing the conduct of Clarence Vanier and his associates, as documented in the intercepted communications [Exhibit B] and the warrant application [Exhibit A] would lead to a different outcome in a new trial. The dates and times of transactions alone would be enough for [Petitioner] to show that he could not have been involved in Mr. Vanier's drug operation. Mr. Vanier would not have been able to mislead the jury as to his culpability regarding his drug operation by placing the blame on [Petitioner]. Records indicate that Mr. Vanier and Mr. Vollkommer met with each

> other to fabricate a story by which they could lessen their potential prison sentences. However, in light of this new evidence their story simply will not hold up.

***27** *Id*. at 37.

Habeas relief is available on the ground of newly discovered evidence only if the evidence bears on the constitutionality of the petitioner's conviction. *Townsend v. Sain*, 372 U.S. 293, 317 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *accord Herrera v. Collins*, 506 U.S. 390, 400 (1993). Newly discovered evidence that goes only to the petitioner's guilt or innocence is not sufficient to grant habeas relief. *Herrera v. Collins*, 506 U.S. at 400; *Chandler v. Girdich*, No. 04-CV-432, 2007 WL 1521128, at *3-4 (W.D.N.Y. Apr. 25, 2007). A federal habeas court is not "permit[ted] ... to make its own subjective determination of guilt or innocence." *Jackson v. Virginia*, 443 U.S. 307, 319 n.13 (1979).

Petitioner raised his claim of newly discovered evidence in his supplemental 440.10 motion to vacate his conviction (Dkt. No. 64-1 at 212), which provides that a conviction may be vacated if:

> New evidence has been discovered since the entry of a judgment based upon a verdict of guilty at trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based on such ground must be made with due diligence after the discovery of such alleged new evidence.

N.Y. Crim. Proc. Law § 440.10(1)(g). In rejecting this claim, the 440 court determined "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of defendant's guilt at trial, there is no basis to vacate the conviction based upon the newly discovered evidence." (Dkt. No. 64-1 at 588.) Further, as discussed above, the court adhered to that ruling its decision on Petitioner's motion to renew: "The court finds that the non-disclosure, even if established, did not contribute to the verdict." *Id*. at 657.

"It is appropriate for a state to insist that a petitioner seeking to overturn his conviction on the basis of new evidence demonstrate the probability that, had such 'new' evidence been received at trial, the verdict would have been more favorable to the petitioner." *Kent v. Smith*, No. 9:05-CV-0785 (LEK/DRH), 2007 WL 2907350, at *16 (N.D.N.Y. Oct. 4, 2007) (quoting *Young v. McGinnis*, No. 98 CV 281, 2006 WL 463507, at *34 (E.D.N.Y. Feb. 24, 2006) (citing to CPL § 440.10(1)(g)). Petitioner failed to satisfy that requirement.

Here, Petitioner has not explicitly alleged any independent constitutional error or that his continued incarceration would deprive him of any specific federal constitutional right. Instead, Petitioner insists that the "newly discovered evidence"—Vanier SWA, the wiretap transcripts, and the claimed cooperation agreements—would have produced a different verdict at trial. However, as noted, Petitioner's claim that his conviction is factually incorrect, or simply that he is actually innocent, does not provide a basis for habeas relief. *Herrera*, 506 U.S. at 403. Moreover, for the reasons discussed above, habeas relief is not warranted with respect to grounds six, seven, and eight of the petition.

***28** In light of the foregoing, habeas relief is not warranted on this claim. Therefore, the Court recommends denying and dismissing ground nine of the petition.

### J. Ground Ten: Ineffective Assistance of Counsel

Petitioner claims he was "deprived of his Federal and State Constitutional rights to the effective assistance of counsel in his defense." (Dkt. No. 35 at 38-39.) Respondent counters the 440 court's conclusion that Petitioner received the effective assistance of counsel was not contrary to, or an unreasonable application of, clearly established Supreme Court law. (Dkt. No. 62 at 74-77.) The Court agrees with Respondent.

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different. *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *accord Strickland v. Washington*, 466 U.S. 668, 694 (1984). "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687) (quotation marks omitted).

*Strickland* instructs a court to "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689 (quoting *Michael v. Louisiana*, 350 U.S. 91, 100-01 (1955)). The Supreme Court recognized in *Strickland* that "there are countless ways to provide effective assistance in any given case," and that even the "best criminal defense attorneys would not defend a particular client the same way." *Id*. Thus, "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

Further, the AEDPA requires a federal habeas court to give deference to a state court's ruling on claims of ineffective assistance of counsel. *See Richter*, 562 U.S. at 101 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). Thus, when ineffective assistance claims are considered under the AEDPA, the reviewing court affords a "doubly" deferential standard regarding the state court opinion. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, when § 2254(d) applies, "[t]he pivotal question" for the federal habeas court "is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Petitioner claims he was "denied the effective assistance of counsel in his defense, where (a) counsel was deprived by the prosecution of crucial *Brady* material; and (b) defense counsel failed to utilize evidence that could have exonerated him on at least Count Two of the indictment. (Dkt. No. 35 at 39.) In its rejection of this claim, the 440 court found Petitioner's arguments "not supported by the record and further finds that in view of the totality of circumstances, that [Petitioner] was not denied effective assistance of counsel." (Dkt. No. 64-1 at 588.) This Court finds the 440 court reasonably rejected Petitioner's ineffective assistance claim.

***29** As to his first claim of ineffective assistance, the Court agrees with Respondent that Petitioner fails to state a claim that counsel was ineffective within the meaning of *Strickland*. (Dkt. No. 62 at 75-76.) Rather, Petitioner appears to be restating the *Brady* claim addressed in ground six, above. This aspect of Petitioner's ineffective assistance is nonsensical and meritless. [23]

23 In his traverse, Petitioner seems to recognize as much: "Admittedly, trial counsel was hamstrung by the prosecution's suppression of evidence." (Dkt. No. 69 at 34.) *See also* Dkt. No. 35 at 22 ("Defense counsel made numerous request for "*Brady* material.").

As to his second claim of ineffective assistance, Petitioner argues defense counsel had in his "possession evidence that could have been used to prove [Petitioner's] innocence on count two of the indictment and failed to use it[,]" including Petitioner's financial records, cell phone records, flight records, and a witness statement that Petitioner was in Dutchess County on December 19, 2011. (Dkt. No. 35 at 39; Dkt. No. 69 at 34-37.) Here, Petitioner cannot make the required showing that no legitimate strategic or other reasons existed for defense counsel's decision not to "use it." "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (holding that there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect").

On the contrary, Petitioner acknowledges "it could be assumed that this was a strategic move on defense counsel's part, especially since [Petitioner] did return home after picking up his daughter from Watervliet, New York, [at approximately 8:30 p.m. on December 19, 2011,] before boarding a flight to Florida" from Albany, New York, the next morning. (Dkt. No. 35 at 39.) Indeed, it is quite possible that this information would have hurt Petitioner's case if financial records, flight records, and cell phone records placed Petitioner in Watervliet at approximately 8:30 p.m., within an hour and half drive from Vanier's Oneonta home, especially in light of Vanier's testimony that Petitioner dropped the oxycodone off a "[c]ouple hours" before the 5:00 a.m. search on December 20, 2011. (Dkt. No. 64-7 at 131.) It is well-settled that "[a]ctions or omission by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citation omitted).

As to Petitioner's contention that counsel failed to notice that, according to a NYSP event report, the police were stationed outside of Vanier's residence starting at 3:00 p.m. on December 19, 2011, and did not see him, the Court agrees with Respondent that such claim lacks merit. (Dkt. No. 62 at 76.) While Petitioner argues "there is no strategic reason for trial counsel's failure to question investigators about their presence outside Vanier's residence on December 19, 2011[,]" (Dkt. No. 69 at 35), Petitioner has not rebutted " 'the strong presumption' that counsel's attention to certain issues to the exclusion of others reflect[ed] trial tactics rather than 'sheer negligence.' " *Richter*, 562 U.S. at 109 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). Because the record does not suggest that defense counsel's performance was deficient, the 440 court reasonably concluded that counsel was not ineffective. *See Minigan v. Donnelly*, No. 01-CV-0026A, 2007 WL 542137, at *22-23 (W.D.N.Y. Feb. 16, 2007) (citing *People v. Benevento*, 674 N.Y.S.2d 629, 632 (1998) (a reviewing court "must avoid confusing true ineffectiveness with mere losing tactics ... a simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial, does not suffice"); *Jenkins v. Unger*, 03 cv 1172, 2007 WL 911889, at *6 (N.D.N.Y. Mar. 22, 2007) (discussing reluctance to second-guess counsel's trial strategy simply because that strategy was unsuccessful).

***30** Therefore, applying the "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt," *Cullen*, 131 S. Ct. 1403, the Court finds that the 440 court's denial of Petitioner's ineffective assistance of counsel claim was neither contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Accordingly, the Court recommends denying and dismissing ground ten of the petition.

### K. Grounds Eleven and Twelve: 440 Court's Denial of Motions

Petitioner next claims the 440 court's denial of his 440.10 motion "without a hearing was contrary to, and involved an unreasonable application of clearly establish[ed] federal law, and was based on an unreasonable determination of the facts presented" (ground eleven), and "erroneously failed to address Petitioner's *Brady* claims in Petitioner's motion to renew the 440.10 motion, basing its decision entirely on a *Rosario* analysis[,] (ground twelve). (Dkt. No. 34 at 41-45.) However, these claims are "not a cognizable, free-standing habeas claim." *Nowakowski v. New York*, No. 13 CV 3709 (RJD), 2018 WL 6421056, at *12 (E.D.N.Y. Dec. 6, 2018).

"As the Supreme Court has recognized, the Constitution does not compel states to provide post-conviction proceedings for relief." *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011); *see Lackawanna Cty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001) ("[E]ach State has created mechanisms for both direct appeal and state postconviction review, even though there is no constitutional mandate that they do so." (citation omitted)). Accordingly, "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word v. Lord*, 648 F.3d at 132. "It follows that a denial of leave to appeal the denial of a CPL § 440 motion [or as in this case, denial of a motion to renew] also fails to present a basis for federal relief." *Toxey v. New York State Div. of Parole*, No. 14-CV-0610, 2017 WL 10398212, at *20 (S.D.N.Y. Nov. 8, 2017) (citation omitted), *report and recommendation adopted*, 2018 WL 4906251 (S.D.N.Y. Oct. 9, 2018).

Thus, to the extent Petitioner is also challenging any procedural errors, including his claim that the 440 court denied the motion without holding a hearing, those claims are also not cognizable on habeas review. *Ferrer v. Superintendent*, No. 05-CV-1010, 2008 WL 2967633, at *11 (N.D.N.Y. Jul. 25, 2008) ("[f]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings.") (internal quotation omitted); *Jones v. Duncan*, 162 F. Supp. 2d 204, 217 (S.D.N.Y. Apr. 3, 2001) (stating that "habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings", and denying habeas relief on the claim that the trial court failed to hold an evidentiary hearing on post-conviction motions); *see also Green v. Haggett*, No. 13-CV-0016 (GLS), 2014 WL 3778587, at *8 (N.D.N.Y. July 31, 2014) ("Petitioner's claim is that there was a procedural defect in the conduct of a state post-conviction proceeding, because the trial court failed to hold a hearing, and federal habeas relief is not available for such alleged defects.").

Additionally, the separate claims raised in Petitioner's 440.10 motion have already been addressed in grounds six, seven, eight, and nine, and for reasons discussed herein, habeas relief is not warranted. Further, as Respondent points out, the new evidence Petitioner submitted to the 440 court with his renewal motion merely showed that the NYSP had custody of the Vollkommer and Burns recordings and of the wiretaps. (Dkt. No. 62 at 78-79; Dkt. No. 64-1 at 590.) But this additional information had no impact on the 440 court's original decision. (Dkt. No. 64-1 at 590.) Although Petitioner argued that the documents showed that the evidence was available to the district attorney at the time of the trial because the NYSP had possession of it, the 440 court had rejected this conclusion because the district attorney was not involved in the NYSP investigation of Vanier. *Id*. at 587 ("It is undisputed that the Otsego County District Attorney's Office was not involved in the investigation of Clarence Vanier, who was ultimately prosecuted by federal prosecutors, nor did the Otsego County District Attorney submit the Search Warrant Application.").

***31** In sum, Petitioner is not entitled to federal relief because "a state is not obliged to provide any appeal at all for criminal defendants." *Ross v. Moffitt*, 417 U.S. 600, 606 (1974).

Accordingly, the Court recommends denying and dismissing grounds eleven and twelve of the petition.

**L. Ground Thirteen: Cumulative Errors**

Petitioner's final claim is that the cumulative effect of all the foregoing errors and constitutional violations he alleges in grounds one through twelve of his petition deprived him of his constitutional right to due process. (Dkt. No. 35 at 43-45; Dkt. No. 69 at 39.) Respondent argues this claim is unexhausted and procedurally defaulted because Petitioner did raise a cumulative error claim in state court until he filed his leave application to appeal the 440.10 motion denial, and then raised it only as to his § 440.10 claims, and in any event, is meritless. (Dkt. No. 62 at 79.) *See Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

A claim raised for the first time in an application for discretionary review has not been properly exhausted. *St. Helens v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Therefore, Plaintiff has failed to properly exhaust his cumulative errors claim. Petitioner's claim is also procedurally barred under adequate and independent state grounds. Petitioner has already had his one and only direct appeal permitted under New York law. Petitioner has also utilized his remedy under CPL § 440.10 and would be barred from raising the issue again in a § 440.10 motion by § 440.10[3](c) (barring review of a claim that could have been presented on prior motion under § 440.10). Since Petitioner no longer has any remedy available, ground thirteen is deemed exhausted and procedurally barred.

Petitioner can overcome this procedural bar only if he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Gueits v. Kilpatrick*, 612 F.3d 118, 127 (2d Cir. 2010) (outlining the standards for overcoming procedural default). Petitioner has not alleged any facts to show cause for the default, actual prejudice or a fundamental miscarriage of justice. Therefore, Petitioner's cumulative error claim is procedurally barred and beyond the scope of federal habeas review.

In any event, the Court finds the claim meritless. In limited circumstances, habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial. *See United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir.1999). However, "implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually *errors*." *Joyner v. Miller*, No. 01 Civ. 2157, 2002 WL 1023141, at * 13 (S.D.N.Y. Jan. 7, 2002) (emphasis in original) (citing *Lumpkin*, 192 F.3d at 290); *see also United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995) (rejecting claim that the collective impact of alleged errors warranted a new trial where the trial court committed only one error which was not itself sufficient to warrant a new trial); *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y.1995) ("only *errors* committed by the trial court may be considered in such an analysis") (emphasis in original) (citation omitted); *Sanders v. Sullivan*, 701 F. Supp. 1008, 1013 (S.D.N.Y.1988) ("[t]he cumulative-error rule ... can only come into play after errors have been discovered"); *see also Hunt v. Superintendent*, No. 9:09-CV-934 (NAM/ATB), 2010 WL 5149279, at *28 (N.D.N.Y. Nov. 17, 2010) ("The court must first find errors, and if no single error justifies a reversal, all the errors must be assessed for their prejudicial effect." (citations omitted), *report and recommendation adopted*, 2010 WL 5147319 (N.D.N.Y. Dec. 13, 2010).

***32** In addition, "in order for the habeas petitioner to be successful on such a claim, the errors must be 'so prejudicial that they rendered petitioner's trial [ ] fundamentally unfair.' " *Joyner*, 2002 WL 1023141, at *13 (quoting *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y. 1995)). "Fundamental fairness" has been defined very narrowly. *Id*. (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). It is not sufficient to simply aggregate rulings that might have been unfavorable to the petitioner. *Id*. (citations omitted).

In this case, the Court has not found that any of the alleged errors were actually errors at all. Nor has Petitioner established that the alleged errors prejudiced his case to the point that his trial was rendered "fundamentally unfair." *See Collins*, 878 F. Supp. at 460-61 (rejecting cumulative error claim where some alleged errors were not errors, others were not cognizable on habeas review and petitioner "failed to establish inherent or actual prejudice resulting from any of the alleged errors"); *Styles v. Zandt*, No. 94 Civ. 1863, 1995 WL 326445, at *11 (S.D.N.Y. May 31, 1995) (dismissing claim of cumulative error where "[m]any of petitioner's alleged errors were not errors at all, and consideration of the record as a whole demonstrates that petitioner received a fundamentally fair trial"), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

For these reasons, the Court recommends denying and dismissing ground thirteen of the petition.

## V. CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2553(c)(1). A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2553(c)(2).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court recommends declining to issue a Certificate of Appealability in this matter. *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).

## VI. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that the petition for a writ of habeas corpus (Dkt. No. 35) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED** that no certificate of appealability should be issued with respect to any of Petitioner's claims; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Report-Recommendation and Order on Petitioner, along with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[24] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

24 If you are proceeding *pro se* and are served with this Report-Recommendation and Order and by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4267851

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 408819
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dante D. MAJOR, Petitioner,
v.
Jamie LAMANNA, Respondent.

9:18-CV-418
|
Signed 02/10/2022

**Attorneys and Law Firms**

DANTE D. MAJOR, Petitioner, Pro Se, 13-B-0181, Green Haven Correctional Facility, P.O. Box 4000, Stormville, NY 12582.

HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: MARGARET A. CIEPRISZ, ESQ., Ass't Attorney General, Attorneys for Respondent, 28 Liberty Street, New York, NY 10005.

**ORDER ON REPORT & RECOMMENDATION**

DAVID N. HURD, United States District Judge

***1** On April 5, 2018, *pro se* petitioner Dante Major ("petitioner") filed a petition for a writ of habeas corpus. Dkt. No. 1. After addressing some procedural matters, Dkt. Nos. 7, 12, petitioner ultimately filed a second amended petition, Dkt. No. 35. Respondent opposed. Dkt. Nos. 62–64.

On September 3, 2021, U.S. Magistrate Judge Thérèse Wiley Dancks advised by Report & Recommendation ("R&R") that the petition be denied and dismissed. Dkt. No. 90. Because the fourteen-day period in which to lodge objections to this R&R expired without the filing of objections from either party, the Court adopted the R&R in full on September 17, 2021, Dkt. No. 91, and directed the Clerk to enter a judgment dismissing the petition, Dkt. No. 92.

On September 22, 2021, petitioner filed a letter requesting an extension of time in which to lodge objections to the R&R. Dkt. No. 93. In his filing, petitioner indicated that he had only belatedly received a copy of the R&R and that, due to ongoing COVID restrictions, his access to the law library was severely limited. *Id.* Accordingly, petitioner sought a 120-day extension of time to object. *Id.*

On October 4, 2021, this Court denied petitioner's letter request as moot because the judgment had already been issued. Dkt. No. 94. However, in light of his *pro se* status, the Court liberally construed his letter as a motion to vacate the Order and Judgment and to reopen the objection period for an additional 120 days. *Id.* So construed, the Court directed respondent to file a response to petitioner's request. *Id.*

On November 2, 2021, respondent indicated that he does not oppose vacatur under these circumstances. Dkt. No. 97. However, respondent sought to shorten the extension from 120 days to just 60 days. *Id.* After considering the parties' filings, the Court granted petitioner's request for vacatur, directed the Clerk to reopen the action, and gave petitioner forty-five days in which to file objections to the September 3 R&R. Dkt. No. 98.

On January 20, 2022, petitioner filed objections, Dkt. No. 102, which have now been fully briefed, Dkt. No. 104. Upon *de novo* review of the portions to which petitioner has objected, the R&R will be accepted and adopted in all respects. *See* 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Petitioner's petition for a writ of habeas corpus (Dkt. No. 35) is DENIED and DISMISSED; and

3. No certificate of appealability shall be issued.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 408819

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.